# EXHIBIT A

The New York Times > Washington > Pentagon Seeks to Transfer More Detainees From Base in Cuba

# The New York Times
### nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY
SIDEWAYS
NOW PLAYING IN THEATERS

March 11, 2005

## Pentagon Seeks to Transfer More Detainees From Base in Cuba

### By DOUGLAS JEHL

**W**ASHINGTON, March 10 - The Pentagon is seeking to enlist help from the State Department and other agencies in a plan to cut by more than half the population at its detention facility in Guantánamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials.

The transfers would be similar to the renditions, or transfers of captives to other countries, carried out by the Central Intelligence Agency, but are subject to stricter approval within the government, and face potential opposition from the C.I.A. as well as the State and Justice Departments, the officials said.

Administration officials say those agencies have resisted some previous handovers, out of concern that transferring the prisoners to foreign governments could harm American security or subject the prisoners to mistreatment.

A Feb. 5 memorandum from Defense Secretary Donald H. Rumsfeld calls for broader interagency support for the plan, starting with efforts to work out a significant transfer of prisoners to Afghanistan, the officials said. The proposal is part of a Pentagon effort to cut a Guantánamo population that stands at about 540 detainees by releasing some outright and by transferring others for continued detention elsewhere.

The proposal comes as the Bush administration reviews the future of the naval base at Guantánamo as a detention center, after court decisions and shifts in public opinion have raised legal and political questions about the use of the facility.

The White House first embraced using Guantánamo as a holding place for terrorism suspects taken in Afghanistan, in part because the base was seen as beyond the jurisdiction of United States law. But recent court rulings have held that prisoners there may challenge their detentions in federal court.

Indeed, the Pentagon has halted, for the last six months, the flow of new terrorism suspects into the prison, Defense Department officials said. In January, a senior American official said in an interview that most prisoners at Guantánamo no longer had any intelligence value and were not being regularly interrogated.

The New York Times > Washington > Pentagon Seeks to Transfer More Detainees From Base in Cuba

The proposed transfers would represent a major acceleration of Pentagon efforts that have transferred 65 prisoners from Guantánamo to foreign countries. The population at Guantánamo includes more than 100 prisoners each from Afghanistan, Saudi Arabia and Yemen, a senior administration official said, and the United States might need to provide money or other logistical support to make possible a large-scale transfer to any of those nations.

Defense Department officials said that the adverse court rulings had contributed to their determination to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects.

Under the administration's approach, the State Department is responsible for negotiating agreements in which receiving countries agree "to detain, investigate, and/or prosecute" the prisoners and to treat them humanely.

"Our top choice would be to win the war on terrorism and declare an end to it and repatriate everybody," a senior Defense Department official said in an interview. "The next best solution would be to work with the home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose."

The official, who spoke on condition of anonymity, said that future transfers into Guantánamo remained a "possibility," but made clear that the court decisions and the burdens of detaining prisoners at the American facility had made it seem less attractive to administration policymakers than before.

"It's fair to say that the calculus now is different than it was before, because the legal landscape has changed and those are factors that might be considered," a senior Defense Department official said.

In addition to working to transfer prisoners to their home countries, either to face charges there or simply to be kept in detention, officials also hope to shed dozens of prisoners whose cases are being studied by special review boards.

Those three-member military boards began working in earnest in January to determine which prisoners are no longer a threat, have no information of value and may be released outright.

At its peak, the population at Guantánamo exceeded 750 prisoners. But the last time prisoners were transferred there was on Sept. 22, 2004, when a group of 10 was transferred from Afghanistan. The United States has already dispatched 211 Guantánamo prisoners, releasing the majority of them. Sixty-five have been transferred to the custody of other counties, including 29 to Pakistan, 5 to Morocco, 7 to France, 7 to Russia, and 4 to Saudi Arabia.

The administration's policy of detaining suspected terrorists at Guantánamo has relied on declarations that the detainees are unlawful "enemy combatants," based on assertions that they did not serve in a

conventional army, and thus did not qualify for the protections listed in the Geneva Conventions.

Administration lawyers argued successfully in lower federal courts that United States laws, including access to the courts, did not apply because Guantánamo is part of Cuba.

But last June, the Supreme Court ruled that United States law applied to Guantánamo and that prisoners there could challenge their detentions in federal courts.

In August, a federal district judge ruled that the Geneva Conventions apply to Guantánamo prisoners and that the special military commissions to try war crimes were unconstitutional. The government's appeal of that ruling is scheduled to be heard next month.

Even as it moves to reduce the population at Guantánamo, the Pentagon has asked Congress for another $41 million in supplemental financing for construction there, including $36 million for a new, more modern prison and $5 million for a new perimeter fence.

The purpose, Defense Department officials said, was to provide a secure, humane detention facility for a remnant of the current population who are expected to remain there for the foreseeable future.

As many as 200 of those now at Guantánamo will most likely remain there indefinitely, the officials said, on grounds that they are too dangerous to be turned over to other nations or would probably face mistreatment if returned to those nations.

Each of the roughly 540 prisoners at Guantánamo have gone before a three-member military board, to have their status as enemy combatants reviewed. A final review has been completed in 487 cases; of those, all but 22 were found to have been properly classified, a status leaving them subject to possible war crimes charges.

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept. 11.

By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring interagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the governments that accept the prisoners are not expected to carry out the will of the United States.

Indeed, officials have been concerned that transfer of some detainees could threaten American security because they might escape from foreign prisons or the foreign governments might free them.

The White House has said its policy prohibits the transfer of prisoners to other nations if it is likely they

will be tortured, and administration officials said the interagency review is intended in part to enforce that standard. Transfers have been approved by the State Department to countries including Saudi Arabia and Pakistan, identified in the department's own human rights reports as nations where the use of torture in prisons is common.

Administration officials said that American diplomats in those countries were responsible for monitoring agreements to make sure prisoners were not mistreated. The senior Defense Department official said that the difficulty of "gaining effective and credible assurances" that prisoners would not be mistreated had been "a cause of some delay in releasing or transferring some detainees we have at Guantánamo."

It is possible that Guantánamo inmates could petition a federal court to stop a transfer to a country where they did not want to be sent. But there is little if any precedent to suggest how the courts would rule.

In November, a lawyer for Mamdouh Habib, a prisoner who claimed he had been tortured in Egypt before being transferred to Guantánamo, asked a federal district court to stop the Bush administration from returning him to Egypt. Before the court ruled, he was sent to Australia in January and freed.

*Neil A. Lewis and Tim Golden contributed reporting for this article.*

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

# EXHIBIT B



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/cgi-bin/dlprint.cgi?
http://www.defenselink.mil/releases/2005/nr20050426-2821.html
Media contact: +1 (703) 697-5131

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711

---

**IMMEDIATE RELEASE**

No. 400-05
April 26, 2005

### Detainee Transfer Announced

The Department of Defense announced today that it transferred two detainees from Guantanamo Bay, Cuba, to the control of the Belgian government. This transfer increases the number of detainees who have departed Guantanamo to 234.

The decision to transfer or release a detainee is based on many factors, including whether the detainee poses a continued threat to the United States or its allies and whether he is of further intelligence value. The decision to transfer these detainees was made after extensive discussions between the two governments

There are ongoing processes to review the status of detainees. A determination about the continued detention or transfer of a detainee is based on the best information and evidence available at the time. The circumstances in which detainees are apprehended can be ambiguous, and many of the detainees are highly skilled in concealing the truth.

During the course of the war on terrorism, the department expects that there will be other transfers or releases of detainees. Because of operational and security considerations, no further details can be provided.

Prior to this transfer, 232 detainees had departed Guantanamo - 167 for release, and 65 transferred to the control of other governments (29 to Pakistan, five to Morocco, seven to France, seven to Russia, four to Saudi Arabia, one to Spain, one to Sweden, one to Kuwait, one to Australia and nine to Great Britain). Two hundred and thirty four detainees have now departed Guantanamo. There are approximately 520 detainees currently at Guantanamo.

http://www.defenselink.mil/releases/2005/nr20050426-2821.html

# EXHIBIT C

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

January 2, 2005 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1165 words

**HEADLINE:** Long-Term Plan Sought For Terror Suspects

**BYLINE:** Dana Priest, Washington Post Staff Writer

**BODY:**

Administration officials are preparing long-range plans for indefinitely imprisoning suspected terrorists whom they do not want to set free or turn over to courts in the United States or other countries, according to intelligence, defense and diplomatic officials.

The Pentagon and the CIA have asked the White House to decide on a more permanent approach for potentially lifetime detentions, including for hundreds of people now in military and CIA custody whom the government does not have enough evidence to charge in courts. The outcome of the review, which also involves the State Department, would also affect those expected to be captured in the course of future counterterrorism operations.

"We've been operating in the moment because that's what has been required," said a senior administration official involved in the discussions, who said the current detention system has strained relations between the United States and other countries. "Now we can take a breath. We have the ability and need to look at long-term solutions."

One proposal under review is the transfer of large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantanamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries. The prisons would be operated by those countries, but the State Department, where this idea originated, would ask them to abide by recognized human rights standards and would monitor compliance, the senior administration official said.

As part of a solution, the Defense Department, which holds 500 prisoners at Guantanamo Bay, plans to ask Congress for $25 million to build a 200-bed prison to hold detainees who are unlikely to ever go through a military tribunal for lack of evidence, according to defense officials.

The new prison, dubbed Camp 6, would allow inmates more comfort and freedom than they have now, and would be designed for prisoners the government believes have no more intelligence to share, the officials said. It would be modeled on a U.S. prison and would allow socializing among inmates.

"Since global war on terror is a long-term effort, it makes sense for us to be looking at solutions for long-term problems," said Bryan Whitman, a Pentagon spokesman. "This has been evolutionary, but we are at a point in time where we have to say, 'How do you deal with them in the long term?' "

The administration considers its toughest detention problem to involve the prisoners held by the CIA. The CIA has been scurrying since Sept. 11, 2001, to find secure locations abroad where it could detain and interrogate captives without risk of discovery, and without having to give them access to legal proceedings.

Little is known about the CIA's captives, the conditions under which they are kept -- or the procedures used to decide how long they are held or when they may be freed. That has prompted criticism from human rights groups, and

The Washington Post January 2, 2005 Sunday

from some in Congress and the administration, who say the lack of scrutiny or oversight creates an unacceptable risk of abuse.

Rep. Jane Harman (D-Calif.), vice chairman of the House intelligence committee who has received classified briefings on the CIA's detainees and interrogation methods, said that given the long-term nature of the detention situation, "I think there should be a public debate about whether the entire system should be secret.

"The details about the system may need to remain secret," Harman said. At the least, she said, detainees should be registered so that their treatment can be tracked and monitored within the government. "This is complicated. We don't want to set up a bureaucracy that ends up making it impossible to protect sources and informants who operate within the groups we want to penetrate."

The CIA is believed to be holding fewer than three dozen al Qaeda leaders in prison. The agency holds most, if not all, of the top captured al Qaeda leaders, including Khalid Sheik Mohammed, Ramzi Binalshibh, Abu Zubaida and the lead Southeast Asia terrorist, Nurjaman Riduan Isamuddin, known as Hambali.

CIA detention facilities have been located on an off-limits corner of the Bagram air base in Afghanistan, on ships at sea and on Britain's Diego Garcia island in the Indian Ocean. The Washington Post reported last month that the CIA has also maintained a facility within the Pentagon's Guantanamo Bay complex, though it is unclear whether it is still in use.

In contrast to the CIA, the military produced and declassified hundreds of pages of documents about its detention and interrogation procedures after the Abu Ghraib prison scandal. And the military detainees are guaranteed access to the International Committee of the Red Cross and, as a result of a U.S. Supreme Court ruling, have the right to challenge their imprisonment in federal court.

But no public hearings in Congress have been held on CIA detention practices, and congressional officials say CIA briefings on the subject have been too superficial and were limited to the chairman and vice chairman of the House and Senate intelligence committees.

The CIA had floated a proposal to build an isolated prison with the intent of keeping it secret, one intelligence official said. That was dismissed immediately as impractical.

One approach used by the CIA has been to transfer captives it picks up abroad to third countries willing to hold them indefinitely and without public proceedings. The transfers, called "renditions," depend on arrangements between the United States and other countries, such as Egypt, Jordan and Afghanistan, that agree to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers.

The practice has been criticized by civil liberties groups and others, who point out that some of the countries have human rights records that are criticized by the State Department in annual reports.

Renditions originated in the 1990s as a way of picking up criminals abroad, such as drug kingpins, and delivering them to courts in the United States or other countries. Since 2001, the practice has been used to make certain detainees do not go to court or go back on the streets, officials said.

"The whole idea has become a corruption of renditions," said one CIA officer who has been involved in the practice. "It's not rendering to justice, it's kidnapping."

But top intelligence officials and other experts, including former CIA director George J. Tenet in his testimony before Congress, say renditions are an effective method of disrupting terrorist cells and persuading detainees to reveal information.

"Renditions are the most effective way to hold people," said Rohan Gunaratna, author of "Inside al Qaeda: Global Network of Terror." "The threat of sending someone to one of these countries is very important. In Europe, the custodial interrogations have yielded almost nothing" because they do not use the threat of sending detainees to a country where they are likely to be tortured.

**LOAD-DATE:** January 2, 2005

# EXHIBIT D

2 of 5 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

March 12, 2005 Saturday
Late Edition - Final

**SECTION:** Section A; Column 5; Foreign Desk; Pg. 1

**LENGTH:** 1216 words

**HEADLINE:** Army Details Scale of Abuse In Afghan Jail

**BYLINE:** By DOUGLAS JEHL

**DATELINE:** WASHINGTON, March 11

**BODY:**

Two Afghan prisoners who died in American custody in Afghanistan in December 2002 were chained to the ceiling, kicked and beaten by American soldiers in sustained assaults that caused their deaths, according to Army criminal investigative reports that have not yet been made public.

One soldier, Pfc. Willie V. Brand, was charged with manslaughter in a closed hearing last month in Texas in connection with one of the deaths, another Army document shows. Private Brand, who acknowledged striking a detainee named Dilawar 37 times, was accused of having maimed and killed him over a five-day period by "destroying his leg muscle tissue with repeated unlawful knee strikes."

The attacks on Mr. Dilawar were so severe that "even if he had survived, both legs would have had to be amputated," the Army report said, citing a medical examiner.

The reports, obtained by Human Rights Watch, provide the first official account of events that led to the deaths of the detainees, Mullah Habibullah and Mr. Dilawar, at the Bagram Control Point, about 40 miles north of Kabul. The deaths took place nearly a year before the abuses at Abu Ghraib prison in Iraq.

Among those implicated in the killings at Bagram were members of Company A of the 519th Military Intelligence Battalion, from Fort Bragg, N.C. The battalion went on to Iraq, where some members established the interrogation unit at Abu Ghraib and have been implicated in some abuses there.

The reports, from the Army Criminal Investigation Command, also make clear that the abuse at Bagram went far beyond the two killings. Among those recommended for prosecution is an Army military interrogator from the 519th Battalion who is said to have "placed his penis along the face" of one Afghan detainee and later to have "simulated anally sodomizing him (over his clothes)."

The Army reports cited "credible information" that four military interrogators assaulted Mr. Dilawar and another Afghan prisoner with "kicks to the groin and leg, shoving or slamming him into walls/table, forcing the detainee to maintain painful, contorted body positions during interview and forcing water into his mouth until he could not breathe."

American military officials in Afghanistan initially said the deaths of Mr. Habibullah, in an isolation cell on Dec. 4, 2002, and Mr. Dilawar, in another such cell six days later, were from natural causes. Lt. Gen. Daniel K. McNeill, the American commander of allied forces in Afghanistan at the time, denied then that prisoners had been chained to the ceiling or that conditions at Bagram endangered the lives of prisoners.

The New York Times March 12, 2005 Saturday

But after an investigation by The New York Times, the Army acknowledged that the deaths were homicides. Last fall, Army investigators implicated 28 soldiers and reservists and recommended that they face criminal charges, including negligent homicide.

But so far only Private Brand, a military policeman from the 377th Military Police Company, an Army Reserve unit based in Cincinnati, and Sgt. James P. Boland, from the same unit, have been charged.

The charges against Sergeant Boland for assault and other crimes were announced last summer, and those against Private Brand are spelled out in Army charge sheets from hearings on Jan. 4 and Feb. 3 in Fort Bliss, Tex.

The names of other officers and soldiers liable to criminal charges had not previously been made public.

But among those mentioned in the new reports is Capt. Carolyn A. Wood, the chief military intelligence officer at Bagram. The reports conclude that Captain Wood lied to investigators by saying that shackling prisoners in standing positions was intended to protect interrogators from harm. In fact, the report says, the technique was used to inflict pain and sleep deprivation.

An Army report dated June 1, 2004, about Mr. Habibullah's death identifies Capt. Christopher Beiring of the 377th Military Police Company as having been "culpably inefficient in the performance of his duties, which allowed a number of his soldiers to mistreat detainees, ultimately leading to Habibullah's death, thus constituting negligent homicide."

Captain Wood, who commanded Company A in Afghanistan, later helped to establish the interrogation and debriefing center at Abu Ghraib. Two Defense Department reports have said that a list of interrogation procedures she drew up there, which went beyond those approved by Army commanders, may have contributed to abuses at Abu Ghraib.

Past efforts to contact Captain Wood, Captain Beiring and Sergeant Boland, who were mentioned in passing in earlier reports, and to learn the identity of their lawyers, have been unsuccessful. All have been named in previous Pentagon reports and news accounts about the incidents in Afghanistan; none have commented publicly. The name of Private Brand's lawyer did not appear on the Army charge sheet, and military officials said neither the soldier nor the lawyer would likely comment.

John Sifton, a researcher on Afghanistan for Human Rights Watch, said the documents substantiated the group's own investigations showing that beatings and stress positions were widely used, and that "far from a few isolated cases, abuse at sites in Afghanistan was common in 2002, the rule more than the exception."

"Human Rights Watch has previously documented, through interviews with former detainees, that scores of other detainees were beaten at Bagram and Kandahar bases from early 2002 on," Mr. Sifton said in an e-mail message.

In his own report, made public this week, Vice Adm. Albert T. Church III cited the deaths of Mr. Habibullah and Mr. Dilawar as examples of abuse that had occurred during interrogations. Admiral Church said his review of the Army investigation had found that the abuse "was unrelated to approved interrogation techniques."

But Admiral Church also said there were indications in both cases "that medical personnel may have attempted to misrepresent the circumstances of the death, possibly in an effort to disguise detainee abuse," and noted that the Army's surgeon general was reviewing "the specific medical handling" of those cases and one other.

The most specific previous description of the cause of deaths of the two men had come from Pentagon officials, who said last fall that both had suffered "blunt force trauma to the legs," and that investigators had determined that they had been beaten by "multiple soldiers" who, for the most part, had used their knees. Pentagon officials said at the time that it was likely that the beatings had been confined to the legs of the detainees so the injuries would be less visible.

Both men had been chained to the ceiling, one at the waist and one by the wrists, although their feet remained on the ground. Both men had been captured by Afghan forces and turned over to the American military for interrogation.

Mr. Habibullah, a brother of a former Taliban commander, died of a pulmonary embolism apparently caused by blood clots formed in his legs from the beatings, according to the report of June 1, 2004. Mr. Dilawar, who suffered from a heart condition, is described in an Army report dated July 6, 2004, as having died from "blunt force trauma to the lower extremities complicating coronary artery disease."

**URL:** http://www.nytimes.com

# EXHIBIT E

**The New York Times**
nytimes.com

PRINTER FRIENDLY FORMAT 
SPONSORED BY NOW PLAYING IN THEATERS

---

May 20, 2005

# In U.S. Report, Brutal Details of 2 Afghan Inmates' Deaths

By TIM GOLDEN

Even as the young Afghan man was dying before them, his American jailers continued to torment him.

The prisoner, a slight, 22-year-old taxi driver known only as Dilawar, was hauled from his cell at the detention center in Bagram, Afghanistan, at around 2 a.m. to answer questions about a rocket attack on an American base. When he arrived in the interrogation room, an interpreter who was present said, his legs were bouncing uncontrollably in the plastic chair and his hands were numb. He had been chained by the wrists to the top of his cell for much of the previous four days.

Mr. Dilawar asked for a drink of water, and one of the two interrogators, Specialist Joshua R. Claus, 21, picked up a large plastic bottle. But first he punched a hole in the bottom, the interpreter said, so as the prisoner fumbled weakly with the cap, the water poured out over his orange prison scrubs. The soldier then grabbed the bottle back and began squirting the water forcefully into Mr. Dilawar's face.

"Come on, drink!" the interpreter said Specialist Claus had shouted, as the prisoner gagged on the spray. "Drink!"

At the interrogators' behest, a guard tried to force the young man to his knees. But his legs, which had been pummeled by guards for several days, could no longer bend. An interrogator told Mr. Dilawar that he could see a doctor after they finished with him. When he was finally sent back to his cell, though, the guards were instructed only to chain the prisoner back to the ceiling.

"Leave him up," one of the guards quoted Specialist Claus as saying.

Several hours passed before an emergency room doctor finally saw Mr. Dilawar. By then he was dead, his body beginning to stiffen. It would be many months before Army investigators learned a final horrific detail: Most of the interrogators had believed Mr. Dilawar was an innocent man who simply drove his taxi past the American base at the wrong time.

The story of Mr. Dilawar's brutal death at the Bagram Collection Point - and that of another detainee, Habibullah, who died there six days earlier in December 2002 - emerge from a nearly 2,000-page confidential file of the Army's criminal investigation into the case, a copy of which was obtained by The New York Times.

Like a narrative counterpart to the digital images from Abu Ghraib, the Bagram file depicts young, poorly trained soldiers in repeated incidents of abuse. The harsh treatment, which has resulted in criminal charges against seven soldiers, went well beyond the two deaths.

In some instances, testimony shows, it was directed or carried out by interrogators to extract

information. In others, it was punishment meted out by military police guards. Sometimes, the torment seems to have been driven by little more than boredom or cruelty, or both.

In sworn statements to Army investigators, soldiers describe one female interrogator with a taste for humiliation stepping on the neck of one prostrate detainee and kicking another in the genitals. They tell of a shackled prisoner being forced to roll back and forth on the floor of a cell, kissing the boots of his two interrogators as he went. Yet another prisoner is made to pick plastic bottle caps out of a drum mixed with excrement and water as part of a strategy to soften him up for questioning.

The Times obtained a copy of the file from a person involved in the investigation who was critical of the methods used at Bagram and the military's response to the deaths.

Although incidents of prisoner abuse at Bagram in 2002, including some details of the two men's deaths, have been previously reported, American officials have characterized them as isolated problems that were thoroughly investigated. And many of the officers and soldiers interviewed in the Dilawar investigation said the large majority of detainees at Bagram were compliant and reasonably well treated.

"What we have learned through the course of all these investigations is that there were people who clearly violated anyone's standard for humane treatment," said the Pentagon's chief spokesman, Larry Di Rita. "We're finding some cases that were not close calls."

Yet the Bagram file includes ample testimony that harsh treatment by some interrogators was routine and that guards could strike shackled detainees with virtual impunity. Prisoners considered important or troublesome were also handcuffed and chained to the ceilings and doors of their cells, sometimes for long periods, an action Army prosecutors recently classified as criminal assault.

Some of the mistreatment was quite obvious, the file suggests. Senior officers frequently toured the detention center, and several of them acknowledged seeing prisoners chained up for punishment or to deprive them of sleep. Shortly before the two deaths, observers from the International Committee of the Red Cross specifically complained to the military authorities at Bagram about the shackling of prisoners in "fixed positions," documents show.

Even though military investigators learned soon after Mr. Dilawar's death that he had been abused by at least two interrogators, the Army's criminal inquiry moved slowly. Meanwhile, many of the Bagram interrogators, led by the same operations officer, Capt. Carolyn A. Wood, were redeployed to Iraq and in July 2003 took charge of interrogations at the Abu Ghraib prison. According to a high-level Army inquiry last year, Captain Wood applied techniques there that were "remarkably similar" to those used at Bagram.

Last October, the Army's Criminal Investigation Command concluded that there was probable cause to charge 27 officers and enlisted personnel with criminal offenses in the Dilawar case ranging from dereliction of duty to maiming and involuntary manslaughter. Fifteen of the same soldiers were also cited for probable criminal responsibility in the Habibullah case.

So far, only the seven soldiers have been charged, including four last week. No one has been convicted in either death. Two Army interrogators were also reprimanded, a military spokesman said. Most of those who could still face legal action have denied wrongdoing, either in statements to investigators or in comments to a reporter.

"The whole situation is unfair," Sgt. Selena M. Salcedo, a former Bagram interrogator who was charged with assaulting Mr. Dilawar, dereliction of duty and lying to investigators, said in a telephone interview. "It's all going to come out when everything is said and done."

With most of the legal action pending, the story of abuses at Bagram remains incomplete. But documents and interviews reveal a striking disparity between the findings of Army investigators and what military officials said in the aftermath of the deaths.

Military spokesmen maintained that both men had died of natural causes, even after military coroners had ruled the deaths homicides. Two months after those autopsies, the American commander in Afghanistan, then-Lt. Gen. Daniel K. McNeill, said he had no indication that abuse by soldiers had contributed to the two deaths. The methods used at Bagram, he said, were "in accordance with what is generally accepted as interrogation techniques."

**The Interrogators**

In the summer of 2002, the military detention center at Bagram, about 40 miles north of Kabul, stood as a hulking reminder of the Americans' improvised hold over Afghanistan.

Built by the Soviets as an aircraft machine shop for the operations base they established after their intervention in the country in 1979, the building had survived the ensuing wars as a battered relic - a long, squat, concrete block with rusted metal sheets where the windows had once been.

Retrofitted with five large wire pens and a half dozen plywood isolation cells, the building became the Bagram Collection Point, a clearinghouse for prisoners captured in Afghanistan and elsewhere. The B.C.P., as soldiers called it, typically held between 40 and 80 detainees while they were interrogated and screened for possible shipment to the Pentagon's longer-term detention center at Guantánamo Bay, Cuba.

The new interrogation unit that arrived in July 2002 had been improvised as well. Captain Wood, then a 32-year-old lieutenant, came with 13 soldiers from the 525th Military Intelligence Brigade at Fort Bragg, N.C.; six Arabic-speaking reservists were added from the Utah National Guard.

Part of the new group, which was consolidated under Company A of the 519th Military Intelligence Battalion, was made up of counterintelligence specialists with no background in interrogation. Only two of the soldiers had ever questioned actual prisoners.

What specialized training the unit received came on the job, in sessions with two interrogators who had worked in the prison for a few months. "There was nothing that prepared us for running an interrogation operation" like the one at Bagram, the noncommissioned officer in charge of the interrogators, Staff Sgt. Steven W. Loring, later told investigators.

Nor were the rules of engagement very clear. The platoon had the standard interrogations guide, Army Field Manual 34-52, and an order from the secretary of defense, Donald H. Rumsfeld, to treat prisoners "humanely," and when possible, in accordance with the Geneva Conventions. But with President Bush's final determination in February 2002 that the Conventions did not apply to the conflict with Al Qaeda and that Taliban fighters would not be accorded the rights of prisoners of war, the interrogators believed they "could deviate slightly from the rules," said one of the Utah reservists, Sgt. James A. Leahy.

"There was the Geneva Conventions for enemy prisoners of war, but nothing for terrorists," Sergeant Leahy told Army investigators. And the detainees, senior intelligence officers said, were to be considered terrorists until proved otherwise.

The deviations included the use of "safety positions" or "stress positions" that would make the detainees uncomfortable but not necessarily hurt them - kneeling on the ground, for instance, or sitting in a "chair" position against the wall. The new platoon was also trained in sleep deprivation, which the previous unit had generally limited to 24 hours or less, insisting that the interrogator remain awake with the prisoner to avoid pushing the limits of humane treatment.

But as the 519th interrogators settled into their jobs, they set their own procedures for sleep deprivation. They decided on 32 to 36 hours as the optimal time to keep prisoners awake and eliminated the practice of staying up themselves, one former interrogator, Eric LaHammer, said in an interview.

The interrogators worked from a menu of basic tactics to gain a prisoner's cooperation, from the "friendly" approach, to good cop-bad cop routines, to the threat of long-term imprisonment. But some less-experienced interrogators came to rely on the method known in the military as "Fear Up Harsh," or what one soldier referred to as "the screaming technique."

Sergeant Loring, then 27, tried with limited success to wean those interrogators off that approach, which typically involved yelling and throwing chairs. Mr. Leahy said the sergeant "put the brakes on when certain approaches got out of hand." But he could also be dismissive of tactics he considered too soft, several soldiers told investigators, and gave some of the most aggressive interrogators wide latitude. (Efforts to locate Mr. Loring, who has left the military, were unsuccessful.)

"We sometimes developed a rapport with detainees, and Sergeant Loring would sit us down and remind us that these were evil people and talk about 9/11 and they weren't our friends and could not be trusted," Mr. Leahy said.

Specialist Damien M. Corsetti, a tall, bearded interrogator sometimes called "Monster" -he had the nickname tattooed in Italian across his stomach, other soldiers said - was often chosen to intimidate new detainees. Specialist Corsetti, they said, would glower and yell at the arrivals as they stood chained to an overhead pole or lay face down on the floor of a holding room. (A military police K-9 unit often brought growling dogs to walk among the new prisoners for similar effect, documents show.)

"The other interrogators would use his reputation," said one interrogator, Specialist Eric H. Barclais. "They would tell the detainee, 'If you don't cooperate, we'll have to get Monster, and he won't be as nice.' " Another soldier told investigators that Sergeant Loring lightheartedly referred to Specialist Corsetti, then 23, as "the King of Torture."

A Saudi detainee who was interviewed by Army investigators last June at Guantánamo said Specialist Corsetti had pulled out his penis during an interrogation at Bagram, held it against the prisoner's face and threatened to rape him, excerpts from the man's statement show.

Last fall, the investigators cited probable cause to charge Specialist Corsetti with assault, maltreatment of a prisoner and indecent acts in the incident; he has not been charged. At Abu Ghraib, he was also one of three members of the 519th who were fined and demoted for forcing an Iraqi woman to strip

during questioning, another interrogator said. A spokesman at Fort Bragg said Specialist Corsetti would not comment.

In late August of 2002, the Bagram interrogators were joined by a new military police unit that was assigned to guard the detainees. The soldiers, mostly reservists from the 377th Military Police Company based in Cincinnati and Bloomington, Ind., were similarly unprepared for their mission, members of the unit said.

The company received basic lessons in handling prisoners at Fort Dix, N.J., and some police and corrections officers in its ranks provided further training. That instruction included an overview of "pressure-point control tactics" and notably the "common peroneal strike" - a potentially disabling blow to the side of the leg, just above the knee.

The M.P.'s said they were never told that peroneal strikes were not part of Army doctrine. Nor did most of them hear one of the former police officers tell a fellow soldier during the training that he would never use such strikes because they would "tear up" a prisoner's legs.

But once in Afghanistan, members of the 377th found that the usual rules did not seem to apply. The peroneal strike quickly became a basic weapon of the M.P. arsenal. "That was kind of like an accepted thing; you could knee somebody in the leg," former Sgt. Thomas V. Curtis told the investigators.

A few weeks into the company's tour, Specialist Jeremy M. Callaway overheard another guard boasting about having beaten a detainee who had spit on him. Specialist Callaway also told investigators that other soldiers had congratulated the guard "for not taking any" from a detainee.

One captain nicknamed members of the Third Platoon "the Testosterone Gang." Several were devout bodybuilders. Upon arriving in Afghanistan, a group of the soldiers decorated their tent with a Confederate flag, one soldier said.

Some of the same M.P.'s took a particular interest in an emotionally disturbed Afghan detainee who was known to eat his feces and mutilate himself with concertina wire. The soldiers kneed the man repeatedly in the legs and, at one point, chained him with his arms straight up in the air, Specialist Callaway told investigators. They also nicknamed him "Timmy," after a disabled child in the animated television series "South Park." One of the guards who beat the prisoner also taught him to screech like the cartoon character, Specialist Callaway said.

Eventually, the man was sent home.

**The Defiant Detainee**

The detainee known as Person Under Control No. 412 was a portly, well-groomed Afghan named Habibullah. Some American officials identified him as "Mullah" Habibullah, a brother of a former Taliban commander from the southern Afghan province of Oruzgan.

He stood out from the scraggly guerrillas and villagers whom the Bagram interrogators typically saw. "He had a piercing gaze and was very confident," the provost marshal in charge of the M.P.'s, Maj. Bobby R. Atwell, recalled.

Documents from the investigation suggest that Mr. Habibullah was captured by an Afghan warlord on

Nov. 28, 2002, and delivered to Bagram by C.I.A. operatives two days later. His well-being at that point is a matter of dispute. The doctor who examined him on arrival at Bagram reported him in good health. But the intelligence operations chief, Lt. Col. John W. Loffert Jr., later told Army investigators, "He was already in bad condition when he arrived."

What is clear is that Mr. Habibullah was identified at Bagram as an important prisoner and an unusually sharp-tongued and insubordinate one.

One of the 377th's Third Platoon sergeants, Alan J. Driver Jr., told investigators that Mr. Habibullah rose up after a rectal examination and kneed him in the groin. The guard said he grabbed the prisoner by the head and yelled in his face. Mr. Habibullah then "became combative," Sergeant Driver said, and had to be subdued by three guards and led away in an armlock.

He was then confined in one of the 9-foot by 7-foot isolation cells, which the M.P. commander, Capt. Christopher M. Beiring, later described as a standard procedure. "There was a policy that detainees were hooded, shackled and isolated for at least the first 24 hours, sometimes 72 hours of captivity," he told investigators.

While the guards kept some prisoners awake by yelling or poking at them or banging on their cell doors, Mr. Habibullah was shackled by the wrists to the wire ceiling over his cell, soldiers said.

On his second day, Dec. 1, the prisoner was "uncooperative" again, this time with Specialist Willie V. Brand. The guard, who has since been charged with assault and other crimes, told investigators he had delivered three peroneal strikes in response. The next day, Specialist Brand said, he had to knee the prisoner again. Other blows followed.

A lawyer for Specialist Brand, John P. Galligan, said there was no criminal intent by his client to hurt any detainee. "At the time, my client was acting consistently with the standard operating procedure that was in place at the Bagram facility."

The communication between Mr. Habibullah and his jailers appears to have been almost exclusively physical. Despite repeated requests, the M.P.'s were assigned no interpreters of their own. Instead, they borrowed from the interrogators when they could and relied on prisoners who spoke even a little English to translate for them.

When the detainees were beaten or kicked for "noncompliance," one of the interpreters, Ali M. Baryalai said, it was often "because they have no idea what the M.P. is saying."

By the morning of Dec. 2, witnesses told the investigators, Mr. Habibullah was coughing and complaining of chest pains. He limped into the interrogation room in shackles, his right leg stiff and his right foot swollen. The lead interrogator, Sergeant Leahy, let him sit on the floor because he could not bend his knees and sit in a chair.

The interpreter who was on hand, Ebrahim Baerde, said the interrogators had kept their distance that day "because he was spitting up a lot of phlegm."

"They were laughing and making fun of him, saying it was 'gross' or 'nasty,' " Mr. Baerde said.

**Though battered, Mr. Habibullah was unbowed.**

"Once they asked him if he wanted to spend the rest of his life in handcuffs," Mr. Baerde said. "His response was, 'Yes, don't they look good on me?' "

By Dec. 3, Mr. Habibullah's reputation for defiance seemed to make him an open target. One M.P. said he had given him five peroneal strikes for being "noncompliant and combative." Another gave him three or four more for being "combative and noncompliant." Some guards later asserted that he had been hurt trying to escape.

When Sgt. James P. Boland saw Mr. Habibullah on Dec. 3, he was in one of the isolation cells, tethered to the ceiling by two sets of handcuffs and a chain around his waist. His body was slumped forward, held up by the chains.

Sergeant Boland told the investigators he had entered the cell with two other guards, Specialists Anthony M. Morden and Brian E. Cammack. (All three have been charged with assault and other crimes.) One of them pulled off the prisoner's black hood. His head was slumped to one side, his tongue sticking out. Specialist Cammack said he had put some bread on Mr. Habibullah's tongue. Another soldier put an apple in the prisoner's hand; it fell to the floor.

When Specialist Cammack turned back toward the prisoner, he said in one statement, Mr. Habibullah's spit hit his chest. Later, Specialist Cammack acknowledged, "I'm not sure if he spit at me." But at the time, he exploded, yelling, "Don't ever spit on me again!" and kneeing the prisoner sharply in the thigh, "maybe a couple" of times. Mr. Habibullah's limp body swayed back and forth in the chains.

When Sergeant Boland returned to the cell some 20 minutes later, he said, Mr. Habibullah was not moving and had no pulse. Finally, the prisoner was unchained and laid out on the floor of his cell.

The guard who Specialist Cammack said had counseled him back in New Jersey about the dangers of peroneal strikes found him in the room where Mr. Habibullah lay, his body already cold.

"Specialist Cammack appeared very distraught," Specialist William Bohl told an investigator. The soldier "was running about the room hysterically."

An M.P. was sent to wake one of the medics.

"What are you getting me for?" the medic, Specialist Robert S. Melone, responded, telling him to call an ambulance instead.

When another medic finally arrived, he found Mr. Habibullah on the floor, his arms outstretched, his eyes and mouth open.

"It looked like he had been dead for a while, and it looked like nobody cared," the medic, Staff Sgt. Rodney D. Glass, recalled.

Not all of the guards were indifferent, their statements show. But if Mr. Habibullah's death shocked some of them, it did not lead to major changes in the detention center's operation.

Military police guards were assigned to be present during interrogations to help prevent mistreatment. The provost marshal, Major Atwell, told investigators he had already instructed the commander of the M.P. company, Captain Beiring, to stop chaining prisoners to the ceiling. Others said they never

received such an order.

Senior officers later told investigators that they had been unaware of any serious abuses at the B.C.P. But the first sergeant of the 377th, Betty J. Jones, told investigators that the use of standing restraints, sleep deprivation and peroneal strikes was readily apparent.

"Everyone that is anyone went through the facility at one time or another," she said.

Major Atwell said the death "did not cause an enormous amount of concern 'cause it appeared natural."

In fact, Mr. Habibullah's autopsy, completed on Dec. 8, showed bruises or abrasions on his chest, arms and head. There were deep contusions on his calves, knees and thighs. His left calf was marked by what appeared to have been the sole of a boot.

His death was attributed to a blood clot, probably caused by the severe injuries to his legs, which traveled to his heart and blocked the blood flow to his lungs.

**The Shy Detainee**

On Dec. 5, one day after Mr. Habibullah died, Mr. Dilawar arrived at Bagram.

Four days before, on the eve of the Muslim holiday of Id al-Fitr, Mr. Dilawar set out from his tiny village of Yakubi in a prized new possession, a used Toyota sedan that his family bought for him a few weeks earlier to drive as a taxi.

Mr. Dilawar was not an adventurous man. He rarely went far from the stone farmhouse he shared with his wife, young daughter and extended family. He never attended school, relatives said, and had only one friend, Bacha Khel, with whom he would sit in the wheat fields surrounding the village and talk.

"He was a shy man, a very simple man," his eldest brother, Shahpoor, said in an interview.

On the day he disappeared, Mr. Dilawar's mother had asked him to gather his three sisters from their nearby villages and bring them home for the holiday. But he needed gas money and decided instead to drive to the provincial capital, Khost, about 45 minutes away, to look for fares.

At a taxi stand there, he found three men headed back toward Yakubi. On the way, they passed a base used by American troops, Camp Salerno, which had been the target of a rocket attack that morning.

Militiamen loyal to the guerrilla commander guarding the base, Jan Baz Khan, stopped the Toyota at a checkpoint. They confiscated a broken walkie-talkie from one of Mr. Dilawar's passengers. In the trunk, they found an electric stabilizer used to regulate current from a generator. (Mr. Dilawar's family said the stabilizer was not theirs; at the time, they said, they had no electricity at all.)

The four men were detained and turned over to American soldiers at the base as suspects in the attack. Mr. Dilawar and his passengers spent their first night there handcuffed to a fence, so they would be unable to sleep. When a doctor examined them the next morning, he said later, he found Mr. Dilawar tired and suffering from headaches but otherwise fine.

Mr. Dilawar's three passengers were eventually flown to Guantánamo and held for more than a year

before being sent home without charge. In interviews after their release, the men described their treatment at Bagram as far worse than at Guantánamo. While all of them said they had been beaten, they complained most bitterly of being stripped naked in front of female soldiers for showers and medical examinations, which they said included the first of several painful and humiliating rectal exams.

"They did lots and lots of bad things to me," said Abdur Rahim, a 26-year-old baker from Khost. "I was shouting and crying, and no one was listening. When I was shouting, the soldiers were slamming my head against the desk."

For Mr. Dilawar, his fellow prisoners said, the most difficult thing seemed to be the black cloth hood that was pulled over his head. "He could not breathe," said a man called Parkhudin, who had been one of Mr. Dilawar's passengers.

Mr. Dilawar was a frail man, standing only 5 feet 9 inches and weighing 122 pounds. But at Bagram, he was quickly labeled one of the "noncompliant" ones.

When one of the First Platoon M.P.'s, Specialist Corey E. Jones, was sent to Mr. Dilawar's cell to give him some water, he said the prisoner spit in his face and started kicking him. Specialist Jones responded, he said, with a couple of knee strikes to the leg of the shackled man.

"He screamed out, 'Allah! Allah! Allah!' and my first reaction was that he was crying out to his god," Specialist Jones said to investigators. "Everybody heard him cry out and thought it was funny."

Other Third Platoon M.P.'s later came by the detention center and stopped at the isolation cells to see for themselves, Specialist Jones said.

It became a kind of running joke, and people kept showing up to give this detainee a common peroneal strike just to hear him scream out 'Allah,' " he said. "It went on over a 24-hour period, and I would think that it was over 100 strikes."

In a subsequent statement, Specialist Jones was vague about which M.P.'s had delivered the blows. His estimate was never confirmed, but other guards eventually admitted striking Mr. Dilawar repeatedly.

Many M.P.'s would eventually deny that they had any idea of Mr. Dilawar's injuries, explaining that they never saw his legs beneath his jumpsuit. But Specialist Jones recalled that the drawstring pants of Mr. Dilawar's orange prison suit fell down again and again while he was shackled.

"I saw the bruise because his pants kept falling down while he was in standing restraints," the soldier told investigators. "Over a certain time period, I noticed it was the size of a fist."

As Mr. Dilawar grew desperate, he began crying out more loudly to be released. But even the interpreters had trouble understanding his Pashto dialect; the annoyed guards heard only noise.

"He had constantly been screaming, 'Release me; I don't want to be here,' and things like that," said the one linguist who could decipher his distress, Abdul Ahad Wardak.

**The Interrogation**

On Dec. 8, Mr. Dilawar was taken for his fourth interrogation. It quickly turned hostile.

The 21-year-old lead interrogator, Specialist Glendale C. Walls II, later contended that Mr. Dilawar was evasive. "Some holes came up, and we wanted him to answer us truthfully," he said. The other interrogator, Sergeant Salcedo, complained that the prisoner was smiling, not answering questions, and refusing to stay kneeling on the ground or sitting against the wall.

The interpreter who was present, Ahmad Ahmadzai, recalled the encounter differently to investigators.

The interrogators, Mr. Ahmadzai said, accused Mr. Dilawar of launching the rockets that had hit the American base. He denied that. While kneeling on the ground, he was unable to hold his cuffed hands above his head as instructed, prompting Sergeant Salcedo to slap them back up whenever they began to drop.

"Selena berated him for being weak and questioned him about being a man, which was very insulting because of his heritage," Mr. Ahmadzai said.

When Mr. Dilawar was unable to sit in the chair position against the wall because of his battered legs, the two interrogators grabbed him by the shirt and repeatedly shoved him back against the wall.

"This went on for 10 or 15 minutes," the interpreter said. "He was so tired he couldn't get up."

"They stood him up, and at one point Selena stepped on his bare foot with her boot and grabbed him by his beard and pulled him towards her," he went on. "Once Selena kicked Dilawar in the groin, private areas, with her right foot. She was standing some distance from him, and she stepped back and kicked him.

"About the first 10 minutes, I think, they were actually questioning him, after that it was pushing, shoving, kicking and shouting at him," Mr. Ahmadzai said. "There was no interrogation going on."

The session ended, he said, with Sergeant Salcedo instructing the M.P.'s to keep Mr. Dilawar chained to the ceiling until the next shift came on.

The next morning, Mr. Dilawar began yelling again. At around noon, the M.P.'s called over another of the interpreters, Mr. Baerde, to try to quiet Mr. Dilawar down.

"I told him, 'Look, please, if you want to be able to sit down and be released from shackles, you just need to be quiet for one more hour."

"He told me that if he was in shackles another hour, he would die," Mr. Baerde said.

Half an hour later, Mr. Baerde returned to the cell. Mr. Dilawar's hands hung limply from the cuffs, and his head, covered by the black hood, slumped forward.

"He wanted me to get a doctor, and said that he needed 'a shot,' " Mr. Baerde recalled. "He said that he didn't feel good. He said that his legs were hurting."

Mr. Baerde translated Mr. Dilawar's plea to one of the guards. The soldier took the prisoner's hand and pressed down on his fingernails to check his circulation.

"He's O.K.," Mr. Baerde quoted the M.P. as saying. "He's just trying to get out of his restraints."

By the time Mr. Dilawar was brought in for his final interrogation in the first hours of the next day, Dec. 10, he appeared exhausted and was babbling that his wife had died. He also told the interrogators that he had been beaten by the guards.

"But we didn't pursue that," said Mr. Baryalai, the interpreter.

Specialist Walls was again the lead interrogator. But his more aggressive partner, Specialist Claus, quickly took over, Mr. Baryalai said.

"Josh had a rule that the detainee had to look at him, not me," the interpreter told investigators. "He gave him three chances, and then he grabbed him by the shirt and pulled him towards him, across the table, slamming his chest into the table front."

When Mr. Dilawar was unable to kneel, the interpreter said, the interrogators pulled him to his feet and pushed him against the wall. Told to assume a stress position, the prisoner leaned his head against the wall and began to fall asleep.

"It looked to me like Dilawar was trying to cooperate, but he couldn't physically perform the tasks," Mr. Baryalai said.

Finally, Specialist Walls grabbed the prisoner and "shook him harshly," the interpreter said, telling him that if he failed to cooperate, he would be shipped to a prison in the United States, where he would be "treated like a woman, by the other men" and face the wrath of criminals who "would be very angry with anyone involved in the 9/11 attacks." (Specialist Walls was charged last week with assault, maltreatment and failure to obey a lawful order; Specialist Claus was charged with assault, maltreatment and lying to investigators. Each man declined to comment.)

A third military intelligence specialist who spoke some Pashto, Staff Sgt. W. Christopher Yonushonis, had questioned Mr. Dilawar earlier and had arranged with Specialist Claus to take over when he was done. Instead, the sergeant arrived at the interrogation room to find a large puddle of water on the floor, a wet spot on Mr. Dilawar's shirt and Specialist Claus standing behind the detainee, twisting up the back of the hood that covered the prisoner's head.

"I had the impression that Josh was actually holding the detainee upright by pulling on the hood," he said. "I was furious at this point because I had seen Josh tighten the hood of another detainee the week before. This behavior seemed completely gratuitous and unrelated to intelligence collection."

"What the hell happened with that water?" Sergeant Yonushonis said he had demanded.

"We had to make sure he stayed hydrated," he said Specialist Claus had responded.

The next morning, Sergeant Yonushonis went to the noncommissioned officer in charge of the interrogators, Sergeant Loring, to report the incident. Mr. Dilawar, however, was already dead.

### The Post-Mortem

The findings of Mr. Dilawar's autopsy were succinct. He had had some coronary artery disease, the

medical examiner reported, but what caused his heart to fail was "blunt force injuries to the lower extremities." Similar injuries contributed to Mr. Habibullah's death.

One of the coroners later translated the assessment at a pre-trial hearing for Specialist Brand, saying the tissue in the young man's legs "had basically been pulpified."

"I've seen similar injuries in an individual run over by a bus," added Lt. Col. Elizabeth Rouse, the coroner, and a major at that time.

After the second death, several of the 519th Battalion's interrogators were temporarily removed from their posts. A medic was assigned to the detention center to work night shifts. On orders from the Bagram intelligence chief, interrogators were prohibited from any physical contact with the detainees. Chaining prisoners to any fixed object was also banned, and the use of stress positions was curtailed.

In February, an American military official disclosed that the Afghan guerrilla commander whose men had arrested Mr. Dilawar and his passengers had himself been detained. The commander, Jan Baz Khan, was suspected of attacking Camp Salerno himself and then turning over innocent "suspects" to the Americans in a ploy to win their trust, the military official said.

The three passengers in Mr. Dilawar's taxi were sent home from Guantánamo in March 2004, 15 months after their capture, with letters saying they posed "no threat" to American forces.

They were later visited by Mr. Dilawar's parents, who begged them to explain what had happened to their son. But the men said they could not bring themselves to recount the details.

"I told them he had a bed," said Mr. Parkhudin. "I said the Americans were very nice because he had a heart problem."

In late August of last year, shortly before the Army completed its inquiry into the deaths, Sergeant Yonushonis, who was stationed in Germany, went at his own initiative to see an agent of the Criminal Investigation Command. Until then, he had never been interviewed.

"I expected to be contacted at some point by investigators in this case," he said. "I was living a few doors down from the interrogation room, and I had been one of the last to see this detainee alive."

Sergeant Yonushonis described what he had witnessed of the detainee's last interrogation. "I remember being so mad that I had trouble speaking," he said.

He also added a detail that had been overlooked in the investigative file. By the time Mr. Dilawar was taken into his final interrogations, he said, "most of us were convinced that the detainee was innocent."

Ruhallah Khapalwak, Carlotta Gall and David Rohde contributed reporting for this article, and Alain Delaqueriere assisted with research.

---

Copyright 2005 The New York Times Company  |  Home  |  Privacy Policy  |  Search  |  Corrections  |  **RSS**  |  ▶

# EXHIBIT F

5 of 5 DOCUMENTS

Copyright 2004 The New York Times Company
The New York Times

May 12, 2004 Wednesday
Late Edition - Final

**SECTION:** Section A; Column 4; Foreign Desk; Pg. 1

**LENGTH:** 2342 words

**HEADLINE:** Afghan Gives Own Account Of U.S. Abuse

**BYLINE:** By CARLOTTA GALL; Abdul Waheed Wafa contributed reporting from Afghanistan for this article.

**DATELINE:** KABUL, Afghanistan, Wednesday, May 12

**BODY:**

A former Afghan police colonel gave a graphic account in an interview this week of being subjected to beating, kicking, sleep deprivation, taunts and sexual abuse during about 40 days he spent in American custody in Afghanistan last summer. He also said he had been repeatedly photographed, often while naked.

"I swear to God, those photos shown on television of the prison in Iraq -- those things happened to me as well," the former officer, Sayed Nabi Siddiqui, 47, said in the interview on Sunday at his home in the village of Sheikho, on the edge of the eastern town of Gardez.

His account could not be independently verified, but members of the Afghan Independent Human Rights Commission accompanied a reporter during the interview and said his story matched the one given to them last fall, shortly after his release and long before the abuse at the Abu Ghraib near Baghdad came to light.

The commission, which was set up by the transitional government of President Hamid Karzai in 2002 and receives money from the United States Congress and other foreign donors, has in recent months received 44 complaints against various actions by American forces.

Those include several on the abuse of detainees who have alleged rough and degrading treatment, including being stripped naked and doused with cold water, even before the pictures of prisoner abuse emerged in Iraq. Afghan military and police officials say they have heard similar stories from detainees and their families.

After queries to the Pentagon about Mr. Siddiqui's case, the United States Embassy in Kabul issued a statement early Wednesday, saying, "The U.S. military has launched an immediate investigation."

It quoted the American ambassador in Kabul, Zalmay Khalilzad, as saying, "To the best of our knowledge this is the first time anyone in the military chain of command or the United States Embassy has heard of this alleged mistreatment."

But a member of the human rights commission said members had mentioned details of Mr. Siddiqui's case, apparently the first complaint of sexual abuse from a detainee in Afghanistan, to American military officials here last year.

Mr. Siddiqui says that he was wrongly detained on July 15 after he reported police corruption and that someone then accused him of being a member of the Taliban.

The New York Times May 12, 2004 Wednesday

He showed a Defense Department letter detailing his stay, as detainee BT676, in a jail at the Bagram air base outside Kabul from Aug. 13 to 20, 2003, and his release after it was decided that he posed "no threat to the U.S. Armed Forces or its interest in Afghanistan."

Mr. Siddiqui said he had also been held for 22 days at the American firebase at Gardez, where United States infantry and Special Forces are based, and where he said the worst abuses occurred. He then spent 12 days at the Kandahar air base in southern Afghanistan, and finally about a week in Bagram, he said.

He described being humiliated repeatedly during his detention in all three places.

"They were taunting me and laughing and asking very rude questions, like which animal did I like having sex with, and which animal do you want us to bring in for you to have sex with," he said of his time in Gardez.

"They were mimicking the sounds of a sheep, a cow and a donkey," he said, "and asking which one I would like to have sex with. They kept insisting, and they were kicking me so much that eventually I said a cow."

"And they made insults about our women," he added. He said the American interrogator, through a translator, had taunted him, asking: "Do you know that your wife and daughter are prostitutes now?"

"The Americans were asking this and the translators were translating, and they were all laughing," he said. "And I was in my full police uniform with insignia showing my rank."

More than once, he said, soldiers inserted their fingers into his anus. He said one had touched his penis and asked, "Why is this unhappy?"

"There was a translator there," Mr. Siddiqui went on, "and I said, 'Maybe because I am away from home.'"

"Every time, they were laughing and putting their fingers in my anus and throwing different colors of beams of light in my eyes, and they were putting their feet on my neck," he said.

Lt. Gen. David Barno, the commander of United States forces in Afghanistan since last October, said in an interview on Tuesday that he had not heard of the allegations but that "I take those accounts very seriously."

"There is some potentially criminal behavior in there," he said.

The main detention center is at the Bagram air base. It is not clear who was in charge of the detainees at the remote bases when Mr. Siddiqui was in custody. The United States infantry and Special Forces have used the Gardez firebase, but General Barno said the officials responsible in Gardez at that time could have been "other than military," a term often used here to refer to the C.I.A.

He also acknowledged that there had been "challenges or problems" in some of the more remote bases and that since he had taken over command there had been about seven investigations into abuse of detainees.

"One of those had some substance to it," he said, without elaborating. "We continue to assess the facts and take corrective action."

Mr. Siddiqui was not interviewed during his detention by the International Committee of the Red Cross, whose officials visit Bagram every two weeks but do not visit the remote bases.

But Rafiullah Bedar, head of the Gardez office of the human rights commission, and other members of his office said they knew Mr. Siddiqui as a reputable man and believed his story.

Mohammad Farid Hamidi, one of the commission's board members, said in an interview on Tuesday that members of his group had at least two meetings late last year with United States military officials here and raised a number of complaints about treatment of detainees and civilians, including Mr. Siddiqui's case.

He said that middle-level military officials had been at the meeting but that he did not know who they were.

Requests for the United States military to appoint a liaison officer to deal with human rights issues have not been answered, Mr. Hamidi said. The commission has also requested access to Bagram and other bases, he said.

But General Barno ruled that out on Tuesday, saying the Red Cross served as an effective "outside set of eyes" that represented the interests of the detainees.

The New York Times May 12, 2004 Wednesday

Former prisoners have complained of harsh interrogation techniques and rough, sometimes humiliating treatment at the hands of their American guards and interrogators since the United States went to war in Afghanistan in October 2001.

In the aftermath of the Sept. 11, 2001, attacks in the United States and during the prelude to the American invasion of Iraq, those complaints did not receive high priority here, even from the Afghan government, which continues to face a violent insurgency in parts of the country.

The complaints peaked around December 2002, when two men died in custody within a week of each other at Bagram. More than a year later, results of an investigation of those deaths by the Army's Criminal Investigation Department have not been disclosed.

Since those deaths, General Barno said, there were "a number of very significant changes made" at Bagram and no complaints of detainee abuse.

United Nations and other foreign officials in Kabul concur that they have not received fresh reports of severe physical abuse at Bagram. But complaints of general ill treatment of prisoners there and elsewhere in Afghanistan continue to emerge.

Ahmad Shah Mirdad, head of monitoring and the investigation unit of the human rights commission, said 11 of the 44 complaints the group had received were about United States bombing of civilians and 33 complaints were of beatings, detention of innocent people, damage to houses, injuries and disrespect of Afghan cultural and religious customs during raids.

Families have also complained that they still have no news of at least six people in American detention three to four months after their arrest.

Mr. Siddiqui said he was stripped naked and photographed in each of the three places he was held. Sometimes, as in Bagram, it appeared to be part of a detailed identification procedure.

There he was photographed full length, naked, from the front, back and two sides, he said. Something was inserted into his rectum during that procedure, he said, but he does not know what it was or why it was done. "I was feeling very bad," he said.

General Barno said that this may have been to search for hidden items, but that the practice of strip searches and fully naked identification photographs was being reviewed and changed. "We're concerned as well about the cultural impact of doing that," he said.

Mr. Siddiqui said that on his arrival in Kandahar, three or four detainees were taken to a room at a time and stripped.

"We were lying on our stomachs, and they put chains on our hands and feet and they were kicking us," he said. "And then they took photos of us, although we were naked." At that point he said he was not hooded or blindfolded.

"There was an old man of 70 or 80," he added. "They stripped him naked. He was so ashamed, he said, 'It would be better if I kill myself.'"

General Barno said that he would not allow such methods to soften up detainees before interrogation, and that photographs would be justified only for identification purposes.

"Some of that is absolutely unacceptable and criminal as well," he said of Mr. Siddiqui's account. "Those things that you describe would not be appropriate techniques."

For the 12 days that he was in Kandahar, Mr. Siddiqui said, the detainees were kept in wire cages, 20 to 30 in a cage, given very little food and water and made to use a bucket for a toilet in front of the other detainees.

American soldiers would throw stones and bottles at the detainees in the cages, he said. "It was like stoning monkeys at the zoo," he said. "They brought buckets of stones and were laughing as they did it."

Mr. Mirdad of the Afghan human rights commission said another man, whose name he did not divulge, had told the commission that he had been detained for six days in the eastern border province of Khost and complained of beating, sleep deprivation and having water poured on him.

The New York Times May 12, 2004 Wednesday

Two United States military bases, Camp Salerno and Camp Chapman, are in Khost, where the Taliban insurgency remains strong.

Afghan officials, including Khan Mohammad, the chief Afghan military commander in southern Afghanistan, say they had received similar complaints from former detainees.

His deputy corps commander, Haji Granai, said a group of people from Helmand Province had recently complained about their detention at the Kandahar air base. "They stripped them and they beat them," he said.

"We told the Americans they should not do this, that we are Muslims and this is shameful for us," Mr. Granai said in a telephone interview last week from his base in Kandahar. "For the Americans, they don't care about being made naked, but Afghans do. The officers wrote it down and said they would tell their superiors."

The chief military public affairs officer in Afghanistan, Lt. Col. Matthew Beevers, said he was hesitant to respond to such allegations.

"We treat these folks very humanely," he said in an interview. "They get three meals a day, food is appropriate to their cultural dietary requirements, they get exercise, and probably the best medical care in the country, and they are allowed freely to practice their religion."

"They are not stripped naked in Bagram," he added. "They wear clothes."

Haji Abdul Rahman, from the same village as Mr. Siddiqui, was released on Friday from Bagram after nearly five months of detention. He said he had not been mistreated but complained bitterly about the circumstances of his arrest, during a nighttime raid, when he said his home had been damaged and money stolen.

The Americans took his family documents and have not returned them, he said. His complaints are similar to dozens of others in the Gardez area, the human rights commission says.

Hundreds of Afghans suspected of belonging to the Taliban, Al Qaeda and other insurgent groups are still being detained in Afghanistan. Last week there were 298 people held at the main detention center in Bagram alone, Colonel Beevers said.

American forces hold detainees and conduct interrogations in 8 to 10 other sites around the country, where people are kept for days or even weeks before being released or transferred to Bagram. General Barno said he was refining procedures to shorten the length of time detainees are kept in remote facilities.

People have also been detained for months at a time in the C.I.A. building in the Ariana Hotel in central Kabul, according to a former detainee, and also interrogated at a compound in the city of Kandahar that used to belong to the Taliban leader, Mullah Muhammad Omar.

Red Cross officials say that they cannot discuss the detention center at Bagram, but that they deliver a report to the detention authorities at the end of each visit and follow it up with a written report to the United States military superiors.

Two men died in Bagram in December 2002, and American pathologists classified those deaths as homicides "caused by blunt force injuries to the lower extremities." A third man died while being interrogated in June 2003 at a United States Special Forces firebase in the eastern province of Kunar.

In a letter to the national security adviser, Condoleezza Rice, on May 3, Human Rights Watch asked for the release of the results of the investigation of the Bagram deaths and said it had received reports "that criminal prosecutions have been foregone in lieu of quiet disciplinary action" in the case.

The United States military here refuses to comment on the investigation, saying it is continuing.

URL: http://www.nytimes.com

GRAPHIC: Photos: Sayed Nabi Siddiqui, at his home in the village of Sheikho, describing mistreatment he suffered while in United States custody for 40 days last year.

The New York Times May 12, 2004 Wednesday

Haji Abdul Rahman, shortly after his release from five months in detention. (Photographs by Carlotta Gall/The New York Times)(pg. A6)Map of Afghanistan highlighting the location of Bagram air base: Complaints at the Bagram air base detention center peaked in late 2002. (pg. A6)

**LOAD-DATE:** May 12, 2004