## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABDUL SALAM ZAEEF, et al., | : | |
| | : | **Case No. 1:05-CV-00660 (RMC)** |
| *Petitioners/Plaintiffs,* | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| v. | : | |
| | : | |
| GEORGE W. BUSH, et al., | : | |
| | : | |
| *Respondents/Defendants.* | : | |

| | | |
|---|---|---|
| ALI SHAH MOUSOVI, et al., | : | |
| | : | **Case No. 1:05-CV-01124 (RMC)** |
| *Petitioners/Plaintiffs,* | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| v. | : | |
| | : | |
| GEORGE W. BUSH, et al., | : | |
| | : | |
| *Respondents/Defendants.* | : | |

## REPLY BRIEF IN SUPPORT OF PETITIONERS' MOTIONS FOR PRELIMINARY INJUNCTION DIRECTING RESPONDENTS TO PROVIDE THE COURT AND PETITIONERS' COUNSEL WITH THIRTY DAYS' ADVANCE NOTICE OF ANY INTENDED TRANSFER FROM GUANTANAMO FOR PURPOSES OTHER THAN RELEASE

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, LCvR 65.1, and the

All Writs Act, 28 U.S.C. § 1651(a), Petitioners in the above-captioned cases hereby submit their

reply in support of their motions requesting that the Court enter an order preliminarily enjoining

Respondents from removing Petitioners from the Guantanamo Bay Naval Base for any purpose

other than release, unless the Court and counsel for Petitioners receive thirty (30) days' advance

notice of such removal.

## I.    **INTRODUCTION**

Petitioners seek exceptionally modest relief: thirty days' notice of any intended transfer of Petitioners from Guantanamo for purposes other than release. In requesting such notice, Petitioners seek only to preserve the status quo so as to be able, if advisable, to contest the legality of any such transfer before it becomes a *fait accompli*. Without the requested relief, Petitioners' ability to enforce their rights in these proceedings is at substantial risk.

Petitioners do not here assert the power to block transfer; nor do they ask the Court to decide that it has the power to do so. Absent notice of transfer, however, the Court cannot protect its jurisdiction over Petitioners' cases. Nor can undersigned counsel comply with their duty to provide proper representation to Petitioners without notice of where Petitioners are, where they may be going, and when. Respondents' opposition to Petitioners' motions provides no justification whatsoever for their refusal to provide such notice.

Respondents contend that there is no "factual or legal basis" for the requested relief. Resp. Br., at 1. They do not deny, however, that they intend to transfer more Guantanamo detainees to other countries for continued detention. Nor do they deny that they intend to do so without notifying counsel or the Court. On July 20, 2005, the Department of Defense announced that it had transferred eight more detainees from Guantanamo, at least two of whom were transferred for continued detention by foreign governments. *See* Department of Defense News Release (July 20, 2005), *available at* http://www.defenselink.mil/releases/ 2005/nr20050720-4122.html (last visited July 27, 2005). The announcement confirmed that "[d]uring the course of the war on terrorism, the department expects that there will other transfers or releases of detainees. . . . [but] [b]ecause of operational and security considerations, no further details can be provided." *Id.* By Respondents' own admission, 242 detainees have been transferred from Guantanamo in the last three years, nearly 70 of whom have been

transferred for continued detention by foreign governments. The prospect for Petitioners to be transferred is not at all remote.[1]

In *Rasul v. Bush*, 124 S. Ct. 2686, 2699 (2004), the Supreme Court ruled that "federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." Judge Kollar-Kotelly has ruled that the detainees have the right to counsel. *Al Odah v. U.S.*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004). Judge Green has ruled that the detainees have rights under the Due Process Clause of the Fifth Amendment to the Constitution. *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 463-64 (D.D.C. 2005). In short, Petitioners have enforceable rights and have properly invoked the jurisdiction of this Court. The Court indisputably has power under the All Writs Act, 28 U.S.C. § 1651(a), to protect its jurisdiction to adjudicate Petitioners' claims and to afford them notice and the opportunity to be heard before being shipped to another country for further potentially indefinite detention without charge.

Petitioners have satisfied the requirements for a preliminary injunction. Respondents argue that no irreparable harm exists, but their argument blinks reality and common sense. Respondents claim that "release from United States custody will give petitioners all the relief they can seek through habeas," Resp. Br., at 10, notwithstanding the fact that "release" into potentially indefinite custody in countries that the State Department concedes employ secret prisons and torture is "release" only in the Orwellian sense of the word.

---

[1]     Notably, Respondents do not now claim, as they did in March 2005, that "[n]o transfer of any current habeas petitioner in this or other pending habeas cases brought by individual, named GTMO detainees, other than for release as a result of being determined by a CSRT to no longer be an enemy combatant, is currently scheduled." Second Declaration of Matthew C. Waxman (March 16, 2005) ¶ 5, attached hereto at Tab 1.

In arguing that Petitioners have failed to raise serious questions going to the merits, Respondents draw an unjustifiable and myopic distinction between the substantive relief sought in the Petitions and the injunctive relief sought in Petitioners' motions. Petitioners' likelihood of success on their substantive claims is irrelevant, Respondents argue, because the only issue is whether Petitioners have a right to stop the transfer itself. Petitioners' substantive claims and their request for notice, however, are inextricably linked. The Department of Defense's "review process" regarding whether to release a detainee from U.S. custody, Prosper Decl. ¶ 2, will be qualitatively different if a neutral decision maker has determined that the detention was mistaken and/or illegal from the outset. Likewise, the State Department need not determine whether a foreign government is "prepared to take the steps necessary to ensure that [an alleged enemy combatant] will not pose a continuing threat to the United States," *id.* ¶ 3, if a neutral decision maker has concluded that the detainee should never have been designated an enemy combatant in the first place.

The balance of hardships, moreover, tips decidedly toward movants. Respondents' parade of horribles is overblown and bears no causal relationship to the requested relief. Respondents make the implausible claims that merely requiring notice of transfer will "have a chilling effect on and cause damage to our ability to conduct foreign relations" and will "jeopardize the cooperation of other nations in the war on terrorism." Resp. Br., at 7, 22. The claims rest on the entirely unsupported assumption that notice will automatically lead to the wholesale disclosure of confidential State Department information. There is no basis, however, to equate judicial review – much less a mere notice requirement – with unrestricted disclosure. There is a detailed confidentiality order in this case, and the Court is capable of structuring

proceedings to minimize any potential harm to government interests, although Respondents have failed to identify any real harm will result from a notice requirement.

Petitioners have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted). The public also has a strong interest in preventing unjustified and indefinite detention without charge. "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable harm on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.* Respondents' opposition fails to undermine any of the reasons Petitioners have offered in support of their modest request for notice. The Court should therefore grant Petitioners' motions and require Respondents to provide the Court and counsel with thirty days' notice of any transfer from Guantanamo for purposes other than release.[2]

## II.   PETITIONERS HAVE SHOWN THE LIKELIHOOD OF IRREPARABLE HARM

The great and irreparable harm that Petitioners face is obvious: They stand to suffer extreme physical and psychological injury. By an involuntary transfer from Guantanamo, they also risk the possible loss of their right to an adjudication of their *habeas* corpus claims in a United States court. Because Respondents have refused to provide advance warning to

---

[2]   Respondents' opposition, at 10, mischaracterizes the relief Petitioners seek. In seeking thirty days' notice of any transfer for purposes other than release, Petitioners do not limit the concept of release to "the United States' perspective." If Respondents have reason to believe that a potential receiving country intends further detention rather than release, Petitioners seek notice of such a transfer.

Petitioners before they are transferred from Guantanamo, and because the timing of any such removal is within the absolute control of Respondents, Petitioners have sufficiently established that the harm they face could occur at any time.

**A.      Transfer Without Notice Threatens This Court's Jurisdiction**

Respondents argue that the conclusions of other judges in this District, including this Court, that Petitioners will be irreparably harmed by transfer without notice "rest on faulty logic." Resp. Br., at 9. Respondents concede that such transfer "would or could extinguish the transferred detainee's *habeas* claims and curtail the Court's review of the legality of his detention," but nevertheless claim that "release from United States custody will give petitioners all the relief they can seek through *habeas*." *Id.* at 9-10.

Respondents' "logic" is as follows: Petitioners seek release from potentially indefinite detention without charge; by "releasing" Petitioners *into* potentially indefinite detention without charge in another country, Respondents have given Petitioners everything they have asked for in their *habeas* petitions. This is logic from "Alice in Wonderland."

Unsurprisingly, many Judges, including this Court, have rejected it. *See Abdah v. Bush*, No. 04-CV-1245 (HHK) (RMC), 2005 WL 589812, at *4 (D.D.C. Mar. 12, 2005) ("Were the Petitioners to be transferred to the control of a foreign country, they would effectively lose their rights to pursue their *habeas* claims in this country. The Court finds that their injury would be continued detention outside the jurisdiction of the U.S. courts – courts that are actively reviewing the constitutionality of that very detention. . . . [A] continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners."); *see also Abdah v. Bush*, No. 04-CV-1254 (HHK), 2005 WL 711814, at *4 (D.D.C. Mar. 29, 2004) ("Such transfers would eliminate any opportunity for Petitioners to ever obtain a fair adjudication of their fundamental right to test the legitimacy of [their] executive detention."

(internal quotation and citation omitted)); *Al-Joudi v. Bush*, No. 05-CV-301 (GK), 2005 WL 774847, at *4 (D.D.C. Apr. 4, 2005) ("Petitioners face the threat of irreparable harm based on the potential elimination of their *habeas* claims. . . . Since such a turn of events would certainly constitute a threat of irreparable harm, an order preserving the status quo in this case is appropriate.").

While it may be true as a practical matter that a U.S. court is powerless to prevent by injunctive means irreparable harm to an individual in the custody of a foreign government, that says nothing whatsoever about a U.S. court's power to prevent such harm from occurring *before* the individual has been transferred, while he is still in U.S. custody, has validly invoked the jurisdiction of the court, and claims to be wrongly detained. In *Abdah*, this Court stated:

> There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul*, 124 S. Ct. at 2698. There is also no doubt that the All Writs Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction.

2005 WL 589812, at *4 (internal quotation omitted). Given that Petitioners' custodians have repeatedly made plain that they "expect[] that there will be other transfers," *see* July 20, 2005 DOD News Release, the threat to the Court's jurisdiction is "not distant or speculative." *Al-Joudi*, 2005 WL 774847, at *4.

Finally, Respondents argue that Petitioners are not threatened with irreparable harm because, after release from U.S. custody, "any subsequent confinement in the receiving country is based upon the receiving government's independent decision, based on its domestic laws, that the individual should be detained." Resp. Br., at 10. This formalistic argument ignores the practical realities of transfer. If Respondents transfer an individual they contend is an enemy combatant, the receiving country will naturally have a far greater interest in investigating and detaining him further. Conversely, a finding prior to transfer by a neutral decision maker

that the individual's detention was in error or illegal, as Petitioners contend, cannot help but influence the receiving government's "independent decision" regarding whether further detention is warranted.

**B.      Respondents Generally Summarized Policies and Procedures Do Not Obviate the Threat that Petitioners May Be Subjected to Indefinite Detention and Torture Upon Transfer**

Respondents argue that only "unfounded speculation" supports Petitioners' claim that they are at risk of indefinite detention and torture if transferred to the custody of Afghanistan or Pakistan. Resp. Br., at 13. Regardless of the government's generally stated policies, it is undisputed that Respondents have transferred dozens of Guantanamo detainees to countries like Pakistan and Saudi Arabia for continued detention, and that the U.S. State Department has concluded that these countries torture prisoners.

Respondents attach to their opposition a declaration from a State Department official describing the U.S. policy against transferring a person to a country where it is more likely than not that the person will be tortured. *See* Prosper Decl. ¶ 4. The declaration states that this policy is "consistent" with the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("Convention Against Torture"), and the Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Refugee Convention"). *See* Prosper Decl. ¶ 4. Pakistan, however, has never signed the Convention Against Torture, and neither Pakistan nor Afghanistan are parties to the Refugee Convention. The declaration goes on to state that "[t]he Department of State considers whether the State in question is party to the relevant treaties, such as the Torture Convention, and pursues more specific assurances if the State concerned is not a party . . . ." Prosper Decl. ¶ 6. It also states that the conclusions presented in the State Department's annual Country Reports on human rights "are important in evaluating foreign government assurances." *Id.* ¶ 7.

Respondents do not deny that the State Department's 2004 Country Report for Afghanistan concludes that prisoners detained in Afghanistan are at risk of indefinite detention without due process and torture in prisons beyond the reach of the Afghan legal system. Likewise, the 2004 Country Report for Pakistan concludes that torture is commonplace in Pakistan's prisons.  In 2004, 29 Guantanamo detainees were transferred to Pakistan for continued detention.  *See* U.S. Dept. of Defense News Release (Sept. 18, 2004), *available at* http://www.defenselink.mil/releases/2004/nr20040918-1363.html (last visited July 28, 2005).

Without ever addressing the specific findings of these reports, Respondents try to explain them away by stating generally that:

> Country Reports may describe problems that are confined to a particular facility or component of a government, may reflect certain types of fact patterns that are not applicable to the situation at hand, or may raise concerns that can be appropriately addressed through assurances from the receiving government . . . .

Resp. Br., at 6 n.5.  Notably, nothing in the Country Reports for Afghanistan or Pakistan suggests that Petitioners' torture concerns are misplaced.  Indeed, notwithstanding whatever "assurances" the U.S. government obtained from Pakistan before transferring 29 detainees there for continued detention in 2004, the State Department concluded in that same year that "[s]ecurity force personnel continued to torture persons in custody throughout the country."  U.S. DEP'T OF STATE, *Country Reports on Human Rights Practices, Pakistan* § 1(c), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41743.htm.  Respondents' implicit suggestion that it must have been some other prisoners that were tortured "throughout the country" is not particularly reassuring.

To be sure, Petitioners do not claim that U.S. policy is a "sham or pretext."  Resp. Br., at 12.  Simply put, however, given the State Department's own evaluation of detention conditions in Afghanistan and Pakistan, and the effect that transfer without notice will have on

Petitioners' *habeas* claims and this Court's jurisdiction, the grave risk that Afghanistan's and Pakistan's "assurances" of proper treatment may be unreliable is sufficient evidence of irreparable harm to justify issuance of the requested injunction. *See Al-Joudi,* 2005 WL 774847, *4 ("While the Government presents declarations that attempt to mitigate these concerns, they neither refute nor render them frivolous. . . . In short, the threatened injury is not merely remote and speculative; it is a serious potential threat.").

## III.    PETITIONERS HAVE RAISED SERIOUS QUESTIONS GOING TO THE MERITS THAT ARE A FAIR GROUND FOR LITIGATION

In *Rasul*, the Supreme Court held that Petitioners have the right to invoke the *habeas* jurisdiction of this Court, and that Petitioners have stated a claim upon which relief can be granted. 124 S. Ct. at 2698 & n.15. Judge Green has ruled that Petitioners have enforceable rights under the Due Process Clause. 355 F. Supp. 2d at 463-64. This easily meets the "fair ground for litigation" standard. *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844. Respondents, however, mischaracterize the relevant merits inquiry and argue that the Court has no power to grant the requested relief anyway. Both arguments are flawed.

### A.    Petitioners' Request for Thirty Days' Notice of Transfer Is Inextricably Linked to Their Substantive *Habeas* Claims

Respondents claim that Petitioners cannot show a likelihood of success on the merits, claiming that the only relevant inquiry is whether Petitioners have a legal basis to "prevent[] termination of detention." Resp. Br., at 14 (emphasis in original). The distinction Respondents try to draw between Petitioners' substantive claims and the injunctive relief they seek to allow those substantive claims to be adjudicated is artificial and unjustifiable. Preventing transfer outright is not the only possible outcome. The proper resolution of Petitioners' substantive claims will affect the *type* of transfer, not just the *fact* of transfer.

Respondents admit that there are at least two types of transfers – transfers for release and transfers for continued detention. Prosper Decl. ¶ 3; Waxman Decl. ¶ 3. The path transferred detainees take depends on whether they "meet the criteria of enemy combatants or no longer pose a continuing threat to the U.S. security interests." Prosper Decl. ¶ 3. The sufficiency of the process afforded in the Combatant Status Review Tribunals ("CSRTs") is precisely the focus of the substantive claims in the Petitions.

If, as Petitioners contend, the CSRT process was legally deficient, the rectification of those deficiencies will markedly affect the circumstances of transfer for a detainee incorrectly labeled an enemy combatant. Respondents' contention to the contrary ignores their own description of how the transfer process works. There is no need to require a receiving country "to take the steps necessary to ensure that [an alleged enemy combatant] will not pose a continuing threat to the United States," *id.* ¶ 3, if a neutral decision maker has concluded that the detainee should never have been designated an enemy combatant in the first place. Thus, contrary to Respondents' suggestion, were Petitioners granted relief on their substantive *habeas* claims, they would assuredly not be in "precisely the same position in which they find themselves now." Resp. Br., at 15. Transfer without notice, however, would preclude such a result; transfer to a country where they are at substantial risk of indefinite detention and torture only compounds the injury.

Respondents' opposition improperly assumes that the allegations in the Petitions are wrong – that Petitioners "are part of . . . a deadly insurgency by lurking Taliban and al Qaeda elements." Resp. Br., at 12 n.10. That puts the rabbit in the hat. *See Abdah v. Bush*, 2005 WL 711814, at *6 ("Petitioners' current designation as enemy combatants is not a foregone conclusion; challenges to the accuracy and legitimacy of the government's determination that

Petitioners have engaged in hostilities against the United States, or aided those who have, are the very core of Petitioners' underlying habeas claims."). As this Court held in the *Abdah* TRO proceeding:

> Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before the Court of Appeals and . . . they raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the Executive.

2005 WL 589812, at *4. The Court should come to the same conclusion here.[3]

### B.     The Separation-of-Powers Doctrine Does Not Bar the Court from Requiring Thirty Days' Notice of Transfer

Respondents argue, as they have at every other opportunity in the Guantanamo detainee litigation, that the separation-of-powers doctrine precludes judicial review of any government action that falls within the realm of "foreign relations." Resp. Br., at 22. This argument sweeps far too broadly and flies in the face of the Supreme Court's decision in *Rasul* establishing Petitioners' rights to challenge the lawfulness of their Executive detention by way of a habeas petition, and Judge Green's ruling that Petitioners have enforceable Due Process rights. An injunction ordering the limited relief requested here would in no way violate separation-of-powers principles.

In *Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004), the Supreme Court addressed, and rejected, Respondents' overbroad interpretation of the separation-of-powers doctrine. The Supreme Court specifically noted the pivotal role of the *habeas* writ in challenging the

---

[3]     Respondents also argue that Federal Rule of Civil Procedure 23(a) does not provide a basis for requiring notice of transfer because Petitioners' cases are not on appeal. Resp. Br., at 16. As Petitioners noted in their opening brief, the Court clearly has the power under the All Writs Act, 28 U.S.C. § 1651(a), to address the harm that Rule 23(a) seeks to prevent: attempts to interfere with *habeas* jurisdiction by transferring the petitioner.

lawfulness of Executive detention, which could not be diminished or eliminated by Respondents'
invocation of war powers:

> Whatever power the United States Constitution envisions for the
> Executive in its exchanges with other nations or with enemy
> organizations in times of conflict, it most assuredly envisions a
> role for all three branches when individual liberties are at stake. . . .
> [W]e have made clear that, unless Congress acts to suspend it, the
> Great Writ of habeas corpus allows the Judicial Branch to play a
> necessary role in maintaining this delicate balance of governance,
> serving as an important judicial check on the Executive's
> discretion in the realm of detentions.

124 S. Ct. at 2650; *see also INS v. St. Cyr*, 533 U.S. 289, 301 (2001) ("At its historical core, the

writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and

it is in that context that its protections have been strongest."). Similarly, in the context of

deportable aliens, federal courts have issued orders under the All Writs Act to prevent the

government from deporting individuals before a court could review the legality of the underlying

order of deportation. *See, e.g., Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995).

 If Petitioners have rights to judicial review of their detentions by the Executive,

and such review does not violate the separation-of-powers doctrine, this Court must be able to

protect its ability to conduct such review without running afoul of the separation of powers.[4]

---

[4] The cases cited by Respondents do not diminish the force of this principle. In *Holmes v.
Laird*, 459 F.2d 1211 (D.C. Cir. 1972), U.S. servicemen duly charged, tried and
convicted in a West German court, and whose convictions were upheld on appeal, sought
an order from a U.S. court preventing their removal to West Germany to serve their
sentences. The court acknowledged that not every dispute "touching on our foreign
relations falls outside the province of the judiciary," but ruled that the surrender of the
servicemen was required by *treaty. Id.* at 1215, 1218. Here, Respondents do not ask for
deference to any treaty or similar instrument. Instead, they broadly invoke "foreign
relations" and "diplomatic matters" to thwart an established right to judicial review of
matters involving the life and liberty of individuals who have never been charged, tried,
convicted or subjected to any form of fair process. Respondents' reliance on *People's
Mojahedin Org. v. Dep't of State,* 182 F.3d 17, 23-24 (D.C. Cir. 1999), is similarly
misplaced. There, the court refused to entertain petitions for review by two groups
designated by the Secretary of State as "foreign terrorist organizations" under the detailed

### C.  **The Rule of Non-Inquiry Does Not Bar the Requested Injunction**

Respondents also broadly invoke the Rule of Non-Inquiry as a bar to relief.  Resp. Br., at 22-23.  The Rule of Non-Inquiry, however, is not an all-purpose separation-of-powers/foreign affairs doctrine, as Respondents suggest.  Its application depends entirely on the existence of an extradition treaty, the existence of which "indicates that, at least in a general sense, the executive and legislative branches consider the treaty partner's justice system sufficiently fair to justify sending accused persons there for trial."  *In re Extradition of Howard*, 996 F.2d 1320, 1329 (1st Cir. 1993); *see also Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) (Holmes, J.) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair.").

The United States and Afghanistan have not entered into an extradition treaty to which this Court could defer.  Respondents have offered no evidence that Pakistan seeks to extradite Petitioners.  Ironically, whereas Respondents insist they can transfer Petitioners without notice, process or review, extradition occurs *only* after a statutory process that "interpose[s] the judiciary between the executive and the individual."  *Lo Duca v. U.S.*, 93 F.3d 1100, 1103 (2d Cir. 1996); 18 U.S.C. § 3184.  Respondents cannot have it both ways:  They cannot invoke extradition's Rule of Non-Inquiry but disclaim extradition's procedural protections.

### IV.  **THE BALANCE OF HARMS HEAVILY FAVORS PETITIONERS**

It is difficult to imagine how merely requiring thirty days' advance notice of transfer will cause the vast damage to U.S. foreign policy interests that Respondents ominously predict in their opposition brief.  Respondents claim that requiring notice will "have a chilling effect on and cause damage to our ability to conduct foreign relations," will "jeopardize the

---

administrative scheme in 8 U.S.C. § 1189.  Here, by contrast, Petitioners seek vindication of their most fundamental rights.

cooperation of other nations in the war on terrorism," and will cause "separation-of-powers harm

by undermining the ability of the Executive Branch to speak with one voice in its dealings with

foreign nations." Resp. Br., at 7, 22, 26.

In *Abdah v. Bush*, Judge Kennedy found that Respondents' parade of horribles

was unconvincing and bore no causal relationship to Petitioners' requested relief:

> Beyond these vague premonitions, however, the court does not
> have any indication that notifying Petitioners' counsel 30 days
> ahead of planned transfers of their clients will intrude upon
> executive authority. The preliminary injunction Petitioners seek
> will not require, or even enable, the court to take the two *specific*
> actions which Respondents warn against: forcing State Department
> officials to "unilaterally . . . disclose outside appropriate Executive
> branch channels its communications with a foreign government
> relating to particular mistreatment or torture concerns," . . . and
> publicly disclosing the facts gathered and analyses prepared by
> various State Department offices, or bringing these findings "to the
> attention of officials and others in foreign States . . . ."

2005 WL 711814, at *5. Judge Kennedy ultimately concluded that the balance of harms favored

Petitioners:

> While the injunction Petitioners seek might restrict or delay
> Respondents with respect to one aspect of managing Petitioners'
> detention, such a consequence  does not outweigh the imminent
> threat facing Petitioners with respect to the *entirety* of their claims
> before the court.

*Id.* at *6. Similarly, in *Al-Joudi v. Bush*, Judge Kessler concluded:

> The Court fails to see any injury whatsoever that the Government
> would suffer from granting the requested preliminary injunction.
> . . . [G]ranting Petitioners' request for 30 days' notice of transfer
> would not require the Court to second-guess foreign policy
> decisions of the Executive, would not require the Government to
> divulge information relating to its negotiations with foreign
> governments, and would not prevent the Government from
> speaking with one voice.

2005 WL 774847, at *5.

Respondents' claims of harm rest on the unsupported assumption that notice will automatically lead to the wholesale disclosure of confidential information. Respondents have no basis to equate judicial review – much less a notice requirement – with unrestricted disclosure. The protective order in this case is specifically designed to protect against such harms, and the Court can structure proceedings, to the extent any proceedings are necessary after notice has been provided, to minimize potential harm to government interests. *Cf. Hamdi*, 124 S. Ct. at 2650 ("We have no reason to doubt that courts faced with these sensitive matters will pay proper heed both to the matters of national security that might arise in an individual case and to the constitutional limitations safeguarding essential liberties that remain vibrant even in times of security concerns.").

## V.     RESPONDENTS CONFLATE THE PUBLIC <u>INTEREST WITH THEIR OWN POSITION</u>

Respondents argue that "[t]he public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as the detention of enemy combatants. . . and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility." Resp. Br., at 26. Respondents essentially conflate the public interest with their own legal position.

The Constitution, however, presupposes that the public interest and the government's interest are not always co-extensive. *See In re Guantanamo Detainee Cases,* 355 F.Supp.2d at 464 ("Of course, it would be far easier for the government to prosecute the war on terrorism if it could imprison all suspected 'enemy combatants' at Guantanamo Bay without having to acknowledge and respect any constitutional rights of detainees. That, however, is not the relevant legal test. By definition, constitutional limitations often, if not always, burden the abilities of government officials to serve their constituencies."). It is also misleading to describe

the relevant interest here as the government's ability to detain and transfer "enemy combatants." "Petitioners' current designation as enemy combatants is not a foregone conclusion. . . [T]he public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process." *Abdah v. Bush*, 2005 WL 711814, at *6.

## CONCLUSION

Respondents' general statements of U.S. policy and unsupported claims of damage to the government's ability to conduct foreign relations do not outweigh the real risks of irreparable harm that Petitioners face. The Supreme Court has ruled that Petitioners have the right to seek review of their potentially indefinite detention as "enemy combatants." This Court indisputably has the power to protect its ability to conduct such a review.

For the foregoing reasons, and for the reasons stated in their initial memoranda of law, Petitioners respectfully request that the Court grant their motions and enter orders in the above-captioned cases requiring Respondents to provide thirty days' advance notice to the Court and counsel of any transfer of Petitioners from Guantanamo for purposes other than release.

Dated:  July 28, 2005

Respectfully submitted,

DECHERT LLP
*Counsel for Petitioners*


By: _R. Michael Smith_____
R. Michael Smith
D.C. Bar No. 372654
1775 Eye Street, N.W.
Washington, D.C.  20006
202.261.3300

Daniel C. Malone
DECHERT LLP
30 Rockefeller Plaza
New York, NY  10112
212.698.3500

George G. Gordon
Peter M. Ryan
DECHERT LLP
1717 Arch Street
Philadelphia, PA  19103-2793
215.994.4000

## CERTIFICATE OF SERVICE

I, R. Michael Smith, hereby certify that on July 28, 2005, I caused to be served

via email true and correct copies of the foregoing Reply Brief in Support of Petitioners' Motions

for Preliminary Injunction Directing Respondents to Provide the Court and Petitioners' Counsel

with Thirty Days' Advance Notice of Any Intended Transfer from Guantanamo for Purposes

Other Than Release on the following counsel of record for Respondents:

Preeya M. Noronha
Preeya.Noronha@usdoj.gov
United States Department of Justice
Civil Division - Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7226
Washington, D.C.  20530
(202) 514-3338

Terry M. Henry
Terry.Henry@usdoj.gov
Senior Trial Attorney
United States Department of Justice
Civil Division - Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7144
Washington, D.C.  20530

Andrew I. Warden
Andrew.Warden@usdoj.gov
Trial Attorney
United States Department of Justice
Civil Division - Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7144
Washington, D.C.  20530

R. Michael Smith

# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAHMOAD ABDAH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1254 (HHK) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

SECOND DECLARATION OF MATTHEW C. WAXMAN

I, Matthew C. Waxman, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

    1.    I am the Deputy Assistant Secretary of Defense for Detainee Affairs in the Department of Defense ("DoD"). My office is organized under the office of the Under Secretary of Defense for Policy. The office of Detainee Affairs, which I supervise, is responsible for providing policy advice to the Under Secretary of Defense on matters regarding detainees in DoD control. I have served in this position since August of 2004. I make the statements in this declaration based upon my personal knowledge and upon information made available to me in the performance of my official duties.

    2.    The declaration dated March 8, 2005, that I provided in this case regarding the transfer of detainees under DoD control at the United States Naval Base at Guantanamo Bay, Cuba ("GTMO detainees"), was, and remains, accurate, except that DoD has transferred, for release, three additional GTMO detainees, who were determined no longer to be enemy combatants by a Combatant Status Review Tribunal. This transfer was effected on Saturday, March 12, 2005.

    3.    I have read the Memorandum Opinion in support of the Temporary Restraining Order entered in this case on March 12, 2005, as well as the article entitled, "Pentagon Seeks to Transfer More Detainees From Base in Cuba," contained in March 11, 2005 issue of the <u>New York Times</u>.

    4.    There is no plan being considered now, or that has been considered in the recent past, to effect an immediate transfer of large numbers of GTMO detainees out of GTMO, including to other countries. Nor is there any plan to effect transfers of GTMO detainees in order to thwart the actual or putative jurisdiction of any court with respect to detainees.

Transfers of detainees in DoD control at Guantanamo are undertaken in accordance with the policy and process outlined in my prior declaration.

5.    No transfer of any current habeas petitioner in this or the other pending habeas cases brought by individual, named GTMO detainees, other than for release as a result of being determined by a CSRT to no longer be an enemy combatant, is currently scheduled and, in all events, any transfer of any such petitioner, including those for release, would be several weeks away, at a minimum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 16, 2005.

Matthew C. Waxman

- 3 -