# EXHIBIT A

## I. Three Guantanamo Bay Detainees Die of Apparent Suicide

By Sgt. Sara Wood, USA
American Forces Press Service

WASHINGTON, June 10, 2006 – Three detainees at U.S. Naval Station Guantanamo Bay, Cuba, died of apparent suicides early this morning, military officials reported today.

Two Saudis and one Yemeni, all located in Camp 1 of the detention center, were found unresponsive and not breathing in their cells, Navy Rear Adm. Harry B. Harris, commander of Joint Task Force Guantanamo, said in a news conference. The first detainee was found shortly after midnight, and the other detainees were found within minutes, Harris said.

Medical teams responded quickly and all three detainees were provided immediate emergency medical treatment in attempts to revive them, Harris said. The three detainees were pronounced dead by a physician after all lifesaving measures had been exhausted, he said.

Harris, who arrived on the scene shortly after the detainees were pronounced dead, said the guard force and medical personnel acted in a professional manner and did everything they could to save the detainees' lives.

"I could see on the faces of the doctors, nurses and corpsmen that they were mourning the loss of a patient," Harris said. "They did exactly what they were trained to do."

The names of the deceased are not being released pending an investigation, said Army Gen. Bantz J. Craddock, commander of U.S. Southern Command. The U.S. State Department is in ongoing discussions with the governments of Saudi Arabia and Yemen in regards to the handling of the detainees' remains and notification of next of kin, he said.

A cultural advisor is assisting Joint Task Force Guantanamo to ensure that the remains are handled in an appropriate cultural and religious manner, Harris said. The bodies will not be buried within 24 hours, as per normal Islamic law, because autopsies must be performed, he said, but Joint Task Force Guantanamo has a religious fatwah, or law, from a reputable imam allowing for delays when the cause of death is uncertain.

The U.S. Naval Criminal Investigative Service has initiated an independent investigation to determine the cause and manner of death, Craddock said.

The detainees appear to have hanged themselves with nooses made from clothing and bed sheets, Harris said. The three detainees' cells were on the same cell block and were near each other, but not next to each other, he said.

Harris said the joint suicides were clearly planned by the detainees as a way to advance their

cause in the war on terror.

"I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantanamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."

The three detainees who died had all participated in a hunger strike at one time, Harris said. The Yemeni detainee was a long-term hunger striker who had begun his strike in 2005 and just ended it last month, he said. The other two detainees participated in one hunger strike in 2005 and another short one this year, he said.

The three detainees were not charged under military commissions and were not being actively interrogated, Harris said.

None of the three detainees had attempted suicide before, Harris said. Craddock added that all three had gone through combatant status review boards and administrative review boards, and none were on medication or had any indication of mental illness.

Harris said he believes the detainees were acting on a rumor circulating in the camps at Guantanamo that says three detainees must die for all the detainees to be released. This rumor has no basis and is not encouraged by the guard force, he said.

The suicides are not thought to be linked to the June 8 death of terrorist leader Abu Musab al Zarqawi, Harris said, because the detainees at Guantanamo do not yet know of his death.

All three detainees left suicide notes in Arabic, which are being included in the investigation, Craddock said.

The servicemembers at Guantanamo Bay are dedicated and, together with Joint Task Force Guantanamo leaders, have worked hard to ensure the conditions don't exist to allow for suicides, Harris said. However, the enemy combatants at Guantanamo are a determined group that will do anything they can to advance their cause, he said.

"These are dangerous men, and they're not here by accident or happenstance," he said.

Joint Task Force Guantanamo leaders are already reviewing procedures to look for ways to ensure things like this won't happen in the future, Harris said. For example, the guards have begun taking bed sheets away from detainees in the morning and giving them back at night, he said.

"We remain focused on our mission; it's a vital mission in the global war on terror," he said.

# EXHIBIT B

## Three Guantanamo Detainees Die, US Army

11/06/2006

MIAMI (Reuters) - Three foreign prisoners being held at the U.S. navy base at Guantanamo Bay, Cuba, died on Saturday in apparent suicides, the U.S. military said.

"Two Saudis and one Yemeni, each located in Camp 1, were found unresponsive and not breathing in their cells by guards," U.S. Southern Command said in a statement.

The military said attempts to resuscitate the detainees failed and they were pronounced dead by a physician at Guantanamo, which holds just under 500 foreigners captured mainly in the U.S. war against the Taliban in Afghanistan.

The Pentagon scheduled a briefing for later Saturday.

Bush, spending the weekend at Camp David, was notified of the incident. The State Department was consulting with the governments of the home countries of the three prisoners, whose names were not being released.

The military said in its statement that "all lifesaving measures had been exhausted" in the attempt to revive the detainees. The remains were being treated "with the utmost respect," an issue important to Muslims. A cultural adviser was assisting the military.

Though the military termed the deaths suicides, the Naval Criminal Investigative Service was investigating to establish the official cause and manner of death.

A U.N. panel said May 19 that holding detainees indefinitely at Guantanamo violated the world's ban on torture. The panel said the United States should close the detention center.

German Chancellor Angela Merkel, Danish Prime Minister Anders Fogh Rasmussen and British Attorney General Lord Goldsmith are among those who also recently have urged the United States to close the prison.

On Friday, after the prison came up during a meeting with Fogh Rasmussen at Camp David, Bush said his goal is to do just that.

"We would like to end the Guantanamo — we'd like it to be empty," Bush said. But he added: "There are some that, if put out on the streets, would create grave harm to American citizens and other citizens of the world. And, therefore, I believe they ought to be tried in courts here in the United States."

Bush said his administration was waiting for the Supreme Court to rule whether he overstepped his authority in ordering the detainees to be tried by U.S. military tribunals. "We're waiting on our

Supreme Court to act," he said.

Moazzam Begg, 37, a British Muslim who spent three years in U.S. detention, including two years at Guantanamo before being released in 2005, told The Associated Press, "We all expected something like this but were not prepared. It's just awful. I hope the Bush administration will finally see this is wrong."

There have been increasing displays of defiance from Guantanamo Bay prisoners, who have been held for up to 4 1/2 years with many claiming their innocence.

Until now, Guantanamo officials have said there have been 41 suicide attempts by 25 detainees and no deaths since the U.S. began taking prisoners to the base in January 2002. Defense lawyers contend the number of suicide attempts is higher.

On May 18, in one of the prison's most violent incidents, a detainee staged a suicide attempt to lure guards into a cellblock where they were attacked by prisoners armed with makeshift weapons, the military said. Earlier that day, two detainees overdosed on antidepressants they collected from other detainees and hoarded in their cells. The men have since recovered.

There also has been a hunger strike among detainees since August. The number of inmates refusing food dropped to 18 by last weekend from a high of 131. The military has at times used aggressive force-feeding methods, including a restraint chair. Force-feeding is performed through tubes inserted into the nose.

Physicians for Human Rights has called on the United States to halt the "brutal and inhumane force-feeding tactics." U.S. officials have said the measures are "safe and humane" and have been used in American civilian prisons.

————

Associated Press writer Paisley Dodds in London contributed to this report.

**SOURCE: Reuters and Associated Press**

# EXHIBIT C





UNITED STATES
# NAVAL CRIMINAL INVESTIGATIVE SERVICE
*Beyond Boundaries*

HOME    ABOUT NCIS    MISSION    LOCATIONS    HELPFUL INFO    JOIN

People

**Leadership**

Director

Deputy Director for Operations

Deputy Director for Management and Administration

Executive Assistant Director - Pacific

Executive Assistant Director - Atlantic

Executive Assistant Director - Criminal Investigations

Executive Assistant Director - Counterintelligence

Executive Assistant Director - Combating Terrorism

Purpose

History

Today's NCIS

Frequently Asked Questions

## Leadership

NCIS is a predominantly civilian agency, with civilian leadership reporting directly to the Secretary of the Navy.

This arrangement—unique in America's military community—provides both a close relationship with the uniformed naval services and a valuable objectivity. NCIS provides support to the Navy and Marine Corps, but also has the authority to initiate investigations and operations on its own.

Director Thomas A. Betro, formerly Deputy Director for Operations, was appointed by Secretary of the Navy Donald C. Winter in January 2006 to lead the agency. Working with him are two Deputy Directors, and five Executive Assistant Directors.



PRIVACY POLICY    SECTION 508    SITE MAP    LINKS

# Department of Defense



**Secretary of Defense**

**Deputy Secretary of Defense**

**Date: March 2000**

**Joint Chiefs of Staff**
Chairman JCS
The Joint Staff
Vice Chairman JCS
Chief of Staff, Army
Chief of Naval Operations
Chief of Staff, Air Force
Commandant, Marine Corps

**Inspector General**

**Office of the Secretary of Defense**
Under Secretaries
Assistant Secretaries of Defense and Equivalents

**Unified Combatant Commands**
Central Command
European Command
Joint Forces Command
Pacific Command
Southern Command
Space Command
Special Operations Command
Strategic Command
Transportation Command

**Department of the Army**
Secretary of the Army
Under Secretary and Assistant Secretaries of the Army
Chief of Staff Army

**Department of the Navy**
Secretary of the Navy
Under Secretary and Assistant Secretaries of the Navy
Chief of Naval Operations
Commandant of Marine Corps

**Department of the Air Force**
Secretary of the Air Force
Under Secretary and Assistant Secretaries of the Air Force
Chief of Staff Air Force

Army Major Commands & Agencies

Navy Major Commands & Agencies

Marine Corps Major Commands & Agencies

Air Force Major Commands & Agencies

**DoD Field Activities**
American Forces Information Service
Defense POW/MP Office
DoD Education Activity
DoD Human Resources Activity
Office of Economic Adjustment
TRICARE Management Activity
Washington Headquarters Services

**Defense Agencies**
Ballistic Missile Defense Organization
Defense Advanced Research Projects Agency
Defense Commissary Agency
Defense Contract Audit Agency
Defense Contract Management Agency
Defense Finance and Accounting Service
Defense Information Systems Agency
Defense Intelligence Agency
Defense Legal Services Agency
Defense Logistics Agency
Defense Security Cooperation Agency
Defense Security Service
Defense Threat Reduction Agency

National Imagery and Mapping Agency*
National Security Agency/Central Security Service*
*Reports direct to Secretary of Defense

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HANI SALEH RASHID ABDULLAH, *et al.*,   )

       Petitioners/Plaintiffs,   )

       v.   )     Civil No.  05-0023 (RWR)

GEORGE W. BUSH, *et al.*,   )

       Respondents/Defendants.   )

---

### NOTICE OF FILING OF
### MOTION TO MODIFY STAY TO DIRECT RESPONDENTS TO RETURN
### IMPOUNDED PRIVILEGED LEGAL MATERIAL AND FOR OTHER RELIEF

       Petitioner Hani Saleh Rashid Abdullah, through his undersigned counsel, hereby

gives notice of filing of his Motion To Modify Stay To Direct Respondents To Return

Impounded Privileged Legal Material And For Other Relief.

       Respectfully submitted,

*Of Counsel*

Barbara J. Olshansky
Director Counsel
Gitanjali S. Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: 212.614.6439
Fax: 212.614.6499

      /s/ Charles H. Carpenter
      Charles H. Carpenter (DC Bar No. 432004)
      Pepper Hamilton LLP
      600 Fourteenth Street, N.W.
      Washington, D.C. 20005-2004
      Tel:  202.220.1507
      Fax: 202.220.1665

      Stephen M. Truitt (DC Bar No. 13235)
      Hamilton Square, Suite 600
      600 Fourteenth Street, N.W.
      Washington, D.C. 20005-2004
      Tel:  202.220.1452

Dated:   July 5, 2006      Fax: 202.220.1665

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Habib v. Bush | ) | Case No. 02-CV-1130 (CKK) |
| Begg v. Bush | ) | Case No. 04-CV-1137 (RMC) |
| Khalid (Benchellali) v. Bush | ) | Case No. 04-CV-1142 (RJL) |
| Mustapha v. Bush | ) | Case No. 04-CV-0022 (JR) |
| Salahi v. Bush | ) | Case No. 05-CV-0569 (JR) (Consolidated with 05-CV-0881) (Consolidated with 05-CV-0995) |
| Al Rashaidan v. Bush | ) | Case No. 05-CV-0586 (RWR) |
| Mokit v. Bush | ) | Case No. 05-CV-0621 (PLF) |
| Ahmed v. Bush | ) | Case No. 05-CV-0665 (RWR) |
| Battayav v. Bush | ) | Case No. 05-CV-0714 (RBW) |
| Hamlily v. Bush | ) | Case No. 05-CV-0763 (JDB) |
| Rahman v. Bush | ) | Case No. 05-CV-0882 (GK) |
| Bostan v. Bush | ) | Case No. 05-CV-0883 (RBW) |
| Nasrullah v. Bush | ) | Case No. 05-CV-0891 (RBW) |
| Shaaban v. Bush | ) | Case No. 05-CV-0892 (CKK) |
| Kahn v. Bush | ) | Case No. 05-CV-1001 (ESH) |
| Zuhoor v. Bush | ) | Case No. 05-CV-1011 (JR) |
| Ali Shah v. Bush | ) | Case No. 05-CV-1012 (ESH) |
| Salaam v. Bush | ) | Case No. 05-CV-1013 (JDB) |
| Alsawam v. Bush | ) | Case No. 05-CV-1244 (CKK) |
| Al Bihani v. Bush | ) | Case No. 05-CV-1312 (RJL) |

| | | |
|---|---|---|
| Ahmed Doe v. Bush | ) | Case No.  05-CV-1458 (ESH) |
| Amon v. Bush | ) | Case No.  05-CV-1493 (RBW) |
| Nabil v. Bush | ) | Case No.  05-CV-1504 (RMC) |
| Al Hawary v. Bush | ) | Case No.  05-CV-1505 (RMC) |
| Shafiiq v. Bush | ) | Case No.  05-CV-1506 (RMC) |
| Al Razak v. Bush | ) | Case No.  05-CV-1601 (GK) |
| Akhtiar v. Bush | ) | Case No.  05-CV-1635 (PLF) |
| Albkri v. Bush | ) | Case No. 05-CV-1639 (RBW) |
| Al-Siba'i v. Bush | ) | Case No.  05-CV-1667 (RBW) |
| Al-Uwaidah v. Bush | ) | Case No.  05-CV-1668 (GK) |
| Al-Jutaili v. Bush | ) | Case No.  05-CV-1669 (TFH) |
| Khandan v. Bush | ) | Case No.  05-CV-1697 (RBW) |
| Qasim v. Bush | ) | Case No.  05-CV-1779 (JDB) |
| Al-Harbi v. Bush | ) | Case No.  05-CV-1857 (CKK) |
| Aziz v. Bush | ) | Case No.  05-CV-1864 (HHK) |
| Hamoud v. Bush | ) | Case No.  05-CV-1894 (RMU) |
| Al-Asadi v. Bush | ) | Case No. 04-CV-2197 (HHK) |
| Amin v. Bush | ) | Case No.  05-CV-2336 (PLF) |
| Ben Bacha v. Bush | ) | Case No.  05-CV-2349 (RMC) |
| Al-Quhtami v. Bush | ) | Case No.  05-CV-2387 (RMC) |
| Almjrd v. Bush | ) | Case No.  05-CV-2444 (RMC) |

## NOTICE OF WITHDRAWAL OF RESPONDENTS' MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS AND REQUEST FOR EXPEDITED BRIEFING

Respondents hereby withdraw their July 7, 2006 Motion For Procedures Related To Review Of Certain Detainee Materials And Request For Expedited Briefing in the above-captioned cases. Respondents withdraw their motion with respect to the petitioners in the above-captioned cases because it has been determined that petitioners have not had attorney-client materials impounded for purposes of the ongoing investigation by the Naval Criminal Investigative Service ("NCIS") described in the motion, or because respondents have been unable to identify petitioners as detainees currently detained at Guantanamo.

Dated: July 20, 2006                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        DOUGLAS N. LETTER
                                        Terrorism Litigation Counsel

                                        ___/s/ Terry M. Henry___
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        TERRY M. HENRY
                                        JAMES J. SCHWARTZ
                                        PREEYA M. NORONHA
                                        ROBERT J. KATERBERG
                                        NICHOLAS J. PATTERSON
                                        ANDREW I. WARDEN
                                        EDWARD H. WHITE
                                        MARC A. PEREZ
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., N.W. Room 7144
                                        Washington, DC 20530
                                        Tel: (202) 514-4107

                                        Attorneys for Respondents

# EXHIBIT F

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SALIM SAID**, *et al.*, ) | |
| ) | |
| **Petitioners** ) | |
| ) | |
| v. ) | Civil Action No. 05-2384 (RWR)(AK) |
| ) | |
| **GEORGE W. BUSH**, *et al.*, ) | |
| ) | |
| **Respondents.** ) | |
| ) | |

## MEMORANDUM ORDER

Pending before the Court is Petitioners' Emergency Motion for an Order Directing

Respondents to Comply with Protective Order and To Facilitate Attorney Meetings with

Petitioners (Mot.) [19], Respondents' Opposition (Opp'n) [21] and Petitioners' Reply [22].[1]

Petitioners claim that Respondents have refused to permit counsel access to Petitioners as

required by the Protective Order. Petitioners further claim that Respondents denied counsel's

request to meet with their clients at the eleventh hour, after initially indicating that the meetings

would be permitted and allowing Petitioners' counsel to incur over $20,000 in non-refundable

airfare and translator fees. Respondents insist that counsel provide written evidence of their

---

[1]On November 2, 2005, in recognition of "the need to promote orderly and efficient case management of all *habeas* petitions . . . relating to the rights of [Guantanamo] detainees," Judge Kessler, acting as Chair of the Calendar and Case Management Committee referred all motions "pertaining to interpretation or construction of any protective order" entered in any of the Guantanamo *habeas* cases to the undersigned for resolution pursuant to LCvR 72.2(a). A party may seek reconsideration of a ruling by a magistrate judge within 10 days after being served with the magistrate judge's order. LCvR 72.2(b). Rulings issued by a magistrate judge pursuant to LCvR 72.2 are reviewed by the district court judge, in this case Judge Roberts, on a "clearly erroneous" or "contrary to law" standard. LCvR 72.2(c).

authorization to represent the Petitioner before counsel will be allowed to meet with their clients.
Upon consideration of the parties' filings to the Court, Petitioners' Motion is hereby
GRANTED.

## **Background**

The Petitioners in this case are Saudi nationals presently held by the United States
Government at the Guantanamo Bay Naval Station. They have been detained without charge and
held virtually incommunicado for more than four years. Three of the five Petitioners in this case
- Saad Al Qahtaani, Bandar Al Jaabir, and Mohammed Zahrani - initiated their *habeas* petitions
through a fellow detainee acting as a 'next friend,' Sami Muhyideen, Jamal Kiyemba and Omar
Deghayes, respectively. (Petition, Exs. B-D.) Petitioners sought the help of fellow detainees in
initiating a challenge to the legality of their detention and in finding counsel, until such time as
the detainees could meet with their own counsel directly. (*Id.*)

The "next friends" in this case - Muhyideen, Kiyemba and Deghayes - forwarded
Petitioners' names to their attorney, Clive Stafford Smith. (*Id.*) Smith then forwarded
Petitioners' names to the Center for Constitutional Rights, a national public interest organization
that has coordinated *pro bono* representation for the majority of Guantanamo detainees.
Attorneys with the law firm of Jenner & Block volunteered to represent Petitioners on a *pro bono*
basis and filed a *habeas* petition on their behalf on Dec. 13, 2005.

On March 15, 2006, Petitioners' filed a motion for entry of the Protective Order.[2] (See

---

[2]In recognition of the security concerns attendant to the Guantanamo *habeas* cases, the
Protective Order sets procedures that counsel must follow in order to meet and communicate
with their clients. The Protective Order was initially approved and entered by Judge Joyce Hens
Green in *In re Guantanamo Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004), following intense

Dkt. No. 6.) Respondents opposed entry of the Protective Order, in part on the grounds that

Muhyideen, Kiyemba and Deghayes lacked standing to file as 'next friends.' (*See* Resp'ts' Mem.

in Opp'n to Pet'rs' Mot. for Entry of Protective Order at 3-4, March 30, 2006, Dkt. No. 9.) On

April 12, 2006, Judge Roberts granted Petitioners' motion for entry of the Protective Order, over

Respondents' objection, in order "[t]o permit counsel access to petitioners." *See* Minute Order

of April 12, 2006.

On April 13, 2006, immediately after receiving notice that the Protective Order had been

entered, counsel for Petitioners contacted one of Respondents' counsel, Andrew Warden, to find

out if a visit to Guantanamo could be accommodated for the week of June 5, 2006. (Mot. at 2.)

Mr. Warden told Petitioners' counsel that the Guantanamo Bay schedule was clear for that week

and that "Jenner & Block attorneys should have no problem making the visits the week of June

5." (*Id.*) On April 18, counsel for Petitioners provided Respondents with the "Habeas Visitation

Coordination Sheets . . . specifically setting forth the requested dates and a schedule to meet with

each of the eight" detainees, including the three Petitioners at issue in this dispute. (*Id.*)

Between April 18 and May 9, counsel for Petitioners also retained the services of two translators,

and booked tickets and hotel rooms, at a non-refundable cost of over $20,000. (*Id.* at 2-3.)

According to Petitioners, "at no time between April 18 and May 9 did Respondents raise any

question about whether the planned June visit would be permitted." (*Id.* at 3.)

On May 10, 2006, Respondents notified Petitioners' counsel that they "'cannot consent to

_____

negotiation and litigation over its terms. *See Adem v. Bush*, __ F. Supp. 2d __, 2006 WL 751309,
at *3-5 (D.D.C. March 21, 2006) (reviewing history of negotiation and entry of Protective
Order), *recons. denied*, No. 05-723, slip op., 2006 WL 1193853 (D.D.C. April 28, 2006). It has
since been entered in the vast majority of Guantanamo *habeas* cases pending before the District
Court.

counsel meeting with petitioners Al Jaabir, Zahrani[3] . . . and Al Qahtaani' because those Petitioners had not directly authorized the filing of their habeas petitions, and their purported next friends . . . had not established proper standing." (*Id.*)  Petitioners now seek an order compelling Respondents to permit them access to their clients, in part so they may obtain the very authorization of representation that Respondents insist be provided prior to any visits.

<u>Analysis</u>

I.    *Interpretation of the Protective Order*

The question presented to the Court is a narrow one, namely, whether a detainee's right to meet with his counsel is conditioned on counsel providing direct, written "evidence of his or her authority to represent the detainee" before a visit, or whether counsel may provide such evidence after meeting with the detainee.  This question has been discussed at length in previous opinions, which held that the Protective Order, by its plain terms, "manifestly does not require evidence of authority to represent a detainee as a ***prerequisite*** to counsel meeting with a detainee." *See Adem v. Bush*, __ F. Supp. 2d __, 2006 WL 751309, at *9-11 (D.D.C. March 21, 2006), *recons. denied*, No. 05-723, slip op., 2006 WL 1193853, at *3-6 (D.D.C. April 28, 2006) (affirming magistrate judge's opinion and rejecting government's argument that evidence of authority to represent a detainee referred to a "two-step sequential showing"); *see also Kabir v. Bush*, No. 05-1704 (D.D.C. May 11, 2006) (Dkt. No. 33) (order granting motion to compel access to counsel).

The instant case is no different.  In fact, the question presented to the Court is identical to the question presented in *Adem*.  The only difference between *Adem* and the instant case is that

---

[3]Respondents contend that they have not been able to identify Mohammed Zahrani as a detainee at Guantanamo.  Petitioners have notified Respondents that they believe Zahrani's Internment Serial Number ("ISN") is 713.

4

*Adem* was filed as a direct petition and the instant case was filed as a 'next friend' petition. The Protective Order, however, does not distinguish between cases filed by a 'next friend' and cases filed directly. *See Adem*, 2006 WL 751309, at *10-13 (rejecting government's argument that the Protective Order requires additional authorization solely for *habeas* petitions initiated through a 'next friend').

Respondents persist in arguing that the Protective Order implicitly distinguishes between direct petitions and 'next friend' petitions. (Opp'n at 5, 11.) According to Respondents, the Court may ignore the plain language of the Protective Order because in those cases filed through a next-friend, the phrase "evidence of [counsel's] authority to represent a detainee" was intended to refer to two separate showings of evidence: 1) authorization by the "next friend," and 2) "a second, subsequent type of authorization, directly from the detainee, once counsel in a proper next friend case is provided access to the detainee." (*Id.* at 5.) Upon receiving this "second, subsequent type of authorization," the Court would then convert the "next friend" petition into a direct petition.

This Court already rejected Respondents' implied "two-layer" theory of interpretation in *Adem v. Bush*, which was upheld by Judge Roberts. The Court will not repeat the entirely of that extensive discussion here. Briefly, Respondents' interpretation would require the Court to ignore the plain meaning of the text of the Protective Order and to flaunt the most basic rules of construction. *See Adem*, 2006 WL 751309, at *9-11, *reconsid. denied*, 2006 WL 1193853, at *4-6 (affirming magistrate judge's opinion and rejecting government's argument that evidence of authority to represent a detainee referred to a "two-step sequential showing"). The Court cannot infer a separate two-step requirement applicable solely to 'next friend' petitions out of thin air.

5

*See id.* at \*7-11 (interpreting protective order); *see also Armstrong v. Executive Office of the President*, 830 F. Supp. 19, 22 (D.D.C. 1993) ("[g]iving plain meaning to [the] language" of the protective order).

Respondents' argument is also belied by the fact that a "proper next friend petition" under *Whitmore v. Arkansas*, 495 U.S. 149, 161-66 (1990) would not need to be converted into a direct petition in order to be litigated. Respondents' theory is tantamount to arguing that unless Petitioners' counsel provides a "second, subsequent authorization, directly from the detainee," neither this court, nor any other court, may entertain even those "next friend" petitions that clearly meet the *Whitmore* standing doctrine. To the contrary, however, a "proper" next friend petition is sufficient by itself to prosecute a case without any additional evidence of authority directly from the real party in interest.

Indeed, as this Court explained in *Adem*, following the Supreme Court's decision in *Rasul* and the negotiation and entry of the Protective Order, the legal fiction of a "next friend" became largely irrelevant except as a mechanism for identifying those detainees who seek to challenge their detention in the first instance. *See Adem*, 2006 WL 751309, at \*3-5 (reviewing history of use of 'next friend' device in Guantanamo *habeas* cases). In those *habeas* cases filed since the creation and entry of the Protective Order, the detainees who initiate a *habeas* petition on behalf of a fellow detainee generally do not seek to serve procedurally as a "next friend" in the traditional sense, but are simply passing on another detainee's request for help, a fact that can be confirmed once counsel meets directly with the detainee. *See id.*, at \*4-5; *see also Hamily v. Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19) (Order of J. Bates dismissing Shaker Aamer as next friend and substituting Adel Hamily as sole petitioner); *Zakirjan v. Bush*, No. 05-2053 (Dec.

12, 2005) (Dkt. No. 24) (Order of Oberdorfer, J. dismissing as moot government's "Motion to Show Cause Why Case Should Not Be Dismissed for Lack of Proper 'Next Friend' Standing" because detainee who was real party in interest authorized counsel to represent him directly); *Muhammed v. Bush*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17) (same); *Idris v. Bush*, No. 05-1555 (Nov. 1, 2005) (Dkt. No. 8) (same).

As was the case in *Adem*, the alleged 'next friends' in this case are not seeking to serve as next friends in the traditional sense, but are merely passing on another detainee's request for help in challenging his detention.[4] *See Adem*, 2006 WL 751309, at *3-7. Notwithstanding Petitioners' use of a 'next friend' to initiate the petition, Petitioners have provided prima facie evidence that they ***personally*** authorized the challenge to the legality of their detention and sought the assistance of counsel by communicating those requests through a fellow detainee. Omar Deghayes, the detainee who communicated Mohammed Zahrani's request for counsel, submitted a signed statement, witnessed by his attorney Clive Stafford Smith, listing the names of twelve detainees who had personally "expressed the desire to have the assistance of counsel." (Petition, Ex. D.) Sami Muhyideen, the detainee who filed on behalf of Saad Al Qahtaani, similarly submitted a signed statement, witnessed by his lawyer, stating that "the following people want lawyers" and listing the names of five detainees, including their detainee identification number, nationality and the language they spoke. (Petition, Ex. B.)

Finally, Jamal Kiyemba, who filed on behalf of Petitioner Bandar Al Jaabir, submitted a

---

[4]This is not to say that Respondents' challenge to Petitioners' next friend standing will necessarily be moot. Petitioners' challenge to their detention may ultimately need to proceed through a "next friend" if, for example, they are incapacitated or otherwise unable to personally verify their intent to challenge their detention within 10 days of a second visit.

signed statement listing the names of the detainees who had come to him seeking help, and

asserting that, "[i]ndependent of their reliance upon [him] as 'Next Friend,'" each of the named

detainees had a "specific desire for a lawyer and for a legal challenge to the illegality of their

detention by the United States of America." (Petition, Ex. C.)  Kiyemba lists the names of 27

detainees, their nationalities, the camps in which they are held, and for most, the languages they

speak.   In the margin by the name of one detainee, Kiyemba noted that he was "very ill."  (*Id.*)

Respondents argue that the Court should deny Petitioners' request for a meeting with

their lawyers because the purported 'next friends' have not supplied sufficient information for the

Court to trust that the Petitioners in fact made such a request.  (Opp'n at 15.)  Respondents

argument boils down to an assertion that the 'next friends' might be lying.[5]  However,

_____

[5]Notably, one of the detainees listed by Kiyemba as wanting counsel is Dr. Abu Muhammed, a/k/a Fethi Boucetta, a non-enemy combatant (NEC).  Respondents previously challenged Kiyemba's standing to serve as Boucetta's 'next friend' and similarly prohibited Boucetta from meeting with his counsel. (*See* Motion for Order to Show Cause, *Muhammed v. Bush*, 05-2087, Nov. 18, 2005, Dkt. No. 8.)  Respondents made the exact same arguments in Boucetta's case as they now make in opposition to allowing Petitioners access to their counsel.  Considering the circumstances under which Respondents' challenge to Kiyemba's next friend standing was resolved, the implication that Petitioners' requests are not sincere rings somewhat hollow.

Respondents' challenge to Kiyemba's next friend standing was rendered moot when Boucetta was able to communicate with counsel in person and confirm his desire for representation purely by accident.  Susan Baker Manning, who is counsel for other non-enemy combatant detainees, was in Guantanamo meeting with her clients. (*See* Decl. of Susan Baker Manning, *attached as* Ex. A to Pet.'s Mem. in Opp'n to Mot. for an Order to Show Cause, *Muhammed v. Bush*, No. 05-2087, Dec. 2, 2005, Dkt. No. 14).  During a break between meetings with her clients, Boucetta approached Ms. Baker Manning and asked her for help finding a lawyer. (*See id.*, ¶¶ 3-9.)  Upon learning that Boucetta had personally requested counsel, Judge Oberdorfer dismissed Kiyemba as 'next friend' and converted the case into a direct petition. *See Muhammed*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17).

Ms. Baker Manning was able to speak directly with Boucetta because he speaks passable English and because he is an NEC being held in Camp Iguana, a fortuity virtually guaranteed not to repeat itself.  In August of 2005, Respondents began housing non-enemy combatants detainees in a separate detention facility called "Camp Iguana."  (*See* Brigadier General Jay W. Hood Decl.

Respondents have provided no evidence to contradict the signed, witnessed statements that

Petitioners want to challenge their detention and that they asked Muhyiheen, Kiyemba and

Deghayes, respectively, to help them get a lawyer.  *See Adem*, 2006 WL 1193853, at *3 (D.D.C.

April 28, 2006) (rejecting government's argument that petition should be dismissed for lack of

next friend standing where government provided no evidence to contradict prima facie evidence

that detainee desired to challenge his detention).

      Respondents insist that, absent Petitioners' signatures on a form, the alleged lack of

proper next friend standing precludes this Court from further inquiring into the truth of

Petitioners' request to challenge their detention.[6]  It is inconceivable that the Court's authority to

investigate Petitioners' request would be so constrained.  Petitioners are "entitled to present the

facts surrounding their confinement to the Court.  It is equally clear that the Court is authorized

to craft the procedures necessary to make this possible, in order that the Court might fully

consider Petitioners' challenge to their detention."  *Al Odah v. United States*, 346 F. Supp. 2d 1,

---------------

¶ 5, *attached as* Ex. 1 to Resp'ts' Mem., *Qassim v. Bush*, 05-497, Aug. 8, 2005, Dkt. No. 27.)
Camp Iguana is a "communal living facility."  (*Id.*)  NEC detainees housed in Camp Iguana have
significantly greater freedom of movement than detainees held as enemy combatants.  They have
a common bunk room, a recreation room and a recreation yard.  (*Id.* ¶¶ 5-6.)  There is a fence
around the facility and guards posted, but detainees in Camp Iguana are otherwise free to move
about the grounds within the confines of the Camp.  (*Id.*)  At the time, counsel meetings with
NEC detainees took place in Camp Iguana, which meant that Boucetta was able to walk up to
Ms. Baker Manning and personally ask her for help getting a lawyer, something detainees in
other parts of Guantanamo could never do.  All counsel meetings, including NEC counsel
meetings, now take place in Camp Echo, a solitary confinement facility.

    [6]Respondents assert that by allowing detainees to meet with their counsel in-person, the
Court ignores "respondents' efforts to provide reasonable mechanisms for detainees to contact
the Court or counsel directly" in compliance with *Rasul v. Bush*, 542 U.S. 466, 484 (2004).
(Opp'n at 14.)  To the contrary, the Court is well aware of these efforts.  Unfortunately, the steps
taken by Respondents to notify detainees of their right to contact counsel and the court have been
largely ineffective.  *See Adem*, 2006 WL 751309 at *5-7 & nn.18-22.

7 (D.D.C. 2004). As Judge Roberts explained, not only does the plain language of the Protective

Order not require a showing of direct evidence of authorization to represent a detainee as a

prerequisite to an in-person meeting, but "[r]equiring a Guantanamo detainee to identify a

specific lawyer from among all the volunteer lawyers -- most of whom are unknown to the

detainee before a meeting -- is a meaningless exercise. It would be unconscionable to tether a

detainee's access to counsel to such an unworkable prerequisite." *Adem*, 2006 WL 1193853, at

\*7 (D.D.C. April 28, 2006).

The Protective Order remains in effect, and the Court has inherent power to enforce its

own lawful orders. *See Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). Absent

evidence that Petitioners' requests are not genuine, they are entitled to meet with their lawyers.

*II.    Jurisdiction*

Respondents also contend that the Detainee Treatment Act of 2005 (the "DTA") divests

this Court of jurisdiction to decide the instant motion.[7]    The retroactive effect of the DTA is a

question presently pending before the D.C. Circuit and the Supreme Court.[8]    Respondents note

that "the sense of the Court was to await anticipated guidance from the D.C. Circuit regarding the

effect of the Act before proceeding further in the Guantanamo habeas cases." (Opp'n at 9 n.6.)

Allowing Petitioners to meet with their lawyers, however, is not the type of interim relief that

even remotely risks infringing on the Court of Appeals' possible exclusive jurisdiction. *Cf.*

---

[7]On December 30, 3005, President Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 (the "DTA"). Respondents argue that the DTA divests the District Court of jurisdiction over the Guantanamo *habeas* petitions, including those already filed prior to the DTA's passage.

[8]Oral argument before the D.C. Circuit was held on March 22, 2006, and before the Supreme Court on March 28, 2006.

*Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 75, 78-79 (D.C. Cir.

1984). The question of when, and under what circumstances the existing Protective Order

permits Petitioners to meet with their lawyers simply has no bearing on the question of which

Court has jurisdiction to review the merits of Petitioner's challenge to his detention.[9] *See Adem*,

2006 WL 1193853, at *7-8. Petitioners have a right to counsel under *Al Odah v. United States*,

346 F. Supp. 2d 1, 7 (D.D.C. 2004). That right extends to the assistance of counsel in litigating

the very jurisdictional questions pending before the Court of Appeals and the Supreme Court.

Furthermore, it is well-settled that until such time as jurisdiction is determined not to

exist, the District Court has the authority to issues such orders as necessary to preserve its own

jurisdiction and to maintain the status quo. *See United States v. United Mine Workers of*

*America*, 330 U.S. 258, 290-93 (1947). The status quo includes the integrity of the Protective

Order, painstakingly negotiated by the parties and approved by the District Court, which remains

binding and in effect in those cases in which it has been entered. "[A] protective order, like any

ongoing injunction, is always subject to the inherent power of the district court." *Poliquin v.*

*Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993); *see also Armstrong v. Executive Office of*

*the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (recognizing courts' "inherent power to

enforce compliance with their lawful orders"); *Broderick v. Donaldson*, 437 F.3d 1226, 1234

(D.C. Cir. 2006) (same); *cf. Gambale v. Deutsche Bank, AG*, 377 F.3d 133, 140-41 (2d Cir.

2004) (recognizing court's jurisdiction to modify protective orders that remain in effect, even

---

[9]Presumably, counsel for Petitioners would also represent them in any proceedings before the D.C. Circuit. Thus, the need to resolve questions regarding the logistics of counsel access will remain an issue, even if the D.C. Circuit and the Supreme Court determine that the DTA applies to those *habeas* cases currently pending in the District Court.

after dismissal of the underlying litigation); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (same), *cert. denied, American Special Risk Ins. Co. v. Rohm & Haas Co.*, 498 U.S. 1073 (1991).   It would be untenable for the District Court to be put in a position where it is powerless to enforce its own protective order, presently in effect and over which it has continuing control.

The Protective Order  was entered in this case on April 12, 2006, several months after the passage of the DTA and over Respondents' objection, "to permit counsel access to petitioners." *See* Minute Order of April 12, 2006.   Therefore, it is hereby, this _23rd_ day of May, 2006

ORDERED that, pending approval (for scheduling and logistical purposes) of the requested visit dates by the naval base at Guantanamo Bay, Respondents shall comply with the Protective Order and allow counsel to meet with their clients Saad Al Qahtaani, Bandar Al Jaabir, and Mohammed Zahrani in person between June 5 and June 10, 2006, and it is

FURTHER ORDERED that, if the naval base at Guantanamo Bay determines that visits during the requested days cannot be accommodated for logistical and scheduling reasons, Respondents shall permit Petitioners' counsel to meet with them in person as soon as possible.

SO ORDERED.

_____/s/_____
ALAN KAY
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT G



# Triple suicide at Guantanamo camp

**Three detainees at the US base at Guantanamo Bay, Cuba have died in what appears to have been a suicide pact.**

The inmates, two Saudis and a Yemeni, hanged themselves in their cells.

The camp commander said the deaths - the first at the camp - were planned in "an act of warfare". Rights groups said they were driven by despair.

President George Bush expressed "serious concern" over the suicides at Guantanamo, which holds about 460 men captured in the US "war on terror".

There have been dozens of suicide attempts since the camp was set up four years ago - but none successful until now.

The men were found unresponsive and not breathing by guards on Saturday morning, said officials.

They were in separate cells in Camp One, the highest security section of the prison.

> **I believe this was not an act of desperation, but an act of warfare waged against us**
> Rear Adm Harry Harris
> Camp commander

They hanged themselves with clothing and bed sheets, camp commander Rear Adm Harry Harris said.

He said medical teams had tried to revive the men, but all three were pronounced dead.

A military investigation into the deaths is now under way.

**'Warfare'**

Rear Adm Harris said he did not believe the men had killed themselves out of despair.

"They are smart. They are creative, they are committed," he said, quoted by Reuters.

"They have no regard for life, either ours or their own. I believe this was not an act of desperation, but an act of asymmetrical warfare waged against us."

> **These people are despairing because they are being held lawlessly**

Ken Roth
Human Rights Watch

All three men had previously taken part in some of the mass on-and-off hunger strikes
undertaken by detainees since last August, reported news agency Reuters, and all three had
been force-fed by camp authorities.

The agency said all three had left suicide notes, but that no details had been made available.

White House spokesman Tony Snow said Mr Bush "expressed serious concern" at the deaths.

"He also stressed that it was important to treat the bodies humanely and with cultural
sensitivity," he said.

A spokesman for UK Prime Minister Tony Blair described the suicide as a "sad incident".

Mr Blair has in the past described Guantanamo as "an anomaly that has to end".

The deaths will increase pressure on the US from human rights groups and several European
countries who have been calling for Guantanamo to be closed, says the BBC's James Westhead in
Washington.

**'Heroes'**

There was a chorus of protest human rights groups at the suicides, including from Amnesty
International, which repeated demands for the camp to be closed.

William Goodman from the New York-based Centre for Constitutional Rights told AFP news
agency the men were "heroes for those of us who believe in basic American values of justice,
fairness and democracy"

Mr Goodman, whose organisation represents some 300 detainees, said the government had
denied them that.

Ken Roth, head of Human Rights Watch in New York, told the BBC the men had probably been
driven by despair.

"These people are despairing because they are being held lawlessly," he said.

"There's no end in sight. They're not being brought before any independent judges. They're not
being charged and convicted for any crime."

On Friday, President Bush said he would "like to end Guantanamo".

"There are some that, if put out on the streets, would create grave harm to American citizens
and other citizens of the world. And, therefore, I believe they ought to be tried in courts here in
the United States," he added.

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/2/hi/americas/5068228.stm

Published: 2006/06/11 04:25:49 GMT

© BBC MMVI

# EXHIBIT H

DOD 5200.1-R



# INFORMATION

# SECURITY

# PROGRAM

## January 1997

**THE ASSISTANT SECRETARY OF DEFENSE FOR
COMMAND, CONTROL, COMMUNICATIONS, AND
INTELLIGENCE**

1

*DoD 5200.1-R, January 1997*

Confidential on...," and add the appropriate date or event. (Note: A downgrading instruction is used in addition to, and not as a substitute for, declassification instructions.) Downgrading instructions shall not be applied to documents containing foreign government information or Restricted Data or Formerly Restricted Data.

C5.2.7. <u>Identification of Specific Classified Information</u>. Every classified document must show, as clearly as is possible, which information in it is classified and at what level. Specific marking of each portion ("parenthetical portion marking") shall be used.

C5.2.7.1. Each section, part, paragraph, and similar portion of a classified document shall be marked to show the highest level of classification of information it contains, or that it is unclassified. When deciding whether a subportion is included in the term "similar portion," the criterion will be whether the marking is necessary to eliminate doubt about the classification of its contents.

C5.2.7.1.1. Portions of text shall be marked with the appropriate abbreviation ("TS," "S," "C," or "U"), placed in parentheses immediately before the beginning of the portion. If the portion is numbered or lettered, place the abbreviation in parentheses between the letter or number and the start of the text.

C5.2.7.1.1.1. Portions containing Restricted Data and Formerly Restricted Data shall have abbreviated markings ("RD" or "FRD") included with the classification marking, for example, "(S-RD)." Critical Nuclear Weapon Design Information shall be marked with an "N" in separate parentheses following the portion marking: "(S-RD)(N)."

C5.2.7.1.1.2. Portions of DoD documents containing foreign government or North Atlantic Treaty Organization (NATO) information shall include identification of the foreign classification in the parenthetical marking, for example, "(UK-S)" or "(N-S)." Use the letter "R" to identify NATO or foreign government Restricted information.

C5.2.7.1.1.3. The abbreviation "FOUO" is used to designate unclassified portions that contain information that may be exempt from mandatory release to the public under the Freedom of Information Act (FOIA) (reference (g)). See Appendix 3 for details.

# EXHIBIT I

DoD 5400.7-R

## Department of Defense



# DOD Freedom of Information Act Program



**September 1998**

**Directorate for
Freedom of Information
and Security Review**



1

*DoD 5400.7-R, September 1998*

C4. CHAPTER 4

FOR OFFICIAL USE ONLY

C4.1. GENERAL PROVISIONS

C4.1.1. General.    Information that has not been given a security classification pursuant to the criteria of an Executive Order, but which may be withheld from the public *because disclosure would cause a foreseeable harm to an interest protected by* one or more FOIA Exemptions 2 through 9 (see Chapter C3.) shall be considered as being for official use only (FOUO).   No other material shall be considered FOUO and FOUO is not authorized as an anemic form of classification to protect national security interests.   Additional information on FOUO and other controlled, unclassified information may be found in reference (g) *or by contacting the Directorate for Security, Office of the Assistant Secretary of Defense (Command, Control, Communications and Intelligence).*

C4.1.2. Prior FOUO Application.    The prior application of FOUO markings is not a conclusive basis for withholding a record that is requested under the FOIA. When such a record is requested, the information in it shall be evaluated to determine whether *disclosure would result in a foreseeable harm to an interest protected by one or more FOIA Exemptions 2 through 9.    Even* if any exemptions apply, the record *shall* be released as a discretionary matter when it is determined that *there is no foreseeable harm to an interest protected by the exemptions.*

C4.1.3. Historical Papers.    Records such as notes, working papers, and drafts retained as historical evidence of DoD Component actions enjoy no special status apart from the exemptions under the FOIA (reference (a)).

C4.1.4. Time to Mark Records.    The marking of records at the time of their creation provides notice of FOUO content and facilitates review when a record is requested under the FOIA.   Records requested under the FOIA that do not bear such markings shall not be assumed to be releasable without examination for the presence of information that requires continued protection and qualifies as exempt from public release.

C4.1.5. Distribution Statement.    Information in a technical document that requires a distribution statement pursuant to DoD Directive 5230.24 (reference (x)) shall bear that statement and may be marked FOUO, as appropriate.