punishment for bad behavior, supermax prisons often subject prisoners to this near total isolation for years on end. Case studies of supermax prisoners provided by prison psychiatrists describe a range of symptoms resulting from long term isolation, including appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, suicidal ideation and self mutilations.[386] A review of the studies of supermax facilities shows that "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects."[387] As mentioned above, in the summer of 2004, US authorities opened a new detention facility at Guantánamo that is modeled on supermax prisons.[388] It is different than the regular supermax prisons in one important way: supermax prisons hold prisoners convicted of major crimes; at Guantánamo the new unit holds individuals who have not even been charged with a crime.

The results of the clinical research and the studies of prison populations are consistent with doctors' evaluations of political prisoners held in isolation. For example, in Germany in the 1970s, members of the Red Army Faction (hereinafter RAF) were being held in solitary confinement with sensory deprivation for periods ranging from months to several years. In order to determine whether they were fit for trial, a court ordered doctors to examine the prisoners. The doctors found that the RAF prisoners suffered from considerable physical and psychological constraints: irritability, exhaustion, sleep disturbance, chronic fatigue, trembling, sweating, loss of sense of reality, memory loss, lack of concentration, dizziness, walking difficulties, chronic headache and generalized body pain, depression, and claustrophobia.[389] Similarly, there has been documentation of the negative effects of solitary confinement from the detention of political prisoners in the German Democratic Republic (hereinafter GDR), as well as the former Soviet Union and China, and of American prisoners held during the Korean War.[390]

These effects also have been observed by clinicians who treat torture survivors. At the Berlin Center, psychiatrists have diagnosed and treated more than 100 ex-political prisoners of the East German communist regime, the GDR, and the Staatssicherheitsdienst, the East German Secret Service (hereinafter Stasi). Most of the ex-prisoners have been exposed to solitary

---

Parties Under Article 19 of the Convention, Conclusions and Recommendations of the Committee against Torture, United States of America. U.N. Committee against Torture. 24th Sess. 2000: para. 5(f). U.N. Doc. CAT/C/XXIV/Concl.6.

[386] Haney, *supra* note 368, at 130.

[387] *Id.* at 132. Isolation can be particularly harmful for individuals with mental illnesses. See, e.g., American Civil Liberties Union. "Indiana's 'Supermax' Confinement Worsens Mental Illness in Prisoners, ACLU Charges." February 3, 2005. Press release accompanying suit charging that prisoners' mental illness is exacerbated by the conditions found in an Indiana supermax prison. Available at: http://www.aclu.org/Prisons/Prisons.cfm?ID=17413&c=121. Accessed April 22, 2005; Physicians for Human Rights, Bellevue/NYU Program for Survivors of Torture. *From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers.* 2003:75. Noting that "[f]or a person who is affected by post-traumatic stress, the prospect of solitary confinement can be especially fearsome."

[388] See *supra* text accompanying notes 219–222.

[389] Gutachten Dr. Schmidt-Voigt zu Astrid Proll, Landgericht Frankfurt AM. 1973. Cited in Graessner S. "Gesundheitliche Auswirkungen von Langzeithaft mit Isolation; Historische Wurzeln und Forderungen." In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare.* Berlin, Germany: Springer Verlag; 2002:253–269; *Ärztegruppe Westberlin für eine ausreichende medizinische Versorgung in den Haftanstalten: Medizin als Strafe, Erfahrungen aus dem Strafvollzug.* Berlin: AG Spak M 30; 1977:63–86.

[390] See, e.g., Kubzansky PE. "The Effects of Reduced Environmental Stimulation on Human Behavior: A Review." In: Biderman, Zimmer, eds. *The Manipulation of Human Behavior.* New York: Wiley; 1961:54.

confinement with sensory deprivation for long periods—from several months to several years.[391] Torture methods included sleep deprivation, long lasting interrogation night and day, and disorientation techniques.[392] Prisoners were confronted with falsified letters from spouses and close friends, telling them that they had abandoned them, or asking them to cooperate with the regime. Parents, siblings, spouses and close friends were successfully turned around by the Stasi to work on the prisoner. In many cases the Stasi managed to infiltrate the entire social network, including family, friends, and workplace, of a dissident with informers. The Stasi used its intimate knowledge of the prisoners' susceptibilities and vulnerabilities, personal weaknesses, familial conflicts, and problems at the workplace that it acquired from the network of informers to undermine the prisoners' basic belief and trust in others.[393] While in prison they report experiencing most of the symptoms that the researchers have found under experimental conditions.  Ex-prisoners reported that they were so confused and disoriented because of the interrogators' techniques that they no longer trusted their own perceptions. Prisoners report that they went through psychotic states with delusions and hallucinations and experienced a total loss of cognitive function.[394]

The psychologist Hans-Eberhard Zahn, a dissident under the communist regime in East Germany, was held in special prisons of the Stasi from 1953 until 1960. He gave a detailed account of his symptoms from the methods of psychological torture practiced by the Stasi.[395] His longing for human contact became so overwhelming that he started to desire being beaten by his guards and he remembers breaking out in tears when a guard shook his hand to say hello. His torturers emotionally confused him by playing the good cop/bad cop game with him and he remembers how grateful he felt towards the good cop. They deprived him of sleep by interrogating him all night, by switching on the light and shouting at him in short intervals. He lost his sense of time, of night and day. He started hallucinating and lost his ability to defend himself in interrogations.  He lost his cognitive capability to differentiate contradicting messages, which his tormentors used to discourage him, e.g., telling him that his political allies outside had betrayed and abandoned him. He reported that the final straw came when the guards made him believe that his girlfriend went out with another man.[396]

[391] Pross C. "Wir sind unsere eigenen Gespenster." In: Behnke K, Fuchs J, eds. *Zersetzung der Seele, Psychologie und Psychiatrie im Dienste der Stasi.* Hamburg, Germany: Rotbuch Verlag; 1995: S.303–315; Pross C. "Social and Individual Effects of Trauma in the Former German Democratic Republic." In: Graessner S, Gurris N, Pross C, eds. *At the Side of Torture Survivors, Treating a Terrible Assault on Human Dignity.* Baltimore, MD:The Johns Hopkins University Press; 2001. Pross C. "Zersetzung" – Psychologische Techniken der Staatssicherheit und ihre Folgen. ein Blick in das zukünftige Instrumentarium von Diktaturen?" In: Birck A, Pross C, Lansen J, eds. *Das Unsagbare. Die Arbeit mit Traumatisierten im Behandlungszentrum für Folteropfer Berlin. Festschrift zum 10jährigen Bestehen des Behandlungszentrums für Folteropfer Berlin.* Berlin, Germany: Springer Verlag; 2002: 271–287; Pross C. "Wir tragen die Diktatur in uns. Gruppentherapie mit Stasiverfolgten." In: Annegret S, ed.: 1945 bis 2000, Ansichten zur deutschen Geschichte. Zehn Jahre Gedenkstätte Moritzplatz Magdeburg für die Opfer politischer Gewaltherrschaft 1945 bis 1989. Landeszentrale für politische Bildung Sachsen-Anhalt 2002. [Findings of the Center for the Treatment of Torture Victims in Berlin, Germany].
[392] Findings of the Center for the Treatment of Torture Victims in Berlin, Germany.
[393] *Id.*
[394] *Id.*
[395] Zahn H. "Haftbedingungen und Geständnisproduktion in den Untersuchungs-Haftanstalten des MfS – Psychologische Aspekte und biographische Veranschaulichung." *Schriftenreihe des Berliner Landesbeauftragten für die Unterlagen des Staatssicherheitsdienstes der ehemaligen DDR.* Band 5. Berlin; 1999.
[396] *Id.*

This account parallels that of Ali Laaridh, a prisoner in Tunisia who was active in Tunisia's Islamist movement.[397] Mr. Laaridh spent more than eleven of his fourteen years in prison in solitary confinement. This isolation was strictly enforced by the prison administration. He ate all of his meals alone and guards escorted him to the shower and emptied the infirmary during visits so that he never came into contact with other prisoners.[398] He described the effects of isolation to interviewers with Human Rights Watch on December 8, 2004:

> In isolation, the only person you can speak to is the guard. But from time to time, the prison staff would decide not to address a single word to you, sometimes for a few hours, sometimes for an entire week. You might ask for a medication, or to see a doctor, and they wouldn't even say 'Yes' or 'No,' or, 'We are looking at your request.' It makes you despondent, ready to do something desperate, toward the guard, or toward yourself, just to prove you exist.[399]

He went on to describe, in more general terms, the toll that isolation took on his mind: "I have lost the ability to concentrate. It now takes a great effort for me to look at a problem in all its dimensions, to get beyond the surface."[400]

Some former political prisoners who have been held in long-term solitary confinement with sensory deprivation wrote down their stories and published them after their release. One of these was the Argentine physician Jacobo Timerman, who was confined during the military junta in Argentina in the late 1970s. Although Timerman experienced various forms of torture, including electric shocks, beatings, exposure to threatening dogs, and mock executions,[401] isolation was the primary form of torture used during his detention. Timerman described how he began to talk to himself and to hear voices while in solitary confinement. He also described his emotional confusion, how he started hating his wife when he received letters from her, and his inability to integrate the distress of solitude, emptiness, and helplessness with positive images and memories of the outside world. He longed to go crazy as a form of relief from the loneliness and fantasized about committing suicide in order to obtain a feeling of power over his torturers.[402] Even years after his release, Timerman continued to experience fear and the effects of what happened to him. He writes, ". . . I'm trying to forget it. Every day, since my release, I've been waiting for some vital shock to take place, some deep, extended nightmare to explode suddenly in the middle of the night, allowing me to relive it all. . . . But nothing has happened, and I find this calm terrifying."[403] He also said, "A journalist asked me how freedom feels. I still do not feel it."[404]

The effects of isolation are exacerbated when prisoners are held in isolation without being told the reasons for their confinement or how long they will be held. Thomas Hilliard, a psychologist who studied conditions at San Quentin Adjustment Center, found that the absence of exercise, activity or other outlets, the indeterminacy of prison terms, and the absence of any program leading to release from isolation led to a "pervasive sense of frustration and hopelessness,"

[397] Human Rights Watch. *Tunisia: Crushing the Person, Crushing the Movement: The Solitary Confinement of Political Prisoners.* Vol. 17. No. 4(E). 2005: 13.
[398] *Id.* at 15.
[399] *Id.* at 15.
[400] *Id.* at 18.
[401] Timerman J. *Prisoner Without a Name, Cell Without a Number.* New York: Alfred A. Knopf; 1981:6-10.
[402] *Id.* at 84-85, 91.
[403] *Id.* at 34.
[404] *Id.*

"deep feelings of despair," and the feeling that the psychological pain caused by isolation may cause prisoners to resort to "extreme actions, and desperate solutions."[405] Prisoners' uncertainty about their fate in detention often makes the impact of prolonged isolation more severe. Psychologists studying a group of prisoners held without a trial at the Belmarsh high security jail in south London concluded, "Indefinite detention is linked to deterioration in mental health and fluctuations in mental state are related to the prisoner regime and to the vagaries of the appeal system."[406] Research done by Professor Craig Haney on US prisoners confirms that "prisoners who are held in solitary-like confinement . . . often complain about the uncertainty of their confinement – not knowing why they are being held there or, and this is most important, when they are getting out or what [they] have to do in order to be released."[407] This information is particularly relevant to detainees held by the United States, who are held in legal limbo and without knowledge of the reason for or length of their detention.

These reports of the severe health effects of solitary confinement parallel reports by government agencies, the ICRC and individual detainees who were subjected to prolonged isolation. As stated above, an FBI memorandum from Guantánamo dated from November 2002 says that FBI agents observed a detainee after being subjected to intense isolation for over three months who was exhibiting symptoms of extreme psychological trauma.[408]

Similarly, a CID report referenced above describes an interview with a detainee who, on the ninth day of sixteen days in solitary confinement at a detention facility near Al Satar City, on Rashad Base, Iraq, claims he began to scream "because he did not like being by himself."[409] When taken to a room by himself after the interview, the agent reports that the detainee became visibly upset and asked to be placed in a cell with other detainees.[410]

In its report of visits to Iraq in 2003, the ICRC called attention to the harmful consequences of extended isolation. ICRC medics who examined detainees described one detainee held in isolation as "unresponsive to verbal and painful stimuli."[411] The physical examination determined that his heart rate was 120 beats per minute and his respiratory rate was 18 per minute. The detainee was diagnosed as suffering from "somatoform (mental) disorder, specifically a conversion disorder, most likely due to the ill-treatment he was subjected to during interrogation."[412]

The Tipton Three, who were held in extended isolation at Guantánamo, describe effects of isolation very similar to those found in studies and by clinicians. With regard to isolation, Mr. Rasul told interviewers that, "I felt like I was going out of my mind. I didn't know where the

---

[405] Brief of Professors and Practitioners of Psychology and Psychiatry as *Amicus Curiae* in Support of Respondent at 18. *Wilkinson v. Austin*. No. 04-495. S. Ct. filed 2005. Citing Hilliard T. "The Black Psychologist in Action: A Psychological Evaluation of the Adjustment Center Environment at San Quentin Prison." *Journal of Black Psychology*. 1976;2:80.

[406] O'Neill, *supra* note 77. Quoting report by British psychologists.

[407] *Id*. Quoting Craig Haney, professor of psychology at the University of California at Santa Cruz.

[408] See *supra* text accompanying note 47.

[409] Agent's Investigation Report. ROI No. 0234-04-CID259-80271. July 19, 2004. In: US Army Criminal Investigation Command, Department of the Army. Memorandum for See Distribution. Subject: CID Report of Investigation—-Initial/Final/SSI—0234-04-CID259-80271-/5C2/5Y2E/5X1. August 2, 2004. Available at: http://www.aclu.org/torturefoia/released/5245_5258.pdf. Accessed April 22, 2005.

[410] *Id*.

[411] ICRC February 2004 Report, *supra* note 86. Para. 27.

[412] *Id*.

others were, I didn't know why I was being held there. Nobody would talk to me . . . I was extremely anxious."[413] Likewise, Mr. Iqbal states:

> Amongst the effects of isolation was that over a period of time it was certainly draining. You would get worn out from it. If you were already depressed it makes you more depressed because you keep thinking repetitively about the same thing and there's no one there to comfort you or distract you. Sometimes you welcome interrogation when you've been in isolation because there is someone to talk to and it's a release . . . .[414]

The attorneys for Moazzam Begg and Feroz Abbasi, who were subjected to strict isolation at Guantánamo for 18 months beginning in February 2003, tell a similar story. According to their attorneys, both men suffered from post-traumatic stress and had attempted suicide.[415] After visiting her client in Guantánamo, Mr. Abbasi's lawyer said, "I left my first visit with [Abbasi and other detainees] thinking the longer they are in Guantanamo, the more psychological and physical damage they are going to suffer at that place."[416]

In late 2003, the ICRC warned the Administration publicly that a system in which detainees were held indefinitely would inevitably lead to mental health problems.[417] When the ICRC visited Guantánamo in June 2004, it found a high incidence of mental illness produced by stress, much of it caused by prolonged solitary confinement.[418] A source familiar with conditions at Guantánamo at that time told PHR that deprivation of sensory stimulation on the one hand and overstimulation on the other were causing spatial and temporal disorientation in detainees. The results were self-harm and suicide attempts.[419]

One current detainee, Salim Ahmed Hamdan, a Yemeni national, was held in solitary confinement at Camp Echo at Guantánamo from December 2003 to late October 2004. While at Camp Echo he was denied contact with other detainees and permitted only very limited access to a translator. Mr. Hamdan was initially denied outdoor exercise during daylight and medical treatment despite his repeated requests.[420] He described his mood during solitary confinement as "deteriorating, . . . encompassing frustration, rage (although he has not been violent), loneliness, despair, depression, anxiety, and emotional outbursts."[421] Mr. Hamdan's appointed military defense counsel, Lieutenant Commander Charles Swift, described his client's condition as "initially agitated and withdrawn" and said that he witnessed in Mr. Hamdan significant mood swings, including "uncontrollable weeping at inappropriate times, undirected anger, and unresponsiveness."[422] Based on these descriptions, an expert psychiatrist

---

[413] Tipton Three statement, *supra* note 32. Para. 182.

[414] *Id.* Para. 233.

[415] O'Neill, *supra* note 77.

[416] Leonnig CD. "Further Detainee Abuse Alleged." *Washington Post.* December 26, 2004. Quoting Gitanjali S. Gutierrez, Abassi's lawyer and one of the first attorneys to receive clearance to visit Guantánamo Bay.

[417] Lewis, *supra* note 223.

[418] *Id.* Summarizing findings from a leaked ICRC report to the US government, based on a June 2004 visit to Guantánamo.

[419] PHR Interview.

[420] Brief of Amici Curiae Human Rights First, Physicians for Human Rights, et al. in Support of Petitioner at 15. *Hamdan v. Rumsfeld.* S. Ct. filed Dec. 27, 2004. No. 04-702. Citing Pet. App. 60-61.

[421] *Id.* at 16. Quoting Decl. of Daryl Matthews, M.D., Ph,D. ¶ 11. *Swift v. Rumsfeld.* No. 04 Civ. 0777L. W.D. Wash. filed Mar. 31, 2004.

[422] *Id.* Quoting Decl. of Lt. Cmdr. Charles Swift. ¶¶ 7-11. *Swift v. Rumsfeld.* No. 04 Civ. 0777L. W.D. Wash. filed May 3, 2004.

concluded that Mr. Hamdan was "at significant risk for future psychiatric deterioration, possibly including the development of irreversible psychiatric symptoms."[423] The psychiatrist also noted "the psychological stress of the uncertainty he faces over his lack of charges and about the nature and duration of his future confinement."[424]

Although some of the symptoms will diminish once an individual is removed from isolation,[425] there are often long lasting, harmful effects. A study of Danish prisoners held in solitary confinement for longer than four weeks were twenty times more likely to be admitted to a psychiatric hospital than a prisoner in a standard prison environment.[426] The study concludes that "individuals detained [in solitary confinement] are forced into an environment that increases their risk of hospitalization . . . for psychiatric reasons."[427] Some of the effects of isolation, including an inability to engage in normal social interactions, may be permanent. One study of former prisoners of war found that even forty years after their release, some soldiers still suffered symptoms of anxiety, confusion, depression, suspiciousness and detachment from social interactions.[428] Long lasting effects encountered by doctors treating ex-prisoners at the Berlin Center include a deep, basic mistrust of other people, chronic anxiety, and fear of becoming psychotic again.[429] People who have experienced long term isolation may also show marked problems with relationships, including the dissolution of marriages, friendships and parent-child relationships. Long term exposure to extreme isolation can lead to an increased withdrawal of prisoners into themselves. One study found that

> [a]s [prisoners] become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence. In extreme cases, another pattern emerges: This environment is so painful, so bizarre and impossible to make sense of, that they create their own reality- they live in a world of fantasy instead.[430]

The doctors at the Berlin Center also report that ex-prisoners recall having felt affection and love for their perpetrators, who during the period of total isolation and solitude were their only human contact.[431] This contradiction, of having affectionate feelings toward a person who was abusive, may be impossible to integrate into one's value system and view of the world. Ex-prisoners also found that those in the outside world were reluctant to believe what had happened to them inside the prison. Before finding a specialist who recognized the after-effects of Stasi persecution, they were often misdiagnosed as suffering from borderline disorder, paranoid behavior, or psychosis.[432]

---

[423] *Id.* Quoting Decl. of Daryl Matthews, *supra* note 421, at ¶ 14.

[424] *Id.* Quoting Decl. of Daryl Matthews, *supra* note 421, at ¶ 15.

[425] See Grassian S. "Psychopathological Effects of Solitary Confinement." *American Journal of Psychiatry.* 1983;140:1450–54.

[426] Haney, *supra* note 368, at 144. Citing Sestoft D, Anderson H, Lilleback T, Gabrielson G. "Impact of Solitary Confinement on Hospitalization Among Danish Prisoners in Custody." *International Journal of Law and Psychiatry.* 1998;21:99–108.

[427] *Id.*

[428] Sutker PB, Winstead DK, Galina ZH, Allain AN. "Cognitive Deficits and Psychopathology Among Former Prisoners of War and Combat Veterans of the Korean Conflict." *American Journal of Psychiatry.* 1991;148(1): 67–72.

[429] Findings of the Center for the Treatment of Torture Victims in Berlin, Germany, *supra* note 391.

[430] Haney, *supra* note 368, at 140.

[431] Findings of the Center for the Treatment of Torture Victims in Berlin, Germany, *supra* note 391

[432] *Id.*

68

These negative effects on individuals have led those who study solitary confinement to caution against its use.[433] Craig Haney, an expert on the psychological effects of incarceration, has stated that "[m]any of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder or PTSD and the kind of psychiatric sequelae that plague victims of what are called 'deprivation and constraint' torture techniques."[434] Even in situations where solitary confinement is imposed as a form of discipline or punishment, and thus not within the legal definition of torture, clinicians have understood solitary confinement to be a form of torture,[435] psychological torture,[436] or inhumane treatment.[437]

## D. Sleep Deprivation

Sleep deprivation also causes a host of negative psychological effects. According to the *Comprehensive Textbook of Psychiatry*, "the most prominent effect of total sleep deprivation in humans is cognitive impairment."[438] Cognitive impairment associated with sleep deprivation includes "impairments in memory, learning, logical reasoning, arithmetic skills, complex verbal processing, and decision making."[439] Sleep-deprived individuals take longer to respond to stimuli, and sleep loss causes "attention deficits, decreases in short-term memory, speech impairments, perseveration, and inflexible thinking."[440] These symptoms may appear after one night of total sleep deprivation, after only a few nights of sleep restriction (5 hours of sleep per night).[441] Sleep restriction also can result in hypertension and other cardiovascular disease.[442]

One review of the literature summarizes the effect of sleep deprivation on decreased immune function, which makes sleep-deprived individuals more vulnerable to illness. In addition, the literature links sleep deprivation to altered glucose tolerance and insulin resistance.[443] Another study concludes that "[i]t seems reasonably certain that [sleep manipulations performed in previous studies] produce disturbances of metabolism and alter some central nervous system

---

[433] Anderson HS, Sestoft D, Lillebæk, Gabrielson G, Hemmingsen R, Kramp P. "A longitudinal Study of Prisoners on Remand: Psychiatric Prevalence, Incidence, and Psychopathology in Solitary vs. Non-solitary Confinement." *Acta Psychiatrica Scandinavica.* 2000;102:19–25. Concluding that from a medical point of view solitary confinement is questionable; Grassian S, Friedman N. "Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement." *International Journal of Law and Psychiatry.* 1986;8:49–65. Promoting limited use of solitary confinement due to "major psychiatric risks" as well as its vulnerability to misuse and inadequate safeguards."

[434] Haney, *supra* note 368, at 132.

[435] Lucas WE. "Solitary Confinement: Isolation as Coercion to Conform." *Australian and New Zealand Journal of Criminology.* 1976;9:153.

[436] Thoenig RH. "Solitary Confinement—Punishment with the Letter of the Law, or Psychological Torture?" Wisconsin Law Review. 1972;237.

[437] Singer RG. "Confining Solitary Confinement: Constitutional Arguments for a 'New Penology.'" *Iowa Law Review.* 1971;56:1296.

[438] Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry.* Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 289.

[439] Nolen-Hoeksema S. *Abnormal Psychology.* 2nd ed. New York: McGraw-Hill; 2005:627.

[440] Sadock B, Sadock V, eds. *Kaplan and Sadock's Comprehensive Textbook of Psychiatry.* Vol. 1. 8th ed. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 289.

[441] *Id.*

[442] Alvarez GG, Ayas NT. "The Impact of Daily Sleep Duration on Health: A Review of the Literature." *Progress in Cardiovascular Nursing.* 2004;19:56–59.

[443] Carskadon, MA. "Sleep deprivation: Health Consequences and Societal Impact." *Medical Clinics of North America.* 2004;88(3):767–776.

functions."[444] The study also correlates sleep deprivation with decreased pain tolerance, which has significant implications for torture and other situations in which sleep restrictions are implemented in tandem with other torture techniques.

The former Israeli Prime Minister, Menachem Begin, describes his experiences with sleep deprivation while being held in a Soviet prison:

> In the head of the interrogated prisoner a haze begins to form. His spirit is wearied to death, his legs are unsteady, and he has one sole desire: to sleep, to sleep just a little, not to get up, to lie, to rest, to forget. . . . Anyone who has experienced this desire knows that not even hunger or thirst are comparable with it. . . . I came across prisoners who signed what they were ordered to sign, only to get what the interrogator promised them. He did not promise them their liberty. He promised them – if they signed – uninterrupted sleep![445]

## E. Individual Responses to Torture

Each individual, of course, responds uniquely to the stressors encountered under psychological torture. Attempting to isolate any one aspect of a given interrogation technique is almost impossible given that the characteristics of the human psyche vary considerably, even within the most homogeneous population. Determining which aspects of psychological stress lead to the negative health consequences exhibited by some victims of psychological torture is still more difficult. Moreover, victims of psychological torture are, in most cases, subjected to a combination of techniques, making it nearly impossible to determine the specific cause of psychopathology shown. Moreover, studies on concentration camp survivors have shown that massive psychic trauma can break through the defenses of even the strongest and healthiest person.[446]

Despite these difficulties, certain personal characteristics have emerged as being important factors in determining the effects of psychological torture. Studies of torture survivors have shown that the severity of the torture, post-torture psychosocial stressors, family history of psychiatric illness, post-captivity social support, "psychological preparedness for trauma," and the education level of victims are predictors of long term psychological status.[447] Among these variables, "psychological preparedness for trauma" appears to be the strongest predictor of post torture psychological health.[448] Several different factors contribute to one's "psychological preparedness." These factors can be broken down into two main categories: cognitive processes and behavioral processes. Cognitive processes include a strong belief system (political, religious or other) and the ability to rationalize the torture experience and give meaning to the

---

[444] Hakki Onen S, Abdelkrim A, Gross A, Eschallier AE, Dubray C. "The Effects of Total Sleep Deprivation, Selective Sleep Interruption and Sleep Recovery on Pain Tolerance Thresholds in Healthy Subjects." *Journal of Sleep Research.* 2001;10:35–42.

[445] Malinowski T. "The Logic of Torture." *Washington Post.* June 27, 2004. Quoting Mr. Begin.

[446] Eitinger L. *Concentration Camp Survivors in Norway and Israel.* London; 1964; Eitinger L. "Psychiatrische Untersuchungsergebnisse bei KZ-Überlebenden." In: Herberg HJ, ed. *Spätschäden nach Extrembelastungen.* Herford; 1971:144 n.237.

[447] Basoglu M, Jaranson JM, Mollica R, Kastrup M. "Torture and Mental Health: A Research Overview." In: Gerrity E, Keane TM, Tuma, F, eds. *The Mental Health Consequences of Torture.* New York: Kluwer Academic/Plenum; 2001:50.

[448] *Id.*

trauma. Behavioral processes are largely dependent on an individual's prior exposure to torture, which provides victims with a better understanding of what is to be expected.[449]

During the torture experience, both of these processes influence the victim's locus of control—the level of perceived control the victim has during the torture experience. Individuals with no prior experience with torture likely will not have developed coping mechanisms and will perceive that the torture experience is out of their control. The theories of the cognitive processes surrounding trauma maintain that PTSD is brought on as a reaction to the violation of previously held assumptions concerning invulnerability and personal safety.[450] Locus of control is also an important factor when discussing the impact of different torture techniques. Techniques that are highly unpredictable or involve a high degree of uncontrollability are associated with higher degrees of distress than those techniques in which the victim feels that he or she has some degree of control over the level of pain and suffering that is inflicted.

## F. Caring for Survivors of Torture[451]

Survivors can be helped to rebuild their lives, to restore their dignity and to resume their productivity in society. Although organized treatment services for survivors of torture began about twenty years ago, the disparity between the needs of survivors and the availability of services in the US and abroad is still considerable. Most of these initiatives started through the efforts of a few clinicians who recognized the need for clinical services.

Since torture may affect many aspects of one's life, effective clinical interventions usually require individual needs assessments and a multi-disciplinary treatment approach. Therapeutic services typically include a variety of medical, psychological, and social services to address different dimensions of survivors' problems. For example, restoring the balance between different spheres of life (social, physical, intellectual, emotional, and spiritual) may require a variety of therapeutic interventions.

Cultural differences between health providers and survivors have important therapeutic implications. The use of a "bicultural approach" may help to mitigate such differences; however, culture is a heterogeneous phenomenon. Even within the same "culture," many interpersonal differences may exist such as differences in social class, political views, educational level, religious beliefs, language and levels of acculturation. The issue of culture underscores the therapeutic imperative of individualizing and contextualizing treatment approaches. Some of the most significant needs that survivors identify relate to legal assistance for political asylum, food, shelter, personal safety, or may have very little to do with past traumatic experiences.

Treatment centers provide more than integration and consolidation of services; they provide professional expertise in dealing with complex emotional issues of survivors and providers alike, a safe and structured environment, and the ability to carry out much needed research. However, these specialized treatment centers have reached only a fraction of those affected by torture.

---

[449] *Id.*

[450] *Id.* at 52.

[451] This section was written by Vince Iacopino, MD, PhD, Director of Research, Physicians for Human Rights, and Principal Organizer of the Istanbul Protocol Project.

# V. Justifying and Facilitating Psychological Torture

## A. The Imposition of a New Legal Framework

Psychological torture has long been outlawed and its use also was contrary to the guidance and tradition of the US military. How did it come about? At the beginning of 2002, the Bush Administration began to create a new legal framework to permit coercive interrogations. The first steps taken by the Administration focused on how to classify detainees from the "war on terror" and whether the protections of the Geneva Conventions could be denied them. The Geneva Conventions protect prisoners of war and civilians in times of war and delineate the protections that they must be afforded. They provide clear prohibitions on the use of torture and other forms of inhumane and degrading treatment and specifically prohibit the use of any form of coercion on protected persons, including POWs.[452] The US is a party to the Geneva Conventions and is bound by its terms, so to justify the use of coercive interrogation techniques, it found a way around applying the Conventions. At the same time, the federal anti-torture statue and other legal prohibitions on the use of torture and cruel, inhuman, and degrading treatment outlaw the techniques interrogators sought to use. So the second step in developing a new legal framework involved restricting the definition of torture, including psychological torture. Following these changes, the Administration approved the use of specific techniques based on the denial of the Geneva Conventions and the new definition of torture.

### 1. Classification of Detainees and Application of Geneva Conventions

On January 9, 2002, the repudiation of US commitments began. John Yoo, Deputy Assistant Attorney General in the Office of Legal Counsel at the Department of Justice, sent a memorandum to William J. Haynes II, the Department of Defense General Counsel, arguing that the laws of armed conflict do not protect members of al Qaeda and the Taliban.[453] Mr. Yoo also sent a copy to William H. Taft, IV, Legal Adviser at the Department of State. Mr. Taft offered comments to Mr. Yoo in a memorandum on January 11.[454] He said that "both the most important factual assumptions on which your draft is based and its legal analysis are seriously flawed."[455] He noted, "In previous conflicts, the United States has dealt with tens of thousands of detainees without repudiating its obligations under the Conventions."[456] A series of memos between Mr. Yoo and Mr. Taft followed,[457] as Mr. Taft contested the repudiation of coverage of certain detainees.[458]

---

[452] See *supra* note 10.

[453] Memorandum for William J. Haynes II, General Counsel, Department of Defense. From John Yoo, Deputy Assistant Attorney General, Robert J. Delahunty, Special Counsel, Office of the Legal Counsel, US Department of Justice. Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees. January 9, 2002. Available at: http://www2.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.01.09.pdf. Accessed April 27, 2005.

[454] Unclassified Memorandum. From William H. Taft, IV, Legal Adviser, U.S Department of State. To John C. Yoo, Deputy Assistant Attorney General, Office of the Legal Counsel, US Department of Justice. Subject: Your Draft Memorandum of January 9. January 11, 2002.

[455] *Id.*

[456] *Id.*

[457] See Memorandum. From John Yoo, Deputy Assistant Attorney General. To The Honorable William H. Taft, IV, Legal Adviser, Department of State. January 14, 2002; Memorandum. From William H. Taft, IV, Legal Adviser, Department of State. To John C. Yoo, Deputy Assistant Attorney General, Office of the Legal Counsel, US Department of Justice. Subject: Your Draft Memorandum of January 18. January 23, 2002:1.

[458] See Memorandum. From William H. Taft, IV, *supra* note 457, at 1, 4.

Secretary of Defense Donald Rumsfeld adopted Mr. Yoo's approach and on January 19, 2002, sent a memorandum to Richard B. Myers, Chairman of the Joint Chiefs of Staff. In it, he asked Gen. Myers to transmit to Combatant Commanders the following message: that "Al Qaida and Taliban individuals under the control of the Department of Defense are not entitled to prisoner of war status for purposes of the Geneva Conventions of 1949" but that "The Combatant Commanders shall . . . treat them humanely and, to the extent appropriate and *consistent with military necessity*, in a manner consistent with the principles of the Geneva Conventions of 1949."[459] It is critically important to note that military necessity can never be a justification for torture under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment[460] (hereinafter Convention against Torture) or the Geneva Conventions.[461] The right to be free from torture is non-derogable, which means that it can not be repudiated in any case, even when there is "military necessity." With this memorandum, Secretary Rumsfeld offered a legally incoherent message that nonetheless got a certain point across: that the Administration did not believe the prohibition against torture was absolute.

Meanwhile, the Justice Department was preparing a formal statement on the matter. On January 22, 2002, Jay S. Bybee, Assistant Attorney General in the Office of Legal Counsel at the Department of Justice, wrote a memorandum on the subject to Mr. Haynes and to Alberto Gonzales, the White House Counsel.[462] Mr. Bybee opined that neither the federal War Crimes Act nor the Geneva Conventions would apply to the detention conditions of al Qaeda prisoners and that the President has the constitutional power to suspend US treaty obligations toward Afghanistan during the period of the conflict. Mr. Bybee also contended that customary international law has no binding legal effect on either the President or the military because it is not federal law, as recognized by the Constitution.[463]

The White House Counsel, Mr. Gonzales, adopted this view in a memorandum to President Bush on January 25, 2002.[464] These legal revisions clearly served to increase coercion in interrogations. In the memo, Mr. Gonzales called the war on terror a "new kind of war" that rendered "obsolete Geneva's strict limitations on questioning of enemy prisoners."[465] He also rejected the arguments of Secretary of State Colin Powell to apply the Geneva Conventions to all

---

[459] Memorandum for Chairman of the Joint Chiefs of Staff. From Secretary of Defense Donald Rumsfeld. Subject: Status of Taliban and Al Qaida. January 19, 2002. Emphasis added. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc1.pdf. Accessed April 27, 2005. On January 21, 2002, Myers transmitted the message. See Memorandum. To United Commands and Services. From Chairman of the Joint Chief of Staff. Subject: Status of Taliban and Al Qaida. January 21, 2002.
[460] "No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. G.A. Res. 39/46. U.N. GAOR. 39th Sess. Supp. No. 51. U.N. Doc. A/Res/39/46. 1984:197. *Entered into force* June 26, 1987. Article 2(2).
[461] See *supra* note 10. Citing articles of the Geneva Conventions that prohibit torture and inhumane treatment in all circumstances and at all times.
[462] Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes II, General Counsel of the Department of Defense. From Jay S. Bybee, Assistant Attorney General, US Department of Justice. Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees. January 22, 2002.
[463] *Id.*
[464] Memorandum for the President. From Alberto R. Gonzales. Subject: Decision Re Application of the Geneva Convention on Prisoners of War to the Conflict with Al Qaeda and the Taliban. January 25, 2002. Available at: http://www2.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.01.25.pdf. Accessed April 27, 2005.
[465] *Id.* at 2.

detainees, finding them "unpersuasive."[466] Attorney General John Ashcroft similarly argued against applying the Geneva Conventions to Taliban detainees.[467]

The day after Mr. Gonzales sent his memo to President Bush, Secretary Powell sent a memorandum to Mr. Gonzales[468] objecting to the decision not to apply the Geneva Conventions. He pointed out that the consequences would be to "reverse over a century of U.S. policy and practice . . . and undermine the protections of the law of war for our troops, both in this specific conflict and in general."[469] He also noted that denying the Conventions would have "a high cost in terms of negative international reaction."[470] Mr. Taft set out objections in greater length in a later memo.[471] In addition to legal arguments, he noted that "[f]rom a policy standpoint, a decision that the Conventions apply provides the best legal basis for treating the al Qaeda and Taliban detainees in the way we intend to treat them.  It demonstrates that the United States bases its conduct not just on its policy preferences but on its international legal obligations."[472]

On February 7, Mr. Bybee wrote another memorandum to Mr. Gonzales, this time laying out the Office of Legal Counsel's views concerning the status of members of the Taliban militia under Article 4 of the Third Geneva Convention.[473] The memorandum opined that the President can determine that Taliban fighters do not qualify as POWs, thereby eliminating any legal "doubt" as to their status and obviating any need for article 5 tribunals.[474]

The rejection of the Geneva Conventions for al Qaeda and Taliban detainees was incorporated into a directive President Bush issued on February 7, 2002.[475] In it, the President accepted OLC's reasoning and determined that the Geneva Conventions do not apply to the conflict with al

---

[466] *Id.* at 3.

[467] Letter to the President. From John Ashcroft, Attorney General. February 1, 2002.

[468] Memorandum. From Colin L. Powell. To Counsel to the President and Assistant to the President for National Security Affairs. Subject: Draft Decision Memorandum for the President on the Applicability of the Geneva Convention to the Conflict in Afghanistan. January 26, 2002. Available at: http://www2.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.01.26.pdf. Accessed April 27, 2005.

[469] *Id.*

[470] *Id.*

[471] Memorandum. From William H. Taft, IV. To Counsel to the President. Subject: Comments on Your Paper on the Geneva Convention. February 2, 2002. Available at: http://www.nytimes.com/packages/html/politics/20040608_DOC.pdf. Accessed April 27, 2005.

[472] *Id.*

[473] Memorandum for Alberto R. Gonzales, Counsel to the President. From Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, Department of Justice. Re: Status of Taliban Forces Under Article 4 of the Third Geneva Convention. February 7, 2002.

[474] *Id.* at 2. Article 5 of the Third Geneva Convention states, "Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy belong [to any of the categories for prisoners of war], such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal." Third Geneva Convention, *supra* note 9. Article 5.  Traditionally, the US has adhered to this principle and has used such tribunals in conflicts from Vietnam to the Gulf War. See Human Rights Watch. Background Paper on Geneva Conventions and Persons Held by U.S. Forces. January 29, 2002. Available at: http://www.hrw.org/backgrounder/usa/pow-bck.htm.  Accessed April 27, 2005. Allowing the President to make the determination wholesale, without individualized consideration, undermines the principles of the Geneva Conventions.

[475] Memorandum for the Vice President, Secretary of State, Secretary of Defense, Attorney General, Chief of Staff to the President, Director of Central Intelligence, Assistant to the President for National Security Affairs, Chairman of the Joint Chiefs of Staff. From President Bush. Subject: Humane Treatment of al Qaeda and Taliban Detainees. February  7, 2002. Available at: http://www2.gwu.edu/~nsarchiv/NSAEBB/NSAEBB127/02.02.07.pdf. Accessed April 27, 2005.

Qaeda in Afghanistan. While he decided that the Geneva Conventions apply to the Taliban, he deemed all Taliban detainees to be "unlawful combatants" who do not qualify for POW status. The memo also adopted the Rumsfeld position that detainees must be treated humanely and "consistent with military necessity, in a manner consistent with the principles of Geneva."[476] Mr. Gonzales later confirmed that this directive applied only to the Armed Forces, not to the CIA.[477]

### 2. Expanding Authority for Coercive Interrogation Tactics

The decision not to apply the Geneva Conventions to detainees in the "war on terror" created confusion among agencies about what methods were available to them in interrogations. Many of the agencies were accustomed to following directives on interrogations—like FM 34-52—that strictly complied with the Geneva Conventions. A decision that the Taliban and al Qaeda detainees were not entitled to the Geneva Conventions protections but were to be treated humanely, consistent with military necessity, left vague the rules for interrogations.

According to news reports, the CIA—which was not included in the President's February 7, 2002 directive—had questions about how far the agency could go in interrogating terror suspects without committing illegal acts. These questions led to high-level meetings, starting in July 2002, about different techniques, including "waterboarding," that were proposed by the CIA. The attendees, including Mr. Gonzales and Mr. Yoo, discussed in great detail how to legally justify certain techniques.[478] Following in part from those meetings, the Office of Legal Counsel in the Department of Justice issued two legal opinions on August 1, 2002. The first, written by Mr. Yoo, reviewed the OLC's views whether interrogation methods used on al Qaeda operatives would violate United States obligations under the Convention against Torture.[479] The memo concluded that if interrogation methods are in compliance with the federal anti-torture statute, 18 U.S.C. §§ 2340-2340(A), the methods will not run afoul of US obligations under the Convention against Torture.[480]

The second August 1, 2002 OLC opinion, written by Mr. Bybee, provided an interpretation of the federal anti-torture statute, 18 U.S.C. §§ 2340 & 2340(A).[481] This opinion appears to build on the

---

[476] Id. Other memorandums discussing legal issues and response to public inquiries followed the President's directive. See Memorandum for William J. Haynes, II, General Counsel, Department of Defense. From Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, Department of Justice. Re: Potential Legal Constraints Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan. February 26, 2002; Memorandum. From John C. Yoo, Deputy Assistant Attorney General, US Department of Justice. To William H. Taft, IV, Legal Adviser, Department of State. March 28, 2002.

[477] See Responses of Alberto R. Gonzales, Nominee to be Attorney General. To the written questions of Senator Patrick Leahy. 2005. On file with PHR.

[478] Isikoff M, Klaidman D, Hirsh M. "Torture's Path." Newsweek. December 27, 2004. Available at: http://www.msnbc.msn.com/id/6733213/site/newsweek/. Accessed April 27, 2005. When asked about these meetings in his confirmation hearing for the position of Attorney General, Mr. Gonzales said he had "a recollection that we had some discussions in my office" but said he could not remember the details. Transcript: Senate Judiciary Committee Confirmation Hearing. January 6, 2005. On file with PHR.

[479] Letter to The Honorable Alberto R. Gonzales, Counsel to the President. From John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, US Department of Justice. August 1, 2002. The memo also addressed whether interrogation methods would create the basis for a prosecution under the Rome Statute of the International Criminal Court.

[480] Id. at 2–5.

[481] Memorandum for Alberto R. Gonzales, Counsel to the President. From Office of Legal Counsel, US Department of Justice. Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340–2340A. August 1, 2002. [2002 OLC opinion].

prior memorandum, which determined that if an interrogation method complies with the federal anti-torture statute, it does not violate the Convention against Torture. The opinion created a legal definition of torture permitting a wide range of interrogation methods, including those that amount to torture.

The content of the 2002 OLC opinion is well-known. It concluded that the federal anti-torture statute may be unconstitutional if applied to interrogations of enemy combatants undertaken pursuant to the President's power as Commander-in-Chief.[482] It also provided a justification for excluding officials from prosecution when they are carrying out the President's powers.[483] Additionally, the opinion provided justification defenses that would be available to potentially eliminate criminal liability for the use of torture.[484]

The narrow definition of torture crafted by the OLC opinion is also well-known. The OLC opined that for an act to constitute torture, it must inflict pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death."[485] It was an extremely restrictive definition of torture, which was inconsistent with prior interpretations of the term by US and international courts, entities responsible for the interpretation of the Convention against Torture, and the State Department. This definition was pulled from statutes defining an emergency medical condition for the purpose of providing health benefits, even though the memo admits that these statutes address a substantially different subject from the anti-torture statute.[486] The opinion never references either the FM 34-52 or the Uniform Code of Military Justice (hereinafter UCMJ). In an admitted departure from the terms of the Convention against Torture, the opinion stated that in order to be convicted of torture, the defendant must have specifically intended to inflict severe pain.[487] And it developed a defense to negate a charge of specific intent.[488]

What is less well-known about the opinion was its new interpretation of psychological torture. The federal anti-torture statute says:

> "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.[489]

---

[482] Id. at 31–35.

[483] Id. at 35.

[484] See id. at 39–46. Examining the defenses of necessity and self-defense.

[485] Id. at 1.

[486] Id. at 5–6.

[487] Id. at 15 n.7. Admitting that the language in the Convention against Torture "might be read to require only general intent for violations of the Torture Convention. . . . If . . . the Convention established a general intent standard, then the Bush understanding represents a modification of the obligation undertaken by the United States."

[488] Id. at 8.

[489] 18 U.S.C. §2340(2).

The statute was a definition agreed to by the Bush Administration and Congress, and reflected an effort to more precisely define psychological torture.[490] But here, too, the OLC sought to strip the statute of any content. The opinion concluded that in order for mental pain or suffering to amount to torture, it must "result in significant psychological harm of significant duration, e.g., lasting for months or even years."[491] It did note, however, that "the development of a mental disorder such as posttraumatic stress disorder . . . or even chronic depression . . . might satisfy the prolonged mental harm requirement."[492] In addition, the opinion noted, someone accused of torture must specifically intend to cause prolonged mental harm to have committed torture.[493] As with severe pain, the opinion additionally argued that someone accused of torture could negate a showing of specific intent to cause severe mental pain or suffering if he has a *good faith belief that his actions will not result in prolonged mental harm*. The opinion then gave advice on how to show that an action was taken in good faith.[494] This defense turns torture on its head; instead of focusing on actions that amount to torture, it focuses on the torturer's beliefs about the extent of harm to the victim.

In considering death threats, the 2002 OLC opinion said that "the threat must indicate that death is 'imminent.'"[495] It concluded that mock executions or playing Russian roulette with detainees would qualify as imminent. But it added that the existence of a threat must be assessed from the perspective of a reasonable person in the same circumstances.[496]

When interpreting the phrase "the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality," the OLC not surprisingly provided a construction that denudes the phrase of content.  It determined that to constitute such acts, the method must "penetrate to the core of an individual's ability to perceive the world around him, substantially interfering with his cognitive abilities, or fundamentally alter his personality."[497] The OLC considered the following to constitute a profound disruption of the senses or personality: drug-induced dementia; the onset of "brief psychotic disorder, including delusions and hallucinations"; the onset of obsessive-compulsive disorder; and pushing individuals to the brink of suicide.[498] This extremely narrow construction of the language of the statute goes far beyond any past interpretation and opened the door to the use of psychological torture.

Reportedly, a companion memorandum to the August 2002 OLC opinion outlined specific methods that the CIA could use.  It remains classified.[499]

Although the 2002 OLC opinion drove interrogation policies, this interpretation remained secret for almost two years, and the Administration never acknowledged that it had substantially reinterpreted the law governing torture. After the opinion was leaked, on June 22, 2004, the

---

[490] See 2002 OLC opinion, *supra* note 481, at 18–19.

[491] *Id.* at 1.

[492] *Id.* at 11.

[493] *Id.* at 8.

[494] "A defendant could show that he acted in good faith by taking such steps as surveying professional literature, consulting with experts, or reviewing evidence gained from past experience." *Id.* at 8.

[495] *Id.* at 12.

[496] *Id.* See also, *id.* at 9. Developing the reasonable person standard for assessing threats under part (A) of 18 U.S.C. §2340(2).

[497] *Id.* at 11.

[498] *Id.*

[499] Jehl D. "C.I.A. Is Seen as Seeking New Role on Detainees." *New York Times.* February 16, 2005.

Administration released the 2002 OLC opinion to the public. After an uproar about the views expressed in the opinion, the Administration said that it was no longer good policy and that it would be revised.

It was not until December 30, 2004 that a new opinion was issued by the OLC.[500] The 2004 OLC opinion interpreting the meaning of torture under the US criminal statute purports to restore the commitment of the Bush Administration to ending torture. A closer look at the new opinion, however, shows the Administration's continued refusal to stop psychological torture.

The new opinion repudiated three important claims in the 2002 OLC opinion. First, it declines to support the claim of the earlier opinion that the President, in his role as Commander in Chief, can choose to ignore international treaties and our own criminal statutes. The new opinion says that because President Bush opposes torture by US forces, there is no need to consider whether the authority exists to engage in it.[501]

Second, the new opinion repudiates the prior interpretation of "severe" pain in the definition of torture. The new opinion interprets "severe" in the ordinary sense, that is, "extremely violent and intense."[502] It does consider torture to be an extreme form of cruel and inhuman treatment,[503] and cites a case from the European Court of Human Rights that the combined use of wall-standing, hooding, subjection to noise, deprivation of sleep, and deprivation of food and drink constituted inhuman or degrading treatment but not torture under the European Convention.[504] It also cites a series of cases under the Torture Victims Protection Act that illuminate the definition.[505] Moreover, it acknowledges that since torture can be defined by "severe suffering" as well as "severe pain" there are circumstances where a practice amounts to torture even in the absence of severe pain if it is of extended duration or persistence.[506]

Third, it revises the specific intent requirement. It rejects the idea that the specific intent requirement of the statute means that the infliction of severe pain or suffering must be the "precise objective" of the perpetrator.[507] It also makes clear that the specific intent requirement is different from motive, and that "there is no exception . . . permitting torture to be used for a 'good reason,'" including to protect national security.[508]

With respect to its interpretation of mental pain and suffering, however, the new opinion introduces a new interpretation that allows psychological torture.[509]

The new opinion does not, as the 2002 OLC opinion did, discuss each of the four practices specifically forbidden by the domestic anti-torture statute. These four practices inflict severe

---

[500] Memorandum for James B. Comey, Deputy Attorney General. From Daniel Levin, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice. December 30, 2004. [2004 OLC opinion].
[501] *Id.* at 2.
[502] *Id.* at 5.
[503] *Id.* at 6–7.
[504] *Id.* at 6 n.14.
[505] *Id.* at 9–10.
[506] *Id.* at 11–12.
[507] *Id.* at 16 n.27.
[508] *Id.* at 17.
[509] See Physicians for Human Rights. New Opinion Will Not Prevent Torture or Cruel, Inhuman or Degrading Treatment, Particularly Severe Mental Pain and Suffering: An Analysis of the Office of Legal Counsel Opinion of December 30, 2004 by Physicians for Human Rights. January 4, 2005. Available at: http://www.phrusa.org/research/torture/tortureopinion.html. Accessed April 27, 2005.

forms of mental pain, including the use or threatened use of "procedures calculated to disrupt profoundly the sense or personality."[510]

The language of the statute on this point is clear.[511] It is obvious from the language and syntax that the four practices enumerated in the statute are prohibited. The use of the phrase "the prolonged mental harm caused by" is a determination that Congress deemed each of these to cause harm; if it were otherwise, the language would read "prolonged mental harm caused by." The inclusion of the word "the" makes this clear.

The new OLC opinion, however, refuses to abide by this natural reading. It acknowledges the language, but says that it does not reflect Congress' intent.[512] But it cites nothing to suggest that Congress had a different intent except language summarizing the provision without the word "the." There is no elucidation, no explanation, no assessment that the language in the statute means anything other than what it says. In fact the OLC analysis claims Congress did not intend a material change, nor to go beyond, the definition of mental pain and suffering in the Convention against Torture.[513] But the Convention itself contains no definition of mental pain and suffering at all, and it seems evident that the very reason Congress placed the four examples in the statute was, as the legislative history makes clear, to implement the section. It did so by giving greater precision to the term than the Convention does.

This is critical because it means that in OLC's view the four types of procedures will not necessarily constitute torture at all and thus are unlikely to be prohibited. Even worse, in OLC's view, these techniques only amount to torture if there is a *specific* showing of prolonged mental harm to the victim, which OLC interprets to mean harm over a long period of time. Its examples suggest that the effects must last years after the fact.[514] This contradicts its statement that to the extent the 2002 OLC interpretation of the phrase "prolonged mental harm" was "intended to suggest that the mental harm would have to last for at least 'months or even years,' we do not agree."[515] Given that, there would be no reason for the Defense Department or CIA to prohibit them, since they are only unlawful if it is shown that they led to prolonged suffering after an extended period.

In other words, under OLC's current view, the acts themselves—which are specifically enumerated in the anti-torture statute—are not considered torture. It is only when there exists proof of long term harm that OLC will concede that torture was committed. This turns the very idea of the prohibition against torture on its head since the purpose of the laws against torture is to prevent interrogators from using it in the first place, not waiting to see what impact it may have. With such an interpretation, there is little reason for interrogators to worry about being held accountable for engaging in horrific acts of psychological torture. In short, if OLC's interpretation is followed, psychological torture in the form of death threats, sensory deprivation, isolation, sexual humiliation, and sleep deprivation, is likely to continue.

---

[510] 18 U.S.C. § 2340(2)(B).

[511] See *supra* text accompanying note 489.

[512] 2004 OLC opinion, *supra* note 500, at 13.

[513] *Id.* at 13, 14.

[514] *Id.* at 15. Reviewing *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002), where "mental effects were continuing years after the infliction of the predicate acts" and *Sackie v. Ashcroft*, 270 F. Supp. 2d 596 (E.D. Pa. 2003), where the resulting mental harm continued over a three-to-four year period.

[515] 2004 OLC opinion, *supra* note 500, at 14 n.24.

## B.  Translating the Legal Interpretations into Policy Guidance

### 1.  Formalizing Methods Already Being Used

The repudiation of the Geneva Conventions' applicability to al Qaeda and Taliban detainees left a void, which was soon filled with improvised forms of coercion. There is evidence, detailed above, that as soon as the "war on terror" began, so too did the use of psychologically abusive interrogation methods.[516] Soon, however, commanders at Guantánamo sought to formalize their improvised forms of psychological coercion through policy guidance.

On October 11, 2002, Lt. Col. Jerald Phifer of the US Army sent a joint task force memorandum to Maj. Gen. Michael Dunlavey, the Commander of Joint Task Force 170, the intelligence task force at Guantánamo at the time.[517] In it, Lt. Col. Phifer complained that the "current guidelines for interrogation procedures at GTMO limit the ability of interrogators to counter advanced resistance."[518] He then requested approval for a new interrogation plan, in which a detainee deemed "uncooperative" could be subjected to increasingly intense interrogation methods.

The proposed interrogation plan separated methods into three different categories.  Category I techniques included yelling at the detainee and techniques of deception.  Category II techniques included deprivation of light and auditory stimuli, hooding during transportation and questioning, the use of 20 hour interrogations, removal of comfort items and clothing, forced grooming, and using detainees' individual phobias (such as fear of dogs) to induce stress. These required approval of the Officer in Charge of the Interrogation Section. The use of the isolation facility for up to 30 days also was categorized as a Category II technique, although a request had to be made and extensions beyond 30 days had to be approved by the Commanding General.  Category III techniques included the use of scenarios designed to convince the detainee that death or severely painful consequences are imminent for him and/or his family and use of a wet towel and dripping water to induce the misperception of suffocation (waterboarding).  These techniques required the submission of a request and appropriate legal review.  The memo stated that Category III techniques were required for less than 3% of the most uncooperative detainees.[519]  It also specified that the techniques would be administered only by individuals specifically trained in their safe application.

Accompanying the Phifer memorandum was a memorandum by Lt. Col. Diane E. Beaver, a Staff Judge Advocate in the US Army.[520]  The Beaver memorandum offered a legal analysis of the proposed interrogation plan to justify the proposed techniques. It authorized the proposed techniques despite recognizing that they violate the UCMJ and the federal anti-torture statute[521] and have been shown to cause mental harm.

---

[516] See *supra* Section III.A.

[517] Memorandum for Commander, Joint Task Force 170. From Jerald Phifer, LTC, USA, Director J2. Subject: Request for Approval of Counter-Resistance Strategies. October 11, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc3.pdf. Accessed April 27, 2005. [Phifer Memorandum].

[518] *Id.*

[519] *Id.*

[520] Memorandum for Commander, Joint Task Force 170. From Diane E. Beaver, LTC, USA, Staff Judge Advocate. Subject: Legal Brief on Proposed Counter Resistance Strategies. October 11, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc3.pdf. Accessed April 27, 2005.

[521] See *infra* Section VI.B.1 and VI.C.1.

The Beaver memorandum started by noting that the commonly approved interrogation techniques being used by Department of Defense (hereinafter DoD) interrogators at Guantánamo were being resisted by detainees. Lt. Col. Beaver pointed out that "compounding this problem is the fact that there is no established clear policy for interrogation limits and operations at GTMO, and many interrogators have felt in the past that they could not do anything that could be considered 'controversial.'"[522] She highlighted the confusion felt by interrogators and commanders who were told by the President that the detainees were not considered enemy prisoners of war but nevertheless were to be treated humanely. Indeed, the confusion was evident when Lt. Col. Beaver stated that the procedures in Army Field Manual 34-52 are not binding because they only apply in situations governed by the Geneva Conventions.[523]

The Beaver memorandum thus concluded that the counter-resistance techniques proposed in the Phifer memorandum "are lawful because they do not violate the Eighth Amendment. . . . or the federal torture statute . . . . An international law analysis is not required for the current proposal because the Geneva Conventions do not apply to these detainees since they are not [enemy prisoners of war]."[524]

Lt. Col. Beaver also took into account the 2002 OLC opinion that redefined torture to allow a host of highly coercive interrogation techniques. With respect to the federal anti-torture statute, the Beaver memorandum mirrored the conclusions of the OLC August 2002 torture opinion:

> The federal torture statute will not be violated so long as any of the proposed strategies are not specifically intended to cause severe physical pain or suffering or prolonged mental harm. Assuming that severe physical pain is not inflicted, absent any evidence that any of these strategies will in fact cause *prolonged* and *long lasting mental harm*, the proposed methods will not violate the statute.[525]

Using the OLC's constricted interpretation of the federal torture statute and ignoring the Convention against Torture and Geneva Conventions allowed Lt. Col. Beaver to give legal cover to the use of psychologically abusive interrogation methods that amount to torture and/or cruel, inhuman, and degrading treatment.

The memorandum then considered each interrogation technique in turn, allowing for many coercive interrogation techniques, including those outlawed by the UCMJ. For example, the memo noted that placing a wet towel or hood over a detainee's head would constitute a per se violation of Article 128 of the UCMJ.[526] She similarly found that threatening a detainee with death may constitute a violation of either Article 128 or Article 134 of the UCMJ. She concluded, however, that these were permissible, advising only, "It would be advisable to have permission or immunity in advance from the convening authority, for military members utilizing these methods."[527]

---

[522] *Id.* at 1.
[523] *Id.* at 1.
[524] *Id.* at 5.
[525] *Id.* at 5. Emphasis added.
[526] *Id.* at 5.
[527] *Id.* at 5.

Other methods were approved based on a combination of reasoning from the 2002 OLC opinion and the President's February 7 directive, which stated that military necessity could overcome the mandate to treat detainees humanely.

With respect to the use of isolation, the Beaver memorandum said its use for up to 30 days is legally permissible "so long as no severe physical pain is inflicted and prolonged mental harm intended, and because there is a legitimate governmental objective in obtaining the information necessary . . . ."[528] She noted that "absent medical evidence to the contrary, there is no evidence that prolonged mental harm would result . . . ."[529] This advice is contrary both to the universal standard that military objectives can never justify torture and to the extensive evidence, cited below, that isolation often does cause prolonged mental harm.[530]

The memo further argued that the deprivation of light and auditory stimuli, the placement of a hood over a detainee's head during transportation and questioning, and the use of 20 hours of interrogation were "all legally permissible so long as there is an important governmental objective, and it is not done for the purpose of causing harm or with the intent to cause prolonged mental suffering."[531]

The memo also approved of the use of forced grooming, removal of clothing, and exploitation of detainees' phobias:

> Forced grooming and removal of clothing are not illegal, so long as it is not done to punish or cause harm, as there is a legitimate governmental objective to obtain information, maintain health standards in the camp and protect both the detainees and the guards. . . . The use of the detainee's phobias is equally permissible.[532]

The memo did, however, caution about the use of some techniques. With respect to techniques that would deprive a detainee of sleep, Lt. Col. Beaver noted that while "[t]here is no legal requirement that detainees must receive four hours of sleep per night," in order to "pass Eighth Amendment scrutiny, and as a cautionary measure, they should receive some amount of sleep so that no severe physical or mental harm will result."[533] The memo did not explain what is meant by "some amount of sleep."

With respect to Category III techniques, Lt. Col. Beaver opined that the use of scenarios designed to convince the detainee that death or severely painful consequences are imminent is not illegal despite its explicit prohibition in the federal anti-torture statute. She justified its use on the basis that exists a compelling governmental interest and it is not done intentionally to cause prolonged harm.[534] She noted, however, that "caution should be utilized with this technique because the torture statute specifically mentions making death threats as an example of inflicting mental pain and suffering."[535] Such cautions, of course, are meaningless when a legal green light is given to use the technique, which is exactly what Lt. Col. Beaver did.

---

[528] *Id.*
[529] *Id.* at 6.
[530] See *supra* Section IV.C.1.
[531] *Id.* at 6.
[532] *Id.*
[533] *Id.*
[534] *Id.* at 6.
[535] *Id.*

Regarding waterboarding, Lt. Col. Beaver found, "The use of a wet towel to induce the misperception of suffocation would also be permissible if not done with the specific intent to cause prolonged mental harm, and absent medical evidence that it would.[536] She did not, "Caution should be exercised with this method, as foreign courts have already advised about the potential mental harm that this method may cause."[537]

In the end, Lt. Col. Beaver recommended that all of the proposed methods of interrogation be approved, and that interrogators be properly trained in the use of the methods.[538] She further recommended that all Category II and III methods undergo a legal, medical, behavioral science, and intelligence review prior to their use.[539]

After receiving the memos from Phifer and Beaver, Maj. Gen. Dunlavey requested that General James T. Hill, Commander of the United States Southern Command (hereinafter SOUTHCOM), approve the Category I, II, and III interrogation techniques.[540] Apparently relying on Lt. Col. Beaver's memo, which followed the reasoning of the 2002 OLC opinion, he argued that these techniques "do not violate U.S. or international law."[541]

Gen. Hill did not approve all of the recommendations. In a memorandum to Gen. Richard B. Myers, Chairman of the Joint Chiefs of Staff, on October 25, 2002, Gen. Hill stated that he believed the first two categories of interrogation techniques are "legal and humane."[542] He noted, however, that he was uncertain whether all the techniques in the third category are legal under US law, given the absence of judicial interpretation of the US torture statute, and indicated that he was "particularly troubled by the use of implied or expressed threats of death of the detainee or his family."[543] He nonetheless requested to have "as many options as possible at my disposal" and said he would "welcome any suggested interrogation methods that others may propose" because "we should provide our interrogators with as many legally permissible tools as possible."[544]

Subsequently, William Haynes, General Counsel of the Defense Department, sent a memorandum on November 27, 2002 to Secretary Rumsfeld that recommended the authorization of the Category I and II techniques during the interrogation of detainees at Guantánamo. Moreover, Haynes argued that they were not prohibited by law and even recommended the use of one technique listed in Category III: mild, non-injurious physical contact such as grabbing, poking in the chest with a finger, and light pushing.[545] In other

---

[536] Id.

[537] Id.

[538] It is interesting that categories were created in the first place, considering that all techniques were authorized.

[539] Id. at 7.

[540] Memorandum for Commander, United States Southern Command. From Michael E. Dunlavey, Major General, USA, Commanding. Subject: Counter-Resistance Strategies. October 11, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc3.pdf. Accessed April 27, 2005.

[541] Id.

[542] Memorandum for Chairman of the Joint Chiefs of Staff. From James T. Hill, General, US Army, Commander. Subject: Counter-Resistance Techniques. October 25, 2002. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc4.pdf. Accessed April 27, 2005.

[543] Id.

[544] Id.

[545] Memorandum. For Secretary of Defense. From William J. Haynes II, General Counsel. Subject: Counter-Resistance Techniques. November 27, 2002. Available at:

words, the only forms of torture he did not recommend for use at Guantánamo were threats of imminent death to detainees and/or detainees' families, exposure to cold weather or water, and waterboarding.[546] At the same time, Mr. Haynes noted, "While all Category III techniques may be legally available, we believe that, as a matter of policy, a blanket approval of Category III techniques is not warranted at this time. Our Armed Forces are trained to a standard of interrogation that reflects a tradition of restraint."[547] This memo is consistent with the prior ones in sending a conflicting message—one that claims to adhere to tradition of restraint in the Armed Forces while undermining that tradition by approving techniques that both go far beyond accepted practices and rely on a legal argument that repudiated the absolute prohibition against torture.

On December 2, 2002, Secretary Rumsfeld approved the interrogation methods recommended by Mr. Haynes for use at Guantánamo, noting, "However, I stand for 8-10 hours A day. Why is standing limited to 4 hours?"[548]

This series of memorandums among military officials was clearly designed to open the door to severe forms of psychological coercion. This was recognized by an FBI agent at Guantánamo who sent an e-mail on December 9, 2002 that included some documents he thought "may be of interest" to someone "reviewing the legal aspects of interviews."[549] One of the included documents was a "review of interrogation methods by a DOD lawyer."[550] This could be the Beaver memorandum, or could refer to Mr. Haynes' approval of the techniques. The FBI agent noted, "[B]asically, it appears that the lawyer worked hard to [write] a legal justification for the type of interviews they [the Army] want to conduct here."[551]

On January 15, 2003, however, Secretary Rumsfeld issued a memorandum for the Commander of SOUTHCOM that rescinded the December 2, 2002 approval of the use of all Category II techniques and the one Category III technique.[552] According to reports, this rescission occurred because of reservations expressed by the General Counsel of the Department of the Navy, Alberto J. Mora.[553] Despite rescinding his approval of the techniques, Secretary Rumsfeld said in the January 15 memorandum that if use of one of the rescinded techniques was warranted, he should receive a request. This willingness to consider the use of techniques that had been rescinded over concerns about their abusive nature conflicts with another statement in the memo: "In all interrogations, you should continue the humane treatment of detainees, regardless of the type of interrogation technique employed."[554] The mixed message of coercion and humane treatment continued.

---

http://www.npr.org/documents/2004/dod_prisoners/20040622doc5.pdf. Accessed April 27, 2005. [Haynes Memorandum].

[546] *Compare* Phifer Memorandum, *supra* note 517, *with* Haynes Memorandum, *supra* note 545.

[547] Haynes Memorandum, *supra* note 545.

[548] *Id.*

[549] E-mail. From [redated]. To [redacted]. Subject: Legal Issues re: Guantanamo Bay. December 9, 2002. Available at: http://www.aclu.org/torturefoia/released/FBI.121504.4076.pdf. Accessed April 27, 2005.

[550] *Id.*

[551] *Id.*

[552] Memorandum for Commander USSOUTHCOM. From Donald Rumsfeld, Secretary of Defense. Subject: Counter-Resistance Techniques. January 15, 2003.

[553] Schlesinger report, *supra* note 15, at 7; Church executive summary, *supra* note 42, at 4.

[554] Memorandum for Commander USSOUTHCOM. From Donald Rumsfeld, Secretary of Defense. Subject: Counter-Resistance Techniques. January 15, 2003.

The same day, Secretary Rumsfeld issued a memorandum establishing a working group within the Department of Defense to assess the legal, policy, and operational issues relating to the interrogation of detainees. He directed the Working Group, composed of administration lawyers, to develop recommendations on the legal considerations raised by interrogation, the policy considerations with respect to the choice of interrogation techniques, and recommendations for employment of particular interrogation techniques by DoD interrogators.[555] This review was not limited to Guantánamo, but rather was to "take into account the various potential geographic locations where U.S. Armed Forces may hold detainees."[556]

On April 4, 2003, the Working Group released its report on detainee interrogations.[557] The report considered three types of interrogation techniques:

> (i) routine (those that have been ordinarily used by interrogators for routine interrogations), (ii) techniques comparable to the first type but not formally recognized, and (iii) more aggressive counter-resistance techniques than would be used in routine interrogations.[558]

The Working Group report reiterated the view that the Geneva Conventions do not protect al Qaeda detainees and that Taliban detainees do not qualify for POW status.
The Working Group also adhered to the view that notwithstanding settled law on the absolute prohibition against torture, including psychological torture, using coercive tactics beyond those permitted by the Geneva Conventions could be justified by "military necessity."[559]

The Working Group report then turned its attention to the federal anti-torture statute. It first contended that the federal anti-torture statute does not apply to the conduct of US personnel at Guantánamo since the statute requires that the offense occur "outside the United States" and the Working Group concluded that Guantánamo is included within the definition of the special and territorial jurisdiction of the United States.[560]

The Working Group report's interpretation of the federal anti-torture statute closely tracked the August 2002 OLC opinion. Like the 2002 OLC opinion, the report looked at legal doctrines under federal criminal law that could render specific conduct, otherwise criminal, *not* unlawful.

---

[555] Memorandum for the General Counsel for the Department of Defense. From Donald Rumsfeld, Secretary of Defense. Subject: Detainee Interrogations. January 15, 2003. Available at: http://www.npr.org/documents/2004/dod_prisoners/20040622doc6.pdf. Accessed April 27, 2005.
[556] Memorandum for the General Counsel of the Department of the Air Force. From William J. Haynes II, General Counsel of the Department of Defense. Subject: Working Group to Assess Legal, Policy, and Operational Issues Relating to Interrogation of Detainees Held by the U.S. Armed Forces in the War on Terrorism. January 17, 2003. In this memo, Mr. Haynes, who was directed to oversee the Working Group, appointed the General Counsel to the Department of the Air Force as Chair of the Working Group and asked for recommendations to be provided to him by January 29, 2003. *Id.*
[557] Working Group Report on Detainee Interrogations in the Global War on Terrorism; Assessment of Legal, Historical, Policy, and Operational Considerations. April 4, 2003. [Working Group Report].
[558] *Id.* at 2.
[559] "It may be appropriate for the appropriate approval authority to authorize as a military necessity the interrogation of such unlawful combatants in a manner beyond that which may be applied to a prisoner of war who is subject to the protections of the Geneva Conventions." *Id.* at 3.
[560] *Id.* at 7–8. This view conflicts with the arguments the Administration made before the Supreme Court in *Rasul v. Bush*, where it argued that Guantánamo is not part of the sovereign US for purposes of granting detainees the right of habeas corpus. See Brief for the Respondents at 11. *Rasul v. Bush.* 124 S. Ct. 2686. 2004. Nos. 03-334, 03-343.

Specifically, it considered commander-in-chief authority, declaring, as did OLC, the President's complete authority over the conduct of war and concluding that the prohibition against torture "must be construed as inapplicable to interrogations undertaken pursuant to his Commander-in-Chief authority."[561] Like the OLC, it reviewed and approved of necessity and self-defense as justifications for torture,[562] and added the defense of superior orders.[563]

The Working Group report repeated language verbatim from the 2002 OLC opinion regarding the specific intent needed to commit torture.[564] It also followed OLC's definition of torture, setting a very high threshold for qualification of torture under the statute.[565]

The Working Group report also iterated the OLC opinion's analysis of severe mental pain or suffering verbatim, including requirements that there must be prolonged mental harm, that it requires specific intent to cause prolonged mental harm, and that a showing of good faith could be a complete defense to a charge.[566] By adopting the same extremely constricted construction of the meaning of torture as the OLC, the Working Group report created space for the use of psychological torture.

With respect to the prohibition against cruel, inhuman, and degrading treatment contained in the Convention against Torture, the Working Group noted that the United States considered the term to mean the same as treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the US Constitution. The Working Group therefore undertook a review of these standards but interpreted the cases it considered very narrowly.[567]

The Working Group report included a section on considerations affecting policy. It understood the implications for the United States and its military personnel of the use of extreme and abusive interrogation techniques. It said consideration should be given to "the possible adverse effects on U.S. Armed Forces culture and self-image, which at times in the past may have suffered due to perceived law of war violations" and to "whether implementation of such exceptional techniques is likely to result in adverse effects on DOD personnel who become POWs, including possible perceptions by other nations that the United States is lowering standards related to the treatment of prisoners, generally."[568] These considerations did not deter it from approving severe psychological coercion.

The Working Group recognized the potential for confusion and problems when allowing coercion, as the Army Field Manual and Geneva Conventions do not. It cautioned that the

---

[561] Working Group Report, *supra* note 557, at 21.

[562] *Compare* Working Group Report, *supra* note 557, at 25–30, *with* 2002 OLC opinion, *supra* note 481, at 39–46.

[563] See Working Group Report, supra note 557, at 32–33.

[564] *Compare id.* at 8–9, *with* 2002 OLC opinion, *supra* note 481, at 3–4.

[565] The Working Group report removed the discussion of "severe pain" in statutes defining an emergency medical condition for the purpose of providing health benefits, which the OLC used as a reference for its definition of torture. And it left the definition of "severe" at "of such a high level of intensity that the pain is difficult for the subject to endure" rather than saying that it must rise to the level of death, organ failure, or serious impairment of bodily function." *Compare* Working Group Report, *supra* note 557, at 10- 11, *with* 2002 OLC opinion, *supra* note 481, at 5–6.

[566] *Compare* Working Group Report, *supra* note 557, at 11–16, *with* 2002 OLC opinion, *supra* note 481, at 6–12.

[567] See Working Group Report, *supra* note 557, at 35–43.

[568] *Id.* at 55.

> [g]eneral use of exceptional techniques (generally, having substantially greater risk than those currently, routinely used by U.S. Armed Forces interrogators), even though lawful, may create uncertainty among interrogators regarding the appropriate limits of interrogations. They should therefore be employed with careful procedures and only when fully justified.[569]

The report also acknowledged that "[p]articipation by U.S. military personnel in interrogations which use techniques that are more aggressive than those appropriate for POWs would constitute a significant departure from traditional U.S. military norms and could have an adverse impact on the cultural self-image of U.S. military forces."[570] Nevertheless, as detailed below, it recommended the use of all techniques beyond FM 34-52 that it considered.

The report considered each individual interrogation technique. In doing so, it assessed the utility, international and US law interpretations, and policy considerations, such as consistency with major partner nation views, effect on captured US forces, and potential effect on detainee prosecutions. It assigned either a green, yellow, or red light for each of the categories. The report acknowledged that "*[w]hile techniques are considered individually within this analysis, it must be understood that in practice, techniques are usually used in combination; the cumulative effect of all techniques to be employed must be considered before any decisions are made regarding approval for particular situations.*"[571] Hooding, environmental manipulation, threats to transfer to a third country where the person could face death, isolation, forced grooming, removal of clothing, sleep deprivation, and inducement of fear were all approved.

With respect to hooding, which was defined as questioning the detainee with a blindfold in place,[572] the Working Group found that it has a high utility, that it is acceptable under the Convention against Torture, is not cruel, inhuman, and degrading treatment, and is acceptable under US domestic law. It approved its use.

When considering the use of environmental manipulation, the Working Group found that it has a high utility, is acceptable, in its view, under the Convention against Torture, is not considered cruel, inhuman, or degrading treatment, and is acceptable under US domestic law. The report did acknowledge, however, that international case law suggests that it might in some circumstances be viewed by other countries as inhumane.[573]

As to threats to transfer the detainee to a third country where the detainee is likely to fear the use of torture or death, the Working Group found this technique to be of medium utility. The report said that it is acceptable under the Convention against Torture and US domestic law and is not considered cruel, inhuman, or degrading—this despite its explicit prohibition in the federal anti-torture statute. The report gave this technique a green light for all policy considerations, although it acknowledged that it "may significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions)."[574]

---

[569] *Id.* at 69.

[570] *Id.*

[571] *Id.* at 62. Emphasis in original.

[572] *Id.* Chart at 2A, 2B, 5 n.8.

[573] *Id.* Chart at 2A, 2B, 5 n.10.

[574] *Id.* Chart at 3A, 3B.

Regarding the use of isolation, the Working Group found that it is of high utility but it is "Not known to have been generally used for interrogation purposes for longer than 30 days."[575] The Working Group found, "The use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval of extensions of the length of isolation by the appropriate level in the chain of command."[576] Nevertheless, it gave isolation a green light. With respect to major partner nations, the report gave isolation a yellow light since other countries that assert that POW protections would apply to the detainees would find it inconsistent with the requirements of the Geneva Conventions. It recommended its use subject to limitations outlined in the report and that it be approved by an officer no lower than the Combatant Commander.[577]

When considering the use of forced grooming, the Working Group categorized it as "force applied with intention to avoid injury."[578] It claimed forced grooming is of high utility but acknowledged that where there are religious or cultural sensitivities, this technique could raise the issue of whether it is "degrading" if it is not applied in accordance with general limitations. Yet the report still gave forced grooming a green light, even though it acknowledged that US forces have not used it historically. It also noted that the technique could be viewed by major partner nations as degrading in some circumstances. It recommended that its use be exceptional and subject to limitations and that approval must come from an officer no lower than a General Officer or Flag Officer.[579]

As to sleep deprivation, which the report said is not to exceed 4 days in succession, the report said it is of high utility. It acknowledged, however, that the Committee against Torture has interpreted "sleep deprivation for prolonged periods" to be a violation of both Articles 16 and 1 of the Convention against Torture.[580] It also noted that the European Court of Human Rights has held that sleep deprivation, in conjunction with four other problematic techniques, constituted inhuman and degrading treatment. The Working Group also cautioned against its use for the effect on captured US forces and potential adverse effect for participants and supervisors. In addition, it acknowledged that the use of sleep deprivation may "significantly affect admissibility of statements provided based on voluntariness consideration (lesser issue for military commissions)."[581] Finally, it said that knowledge of the use of sleep deprivation may have a significant adverse impact on public opinion. Nevertheless, it recommended its use, subject to limitations and with approval coming from an officer no lower than the Combatant Commander.[582]

When considering the removal of clothing, the Working Group acknowledged that it can create a feeling of helplessness and dependence in the detainee.[583] It therefore said that its use must be monitored to ensure the environmental conditions are such that this technique does not injure the detainee. It said it is of high utility, but that depending on application of the technique, it could be construed as degrading. It also gave it yellow lights for US law, consistency with major

---

[575] *Id.* Chart at 3A, 3B, 6 n.14.
[576] *Id.* Chart at 3A, 6 n.11.
[577] *Id.* Chart at 3A, 3B.
[578] *Id.* Chart at 11.
[579] *Id.* Chart at 3A, 3B, 6 n.19, 7 n.21 & 22.
[580] *Id.* Chart at 3B, 7 n.24.
[581] *Id.* Chart at 3B, 7 n.25.
[582] *Id.* Chart at 3B, 7 n.26.
[583] *Id.* Chart at 11.

partner nation views, and potential effect on detainee prosecutions. Finally, it noted that knowledge of this technique may have a significant adverse impact on public opinion. Nonetheless, it recommended its use, subject to limitations and approval from no lower than the Combatant Commander.[584]

Regarding severely increasing detainee fear by the use of aversive methods, such as the "simple presence of dogs without directly threatening action," the Working Group said that this technique requires the commander to develop specific and detailed safeguards to insure detainees' safety.[585] The report said it is of high utility but that it could be considered cruel, inhuman, or degrading, depending on the specific technique employed. It also said that, depending on the technique used and subject response, "potential exists that technique could be viewed as violating 5th/8th/14th Amendment standards, and therefore violate U.S. interpretation of Torture Convention."[586] It acknowledged that its use could provide a basis for other nations to justify the use of more aggravated mental techniques on US POWs, but still gave it a green light. It recommended its use but on an exceptional and limited level and with approval from no lower than the Combatant Commander.

Thus, despite the numerous concerns it recognized about the use of psychologically abusive interrogation techniques and the prohibition of many of them under law, the Working Group nonetheless recommended the use of 35 techniques. The Working Group recommended 26 techniques for use with alleged unlawful combatants outside the United States subject to general limitations. The first 17 of these techniques were taken from FM 34-52. The remaining 9 included hooding, environmental manipulation, sleep adjustment, false flag, and threaten to transfer to a 3rd country. It then recommended an additional 9 techniques, including isolation, forced grooming, sleep deprivation, removal of clothing, and increasing anxiety by use of aversions. These were recommended to be approved for use with unlawful combatants outside the United States subject to the general limitations as well as the specific limitations regarding "exceptional" techniques as follows: conducted at strategic interrogation facilities; where there is a good basis to believe that the detainee possesses critical intelligence; the detainee is medically and operationally evaluated as suitable (considering all techniques to be used in combination); interrogators are specifically trained for the technique(s); a specific interrogation plan (including reasonable safeguards, limits on duration, intervals between applications, termination criteria and the presence or availability of qualified medical personnel) is developed; appropriate supervision is provided; and, appropriate specific senior level approval is given for use with any specific detainee (after considering the foregoing and receiving legal advice).[587]

Overall, the Working Group report acknowledged that such alleged safeguards did not ameliorate the danger of going beyond techniques authorized by Army FM 34-52 and the Geneva Conventions; that certain of the recommended techniques have not historically been used by US military forces; that some have been interpreted to constitute torture or cruel, inhuman, and degrading treatment; and that they could be viewed negatively by other countries and the public. Yet the Working Group approved the use of these psychologically abusive techniques. Although it recommended the use of safeguards, the overall message of the report was one of permissiveness.

---

[584] *Id.* Chart at 3A, 3B, 8 n.34-37.

[585] *Id.* Chart at 11.

[586] *Id.* Chart at 3A, 8, n.38 & 39.

[587] *Id.* at 70.

On April 16, 2003, in response to the Working Group's report, Secretary Rumsfeld sent a memorandum to SOUTHCOM, the command with control over Guantánamo, regarding counter-resistance techniques in the "war on terror."[588] The memo approved the use of 24 specified counter-resistance techniques, which were attached to the memo, including environmental manipulation and isolation.[589]  The memo did not explain why it omitted 11 of the techniques approved by the Working Group, including hooding, threat of transfer, use of prolonged interrogation, forced grooming, sleep deprivation, removal of clothing, and increasing anxiety by use of aversions.  The techniques not mentioned were not completely excluded, however. The memo states, "It is important that interrogators be provided reasonable latitude to vary techniques depending on the detainee's culture, strengths, weaknesses, environment, extent of training in resistance techniques as well as the urgency of obtaining information that the detainee is known to have."[590]

The memo acknowledged that "[w]hile techniques are considered individually within this analysis, it must be understood that in practice, techniques are usually used in combination; the cumulative effect of all techniques to be employed must be considered before any decisions are made regarding approval for particular situations."[591]

With respect to isolation, the memo cautioned,

> The use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval for extensions of the length of isolation by the appropriate level in the chain of command.  This technique is not known to have been generally used for interrogation purposes for longer than 30 days.  Those nations that believe detainees are subject to POW protections may view use of this technique as inconsistent with the requirements of Geneva III, Article 13 which provides that POWs must be protected against acts of intimidation; Article 14 which provides that POWs are entitled to respect for their person; Article 34 which prohibits coercion and Article 126 which ensures access and basic standards of treatment.  Although the provisions of Geneva are not applicable to the interrogation of unlawful combatants, consideration should be given to these views prior to application of the technique.[592]

The cover memo noted that if isolation is intended, "you must specifically determine that military necessity requires its use and notify me in advance."[593]

---

[588] Memorandum for the Commander, US Southern Command. From Donald Rumsfeld, The Secretary of Defense. Subject: Counter-Resistance Techniques in the War on Terrorism. April 16, 2003.
[589]  The first 18 approaches all appeared in the current (1992) version of FM 34-52, except the Mutt-and-Jeff approach, which was derived from the superseded 1987 version of FM 34-52. The remaining approaches were similar to the ones identified in the Working Group report and derived from the CJTF-180 memorandum, explained below, and the original October 2002 request asking for approval of methods for Guantánamo. Fay report, *supra* note 40, at 23.
[590] Memorandum for the Commander, US Southern Command. From Donald Rumsfeld, The Secretary of Defense. Subject: Counter-Resistance Techniques in the War on Terrorism. April 16, 2003.
[591] *Id.*
[592] *Id.*
[593] *Id.*

Although Secretary Rumsfeld reiterated that the US Armed Forces "shall continue to treat detainees humanely,"[594] he qualified that mandate in two ways. He said that detainees should be treated humanely only "to the extent appropriate and consistent with military necessity."[595] He also gave latitude to interrogators in the choice of techniques. And although Secretary Rumsfeld noted the approved techniques were limited to interrogations of unlawful combatants held at Guantánamo, as will be explained below, the techniques intended for Guantánamo and the qualification on humane treatment found their way to other theaters of operation.

### 2. Techniques in the Field

The policy directives and legal memorandums ending in Secretary Rumsfeld's April 16, 2003 guidance said that only certain techniques were permitted at Guantánamo. Yet the directives and memorandums also shattered the absolute prohibition on torture by privileging military necessity and defining torture narrowly. The mixed message and general approval of coercion from the highest levels led to the adoption of techniques in the field that went far beyond those traditionally permitted and those approved by Rumsfeld for use at Guantánamo.

As mentioned above, the Schlesinger report said that interrogators in Afghanistan in 2002 were following FM 34-52.[596] Similarly, the Church executive summary said that in early 2002, interrogators at Guantanamo relied on FM 34-52 techniques.[597] However, the evidence, including internal FBI documents, CID reports, and other documents released by the government pursuant to the Freedom of Information Act, shows that interrogators at the beginning of the "war on terror" were not strictly following FM 34-52.[598] Rather, it is obvious from the evidence that psychologically coercive techniques far beyond what was authorized in FM 34-52 were allowed and were being utilized throughout 2002 in both Afghanistan and Guantánamo.

The informal use of psychologically coercive interrogation techniques beyond FM 34-52 became formalized in 2003 in Afghanistan. Although the directives that guided interrogations there remain classified, investigations and reports have shed light on them. According to the Church executive summary, a January 24, 2003 memorandum from the Combined Joint Task Force-180 (hereinafter CJTF-180)[599] Acting Staff Judge Advocate described the interrogation tactics already being used in Afghanistan.[600] The details remain classified but Adm. Church reported that these techniques were similar to the ones that Secretary Rumsfeld approved on December 2, 2002 for use only at Guantánamo.[601] Since those included sensory deprivation, hooding, removal of comfort items and clothing, forced grooming, isolation, and use of detainees' phobias, this confirms that interrogators had already gone far beyond the restrictions of FM 34-52 by early 2003.

The Fay report confirms that the techniques went beyond standard military practice. It said that one technique discussed in the memo was deprivation of clothing. The Fay report found that the memorandum

---

[594] *Id.*

[595] *Id.*

[596] See *supra* text accompanying note 15.

[597] See *supra* text accompanying note 42.

[598] See *supra* Section III.A.

[599] Combined Joint Task Force 180 is the forward deployed headquarters for Afghanistan.

[600] Church executive summary, *supra* note 42, at 6.

[601] *Id.*

highlighted that deprivation of clothing had not historically been included in battlefield interrogations. However, it went on to recommend clothing removal as an effective technique that could potentially raise objections as being degrading or inhumane, but for which no specific written legal prohibition existed.[602]

According to the Church executive summary, on February 27, 2003 the CJTF-180 Commander revised the January 24, 2003 techniques in response to investigations of detainee deaths.[603] The revised policy remained in place in Afghanistan until March 2004. At that point, new interrogation guidance was issued.[604] Rather than moving toward an absolute prohibition on psychological torture, the new guidance revived interrogation practices from the January 2003 memo, tactics that went far beyond FM 34-52. According to the Church executive summary, some of these techniques were identical to Secretary Rumsfeld's April 2003 policy, which was intended for use only in Guantánamo.[605]

In Guantánamo, meanwhile, according to a one page summary issued to reporters by Bush aides on June 22, 2004, techniques actually used at the facility between December 2002 and January 15, 2003 included isolation in Camp X-Ray, deprivation of light (use of red light), inducing stress (use of female interrogators), and forced grooming (to include shaving facial hair and head).[606] Secretary Rumsfeld later said that those procedures, which he had authorized and had to approve, "were not torture."[607] From January 15, 2003 to April 16, 2003, as explained above, it appears that there was no clear policy as Secretary Rumsfeld awaited the recommendations of the Working Group.[608] As of April 16, 2003, Secretary Rumsfeld's new policy went into effect, with its troubling message of humane treatment unless justified by military necessity.

In Iraq, Gen. Miller arrived from Guantánamo in August 2003 in order to conduct an assessment of DoD counter-terrorism interrogation and detention operations in Iraq. General Karpinski, who was then in charge at Abu Ghraib, said that Gen. Miller told her they wanted to "GITMOize" Abu Ghraib.[609] One FBI agent wrote in an e-mail that he was not sure what that meant, but thought that it "suggests [Gen. Miller] has continued to support interrogation strategies we not only advised against, but questioned in terms of effectiveness."[610]

---

[602] Fay report, *supra* note 40, at 88.

[603] Church executive summary, *supra* note 42, at 7.

[604] *Id.*

[605] *Id.*

[606] GTMO Interrogation Techniques. June 22, 2004. Available at: http://www.washingtonpost.com/wp-srv/world/daily/graphics/interrogation_062304.htm. Accessed April 27, 2005.

[607] Secretary of Defense Donald H. Rumsfeld. Speech at the National Press Club. September 10, 2004. Available at: http://www.defenselink.mil/transcripts/2004/tr20040910-secdef1286.html. Accessed April 27, 2005.

[608] See *supra* text accompanying notes 552–588.

[609] Article 15-6 Investigation Interview by Maj. Gen. Taguba, CFLCC Deputy Commanding General, US Army. With Brig. Gen. Janis L. Karpinski, US Army. Camp Doha, Iraq. February 15, 2004: 89.

[610] E-mail. From [redacted]. To [redacted]. Subject: current events. May 13, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI_4140.pdf. Accessed April 27, 2005. For more on the disagreement between the FBI and DoD regarding techniques, see *infra* Section V.D.

When he arrived in Iraq, Gen. Miller had with him Secretary Rumsfeld's April 16, 2003 memorandum of approved techniques for Guantánamo.[611] He gave it to Combined Joint Task Force-7 (hereinafter CJTF-7)[612] as a possible model for techniques in Iraq. This memo was eventually copied into a new document entitled CJTF-7 Interrogation and Counter-Resistance Policy (ICRP).[613] This policy was then sent to the 519th Military Intelligence Battalion, *which added the use of dogs, stress positions, sleep management, sensory deprivation, and yelling, loud music and light control* from its 27 August 2003 memo.[614] The use of all the techniques was to apply to interrogations of detainees, security internees, and Enemy Prisoners of War (hereinafter EPWs).[615] These techniques were formally added to the official CJTF-7 memo between September 10 and 14, 2003.[616] Upon the guidance and recommendation of the Staff Judge Advocate staff, it was decided that Lt. Gen. Sanchez would approve the use of those additional methods on a case-by-case basis.[617]

On September 14, 2003, Lt. Gen. Sanchez approved the CJTF-7 Interrogation and Counter-Resistance Policy, authorizing a dozen interrogation techniques beyond FM 34-52—five beyond those approved for Guantánamo.[618] In doing so, he used reasoning from the President's February 7 memorandum denying Geneva Convention protections to al Qaeda and Taliban detainees[619] even though the Administration conceded that the Geneva Conventions applied to the conflict in Iraq. The memo claimed that the policy was "modeled on the one implemented for interrogations conducted at Guantanamo Bay, but modified for applicability to a theater of war in which the Geneva Conventions apply."[620] Nevertheless, the policy approved 12 techniques beyond what is authorized in the 1987 Army Field Manual 34-52: change of scenery up, change of scenery down, dietary manipulation, environmental manipulation, sleep adjustment, false flag, isolation, presence of military working dogs, sleep management, yelling, loud music and light control, deception, and stress positions.[621]

With respect to environmental manipulation, the memo acknowledged, "Based on court cases in other countries, some nations may view application of this technique in certain circumstances to be inhumane."[622] Regarding isolation, the memo noted that

---

[611] Schlesinger report, *supra* note 15, at 9.

[612] Combined Joint Task Force 7 was the forward deployed headquarters for Operation Iraqi Freedom.

[613] Fay report, *supra* note 40, at 25.

[614] The 519th Military Intelligence Brigade was the tactical exploitation element of the 525th Military Intelligence Brigade. Company A was located at Abu Ghraib. The August 27, 2003 memo is not available to the public. According to Mark Danner, who obtained a classified section of the Fay report, this memo might have been based on the interrogation policy of the "shadowy, elite unit Joint Task Force-121, which spent its time searching for 'high value' targets in Iraq." According to Danner, the Fay report says, "'At some point,' the leading military intelligence battalion at Abu Ghraib 'came to possess the JFT-121 interrogation policy' and the first set of interrogation rules used by this unit 'were derived almost verbatim from JTF-121 policy,' which 'included the use of stress positions during fear-up harsh interrogation approaches, as well as presence of military working dogs, yelling, loud music, and light control. The memo also included sleep management and isolation approaches.'" Danner M. *Torture and Truth: America, Abu Ghraib, and the War on Terror.* New York: New York Review of Books; 2004:44.

[615] Fay report, *supra* note 40, at 25.

[616] *Id.*

[617] *Id.*

[618] Schlesinger report, *supra* note 15, at 9.

[619] *Id.* at 10.

[620] Memorandum for Commander, US Central Command. From Ricardo S. Sanchez, Lt. Gen., US Army, Commanding. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. September 14, 2003.

[621] *Id.*

[622] *Id.*

the use of isolation as an interrogation technique requires detailed implementation instructions, including specific guidelines regarding the length of isolation, medical and psychological review, and approval for extensions of the length of isolation by the 205th MI BDE Commander. Use of this technique for more than 30 days, whether continuous or not, must be briefed to 205th MI BDE Commander prior to implementation.[623]

The memo acknowledged that the use of military working dogs "[e]xploits Arab fear of dogs while maintaining security during interrogations."[624]

Some of these techniques, including isolation, presence of military working dogs, and yelling, loud music and light control, required approval from Lt. Gen. Sanchez personally before use and requests had to be accompanied by a legal review. Yet this restriction was undermined by the apparent flexibility given to interrogators:

It is important that interrogators be provided reasonable latitude to vary techniques depending on the detainee's culture, strengths, weaknesses, environment, extent of training in resistance techniques as well as the urgency of obtaining information that the detainee is believed to have.[625]

Although the policy noted that "CJTF-7 is operating in a theater of war in which the Geneva Conventions are applicable" and "[c]oalition forces will continue to treat all persons under their control humanely,"[626] the techniques approved undercut those statements. The techniques approved amount to coercion, which is flatly prohibited by the Geneva Conventions and cannot be justified by military necessity.

Controversy about the use of psychological coercion continued within the Pentagon. On October 12, 2003, CJTF-7 approved new interrogation rules of engagement,[627] in part because US Central Command thought the September 14 memo was unacceptably aggressive.[628] In the new memo, Lt. Gen. Sanchez approved only the use of approaches contained in the 1987 FM 34-52. Despite this apparent return to the standards of the Army Field Manual, other statements contained in the policy implied permissiveness with use of other techniques. For example, the policy said that "requests for use of approaches not listed in Enclosure 1 will be submitted to [Lt. Gen. Sanchez] . . . and will include a description of the proposed approach and recommended safeguards."[629] So while limiting approval to those techniques listed in FM 34-52, it also told personnel that they could use techniques beyond that if they first sought approval. There is evidence that such approval was freely given.[630]

---

[623] *Id.*

[624] *Id.*

[625] *Id.*

[626] *Id.*

[627] Memorandum for C2 and C3, Combined Joint Task Force Seven, Baghdad and Commander, 205th Military Intelligence Brigade, Baghdad. From Ricardo S. Sanchez, Lt. Gen., Commanding, Combined Joint Task Force Seven, Baghdad. Subject: CJTF-7 Interrogation and Counter-Resistance Policy. October 12, 2003. [Sanchez memorandum].

[628] Schlesinger report, *supra* note 15, at 10.

[629] Sanchez memorandum, *supra* note 627.

[630] See *supra* text accompanying note 119.

Second, it included provisions found in the superseded 1987 FM 34-52 that authorized interrogators to control "all aspects of the interrogation, to include the lighting, heating and configuration of the interrogation room, as well as the food, clothing and shelter given to the security internee."[631] In the Field Manual, this sentence is followed closely by one that says, "However, everything that he says and does must be within the limits of the Geneva and Hague Conventions, as well as the standards of conduct outlined in the UCMJ."[632] The October 12 policy omitted this portion. The Fay report found that the inclusion of the sentence regarding control by the interrogator created confusion among interrogators about the use certain techniques.[633] Finally, while it acknowledged the applicability of the Geneva Conventions and the requirement to treat all detainees humanely, it also "cited Articles 5 and 78 noting specifically that those 'detainees engaged in activities hostile to security of coalition forces had forfeited their Geneva Convention rights of communication.'"[634]

On October 16, 2003, an officer of the Joint Interrogation and Debriefing Center produced an "Interrogation Rules of Engagement" chart as an aid for interrogators in Iraq based on the October 12, 2003 policy.[635] It listed the approved approaches, which included all but two of the FM 34-52 techniques.[636] It also identified the techniques not authorized as interrogation techniques, but which nonetheless could be used with Lt. Gen. Sanchez's approval. These included change of scenery down, dietary manipulation, environmental manipulation, sleep adjustment, isolation for longer than 30 days, presence of military working dogs, sleep management, sensory deprivation, and stress positions. According to the Fay report, "the chart was confusing."[637] Gen. Fay found that

> [w]hat was particularly confusing was that nowhere on the chart did it mention
> a number of techniques that were in use at the time: removal of clothing, forced
> grooming, hooding, and yelling, loud music and light control. Given the detail
> otherwise noted on the aid, the failure to list some techniques left a question of
> whether they were authorized for use without approval.[638]

On January 27, 2004, a memorandum was issued to review the policy of October 12, 2003.[639] This memorandum confirmed that techniques beyond FM 34-52 were acceptable for use, with prior approval. The memo specifically cited environmental manipulation, sleep deprivation for 72 hours maximum, the presence of working dogs, isolation for longer than 30 days, and sensory deprivation for 72 hours maximum. The memorandum confirmed that "[t]his is not an all-inclusive list for approaches."[640] At the same time that it approved these techniques, many of which amount to torture or cruel, inhuman or degrading treatment, the policy memorandum noted, "At no time will detainees be treated inhumanely nor maliciously humiliated."[641] This policy was in existence through the Abu Ghraib scandal.

---

[631] Sanchez memorandum, *supra* note 627.

[632] FM 34-52, *supra* note 3. Chapter 3, Interrogation Process.

[633] Fay report, *supra* note 40, at 16.

[634] *Id.* at 26.

[635] Taguba report, *supra* note 100. Annex no. 28. Interrogation Rules of Engagement.

[636] Not included were the Mutt and Jeff approach and the Pride and Ego Down approach.

[637] Fay report, *supra* note 40, at 28.

[638] *Id.*

[639] Memorandum For Record. From Department of the Army, Joint Interrogation & Debriefing Center, Abu Ghurayb Prison, Iraq APO AE 09302. Subject: CJTF-7 Interrogation Rules of Engagement. January 27, 2004.

[640] *Id.*

[641] *Id.*

## C. The Current Situation

After the Abu Ghraib scandal was exposed in late April and early May 2004, more attention was given to what interrogation techniques were actually being used at US-run detention facilities. In early May 2004, Gen. Miller admitted the routine use of certain psychologically coercive tactics and said their use would end.  According to the *New York Times*, Gen. Miller said, "We will no longer, in any circumstances, hood any of the detainees. We will no longer use stress positions in any of our interrogations. And we will not use sleep deprivation in any of our interrogations."[642] On May 14, 2004, Lt. Gen. Ricardo S. Sanchez, the Commander of the US forces in Iraq, reportedly barred virtually all coercive interrogation practices such as forcing detainees to crouch for long periods or depriving them of sleep.  Yet according to a senior Central Command officer who briefed reporters that day, the Commander would still consider requests to hold detainees in isolation for more than 30 days and had reportedly approved 25 such requests since October 2003.[643]

The different theaters of operation have different policies in effect today. In Guantánamo, the April 16, 2003 guidance from Secretary Rumsfeld remains in effect. This policy approved 24 interrogation techniques, including isolation.  In Afghanistan new policy was adopted in June 2004. Details of this policy are classified, but according to the Church executive summary, this policy relies almost exclusively on interrogation techniques specifically outlined in FM 34-52.[644] This policy remains in effect for Afghanistan.

Details are also scarce about current policy in Iraq.  According to the Church executive summary, the Commander, Multi-national Forces Iraq (hereinafter MNF-I), approved on January 27, 2005 a new interrogation policy for Iraq.  Evidently, this policy "approves a more limited set of techniques for use in Iraq, and also provides additional safeguards and prohibitions, rectifies ambiguities, and – significantly – requires commanders to conduct training on and verify implementation of the policy and report compliance to the Commander, MNF-I."[645] But the contents of this policy remain confidential.

Even more troubling than the lack of details on current policy is the fact that many problematic and legally incoherent memorandums and guidance remain in effect. For example, the April 2003 Working Group report has not been repudiated, despite the fact that it contains language verbatim from the now repudiated 2002 OLC opinion and is presumably still applicable to all three theaters of operation.

In April 2005, it became clear that the Administration continued its strategy of claiming to uphold the prohibition on torture and cruel, inhuman and degrading treatment while finding ways to avoid it. Human Rights Watch obtained a 142-page final draft document prepared by the Joint Chiefs of Staff entitled "Joint Publication 3-63: Joint Doctrine for Detainee Operations."[646]

---

[642] Van Natta Jr. D. "The Struggle for Iraq: Techniques; Interrogation Methods in Iraq Aren't All Found in Manual." *New York Times*. May 7, 2004.

[643] Report of the United Nations High Commissioner for Human Rights and Follow-Up to the World Conference on Human Rights: The Present Situation of Human Rights in Iraq. UN ESCOR. 61st Sess. Agenda Item 4. 2004: para. 66. U.N. Doc. E/CN.4/2005/4. Citing the *New York Times*. May 15, 2004: 1.

[644] Church executive summary, *supra* note 42, at 7.

[645] *Id.* at 9.

[646] Department of the Army, Department of the Navy, Department of the Air Force, US Coast Guard, Jt. Chiefs of Staff. Joint Publication 3-63: Joint Doctrine for Detainee Operations. March 23, 2005. On file with PHR.

According to the document, dated March 23, 2005, its purpose is "to establish joint level doctrine that will govern detainee operations."[647] The policy says that "all detained personnel shall be accorded the appropriate legal status under the law of armed conflict, and shall be treated humanely at all times."[648] It goes on to say:

> The inhumane treatment of detainees is prohibited by international law and DOD policy. *There is no military necessity exception to this humane treatment mandate.* Accordingly, neither the stress of combat operations, the need for actionable information, nor the provocations by captured/detained personnel justify deviation from this obligation. Acts and/or omissions that constitute inhumane treatment are violations of the law of armed conflict.[649]

Yet only 7 pages later, the document contradicts this statement. It formalizes "enemy combatant" as an "additional classification" of detainee and declares that, "they are still entitled to be treated humanely, *subject to military necessity. . . .*"[650] As noted repeatedly above, this is a position contrary to international and domestic law and a position that created the space for the ill-treatment and torture of detainees. This policy, especially when understood in tandem with its continued interpretation of psychological torture, is a signal that nothing has changed, despite the public outrage over what happened at Abu Ghraib. The Administration will continue to seek justifications and legal maneuvers for using coercive interrogation methods.

On April 28, 2005, a front page story in the *New York Times* reported that the Army is preparing to issue an updated interrogations manual, to be titled "Human Intelligence Collector Operations."[651] This manual will expressly prohibit techniques like stripping prisoners, keeping them in stressful positions for prolonged periods, using military dogs to intimidate prisoners, and sleep deprivation.[652] According to the *Times*, "[a]ccompanying the new manual, which runs more than 200 pages, will be a separate classified training document that will provide dozens of interrogation sessions and go into exacting detail on what procedures may or may not be used, and in what circumstances."[653] If what the *New York Times* reports is true, these prohibitions are good. But it does not go far enough. The article does not mention whether other psychologically abusive techniques, like isolation, other methods of inducing fear, and other forms of sexual and cultural humiliation, are prohibited. There also is no mention of whether exceptions are permitted. The "unlawful combatant" category permits military necessity to override humane treatment; what does that mean for the specific prohibitions in this new manual? The new manual must be publicly released so that these issues can be identified and solved. Additionally, this manual is applicable only to the Armed Forces; it does not guide interrogations by the CIA or other agencies. This gap must be addressed.

## D. Other Governmental Agencies

The CIA played a major role in the development of the legal framework to permit coercive interrogation techniques. As mentioned above, the February 7, 2002 directive from President Bush ordering the humane treatment of detainees was not meant to apply to the CIA, in effect

---

[647] *Id.* at I–2.

[648] *Id.* at I–3.

[649] *Id.* at I–4. Emphasis added.

[650] *Id.* at 1–11. Emphasis added.

[651] Schmitt E. "Army, In Manual, Limiting Tactics in Interrogation." *New York Times.* April 28, 2005: A1.

[652] *Id.*

[653] *Id.*

authorizing the CIA to use abusive treatment against detainees.[654] And, as explained above, the CIA sought clarification of the legality of certain tactics, leading to the infamous August 2002 OLC opinion and a still-classified companion document that outlined specific methods the agency could use.[655] Reportedly, the CIA views the repudiation of the 2002 OLC opinion as "undercutting its authority to use coercive methods in interrogations."[656]

CIA policy and the CIA's treatment of detainees are shrouded in secrecy, but some details are known. There have been reports that the CIA operates interrogation centers at Bagram Air Force Base in Afghanistan and in other locations.[657] Apparently the CIA has used techniques of psychological torture at these interrogation centers.[658] One intelligence official called such techniques, "not quite torture, but about as close as you can get."[659] The CIA also reportedly "hid" some detainees by keeping them unregistered and placed in certain cells, including at Abu Ghraib.[660] Finally, the CIA has used a process called extraordinary rendition, in which it turns suspects over to countries that are known to employ torture techniques in gathering information.[661] American and foreign intelligence officials acknowledged that suspects were sent to Jordan, Syria, and Egypt,[662] all countries that the US has criticized for using psychological torture.[663]

With respect to the FBI, there is evidence that FBI policy to treat detainees humanely conflicted with DoD policy and there is evidence that FBI agents expressed concerns about what they witnessed upon visiting DoD-run detention facilities.

There is evidence that FBI agents witnessed techniques that they considered abusive when they visited DoD-run detention facilities. One e-mail from an FBI agent about Guantánamo said that "I was in GTMO and I did observe aggressive interrogation practices and as a Behavioral Analysis Advisor on interrogation techniques was aware of extreme interrogation techniques that were planned and implemented against certain detainees."[664] Another agent sent an e-mail saying, "I did observe treatment [at Guantánamo] that was not only aggressive, but personally very upsetting . . . . It seemed that these techniques were being employed by the military, government contract employees and [redacted]."[665]

---

[654] See *supra* text accompanying note 477.

[655] See *supra* Section V.A.2. Reportedly, there are additional documents spelling out the agency's authorization to use coercive interrogation methods that remain classified. Jehl, *supra* note 499.

[656] Jehl, *supra* note 499. Summarizing the views of unnamed current and former intelligence officials.

[657] Van Natta Jr., *supra* note 18. See also, Priest D. "CIA Avoids Scrutiny of Detainee Treatment." *Washington Post.* March 3, 2005: A1. Describing the Salt Pit, a secrete prison run by the CIA just north of Kabul.; Pearlstein D, Patel P. Human Rights First. Behind the Wire: An Update to *Ending Secret Detentions.* 2005: 1–11. Discussing other suspected CIA-run facilities. Available at: http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf. Accessed April 27, 2005.

[658] See *supra* text accompanying notes 26–29.

[659] Van Natta Jr., *supra* note 18. Quoting unnamed Western intelligence official.

[660] See *supra* text accompanying notes 115–117. See also, White J. "Army Documents Shed Light on CIA 'Ghosting.'" *Washington Post.* March 24, 2005: A15.

[661] Mayer J. "Outsourcing Torture." *New Yorker.* February 14, 2005.

[662] Van Natta Jr., *supra* note 18.

[663] See *infra* section VI.E.

[664] E-mail. From [redacted]. To [redacted] (INSD) (FBI). Subject: GTMO. Undated. Available at: http://www.aclu.org/torturefoia/released/t3449.pdf. Accessed April 27, 2005.

[665] E-mail. From [redacted]. To [redacted]. Subject: RE GTMO. July 12, 2004. Available at: http://www.aclu.org/torturefoia/released/FBI.121504.5054.pdf. Accessed April 27, 2005.

On July 14, 2004, T.J. Harrington, Deputy Assistant Director of the Counterterrorism Division of the FBI, sent a letter to Maj. Gen. Ryder regarding three situations where FBI agents witnessed the use of "highly aggressive" interrogation techniques being used against detainees at Guantánamo. He notes, "Although [the person who first brought these concerns to DoD's attention] was assured that the general concerns expressed, and the debate between the FBI and DoD regarding the treatment of detainees was known to officials in the Pentagon, I have no record that our specific concerns regarding these three situations were communicated to DoD for appropriate action."[666]

Evidence also indicates that the FBI and DoD were engaged in a struggle to define what was appropriate behavior for interrogators. On December 5, 2003, an e-mail from an FBI agent about Guantánamo said that the FBI's Military Liaison and Detainee Unit (MLDU) "requested this information be documented to protect the FBI. MLDU has had a long standing and documented position against use of some of DOD's interrogation practices, however, we were not aware of these latest techniques until recently."[667]

On May 5, 2004 in a series of e-mails about Guantánamo, an FBI agent wrote that "Our Behavioral Assessment Unit (BAU) disagreed with the use of specific techniques in the case of [redacted] as they opined that the techniques would not be successful and they could produce unreliable results."[668]

On May 10, 2004, an FBI agent wrote an e-mail that says, "We did advise each supervisor that went to GTMO to stay in line with Bureau policy and not deviate from that (as well as made them aware of some of the issues regarding DoD techniques)."[669] The agent also states that FBI representatives met with Generals Dunleavy and Miller at Guantánamo to explain their position on law enforcement techniques compared to DoD techniques.[670] It says, "Both agreed the Bureau has their way of do[i]ng business and DoD has their marching orders from the Sec Def."[671] The e-mail goes on to note, "In my weekly meetings with DOJ we often discussed DoD techniques and how they were not effective or producing Intel that was reliable."[672] The agent cites one case in particular, where DoD evidently gave the FBI a deadline "to use our traditional methods. Once our timeline (that DoD put into place) was up, DoD took the reigns [sic]."[673] This happened because the DoD wanted to "get 'more out of him.'"[674] He also explains how Gen. Miller, FBI, and others met with the Pentagon Detainee Policy Committee.  During the meeting, the agent "voiced concerns that the intel produced was nothing more than what FBI got using simple investigative techniques."[675] He said the conversations were "somewhat heated" and that "DoD finally admitted the information was the same info the Bureau obtained" but that "it

---

[666] Letter from T.J. Harrington, *supra* note 47.

[667] E-mail. From [redacted]. To Gary Bald, Frankie Battle, Arthur Cummings. Subject: Impersonating FBI at GTMO. December 5, 2003. Available at: http://www.aclu.org/torturefoia/released/FBI_3977.pdf. Accessed April 27, 2005.

[668] E-mail. From [redacted]. To [redacted] (Div13)(FBI). Subject: RE: Detainee abuse claims. May 5, 2004. Available at: http://www.aclu.org/torturefoia/released/t3137_3139.pdf. Accessed April 27, 2005.

[669] E-mail. From [redacted]. To T.J. Harrington (Div13)(FBI). Subject: Instructions to GTMO Interrogators. May 10, 2004. Disclosed to Senator Levin by William E. Moschella, Assistant Attorney General, US Department of Justice. March 18, 2005.

[670] *Id.*

[671] *Id.*

[672] *Id.*

[673] *Id.*

[674] *Id.*

[675] *Id.*

still did not prevent them from continuing the 'DoD methods.'"[676] Another e-mail to Harrington dated May 10, 2004 says that BAU wrote an electronic communication (hereinafter EC) that explained "the Bureau way of interrogation vs. DoDs methodology."[677] BAU explained "FBI has been successful for many years obtaining confessions via non-confrontational interviewing techniques."[678]

On May 19, 2004, the FBI sent an electronic communication (EC) to all divisions.[679] Its purpose was to remind FBI personnel of FBI policy in light of the Abu Ghraib abuses.  It stated that FBI policy "has consistently provided that FBI personnel may not obtain statements during interrogations by the use of force, threats, physical abuse, threats of such abuse or severe physical conditions."[680] It reiterated, "It is the policy of the FBI that no interrogation of detainees, regardless of status, shall be conducted using methods which could be interpreted as inherently coercive, such as physical abuse or the threat of such abuse to the person being interrogated or to any third party, or imposing severe physical conditions."[681] The EC also states that if FBI employees know or suspect non-FBI personnel have abused or are abusing or mistreating a detainee, they must report the incident.

---

[676] *Id.*

[677] E-mail. From [redacted]. To T.J. Harrington (Div13)(FBI). Subject: RE: pls confirm. May 10, 2004. Disclosed to Senator Levin by William E. Moschella, Assistant Attorney General, US Department of Justice. March 18, 2005.

[678] *Id.*

[679] Electronic Communication to All Divisions. From General Counsel, Federal Bureau of Investigation. Title: Treatment of Prisoners and Detainees. May 19, 2004. Available at: http://www.aclu.org/torturefoia/released/44A.pdf. Accessed April 27, 2005.

[680] *Id.*

[681] *Id.*

## VI.  Legal Prohibitions against the Use of Psychological Torture and Cruel, Inhuman and Degrading Treatment

The use of psychologically abusive interrogation methods by US forces in Afghanistan, Guantánamo, and Iraq are in direct violation of the prohibition against torture and cruel, inhuman and degrading treatment, which is firmly established in US law, international treaties signed by the US, and other international instruments.

### A.  Geneva Conventions

The Geneva Conventions govern the treatment of detainees in situations of armed conflict. Captured combatants are covered under the Third Geneva Convention relative to the Treatment of Prisoners of War.[682] Article 5 of the Third Geneva Convention says that if any doubt arises as to whether a captured individual is entitled to POW status, that person should be protected by the Third Geneva Convention until a competent tribunal determines the individual's correct status.[683] In the "war on terror," the US decided to allow the President to determine the status of all al Qaeda and Taliban detainees, without the benefit of individualized determinations that the Third Geneva Convention contemplates.  As explained above, President Bush decreed that the Geneva Conventions do not apply to al Qaeda operatives. With respect to the Taliban detainees, President Bush created a new category of individuals, "unlawful combatants" and deemed that they do not qualify for POW status.[684]

According to the Geneva Conventions, however, individuals who are not entitled to POW status, even so-called "unlawful combatants," are covered by the Fourth Geneva Convention relative to the Protection of Civilian Persons in Time of War.[685]

According to the ICRC, all detainees fall somewhere within the protections of these two Conventions.[686]

---

[682] Third Geneva Convention, *supra* note 9.

[683] Article 5 of the Third Geneva Convention states, "Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy belong [to any of the categories for prisoners of war], such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal." Third Geneva Convention, *supra* note 9. Article 5.

[684] See *supra* text accompanying notes 475–476.

[685] Fourth Geneva Convention, *supra* note 9.

[686] According to the ICRC Commentary:

> Every person in enemy hands must have some status under international law: he is either a prisoner of war and, as such, covered by the Third Convention, a civilian covered by the Fourth Convention, or . . ., a member of the medical personnel of the armed forces who is covered by the First Convention. 'There is no' intermediate status; nobody in enemy hands can be outside the law.

International Committee of the Red Cross. *Commentary: Convention (IV) Relative to the Protection of Civilian Persons in Time of War. Geneva, 12 August 1949. Article 4—Definition of Protected Persons:* 51. Available at: http://www.icrc.org/ihl.nsf/b466ed681ddfcfd241256739003e6368/18e3ccde8be7e2f8c12563cd0042a50b? OpenDocument. Accessed April 25, 2005.

1. *Third Geneva Convention*

The Third Geneva Convention protects POWs. Article 17 specifically prohibits mental torture and any other form of coercion of POWs in order to secure information.[687] Additionally, it protects POWs who refuse to give information from threats, insults, or exposure to unpleasant treatment.[688]

The Third Geneva Convention defines POWs and delineates general provisions that prohibit abusive treatment of POWs and protect their health:

- Article 13 requires that POWs must at all times be treated humanely, and that any unlawful act or omission by the detaining power that causes death or seriously endangers the health of a POW will be regarded as a serious breach of the Convention.[689]
- Article 14 says that POWs are entitled to respect for their person and their honor.[690]
- Article 87 forbids collective punishment for individual acts, corporal punishment, imprisonment in premises without daylight and, in general, any form of torture or cruelty.[691]
- Article 89 says that in no case shall disciplinary punishments be inhuman, brutal or dangerous to POW's health.[692]
- Under Article 130, torture or inhuman treatment, or willfully causing great suffering or serious injury to body or health of a POW are considered "grave breaches" of the Convention.[693]

In addition, the Third Geneva Convention describes specific conditions of confinement for prisoners of war.[694]

2. *Fourth Geneva Convention*

The Fourth Geneva Convention protects civilians in times of war. Like the Third Geneva Convention, the Fourth provides a specific prohibition on coercion. Article 31 provides that "No physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties."[695]

The Fourth Geneva Convention also contains general prohibitions on ill-treatment, as well as specific conditions.

---

[687] "[N]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever." Third Geneva Convention, *supra* note 9. Article 17.
[688] "Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment of any kind." *Id.*
[689] *Id.* Article 13.
[690] *Id.* Article 14.
[691] *Id.* Article 87.
[692] *Id.* Article 89.
[693] *Id.* Article 130.
[694] See, e.g., *id.* Article 21. Specifying that POWs may not be held in close confinement except where necessary to safeguard their health; Article 25. Specifying conditions must make allowance for the habits and customs of POWs and "shall in no case be prejudicial to their health."; Article 90. Prohibiting punishment that lasts more than 30 days.
[695] Fourth Geneva Convention, *supra* note 9. Article 31.

- Article 27 says that protected persons are entitled to respect for their persons, honor, religious convictions and practices, manners and customs. In addition, it specifies, "They shall at all times be humanely treated, and shall be protected especially against all acts of violence or threats thereof. . . ."[696]
- Article 32 prohibits measures that cause physical suffering, including murder, torture and mutilation.[697]
- Article 118 forbids without exception imprisonment in premises without daylight, and, in general, all forms of cruelty.[698]

The ICRC, after visiting various detention facilities in Iraq during 2003, reported to the US that it was violating various provisions of the Geneva Conventions by using psychologically abusive interrogation methods. In its February 2004 report, the ICRC said:

- "In the case of 'High Value Detainees' held in Baghdad International Airport, their continued internment, several months after their arrest, in strict solitary confinement in cells devoid of sunlight for nearly 23 hours a day constituted a serious violation of the Third and Fourth Geneva Conventions."
- It went on to elaborate: "The internment of persons in solitary confinement for months at a time in cells devoid of daylight for nearly 23 hours a day is more severe than the forms of internment provided for in the Third and Fourth Geneva Conventions . . . . It cannot be used as a regular, ordinary mode of holding of prisoners of war or civilian internees. The ICRC reminds the authorities of the Coalition Forces in Iraq that internment of this kind contravenes Articles 21, 25, 89, 90, 95, 103 of the Third Geneva Convention and Articles 27, 41, 42, 78, 82, 118, 125 of the Fourth Geneva Convention."[699]
- The ICRC also found violations of Articles 13, 14, 17, 87 of the Third Geneva Convention and Articles 5, 27, 31, 32, 33 of the Fourth Geneva Convention.

## B. US Law

### 1. Federal Criminal Anti-Torture Statute

The federal anti-torture statute, 18 U.S.C. § 2340A, prohibits the use of torture outside of the United States.[700] It defines torture as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering . . . upon another person within his custody or physical control."[701] As described above, the statute defines "severe mental pain or suffering" as

> the prolonged mental harm caused by or resulting from—
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind-altering substances or *other procedures calculated to disrupt profoundly the senses or the personality*;
> (C) the threat of imminent death; or

---

[696] *Id.* Article 27.
[697] *Id.* Article 32.
[698] *Id.* Article 118.
[699] ICRC February 2004 report, *supra* note 86. Para. 44.
[700] 18 U.S.C. § 2340(A).
[701] 18 U.S.C. § 2340(1).

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality;[702]

The death threats and mock executions used on detainees in Afghanistan, Iraq, and Guantánamo fall under part (C) of the statute, as they are threats of imminent death. In fact, even the 2002 OLC memo recognized that "subjecting a prisoner to mock executions . . . would have sufficient immediacy to constitute a threat of imminent death" and therefore qualify as torture under the statute.[703] Threats made about detainees' family members and relatives also qualify as torture, and are covered by part (D) of the statute. The use of military working dogs qualifies under part (A): the "threatened infliction of severe physical pain or suffering," and in cases where detainees were actually bit by the dogs, "the intentional infliction" of severe physical pain or suffering. Additionally, the 2002 OLC opinion said that threats of rape or sexual assault could constitute torture under the statute.[704] As shown above, the use of sensory deprivation, including prolonged isolation and sleep deprivation, is clearly meant to and does "disrupt profoundly the senses or the personality"[705] and therefore qualifies as torture under part (B).

As explained above, however, the Office of Legal Counsel's latest interpretation of the statute undermines the plain interpretation of severe mental pain or suffering.[706] Its interpretation could mean that the four types of procedures specifically enumerated in the statute will not necessarily constitute torture and are not prohibited per se. This is an unacceptable reading of the statute, but it has not received the condemnation and outrage that it deserves. The legal interpretation of the OLC is so unreasonable that it appears to reflect a deliberate attempt to authorize acts of torture by US officials.

Even more troubling is the OLC's view that for one of the enumerated acts to amount to torture, there must be a specific showing of prolonged mental harm to the victim, with harm lasting years after the fact. This interpretation turns the prohibition of torture on its head, since the purpose of laws against torture is to prevent it from being used in the first place, rather than waiting to see the impact on individuals years after the fact. Moreover, it is clear from the literature, studies, and experiences of clinicians treating torture survivors, detailed above, that the types of psychologically coercive interrogation techniques employed by US personnel in Afghanistan, Iraq, and Guantánamo have been shown to have devastating and long-lasting mental harm. Thus, although PHR strongly disagrees with OLC's interpretation of the statute, we believe these techniques nonetheless constitute torture under the OLC's extremely narrow definition.

---

[702] 18 U.S.C. §2340(2). Emphasis added.

[703] 2002 OLC opinion, *supra* note 481, at 12.

[704] See *id.* at 24.

[705] See *supra* section IV.C.

[706] See *supra* text accompanying notes 509–514.

*2. Other US Statutes*

Although jurisprudence under the federal anti-torture criminal statute is limited, federal courts have considered what constitutes torture in cases brought under the Alien Tort Claims Act[707] (hereinafter ATCA) and the Torture Victims Protection Act[708] (hereinafter TVPA).

In one case brought under both ATCA and the TVPA, a court found that mental torture included fearing "they would be killed by [defendant] during the beatings he inflicted or during games of 'Russian roulette.'"[709] The court noted that the plaintiffs continue to suffer long-term psychological harm, including anxiety, nervousness, frequent nightmares, depression, difficulty sleeping, inability to work, and difficulty trusting people.[710] The 2002 OLC opinion read this case to confirm its view that, to satisfy the prolonged mental harm requirement of the federal anti-torture statute, the harm must be of a substantial duration.[711] The 2004 OLC opinion also cites this case, similarly pointing out that the "mental effects were continuing years after the infliction of the predicate acts."[712] But the 2004 OLC opinion specifically rejected the 2002 OLC opinion's conclusion that "to constitute 'prolonged mental harm,' there must be 'significant psychological harm of significant duration, e.g., lasting for months or even years.'"[713] Its reading of the case, however, suggests otherwise.[714]

In another case, one plaintiff was held at gunpoint, threatened with physical injury, and incarcerated in a room with no bed, window, light, electricity, water, toilet, or adequate access to sanitary facilities. Other plaintiffs faced similar treatment. The court found that these acts constituted torture.[715] Similarly, a court found that a course of conduct including beatings, threats of imminent death, attempts to play Russian roulette, and prolonged solitary confinement, constituted torture.[716]

Another court considered the ATCA case of a plaintiff who was, among other things, blindfolded, beaten while handcuffed, threatened with death, and denied sleep. The court found that "all of

---

[707] 28 U.S.C. § 1350. The ATCA permits civil actions by an alien for a tort committed "in violation of the law or nations or a treaty of the United States." *Id.*

[708] 28 U.S.C. § 1350 note. 2000. The TVPA supplies a tort remedy for victims of torture.

[709] *Mehinovic v. Vuckovic.* 198 F. Supp. 2d 1322, 1346. N.D. Ga. 2002.

[710] *Id.* at 1334, 1336, 1337–38, 1340.

[711] 2002 OLC opinion, *supra* note 481, at 26.

[712] 2004 OLC opinion, *supra* note 500, at 15.

[713] *Id.* at 14, n.24.

[714] The 2004 OLC opinion also approves of *Sackie v. Ashcroft*, 270 F. Supp. 2d 596 (E.D. Pa. 2003), in which an individual was forcibly recruited as a child soldier at age 14 and given narcotics and threatened with death over the next three to four years. The court concluded that the resulting mental harm, which continued over the three to four year period, qualified as prolonged mental harm. *Id.* at 15. It distinguishes *Villeda Aldana v. Fresh Del Monte Products, Inc.*, 305 F. Supp. 2d 1285 (S.D. Fla. 2003), in which a court rejected a claim under the TVPA brought by individuals who were held at gunpoint and repeatedly threatened with death for one night. The court concluded that they failed to show that their experience caused lasting damage. *Id.*

[715] *Daliberti v. Republic of Iraq.* 146 F. Supp. 2d 19, 25. D.D.C. 2001. This case was actually brought under the Foreign Sovereign Immunities Act, but the FSIA adopts the definition of torture used in the TVPA.

[716] *Cicippio v. Islamic Republic of Iran.* 18 F. Supp. 2d 62. D.D.C. 1998. This case also was brought under the Foreign Sovereign Immunities Act.

the abuses to which he testified—including the eight years during which he was held in solitary or near-solitary confinement—constituted a single course of conduct of torture."[717]

Although the types of conduct these cases consider appear similar to those perpetrated by US forces in the "war on terror," OLC pointed to these cases in its 2004 opinion to support its determination that conduct constituting torture under the federal anti-torture statute is extreme in nature.[718]

There have been cases, however, in which courts have considered evidence of acts of psychological coercion but found them insufficient to meet the definition of torture. For example, in one TVPA case a plaintiff alleged she was interrogated and then held incommunicado, threatened with death, and forcibly separated from her husband.[719] Although the district court found that the plaintiff had stated a claim for torture on which relief could be granted,[720] the appeals court reversed.[721] It said, "Although these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators, they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture . . . ."[722]

### 3. US Constitution

Certain practices may not rise to the level of intensity to constitute psychological torture. They will, however, constitute cruel, inhuman, or degrading treatment or punishment. When the US ratified the Convention against Torture, it issued a reservation to Article 16, which prohibits the use of cruel, inhuman, and degrading treatment or punishment. The US said:

> That the United States considers itself bound by the obligation under Article 16 to prevent "cruel, inhuman or degrading treatment or punishment," only insofar as the term . . . means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States.[723]

Jurisprudence under each of these Amendments makes clear that many of the psychologically coercive techniques qualify as cruel and unusual punishment under domestic law, and thus are considered cruel, inhuman, and degrading treatment.

Courts have recognized the destructive nature of solitary confinement and have held it unconstitutional under the Eighth Amendment. For example, the United States District Court for the Eastern District of Illinois considered the conditions at a maximum security prison in Illinois, where prisoners were held in small cells, some of which were equipped with a steel

---

[717] *Hilao v. Estate of Marcos.* 103 F.3d 789, 795. 9th Cir. 1996. The court does say, however, "To the extent [plaintiff's] years in solitary confinement do not constitute torture, they clearly meet the definition of prolonged arbitrary detention. . . ." *Id.*

[718] 2004 OLC opinion, *supra* note 500, at 10.

[719] *Simpson v. Socialist People's Libyan Arab Jamahiriya.* 180 F. Supp. 2d 78. D.D.C. 2001.

[720] *Id.* at 88.

[721] *Simpson v. Socialist People's Libyan Arab Jamahiriya.* 326 F.3d 230. D.C. Cir. 2003.

[722] *Id.* at 234.

[723] U.S. Reservations, Declarations, and Understandings, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Cong. Rec. S17486-01. Daily ed. October 27, 1990. Available at: http://www1.umn.edu/humanrts/usdocs/tortres.html. Accessed April 25, 2005.

front door kept closed as a disciplinary measure.[724] The court recognized the harmful health consequences of being isolated in the cells, even the ones without a closed front door. It found that "[t]he impact of confinement on Control Unit prisoners' mental and physical health can be harmful, debilitating and dehumanizing."[725] The court found that use of the closed front cells constituted a violation of the Eighth Amendment's prohibition on cruel and unusual punishment. The court said that the "sensory deprivations occasioned by use of the [the closed front cells], along with the lack of any idea about what could be done to be released from the control unit, resulted in both mental and physical deterioration. Simultaneously, unnecessary pain and suffering was the result."[726]

The United States District Court for the Southern District of Texas also found solitary confinement to be a violation of the Eighth Amendment and even called it tantamount to torture. In a case concerning the prison system in Texas, the court found that inmates in administrative segregation "suffer actual psychological harm from their almost total deprivation of human contact, mental stimulus, personal property and human dignity."[727] The court went on to say, "It goes without question that an incarceration that inflicts daily, permanently damaging, physical injury and pain is unconstitutional. Such a practice would be designated as torture."[728] The court therefore found a violation of the Constitution's prohibition against cruel and unusual punishment. It eloquently stated:

> As the pain and suffering caused by a cat-o'-nine tails lashing an inmate's back are cruel and unusual punishment by today's standards of humanity and decency, the pain and suffering caused by extreme levels of psychological deprivation are equally, if not more, cruel and unusual. The wounds and resulting scars, while less tangible, are no less painful and permanent when they are inflicted on the human psyche.[729]

There are cases in which US courts have determined that allegations of sleep deprivation did not rise to the level of cruel and unusual punishment.[730] However, as noted above, the Beaver memorandum considering the legality of interrogation techniques noted that sleep deprivation could constitute a violation of the Eighth Amendment.[731]

---

[724] *Bono v. Saxbe.* 450 F. Supp. 934. D. Ill. 1978. According to the court, each of the cells measured approximately 6'6" by 8' by 8'6" (high), had three concrete walls, and a steel bar front and was equipped with one steel bunk, a stainless steel commode and sink combination, and one light fixture containing a 40 or 60 watt bulb. *Id.* at 937. Ten of the cells were equipped with a steel front door. *Id.*

[725] *Id.* at 940.

[726] *Id.* at 947.

[727] *Ruiz v. Johnson.* 37 F. Supp. 2d 855, 913. S.D. Tex. 1999.

[728] *Id.* at 914.

[729] *Id.*

[730] See *Singh v. Holcomb.*1992 U.S. App. LEXIS 24790. 8th Cir. 1992. Holding that the sleep deprivation described by the plaintiff "did not show the 'extreme deprivation' needed to fulfill the objective component of an Eighth Amendment conditions-of-confinement claim."; *Ferguson v. Cape Girardeau County.* 88 F.3d 647. 8th Cir. 1996. Holding that the totality of the circumstances, including the fact that the plaintiff was observed sleeping ninety-three hours of the fourteen days he spent confined in the vestibule area of the jail did not constitute an Eighth Amendment violation; *Green v. CSO Strack.* 1995 U.S. App. LEXIS 14451. 9th Cir. 1995. Rejecting an Eighth Amendment claim for sleep deprivation where plaintiff failed to produce evidence of excessive noise to interrupt sleep.

[731] See *supra* text accompanying note 533.

With respect to the due process clause of the Fifth and Fourteenth Amendments, courts have found that psychological coercion can constitute a violation of due process. In one case, a court explained that under the due process clause of the Fourteenth Amendment, "[p]sychological coercion can suffice."[732] The court found that the plaintiff was "weakened by pain and shock, *isolated from family, friends, and legal counsel*, and barely conscious, and his will was simply overborne."[733] The court said that this "can fairly be described as sophisticated psychological torture."[734] Another court said that "[e]motional distress can produce injury of the same severe magnitude as occurred in the cases of physical harm. . . and it can be inflicted in the same wanton and unreasonable manner."[735]

Courts also have stated that a threat is enough to constitute a violation of the due process clause of the Fifth and Fourteenth Amendments.[736] In one case, in which an individual being held by police had a pistol pointed to his temple, thereby inflicting severe mental distress, a court held that the due process clause of the Fifth and Fourteenth Amendments has "long been interpreted to include freedom from severe, and sometimes not so severe . . ., bodily harm . . ., to which severe mental distress can reasonably be compared."[737]

## C. US Military Law, Regulations, and Guidelines

### 1. Uniform Code of Military Justice

US military personnel are subject to the UCMJ.[738] This code applies to US forces on active duty, at all times and in all places throughout the world. Like Army policy, the UCMJ prohibits actions that are intended to degrade or humiliate. Article 93 focuses on cruelty, oppression, or maltreatment.[739] According to the Working Group report, the cruelty, oppression, or maltreatment need not be physical.[740] Article 128 prohibits assault, which includes the use of threatening words accompanied by a menacing act or gesture.[741]

As noted above, the Beaver memorandum regarding interrogation techniques found that placing a wet towel or hood over a detainee's head would constitute a per se violation of Article 128 of the UCMJ.[742] The memo similarly found that threatening a detainee with death may constitute a violation of either Article 128 or Article 134 of the UCMJ.[743] The Army Field Manual agrees. It states, "The absence of threats in interrogation is intentional, as their enforcement and use normally constitute violations of international law and may result in prosecution under the UCMJ."[744]

---

[732] *Cooper v. Dupnik.* 963 F.2d 1220, 1245. 9th Cir. 1992.

[733] *Id.* at 1247. Emphasis in original.

[734] *Id.* at 1248.

[735] *Rhodes v. Robinson.* 612 F.2d 766, 772. 3rd Cir. 1979.

[736] See, e.g., *Gray v. Spillman.* 925 F.2d 90. 4th Cir. 1990.

[737] *Wilkins v. May.* 872 F.2d 190, 195. 7th Cir. 1989.

[738] 10 U.S.C. §§ 801–941 (1994 and Supp. IV, 1999).

[739] "Any person subject to this chapter who is guilty of cruelty toward, or oppression or maltreatment of, any person subject to his orders shall be punished as a court-martial may direct." 10 U.S.C. § 893.

[740] See Working Group report, *supra* note 557, at 45.

[741] 10 U.S.C. § 928; Working Group report, *supra* note 557, at 46. Citing MCM IV-81; MJB, Section 3-54-1.

[742] See *supra* text accompanying note 526.

[743] See *supra* text accompanying note 527.

[744] FM 34-52, *supra* note 3. Chapter 1: Interrogation and the Interrogator.

General Fay found that keeping detainees in a state of undress and simulated sexual positions at Abu Ghraib was clearly degrading and humiliating and violated the UCMJ and other laws and regulations.[745]

### 2. Army Regulations

Army Regulation 190-8 (hereinafter AR 190-8) establishes the policy in executive agency for detention operations.[746] It enumerates in paragraphs 1-5 the general policy and treatment of not just enemy prisoners of war, but civilian internees, retained personnel, and other detainees. AR 190-8 makes clear that torture and coercion are prohibited.[747] Some of the most relevant directives regarding treatment of detainees include:

- to treat detainees with respect for their person and honor and to treat them humanely[748];
- to protect detainees against violence, insults, or any form of indecent assault[749];
- not to imprison a detainee in a place without daylight[750];
- not to confine for more than 30 consecutive days.[751]

General Fay concluded in his report on Abu Ghraib that all of these directives were violated by psychologically coercive interrogation methods, such as stripping detainees and placing them in isolation.[752] General Fay also found a violation of the policy and intent of AR 190-12 when interrogators ordered the use of dogs as an interrogation technique at Abu Ghraib.[753]

### 3. Army Field Manual 34-52

Army Field Manual 34-52 provides general guidelines for commanders, staff officers, and other personnel in the use of interrogation elements in Army intelligence units.[754] The manual outlines procedures for handling sources of interrogations, the processing of documents, and the reporting of intelligence gained through interrogation. FM 34-52 specifically prohibits the use of force, mental torture, threats, and inhumane treatment. It says:

---

[745] Fay report, *supra* note 40, at 69.

[746] Army Regulation 190-8. Military Police: Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees. Washington, DC: Headquarters Departments of the Army, the Navy, the Air Force, and the Marine Corps. October 1, 1997. Available at: http://www.au.af.mil/au/awc/awcgate/law/ar190-8.pdf. Accessed April 25, 2005.

[747] "No form of physical torture or moral coercion will be exercised against the CI [civilian internee]." *Id.* Para. 5-1(1).

[748] "In all circumstances, [civilian internees] will be treated with respect for their person, their honor, their family rights, their religious convictions and practices, and their manners and customs. At all times the CI will be humanely treated and protected against all acts of violence or threats . . . ." *Id.* Para. 5-1a(2).

[749] "The CI will be especially protected against all acts of violence, insults, public curiosity, bodily injury, reprisals of any kind, sexual attack such as rape, forced prostitution, or any form of indecent assault." *Id.* Para. 5-1a(3).

[750] "Imprisonment in premises without daylight is prohibited." *Id.* Para. 6-11a(5).

[751] "The duration of any single disciplinary punishment will not exceed 30 consecutive days." *Id.* Para. 6-12d(1).

[752] Fay report, *supra* note 40, at 30.

[753] *Id.*

[754] FM 34-52, *supra* note 3.

> The use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind is prohibited by law and is neither authorized nor condoned by the US Government. . . .[755]

As stated above, legitimate psychological ploys and deception techniques are permitted by FM 34-52, as long as they do not violate the Geneva Conventions.[756]

Other Field Manuals also contain relevant provisions. For example, FM 3-19.40 specifically directs that internees will retain their clothing.[757] General Fay found a violation of this directive because detainees were stripped of their clothes during interrogations at Abu Ghraib.[758]

## D.  International Human Rights Treaties

The US has ratified the International Covenant on Civil and Political Rights (hereinafter ICCPR) and the Convention against Torture, both of which prohibit torture and other forms of ill-treatment. The treaty bodies responsible for interpreting the treaties have made clear their view that the use of psychologically coercive techniques can have harmful psychological consequences and can constitute treaty violations.

### 1.  International Covenant on Civil and Political Rights (ICCPR)

The United States ratified the International Covenant on Civil and Political Rights in 1992. Article 7 of the ICCPR prohibits both torture and cruel, inhuman or degrading treatment or punishment.[759] According to the Human Rights Committee, which is charged with interpreting the treaty and hearing cases that arise under it, "[t]he aim of the provisions of article 7 . . . is to protect both the dignity and the physical and mental integrity of the individual."[760] Indeed, the Human Rights Committee has said that the prohibition in article 7 relates not only to acts that cause physical pain but also to acts that cause mental suffering to the victim.[761] Article 7 allows no exceptions.[762] The Human Rights Committee has affirmed that no derogation is permitted even in situations of public emergency[763] and that no justifications, such as those based on orders from a superior officer, can be invoked to excuse violations.[764]

---

[755] *Id.*

[756] See *supra* text accompanying notes 3–6.

[757] Department of the Army. Army Field Manual 3-19.40. Military Police Internment/Resettlement Operations. Chapter 5, Civilian Internees. Paras. 5-20. August 1, 2001. Available at: http://www.globalsecurity.org/military/library/policy/army/fm/3-19-40/ch5.htm#par4. Accessed April 25, 2005.

[758] Fay report, *supra* note 40, at 30.

[759] "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." International Covenant on Civil and Political Rights. Opened for signature December 16, 1966. Article 7. 999 U.N.T.S. 171. Entered into force March 23, 1976. [ICCPR].

[760] General Comment No. 20: Replaces General Comment 7 Concerning Prohibition of Torture and Cruel Treatment or Punishment (Art. 7):10/03/92. Human Rights Committee. CCPR General Comment No. 20. 44th Sess.;1992: para. 2. [General Comment No. 20].

[761] *Id.* Para. 5.

[762] See *id.* Para. 3.

[763] ICCPR, *supra* note 759. Article 4. Prohibiting derogation under any circumstances from the obligations under Article 7.

[764] General Comment No. 20, *supra* note 760. Para. 3.

Article 7's prohibition of torture and cruel, inhuman, and degrading treatment is complemented by positive requirements in article 10, paragraph 1, which says, "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."[765] The Human Rights Committee explained:

> Article 10, paragraph 1, imposes on States parties a positive obligation towards persons who are particularly vulnerable because of their status as persons deprived of their liberty, and complements for them the ban on torture or other cruel, inhuman or degrading treatment or punishment contained in Article 7 of the Covenant. Thus, not only may persons deprived of their liberty not be subjected to treatment that is contrary to Article 7 . . ., but neither may they be subjected to any hardship or constraint other than that resulting from the deprivation of liberty; respect for the dignity of such persons must be guaranteed under the same conditions as for that of free persons.[766]

The Human Rights Committee has made clear that psychologically coercive interrogation techniques, including death threats, solitary confinement, and sleep deprivation, can have negative mental health effects and can violate Articles 7 and 10 of the treaty.

In its concluding observations regarding Israel's compliance with the treaty, the Human Rights Committee noted:

> that the methods of handcuffing, hooding, shaking and sleep deprivation have been and continue to be used as interrogation techniques, either alone or in combination. The Committee is of the view that the guidelines can give rise to abuse and that *the use of these methods constitutes a violation of article 7 of the Covenant in any circumstances*. . . . The Committee urges the State party to cease using the methods . . . .[767]

With respect to death threats, the Human Rights Committee held in one case that a mock execution, along with other ill-treatment, "constitute cruel and inhuman treatment within the meaning of article 7 and, therefore, also entail a violation of article 10, paragraph 1, of the Covenant, which requires that detained persons be treated with respect for their human dignity."[768]

The Human Rights Committee has clearly condemned the use of solitary confinement as a violation of the ICCPR. It has stated that "prolonged solitary confinement . . . may amount to acts prohibited by article 7."[769]

2. *Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment*

---

[765] ICCPR, *supra* note 759. Article 10(1).

[766] General Comment 21. Human Rights Committee. 44th Sess.;1992: para. 3.

[767] Concluding Observations of the Human Rights Committee : Israel. Human Rights Committee. 63rd Sess.1998: para. 19. U.N. Doc. CCPR/C/79/Add.93. Emphasis added.

[768] Communication No. 255/1987: Jamaica, 22/10/92. Human Rights Committee. 46th Sess. 1992: para 8.5. U.N. Doc. CCPR/C/46/D/255/1987.

[769] General Comment No. 20, *supra* note 760. Para. 6.

The US ratified the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment in 1994. The Convention against Torture prohibits torture and other forms of cruel, inhuman and degrading treatment.[770] Like the ICCPR, the Convention against Torture says that these prohibitions are absolute; no emergency or exceptional circumstance can permit their limitation.[771]

The Committee against Torture, which interprets the provisions of the Convention against Torture, has recognized the negative health consequences of psychologically coercive interrogation techniques and has said that they constitute torture and ill-treatment, thereby violating the Convention against Torture's provisions.

In 1997, the Committee Against Torture considered techniques used by Israel. These included (1) restraining in very painful conditions, (2) hooding under special conditions, (3) sounding of loud music for prolonged periods, (4) sleep deprivation for prolonged periods, (5) threats, including death threats, (6) violent shaking, and (7) using cold air to chill. The Committee found that they are "in the Committee's view, breaches of article 16 and also constitute torture as defined in article 1 of the Convention. This conclusion is particularly evident where such methods of interrogation are used in combination, which appears to be the standard case."[772]

The Committee returned to methods of interrogation used by the Israeli Security Agency in 2001, when it considered Israel's report.[773] The Israel Supreme Court had just issued a decision on the methods of interrogation,[774] including covering a suspect's head with an opaque sack during interrogation. The Court held that such a method is not inherent to an interrogation, is forbidden, and "harms the suspect and his (human) image. It degrades him. . . ."[775] The Court similarly prohibited the playing of loud music while in a stress position.[776] With respect to sleep deprivation, the Court noted that interrogations may be lengthy and as a "side effect" may cause a person not to be able to sleep during the interrogation. The Court noted, however, that the situation changes if

> sleep deprivation shifts from being a 'side effect' inherent to the interrogation, to [being] an end in itself. If the suspect is intentionally deprived of sleep for a prolonged period of time, for the purpose of tiring him out or 'breaking' him – it shall not fall within the scope of a fair and reasonable investigation. Such means harm the rights and dignity of the suspect in a manner surpassing that which is required.[777]

With respect to the Israel Supreme Court's ruling, the Committee against Torture said that the ruling "was a step in the right direction, although, unfortunately, it did not outlaw torture

---

[770] Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. G.A. Res. 39/46. U.N. GAOR. 39th Sess. Supp. No. 51. 1984:197. *Entered into force* June 26, 1987. U.N. Doc. A/Res/39/46.

[771] "No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." *Id.* Article 2(2).

[772] Concluding Observations of the Committee against Torture: Israel. 09/05/97. Committee against Torture. 1997:para. 257. U.N. Doc. A/52/44.

[773] Consideration of Reports Submitted by States Parties Under Article 19 of the Convention. Committee against Torture. 2001. U.N. Doc. CAT/C/54/Add.1. [Israel report].

[774] Public Committee Against Torture in Israel v. Israel. HCJ 5100/94. September 1999.

[775] Israel report, *supra* note 773. Para. 14(v). Quoting Israel Supreme Court decision. Para. 28.

[776] *Id.* Para. 14(vi). Quoting Israel Supreme Court decision. Para. 29.

[777] *Id.* Para. 14(viii). Quoting Israel Supreme Court decision. Para. 31.

completely. It fell short of the obligations imposed by the Convention because it allowed such measures as deprivation of sleep so long as they were not used as a means of interrogation pressure; in other words the [Israel Security Agency] could continue to torture."[778]

It is worth noting that the Israel Supreme Court also considered the defense of necessity. Although the Court held that such a defense might be available, it held that the necessity defense could not serve as a statutory basis for authorizing, in advance, the use of abusive methods in the course of an investigation. In other words,

> the 'necessity' defense does not constitute a source of authority . . . . The very fact that a particular act does not constitute a criminal act (due to the 'necessity' defense) does not in itself authorize the administration to carry out this deed and in doing so infringe upon human rights.[779]

In its consideration of the Republic of Korea's report in 1996, the Committee against Torture expressed concern about reports from NGOs that show that many political suspects continued to endure various methods of ill-treatment during interrogation. It singled out the use of sleep deprivation: "The *sleep deprivation* practiced on suspects, which *may in some cases constitute torture* and which seems to be routinely used to extract confessions, *is unacceptable.*"[780] In 1993, the Committee Against Torture said that blindfolding during interrogation "should be expressly prohibited."[781]

The Committee against Torture also has made clear its concern about the use of solitary confinement. In 2002, the Committee considered the case of a woman in Denmark who was held in solitary confinement for less than two months total. In considering the circumstances, the Committee notes that the cell measured 8 by 2 and had no windows, that the woman had no radio and TV was only available upon payment of a fee, and that she was never informed about the access to certain books from a local library. The Committee also noted that the prison doctor reported that the woman was "close to a psychotic breakdown... [which] can fully be explained as the result of incarceration and solitary confinement."[782] The Committee against Torture said:

> It is clear from the Committee's concluding observations [to Denmark] that solitary confinement, particularly in cases of pre-trial detention, is considered to have *extremely serious mental and psychological consequences for the detainee; States parties are encouraged to abolish the practice.* Although abolition is preferable, the concluding observations of the Committee reveal that solitary confinement should be applied only in exceptional cases and not for prolonged periods of time.[783]

---

[778] Summary record of the 496th meeting: Israel. Committee against Torture. November 29, 2001: para. 45. U.N. Doc. CAT/C/SR.496.

[779] Israel report, *supra* note 773. Para. 18. Quoting Israel Supreme Court decision. Para. 36.

[780] Concluding Observations of the Committee against Torture: Republic of Korea. Committee against Torture. November 13, 1996: para. 56. U.N. Doc. A/52/44. Emphasis added.

[781] Activities of the Committee against Torture Pursuant to Article 20 of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment: Turkey. 15/11/93. Committee against Torture. November 15, 1993: para. 48(a). U.N. Doc. A/48/44/Add.1.

[782] Communication No. 202/2002: Denmark. Committee against Torture. May 11, 2004: para. 25. U.N. Doc. CAT/C/32/D/202/2002.

[783] *Id.* Para. 5.6. Emphasis added.

In its conclusions and recommendations to New Zealand in 2004, the Committee against Torture expressed concerns about "[c]ases of prolonged non-voluntary segregation in detention (*solitary confinement), the strict conditions of which may amount, in certain circumstances, to acts prohibited by article 16* of the Convention."[784]

## E. US State Department Report on Human Rights

A strong indication of the US interpretation of legal restrictions on torture and cruel, inhuman, and degrading treatment over many years can be found in the annual Country Reports on Human Rights Practices by the US State Department. These reports describe the status of internationally recognized human rights in nearly all countries outside the US. In the 2005 report's section on torture and other cruel, inhuman, or degrading treatment or punishment, the US government has consistently referred to the use of isolation, sleep deprivation, "humiliations such as public nakedness," and "being forced to stand-up and sit-down to the point of collapse."[785] The report criticizes Egypt, for example, as having a "systematic pattern of torture"[786] and points to stripping prisoners naked and blindfolding them and the use of threats, including threats of rape.[787] With respect to Iran, the report criticizes the use of sleep deprivation, "prolonged solitary confinement with sensory deprivation," and threats of execution.[788] The report condemns Libya for threats of attack by dogs and calls them acts of torture.[789] Other countries, including North Korea,[790] Jordan,[791] Pakistan,[792] Saudi Arabia,[793] and Syria[794] are chastised in the report for similar violations of human rights.[795] It is evident that these very techniques were approved and systematically used by the United States as methods of interrogation in the "war on terror."

## F. Special Rapporteur on Torture

The Special Rapporteur on Torture, an independent expert mandated by the United Nations Human Rights Commission to report on the situation of torture around the world, has considered a wide range of psychologically coercive interrogation techniques and their effects on detainees. In 2004, the Special Rapporteur specifically responded to allegations about the

---

[784] Conclusions and Recommendations of the Committee against Torture: New Zealand. Committee against Torture. June 11, 2004: para. 5(d). U.N. Doc. CAT/C/CR/32/4. Emphasis added.

[785] *US State Department Report on Human Rights 2004*. February 28, 2005. Available at: http://www.state.gov/g/drl/rls/hrrpt/2004/index.htm. Accessed April 25, 2005.

[786] *Id.* Citing U.N. Committee Against Torture.

[787] *Id.*

[788] *Id.*

[789] *Id.*

[790] "Methods of torture included . . . humiliations such as public nakedness; confinement to small 'punishment cells,' in which prisoners are unable to stand upright or lie down, where they could be held for several weeks." *Id.*

[791] "The most frequently reported methods of torture included beating, sleep deprivation, extended solitary confinement, and physical suspension." *Id.*

[792] "Security force personnel continued to torture persons in custody throughout the country. . . . [M]ethods used included . . . prolonged isolation; denial of food or sleep." *Id.*

[793] "Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation." *Id.*

[794] *Id.* Citing a case reported by Amnesty International in which four young men were "subjected to various forms of torture and ill-treatment, including . . . hearing loud screams and beatings of other detainees; being stripped naked in front of others; and being prevented from praying and growing a beard."

[795] *Id.*

kinds of psychological methods being used on detainees in the "war on terror." He was clear in his condemnation of the methods as torture and ill-treatment:

> The Special Rapporteur has recently received information on certain methods that have been condoned and used to secure information from suspected terrorists. They notably include holding detainees in painful and/or stressful positions, depriving them of sleep and light for prolonged periods, exposing them to extremes of heat, cold, noise and light, hooding, depriving them of clothing, stripping detainees naked and threatening them with dogs. The jurisprudence of both international and regional human rights mechanisms is unanimous in stating that such methods violate the prohibition of torture and ill-treatment.[796]

The Special Rapporteur said that "blindfolding and hooding should be forbidden."[797] He also has determined that intimidation, including threats, can be torture:

> A number of decisions by human rights monitoring mechanisms have referred to the notion of mental pain or suffering, including suffering through intimidation and threats, as a violation of the prohibition of torture and other forms of ill-treatment. Similarly, international humanitarian law prohibits at any time and any place whatsoever any threats to commit violence to the life, health and physical or mental well-being of persons. It is my opinion that serious and credible threats, including death threats, to the physical integrity of the victim or a third person can amount to cruel, inhuman or degrading treatment or even torture, especially when the victim remains in the hands of law enforcement officials.[798]

As for solitary confinement, the Special Rapporteur expressed particular concern, noting that the use of solitary confinement "in itself may constitute a violation of the right to be free from torture."[799] The Special Rapporteur also said that solitary confinement can amount to cruel, inhuman or degrading treatment.[800] He has recognized that prolonged solitary confinement in conditions of severe material deprivation and with no or little activity may have a serious impact on the psychological and moral integrity of the prisoner.[801] He has noted a specific limitation in its use; in a report to Chile, the Special Rapporteur on Torture said, "Judges should not have the power to order solitary confinement, other than as a measure in cases of breach of institutional discipline, for more than two days."[802]

---

[796] Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. U.N. GAOR. 59th Sess. Agenda Item 107(a). September 1, 2004: para. 17. U.N. Doc. A/59/324.

[797] Civil and Political Rights, Including the Question of: Torture and Detention, Report of the Special Rapporteur, Sir Nigel Rodley, Submitted Pursuant to Commission on Human Rights Resolution 2001/62. U.N. ESCOR. 58th Sess. Agenda Item 11(a). December 27, 2001; Annex 1, para. (f). U.N. Doc. E/CN.4/2002/76.

[798] *Id.* Annex II.

[799] Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *supra* note 796. Para. 20.

[800] Question of the Human Rights of All Persons Subjected to Any Form of Detention or Imprisonment, in particular: Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Report of the Special Rapporteur, Mr. Nigel S. Rodley, Submitted Pursuant to Commission on Human Rights Resolution 1995/37, Visit by the Special Rapporteur to Chile. U.N. ESCOR. Commission on Human Rights. 52nd Sess. Agenda Item 8. December 4, 1996: para. 76(c). U.N. Doc. E/CN.4/1996/35/Add.2. [Chile Visit].

[801] Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *supra* note 796. Para. 46.

[802] Chile Visit, *supra* note 800. Para. 76(c).

The Special Rapporteur also has considered the legal framework constructed by the Bush Administration in its efforts to justify psychologically abusive interrogation methods.

In a 2004 document published a few months after the 2002 OLC opinion became public, the Special Rapporteur clarified his views on the definition of torture.

> The Special Rapporteur notes with serious concern that attempts have been made to narrow the scope of the definition of torture contained in article 1 of the Convention Against Torture . . . . In this respect, the Special Rapporteur wishes to stress that the definition contained in the Convention cannot be altered by events or in accordance with the will or interest of States. The Special Rapporteur also wishes to recall that the prohibition applies equally to torture and to cruel, inhuman or degrading treatment or punishment.[803]

He also made clear that the prohibition on torture applies regardless of legal status of individuals

> [A]lthough the status of detainees may remain unclear, there is no uncertainty as to the international obligations, standards and protections that apply to them, the prohibition of torture being applicable to all individuals without exception and without discrimination, regardless of their legal status.[804]

He also responded to arguments put forward to permit the use of torture.

> While being aware of the threats posed by terrorism and recognizing the duty of States to protect their citizens and the security of the State against such threats, the Special Rapporteur would like to reiterate that the absolute nature of the prohibition of torture and other forms of ill-treatment means that no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification for torture.
>
> . . .
>
> No special circumstance may be invoked to justify a violation of the prohibition of torture for any reason, including an order from a superior officer or a public authority.[805]

## G.  Other International Instruments

Other international instruments, including the American Convention on Human Rights, the European Convention for the Protection of Human Rights and Fundamental Freedoms and the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, also have found the use of psychologically coercive interrogation techniques to cause harmful psychological effects and to violate prohibitions on torture and ill-treatment. Although the US is not a party to these treaties, the jurisprudence that has developed from them is some of the most fully developed in the human rights movement and is therefore a useful

---

[803] Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *supra* note 796. Para. 16.
[804] *Id.* Para. 22.
[805] *Id.* Paras. 14–15.

barometer of the international view of what actions amount to torture or cruel, inhuman, and degrading treatment. As the 2002 OLC opinion noted, international decisions "provide guidance about how other nations will likely react to our interpretation of the [Convention against Torture] and [the federal anti-torture statute]."[806]

### 1. American Convention on Human Rights

The American Convention on Human Rights, which was signed by US in 1977 but never ratified, has a specific prohibition of torture and cruel, inhuman or degrading treatment or punishment.[807] It also specifies that "all persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person."[808]

In the *Loayza Tamayo* case, the Inter-American Court of Human Rights held, "The violation of the right to physical and psychological integrity of persons is a category of violation that has several gradations and embraces treatment ranging from torture to other types of humiliation or cruel, inhuman or degrading treatment with varying degrees of physical and psychological effects. . . ."[809]

It also explained what it meant by degradation and respect for dignity in the context of a struggle against terrorism:

> The degrading aspect is characterized by the fear, anxiety and inferiority induced for the purpose of humiliating and degrading the victim and breaking his physical and moral resistance. . . . That situation is exacerbated by the vulnerability of a person who is unlawfully detained . . . Any use of force that is not strictly necessary to ensure proper behavior on the part of the detainee constitutes an assault on the dignity of the person . . . in violation of Article 5 of the American Convention. The exigencies of the investigation and the undeniable difficulties encountered in the anti-terrorist struggle must not be allowed to restrict the protection of a person's right to physical integrity.[810]

It found that "*incommunicado* detention, . . . solitary confinement in a tiny cell with no natural light, blows, and maltreatment, including total immersion in water, intimidation with threats of further violence, a restrictive visiting schedule . . ., all constitute forms of cruel, inhuman or degrading treatment in violation of Article 5(2) of the American Convention."[811]

In another case, the Inter-American Court of Human Rights held that "the mere subjection of an individual to prolonged isolation and deprivation of communication is in itself cruel and inhuman treatment which harms the psychological and moral integrity of the person, and violates the right of every detainee under Article 5(1) and 5(2) to treatment respectful of his dignity."[812]

---

[806] 2002 OLC opinion, *supra* note 481, at 27.

[807] "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." American Convention on Human Rights. November 22, 1969. Article 5. 1144 U.N.T.S. 123.

[808] *Id.*

[809] *Loayza Tamayo.* Judgment of September 17, 1997. Inter-Am. Ct. H.R. (Ser. C). No. 33. 1997: para. 57.

[810] *Id.*

[811] *Id.* Para. 58.

[812] *Velasquez Rodriguez* Case. Judgment of July 29, 1998. Inter-Am. Ct. H.R. (Ser. C). No. 4. 1998: para. 187.

2. *European Convention for the Protection of Human Rights and Fundamental Freedoms*

Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter European Convention) has a strict prohibition on torture and inhuman or degrading treatment or punishment.[813] The European Convention, however, does not contain a definition of torture and does not specifically mention a prohibition on mental or psychological torture. The European Court of Human Rights (hereinafter European Court), which decides cases brought under the European Convention, interprets the provisions of the European Convention. The European Court has noted, "Even in the most difficult circumstances, such as the fight against terrorism and organised crime, the Convention prohibits in absolute terms torture and inhuman or degrading treatment or punishment."[814] There is no derogation allowed even in the event of a war or public emergency threatening the life of a nation.[815] The European Court has considered treatment to be "inhuman" because, *inter alia*, it was premeditated, was applied for hours at a stretch and caused either actual bodily injury or intense physical or mental suffering. It has deemed treatment to be "degrading" because it was such as to arouse in the victims feelings of fear, anguish and inferiority capable of humiliating and debasing them.[816]

The European Court has declared various forms of psychologically coercive interrogation techniques to be torture or cruel, inhuman, and degrading treatment.

In a 1978 case, the European Court examined the government of Northern Ireland's policy of arrest and detention.[817] In doing so, it considered the arrest and internment of 12 persons at unidentified centers. At the centers, detainees were submitted to a form of "interrogation in depth," which involved the combined application of five particular sensory deprivation techniques: wall-standing, hooding, subjection to noise, deprivation of sleep, and deprivation of food and drink.[818] The European Court held that the "five techniques were applied in combination, with premeditation and for hours at a stretch; they caused, if not actual bodily injury, at least intense physical and mental suffering to the persons subjected thereto and also led to acute psychiatric disturbances during interrogation."[819] Accordingly, the European Court held that the use of the five techniques constituted a practice of inhuman and treatment. They also found that the practices were degrading, since "they were such as to arouse in their victims feelings of fear, anguish and inferiority capable of humiliating and debasing them and possibly breaking their physical or moral resistance."[820]

---

[813] "No one shall be subjected to torture or to inhumane or degrading treatment or punishment." European Convention for the Protection of Human Rights and Fundamental Freedoms. November 4, 1950. 213 U.N.T.S. 221. As amended by Protocols Nos. 3, 5, 8, and 11, which entered into force on Sept. 21, 1970, Dec. 20, 1971, Jan. 1, 1990, and Nov. 1, 1998, respectively. Article 3. [European Convention].

[814] *Ilascu and Others v. Moldova and Russia.* Application no. 48787/99. Judgment. July 8, 2004: para 424.

[815] European Convention, *supra* note 813. Article 15(2); *Ocalan v. Turkey.* Application no. 46221/99. Judgment. March 12, 2003: para. 218. "The Court is well aware of the immense difficulties faced by States in modern times in protecting their communities from terrorist violence. However, even in these circumstances, the Convention prohibits in absolute terms torture or inhuman or degrading treatment or punishment, irrespective of the victim's conduct. Article 3 makes no provision for exceptions and no derogation from it is permissible even under Article 15 of the Convention in time of war or other national emergency."

[816] *Ilascu and Others v. Moldova and Russia.* Application no. 48787/99. Judgment. July 8, 2004: para 425.

[817] *Ireland v. United Kingdom.* Application no. 5310/71. Judgment. December 13, 1977.

[818] *Id.* Para. 96.

[819] *Id.* Para. 167.

[820] *Id.*

Although the European Court held that these acts did not constitute torture, it did say, in a subsequent decision 20 years later, that

> certain acts which were classified in the past as "inhuman and degrading treatment" as opposed to "torture" could be classified differently in future. It takes the view that the increasingly high standard being required in the area of the protection of human rights and fundamental liberties correspondingly and inevitably requires greater firmness in assessing breaches of the fundamental values of democratic societies.[821]

In a 1998 case considered by the European Court, the applicant had been blindfolded while being aggressively interrogated, assaulted and threatened with death, detained for four days in total darkness in sub-zero temperatures with no bed or blankets, and denied food and liquids. He also was stripped naked, hosed with cold water, beaten with a truncheon on his body and the soles of his feet, and had electric shocks administered to his fingers and toes.[822] The European Court found a violation of Article 3 of the Convention.[823]

In a 1997 case, the applicant had been subjected to rape, blindfolding, and being paraded around naked. The European Court recognized the harmful effects of such techniques:

> She was detained over a period of three days during which she must have been bewildered and disoriented by being kept blindfolded, and in a constant state of physical pain and mental anguish brought on by the beatings administered to her during questioning and by the apprehension of what would happen to her next. She was also paraded naked in humiliating circumstances thus adding to her overall sense of vulnerability.[824]

The European Court found that "the accumulation of acts of physical and mental violence inflicted on the applicant and the especially cruel act of rape to which she was subjected amounted to torture in breach of Article 3 of the Convention. Indeed, the Court would have reached this conclusion on either of those grounds taken separately."[825]

In one case, the European Court noted in particular "threats made concerning the ill-treatment of [the applicant's] children, which caused the applicant intense fear and apprehension. This treatment left the applicant with long-term symptoms of anxiety and insecurity, diagnosed as post-traumatic stress disorder and requiring treatment by medication."[826] The Court therefore finds that "[the applicant] was a victim of very serious and cruel suffering that may be characterised as torture."[827]

In one case before the European Court, an applicant was stripped naked in the presence of a female police officer, with the intention of humiliating him. He was then ordered to squat, and his sexual organs and the food he had received from his visitor were examined by guards who

---

[821] *Selmouni v. France.* Application no. 25803/94. Judgment. July 28, 1999: para. 101.
[822] *Tekin v. Turkey.* Application no. 52/1997/836/1042. Judgment. June 9, 1998: para. 49.
[823] *Id.* Para. 54.
[824] *Aydin v. Turkey.* Application no. 57/1996/676/866. Judgment. September 25, 1997: para. 25.
[825] *Id.* Para. 27.
[826] *Akkoc v. Turkey.* Application nos. 22947/93 and 22948/93. Judgment. October 10, 2000: para. 116.
[827] *Id.* Para. 117. Citation omitted.

were not wearing gloves. The Court found a violation of Article 3. It noted that, "Obliging the applicant to strip naked in the presence of a woman, and then touching his sexual organs and food with bare hands showed a clear lack of respect for the applicant, and diminished in effect his human dignity. It must have left him with feelings of anguish and inferiority capable of humiliating and debasing him."[828]

In another, the applicant was stripped to his underwear in front of a group of prison guards and the guards verbally abused and derided the applicant.[829] The European Court found, "Their behaviour was intended to cause in the applicant feelings of humiliation and inferiority. This, in the Court's view, showed a lack of respect for the applicant's human dignity."[830] Accordingly, there was a violation of Article 3.[831]

The European Court has considered various forms of sensory deprivation and has consistently found it to have negative health consequences and to violate Article 3's prohibition on torture and/or cruel, inhuman and degrading treatment. Indeed, the Court has said that "complete sensory isolation, coupled with total social isolation can destroy the personality and constitutes a form of inhuman treatment which cannot be justified by the requirements of security or any other reason. . . ."[832] Similarly, the European Court said "that artificially depriving prisoners of their sight by blindfolding them for lengthy periods spread over several days may, when combined with other ill-treatment, subject them to strong psychological and physical pressure."[833]

In one case, the applicant, who being held in prison under a death sentence, was locked up for 24 hours a day in cells which offered a very restricted living space and had covered windows blocking access to natural light.[834] In addition, there was no provision for any outdoor exercise, and there was little or no opportunity for activities by which the applicant could occupy himself or have contact with others.[835] The European Court said, "It considers that the conditions of detention . . . must have caused him considerable mental suffering, diminishing his human dignity."[836] According, there was a violation of Article 3 of the European Convention.

In another case, the European Court found that the applicant was detained in very strict isolation for eight years, with no contact with other prisoners, no news from the outside, and no right to contact his lawyer or receive regular visits from his family. In addition, his cell was unheated, and had no natural light source or ventilation. The European Court noted that the applicant's conditions of detention had deleterious effects on his health and found a violation of Article 3.[837]

Another applicant in the same case faced blows and ill-treatment, deprivation of food, and solitary confinement in an unheated, badly ventilated cell without natural light. The European

---

[828] *Valasinas v. Lithuania*. Application no. 44558/98. Judgment. July 24, 2001: para. 117.

[829] *Iwanczuk v. Poland*. Application no. 25196/94. Judgment. November 15, 2001: para. 15.

[830] *Id.* Para. 59.

[831] *Id.* Para. 60.

[832] *Ilascu and Others v. Moldova and Russia*. Application no. 48787/99. Judgment. July 8, 2004: para 432.

[833] *Ocalan v. Turkey*. Application no. 46221/99. Judgment. March 12, 2003: para. 222.

[834] *Kuznetsov v. Ukraine*. Application no. 39042/97. Judgment. April 29, 2003: para.125.

[835] *Id.*

[836] *Id.* Para. 126.

[837] *Ilascu and Others v. Moldova and Russia*. Application no. 48787/99. Judgment. July 8, 2004: paras. 438–442.

Court said, "such treatment was apt to engender pain and suffering, both physical and mental, which could only be exacerbated by the applicant's total isolation and were calculated to arouse in him feelings of fear, anxiety and vulnerability likely to humiliate and debase him and break his resistance and will."[838] Accordingly, the Court found a violation of Article 3.

   3.  *European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment*

The European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment grew out of Article 3 of the European Convention on Human Rights. Again, although the US is not a party to this instrument, its interpretation is instructive in considering what acts amount to torture and cruel, inhuman and degrading treatment.

The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (hereinafter CPT), which ensures implementation of the Convention, has said that psychologically coercive interrogation techniques can constitute methods of torture and ill-treatment.

For example, in a report on a visit to the Russian Federation, the CPT said that threats of sexual humiliation "could be considered to amount to psychological torture."[839] Similarly, in a report to Finland, it recommended "that the practice of placing prisoners naked in the observation cell be ended immediately."[840]

The CPT has paid "particular attention to prisoners detained in conditions akin to solitary confinement. . . . Solitary confinement can, in certain circumstances, amount to inhuman and degrading treatment; in any event, all forms of solitary confinement should be as short as possible."[841] The CPT has acknowledged the harmful consequences of solitary confinement. It said, "It is generally acknowledged that *all forms of solitary confinement* without appropriate mental and physical stimulation *are likely, in the long term, to have damaging effects, resulting in deterioration of mental faculties and social abilities.*"[842]

---

[838] *Id.* Paras. 443–449.
[839] Report to the Russian Government on the Visit to the Russian Federation Carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 2 to 17 December 2001. June 30, 2003: para. 18. Doc. No. CTP/Inf (2003) 30.
[840] Report to the Finnish Government on the Visit to Finland Carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 7 to 17 June 1998. May 11, 1999: para. 102. Doc. No. CPT/Inf (99) 9.
[841] Report to the Finnish Government on the Visit to Finland Carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 10 to 20 May 1992. April 1, 1993: para. 67. Doc. No. CPT/Inf (93) 8. The conditions that were referenced by CPT: "Most of the cells contained only a platform bed and a lavatory—both made of concrete. . . . Many of the cells were in an unhygienic condition and some were extremely dirty. . . . To sum up, the vast majority of prisoners spent their time alone in their cells, with little to occupy them. Given the extended periods for which persons may be held under voluntary or non-voluntary segregation, the regime which was offered to them cannot be regarded as acceptable." *Id.* Paras. 70–72.
[842] *Id.* Para. 73. Emphasis added.

It has condemned other psychologically coercive interrogation various techniques:

- In a report on a visit to the Ukraine, the CPT said that the use of muzzled dog, along with tear gas, "can only be justified in very exceptional circumstances."[843]
- The CPT visited Turkey in September 2003 and received reports of ill-treatment, including sleep deprivation, prolonged standing, blindfolding, and threats to harm the detainee and/or family members.[844]
- In a visit report to the former Yugoslav Republic of Macedonia, the CPT listed sleep deprivation during prolonged periods and mock executions as types of ill-treatment being used.[845]

Based on a consideration of criminal, constitutional, and military US law, it is clear that the use of psychologically abusive interrogation methods is a violation of the federal anti-torture statute, the US Constitution, and military law and regulations. It is also a violation of international human rights treaties to which the US is a party. Finally, after considering other international instruments and jurisprudence surrounding interrogation methods, it is clear that the use of psychologically abusive interrogation methods places the US out of step with the rest of the world, even though it claims to be a human rights standard setter and role model. The US is clearly not fulfilling its legal obligations to prevent torture and cruel, inhuman, or degrading treatment.

---

[843] Report to the Ukrainian Government on the Visit to Ukraine Carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 24 November to 6 December 2002. December 1, 2004: para. 140. Doc. No. CPT/Inf (2004) 34.

[844] Report to the Turkish Government on the Visit to Turkey Carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 7 to 15 September 2003. June 18, 2004: para. 11. Doc. No. CPT/Inf (2004) 16.

[845] Report to the Government of "the former Yugoslav Republic of Macedonia" on the Visit to "the former Yugoslav Republic of Macedonia" Carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) from 15 to 19 July 2002. January 16, 2003: para. 9. Doc. No. CPT/Inf (2003) 5.

# VII. Conclusion

The descent into routine use of psychological torture required a willingness to depart from values, law, and practices long enshrined in military and civilian investigative traditions. The process inexorably followed from the willingness to "take the gloves off" and replace the firm and unyielding standards of the Geneva Conventions and Convention against Torture with some vague notion of "humaneness," which was always to be balanced against claimed military necessity. After that, practices in the field, legal interpretations, and policy directives all reinforced one another. At Abu Ghraib, for example, nakedness became an accepted part of interrogation strategy and Pentagon lawyers found a way to justify its use, which in turn served to reinforce its use. The authors of the policies recognized that many of the coercive and abusive techniques were very harmful and degrading, so they introduced bogus "safeguards" like medical sign-offs, command approval, and monitoring. There is no indication that these supposed safeguards were carried out; on the contrary, the evidence suggests that even limitations placed in directives on abusive techniques that had become commonplace had little effect. Like all forms of abuse, once unleashed, psychological torture became the norm.

The full extent of psychological torture remains unknown. In the first place, despite the thousands of pages of documents now produced, many questions still exist. How many detainees were subjected to sleep deprivation and to what effect? How many have been kept in isolation for days, weeks, and even months at a time? Who signed off on interrogation plans allowing illegal techniques? What was the role of medical personnel in interrogation planning and monitoring? What was the impact on the detainees – perhaps numbering in the thousands – subjected to psychological torture? Freedom of Information Act requests and leaked documents are no substitute for a full and independent investigation by an entity that can subpoena documents and witnesses.

Second, there has been no accountability at the highest levels.

Third, there has been virtually no concern for the victims. The United States gives more than $5 million to the UN Voluntary Fund for Victims of Torture,[846] yet it has never acknowledged the harm it has done to individuals through its own policies and practices, much less offered any assistance to them. It should be noted, too, that this report does not address the impact of participation in torture by perpetrators, but there is abundant evidence of long term psychological effects on those who participated in or witnessed torture.

Finally, and most disturbing of all, there are strong indications that psychological torture remains in use to this day. The recent announcement by the Defense Department that a new interrogation manual will eliminate techniques like stripping prisoners, keeping them in stressful positions for prolonged periods, using military dogs to intimidate prisoners, and sleep deprivation is a welcome sign but it remains unclear whether other techniques, including isolation and severe humiliation, remain permitted, and whether there are exceptions either at the behest of commanders or for certain detainees. And while the December 2004 opinion of the Office of Legal Counsel of the Justice Department largely restored individual accountability for engaging in physical torture, it essentially immunized military and intelligence officials from liability for psychological torture. The elimination of psychological torture requires decisive and unequivocal action.

---

[846] *US State Department Report on Human Rights 2004*. February 28, 2005. Appendix E: Economic and Security Assistance. Available at: http://www.state.gov/g/drl/rls/hrrpt/2004/41783.htm. Accessed April 28, 2005.

## VIII. Recommendations

### I. To the Executive Branch

#### A. End and Prohibit Use of Psychological Torture

1. All agencies of the United States government should end the use of all psychologically coercive interrogation methods and custodial practices against detainees that amount to torture or cruel, inhuman and degrading treatment or punishment, including but not limited to the use of death threats, mock executions, military working dogs, cultural and sexual humiliation, sensory deprivation and overload, isolation, and sleep deprivation. These prohibitions should be contained in instructions to US personnel and contract employees issued by the Department of Defense, the Central Intelligence Agency (CIA) and other agencies that have custody responsibilities or engage in interrogations.

2. In this connection, the Department of Defense should also repudiate the Working Group report from April 2003, which incorporated language verbatim from the August 2002 torture opinion by the Office of Legal Counsel of the Department of Justice and approved the use of interrogation techniques that amount to psychological torture or cruel, inhuman or degrading treatment.

3. Education and information regarding the prohibition against torture under domestic and international law, including psychological torture, should be fully included in the training of military and intelligence personnel, and other persons who may be involved in the custody, interrogation or treatment of any individual subjected to any form of arrest, detention, or imprisonment.

#### B. Withdraw Legal Opinions That Permit Psychological Torture and Replace with Interpretation Faithful to Statute

1. The Department of Justice should repudiate and withdraw the December 30, 2004 opinion of the Office of Legal Counsel that purports to interpret the federal anti-torture statute to permit the use of psychological torture. It should replace the December 30 opinion with an interpretation that is consistent with the language of the statute criminalizing torture, the Convention Against Torture, with the Geneva Conventions, and with decisions and opinions regarding psychological torture under domestic and international law.

2. The Department of Justice should provide guidance on the prohibition of cruel, inhuman, or degrading treatment, which is embodied in Article 16 of the Convention against Torture, that is consistent with the Senate Reservation in adopting the Convention.

3. The Department of Justice should make clear that the obligations of the United States to prohibit the use of cruel, inhuman or degrading treatment extend to the CIA.

4. The Department of Justice and White House Counsel should withdraw opinions that al Qaeda and Taliban detainees are not covered under the Geneva Conventions.

### C. Publicly Disclose Interrogation Rules

In the tradition and consistent with Army Field Manual 34-52, all agencies of the United States government that engage in interrogation must make public the current policies that govern interrogations in Afghanistan, Guantánamo, Iraq and elsewhere.

### D. Hold Perpetrators Accountable

In view of the failure to prosecute officials responsible for the policies leading to psychological torture, the Attorney General should appoint a special counsel to investigate and, where appropriate, prosecute officials at every level for crimes they may have committed, including violating the prohibition on psychological torture.

### E. Rehabilitate and Compensate Victims of Torture

The United States should provide compensation and resources to rehabilitate victims of torture, including psychological torture. For individuals released from custody, those resources should be provided to assure the individuals have access to rehabilitation services if needed. For those who remain in custody, rehabilitation services should be provided directly.

### F. Permit Ongoing Monitoring

All agencies of the United States government that hold detainees should provide access to facilities where detainees are being held to independent human rights organizations that report their findings publicly.

### G. Promote Ethical Practice by Military Medical Personnel

1. The Department of Defense should respect the duty of health personnel not to participate in any way in torture and/or ill treatment as provided in the World Medical Association's Declaration of Tokyo and the UN Principles of Medical Ethics Relevant to the Role of Health Personnel, Particularly Physicians, in the Protection of Prisoners and Detainees Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. It should communicate these ethical standards to all military medical personnel and assure that commanders in the field do not seek to compromise them.

2. Military medical personnel also should be trained in the effective investigation and documentation of torture and ill-treatment.

## II. To Congress

### A. Establish an Independent Commission to Investigate

Congress should create a 9/11-style independent commission to fully investigate the use of torture, including psychological torture, and cruel, inhuman and degrading treatment by US personnel at detention facilities in Afghanistan, Iraq, and Guantánamo. Its mandate should include the role of medical personnel in advising interrogators and custodians about interrogation methods, monitoring or evaluating detainees before, during or after interrogation, providing medical records to interrogators, reporting on abuses they may have witnessed, and engaging in policy-making on interrogation. The commission should have subpoena power for personnel and documents (including tasking orders, physician reports, and cable traffic related to the health of detainees), hold hearings, and report publicly.

### B. Carry out its Oversight Responsibilities

Congressional committees with oversight responsibilities should hold full hearings and obtain all records relating to the use of psychological torture by agencies of the United States government.

### C. Legal reform

1. Enact legislation that reaffirms the prohibition against psychological torture, including a provision that overturns and corrects the interpretation of psychological torture in the opinion from the Justice Department's Office of Legal Counsel in December, 2004.

2. Enact legislation that reaffirms that the Central Intelligence Agency is subject to the prohibitions on torture and cruel, inhuman and degrading treatment.

3. Enact legislation requiring that medical personnel abide by ethical requirements of their profession regarding the custody and interrogation of detainees and that they be protected from pressures from commanders to subordinate their ethical responsibilities to the policies of commanders.