# EXHIBIT K

# REPORT

## THE GUANTÁNAMO DETAINEES DURING DETENTION
Data from Department of Defense Records
10 July 2006

By

Mark Denbeaux
Professor, Seton Hall University School of Law

&

Joshua Denbeaux, Esq.
Denbeaux & Denbeaux

&

David Gratz
John Gregorek
Matthew Darby
Shana Edwards
Shane Hartman
Daniel Mann
Megan Sassaman
Helen Skinner
Seton Hall University School of Law

*Government Data for Detainee Threat to Self*

The data for detainee self-harm is taken entirely from statements by Government officials to the press.

During the year 2003, detainees committed 350 acts of "self-harm," otherwise known as "manipulative self-injurious behavior." Of these 350, 120 were classified as "hanging gestures."[10]

During the year 2004, detainees committed 110 acts of "manipulative self-injurious behavior." The Government did not report how many of these 110 were "hanging gestures." [11]

Detainees commit "manipulative self-injurious behavior" more frequently than they commit disciplinary violations. The Government reports 460 incidents of "manipulative self-injurious behavior" over two years, or 731 days, for an average of one such behavior every 1.59 days. The Government reports 499 disciplinary violations over two years and eight months, or 952 days, for an average of one such violation every 1.91 days. Detainees committed 460 acts of "manipulative self-injurious behavior" during the years 2003 and 2004.[12]

In August 2003, 23 detainees attempted to hang themselves. The Government classified only two of these as "suicide attempts;" the other 21 were "hanging gestures," a category of "manipulative self-injurious behavior."

The meaning of the terms of the terms "manipulative self-injurious behavior," "self-harm" and "hanging gestures" and the manner in which the Government created them is discussed in the section "Government Characterization of Detainee Self-Harm".

## Analysis of Government Data

*Analysis of Detainee Misconduct Data*

Due to the manner in which the Incident Reports are released, it is impossible to determine which prisoner committed which disciplinary violation; thus, it is impossible to know whether one detainee, or a relatively few detainees, committed multiple violations. If each detainee each committed one of the reported disciplinary violations, and none committed two (an extremely unlikely scenario), then one-third of the detainees never committed a disciplinary violation of any kind. Taking into account the reports of spitting, and again assuming one violation per detainee, then almost two-thirds of the detainees have either never committed a disciplinary violation or, one time, were reported to have spit at a guard.

---

[10] Paisley Dodds, *Terror Suspects at Guantanamo Attempted Mass Hanging and Strangling Protest in 2003, U.S. Military Reports,* ASSOCIATED PRESS WORLDSTREAM, Jan. 24, 2005, § International News.
[11] *Id.*
[12] *Id.*

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ISA ALI ABDULLA ALMURBATI, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1227 (RBW) |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Respondents hereby oppose petitioner Jumah Al Dossari's motion for temporary restraining order and preliminary injunction ("motion for preliminary injunction") which seeks extraordinary court intervention and governance over numerous conditions of petitioner's confinement at the United States Naval Base at Guantanamo Bay, Cuba ("Guantanamo"). Petitioner's motion stems from his recent suicide attempt and rests on the faulty premise that petitioner is detained under stringent conditions of solitary confinement that purportedly cause him to be suicidal. See Motion for Preliminary Injunction at 2-4. Contrary to petitioner's allegations, petitioner is not held in isolation and has adequate opportunities for human interaction, exercise, and intellectual stimulation. In addition, petitioner's physical and mental health is carefully supervised and maintained by the Guantanamo medical staff. Petitioner, accordingly, fails to demonstrate that he will experience irreparable harm without an injunction. Petitioner also fails to establish a substantial likelihood of success on his claim of inhumane confinement conditions in light of the significant legal authority standing for the proposition that courts should accord substantial deference to the judgment of Executive authorities pertaining to

the operation of detention facilities and the medical care provided to detainees. Furthermore,

many of the items on petitioner's laundry list of requests for relief, which includes permitting

phone calls with his family and attorneys, viewing family DVD messages, providing periodic

medical reports, and access to medical records, would impose undue burdens on the government

and injure its interest and the public's interest in the efficient and appropriate operation of the

military's detention facilities and the detention hospital at Guantanamo. Accordingly, petitioner

fails to satisfy each of the requirements for preliminary injunctive relief, and his motion should

be denied.

## ARGUMENT

### I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton,

391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a

movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he]

would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be furthered by

the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

The irreparable harm that must be shown to justify a preliminary injunction "must be

both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758

F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely

feared as liable to occur at some indefinite time; the party seeking injunctive relief must show

that the injury complained of is of such <u>imminence</u> that there is a clear and present need for

equitable relief to prevent irreparable harm." <u>Id.</u> (citations and internal quotation marks omitted;

emphasis in original). Injunctions are not intended "to prevent injuries neither extant nor

presently threatened, but only merely feared." <u>Comm. in Solidarity v. Sessions</u>, 929 F.2d 742,

745-46 (D.C. Cir. 1991); <u>see also</u> <u>Milk Indus. Found v. Glickman</u>, 949 F. Supp. 2d 882, 897

(movant must show that the threatened injury is not merely "remote and speculative").

## II.    PETITIONER FAILS TO ESTABLISH THAT HE FACES IMMINENT IRREPARABLE INJURY.

Petitioner has failed to carry his burden of establishing imminent irreparable injury.

Petitioner's motion for preliminary injunction is based on the faulty premise that petitioner is

detained under unlawfully restrictive conditions of confinement. However, petitioner's factual

allegations regarding his conditions of confinement are without merit. As the Declaration of

Colonel Michael I. Bumgarner[1] makes clear, petitioner has regular and meaningful opportunities

for human interaction, exercise, personal hygiene, sleep, communication with family members

and intellectual stimulation. <u>See</u> Declaration of Colonel Michael I. Bumgarner, attached as

Exhibit 1.

Moreover, petitioner erroneously contends that Guantanamo medical personnel have not

been sufficiently attentive to his medical needs and do not provide appropriate care to treat his

---

[1] Col. Bumgarner currently serves as the Commander of the Joint Detention Group for the Joint Task Force - Guantanamo Bay, Cuba. He is responsible for all aspects of detention operations for Joint Task Force - Guantanamo Bay, Cuba. <u>See</u> Bumgarner Decl. ¶ 2.

physical and mental health conditions. The Declaration of Dr. John S. Edmondson[2] directly

refutes petitioner's claims. See Declaration of Dr. John S. Edmondson, attached as Exhibit 2.

Petitioner has been provided extensive high-quality medical care, including individualized

examination, treatment and counseling by qualified mental health professionals who have

regularly worked with petitioner over the past two and a half years in order to treat his ongoing

mental health conditions. Id.

As explained more fully below, the Declarations of Colonel Bumgarner and Dr.

Edmondson collectively establish that petitioner is not suffering irreparable harm based upon

either the conditions of his confinement or Guantanamo's provision of medical care.

### A.   Petitioner's Conditions of Confinement Are Not Inappropriate.

As threshold matter, every detainee at Guantanamo is housed in an area that provides

adequate shelter, ventilation, access to potable drinking water, a toilet, and a sleeping area. See

Bumgarner Decl. ¶ 3. Detainees also receive three nutritionally sound meals prepared in

compliance with their specific religious, cultural, and, where applicable, medical dietary

requirements. Id. Further, detainees in each detention area within Guantanamo receive regular

opportunities for recreation and regular opportunities to maintain adequate personal hygiene. Id.

For the past six months, the petitioner in this case has been detained primarily in an area

---

[2] Dr. Edmondson is the Commander, US Navy Hospital, Guantanamo Bay, Cuba and also serves as the Task Force Surgeon for Joint Task Force - Guantanamo Bay, Cuba. He is directly responsible for the medical care provided to personnel living at Guantanamo Bay and oversees the operation of the detention hospital that provides medical care to the detainees held at Guantanamo. See Edmondson Decl. ¶ 1.

of Guantanamo known as Camp 5, which is a state-of-the-art, maximum security facility.[3] Id. at

¶ 4. Camp 5 is modeled on an existing state prison facility in Indiana that meets American

Corrections Association ("ACA") standards. Id. at ¶ 5. The individual cell block wings of Camp

5 contain standard-sized detention cells based upon ACA standards. Id.

Petitioner's motion for preliminary injunction essentially argues that the conditions of

confinement in Camp 5 are unlawfully restrictive in five respects: lack of communication with

others at Guantanamo, lack of exercise and personal hygiene opportunities, insufficient

opportunities for sleep, lack of communication with persons outside Guantanamo, and lack of

intellectual stimulation. See Motion for Preliminary Injunction at 21-28. As explained below,

however, petitioner's allegations lack a sufficient factual basis to support his claim of irreparable

injury.

1. Petitioner Has Frequent Opportunities For Communication With Others At Guantanamo

Contrary to petitioner's allegations, petitioner is not being held in solitary confinement.

In fact, there are no detention areas at Guantanamo, including Camp 5, where detainees are

housed in solitary confinement. See Bumgarner Decl. ¶ 3. Although petitioner resides in his

own individual cell that has solid walls, he has the ability to communicate with other detainees

on his cell block in addition to daily interactions with guards, medical staff, library personnel

and mail delivery personnel who make daily rounds on the cell block. Id. at ¶ 4. Even when

petitioner's cell is fully secured with the feed tray slot closed, his cell, like others in Camp 5,

allows communication between adjacent cells, and opposing cells on the block. Id. at ¶ 6.

---

[3] Petitioner is current hospitalized due to recent medical incidents. See Edmondson Decl.
¶ 10.

Indeed, with a raised voice petitioner can communicate effectively with a detainee on the opposite end of the block. Id. Contrary to petitioner's claims, this type of open and free communication between detainees is not discouraged. Id. In fact, for the duration of the five separate thirty-minute prayer call periods during each day, the feed tray slots in the Camp 5 cells are opened to facilitate this type of communication between detainees to accomplish coordinated prayer. Id. Notably, petitioner often leads other detainees on his cell block during the daily prayer periods.[4] Id.

In addition to regular communications with other detainees and Guantanamo personnel on the cell block, petitioner has been visited by and/or met with representatives of the International Committee of the Red Cross ("ICRC") on various occasions. Id. ¶ 11. Petitioner has met with the Guantanamo Chaplain. Id. ¶ 4. Petitioner also has had significant interactions with both medical and mental health professionals. Id.; see Edmondson Decl. ¶¶ 6, 9. Furthermore, petitioner has established a cordial relationship with members of his interrogation team. See Bumgarner Decl. ¶ 10. During the past two years, petitioner, who speaks English, has had at least 29 interview sessions, which allow petitioner to interact with one or more interrogators in various ways, including eating western food such as hamburgers and pizza, watching movies, playing checkers or engaging in other informal interactions. Id.

---

[4] Prior to his arrival in Camp 5, and during the course of the past two years, petitioner has been detained at several different detention locations at Guantanamo, including Camp 1, Camp Echo and the detention hospital facilities. All of these locations have multiple opportunities for daily interaction with other detainees and Guantanamo personnel. Within Camp 1, the walls of the cells are metal mesh and detainees can communicate with all the detainees on the entire block. At the detention hospital, detainees also have interaction with medical staff and/or other detainees. Petitioner has availed himself of opportunities for interaction with other detainees in each of the locations in which he has lived. He has never resided on any block as the only detainee. See Bumgarner Decl. ¶ 4.

2. Petitioner Is Provided Meaningful Exercise And Personal Hygiene Opportunities

Petitioner also inaccurately alleges that he is not provided with sufficient opportunities for exercise and personal hygiene, claiming that he is only permitted to leave his cell for one hour or less of exercise per week and one shower every five or six days. See Motion for Preliminary Injunction at 14. These allegations are without merit. As the sworn declaration of Colonel Bumgarner explains, each day detainees are offered one two-hour exercise period followed by a 15-minute personal hygiene period where they may shower, shave and clip their nails.[5] See Bumgarner Decl. ¶ 7. Due to ongoing improvements and the installation of a larger recreation yard at Camp 5, allotted exercise periods have increased over the past six months from a minimum of three one-hour periods per week, to its present state of seven two-hour periods per week. Id. Petitioner, however, frequently does not avail himself of these opportunities. Since May 2005, petitioner has been offered recreation time on 97 separate occasions, but he refused to participate on 72 of those occasions. Id. Further undermining petitioner's claims of isolation, on those occasions when petitioner agreed to participate in the exercise periods, he shared his time with a minimum of two and a maximum of eleven other detainees. Id.

3. Petitioner Is Provided Appropriate Conditions to Sleep.

Contrary to petitioner's allegations, the cells in Camp 5 provide adequate sleeping conditions for the detainees. As explained above, detainees are provided with a sleeping area in their cells. The cells also are temperature-regulated by a central cooling system to between 72 and 74 degrees Fahrenheit. See Bumgarner Decl. ¶ 5. Thus, there is no merit to petitioner's

_____

[5] Detainees are offered a shower period every day even if they refuse recreation time. The two are not linked. See Bumgarner Decl. ¶ 7.

-7-

claim that Guantanamo authorities keep the cells at a very cold temperature intentionally. See Motion for Preliminary Injunction at 14. Furthermore, since early May 2005, the lighting within each cell in Camp 5 is dimmed from 10 p.m. until 5:00 a.m. to enable detainees to sleep during these hours. See Bumgarner Decl. ¶ 5. Detainees in Camp 5 also are offered the opportunity to control lighting within their cells during other periods of the day by asking the guards to dim the lights.[6] Id.

### 4. Petitioner Has Opportunities To Communicate With Others Outside Guantanamo.

Petitioner's complaints regarding a lack of access to family communications do not rise to the level of irreparable harm and, in any event, are without merit. Petitioner has never been prevented from communicating via letters and ICRC mail with his family. Id. ¶ 8. Indeed, Guantanamo's records reflect that, since his arrival at Guantanamo, petitioner has received 51 pieces of mail, and he has written 168 pieces of mail. Id. Most of the mail is attributed to family members. Id. In addition, Guantanamo officials permit habeas counsel to deliver written family mail to Guantanamo staff for delivery to petitioners through normal channels, which include security review, consistent with the terms of the Court's November 8, 2004 Amended Protective Order governing counsel access. See Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, 344 F. Supp. 2d 174 (D.D.C. 2004). Furthermore, pursuant to the Amended Protective Order, petitioner is permitted to engage in unlimited privileged legal mail communications with his attorneys, in

---

[6] Although Guantanamo previously illuminated the cells in Camp 5 at all times as an institutional security measure, that is, permitting guards to see inside the cells during security checks or emergencies, the cells are now dimmed for seven hours per day and detainees may request further dimming during other periods of the day by asking the guards on the cell block.

addition to in-person visits with his attorneys at Guantanamo.[7] See id. Finally, as mentioned

above, petitioner has been visited by ICRC representatives on various occasions at Guantanamo.

See Bumgarner Decl. ¶ 11.

    5. Petitioner Has Access To Reading Material And Opportunities For Intellectual Stimulation.

        Petitioner's complaints regarding insufficient reading material also are without merit. As

petitioner admits, he is provided with the Koran, attorney-client letters, and family letters. See

Motion for Preliminary Injunction at 15. Additionally, subject to advance review, Guantanamo

authorities have permitted petitioner's counsel to provide petitioner with various non-legal

reading materials, most recently an English-language soccer magazine. See id. at 3 n.2.

Furthermore, as the Declaration of Colonel Bumgarner explains, over the past six month period,

petitioner made many requests for intellectually engaging items such as board games, novels and

library visits, most of which were granted.[8] See Bumgarner Decl. ¶ 7. Petitioner also has had

the opportunity to view feature films, including most recently "Troy" and "Gladiator." Id. ¶ 10.

<div align="center">***</div>

        In summary, petitioner faces no threat of irreparable harm due to his conditions of

confinement. As reflected in Colonel Bumgarner's declaration, petitioner has not been isolated.

He has been provided sufficient opportunities for exercise, personal hygiene, and intellectual

stimulation. Petitioner also has regular opportunities for personal interaction with other

detainees as well as Guantanamo personnel and ICRC representatives. Further, he has the ability

---

    [7] Since October 2004, counsel for petitioner have visited Guantanamo on five separate
occasions to conduct interviews with him.

    [8] Detainees in neighboring cells have the ability to play board games by communicating
with each other and directing where the pieces should be placed.

<div align="center">-9-</div>

to communicate with his family and his lawyers. For these reasons, petitioner has not carried his

burden of establishing imminent irreparable harm warranting extraordinary court intervention

and governance of his conditions of confinement.

**B.**    **Petitioner Has Been Provided Appropriate Mental Health Care.**

In addition to challenging the conditions of his confinement, petitioner also alleges that

he faces irreparable harm because the mental health care at Guantanamo has been unlawfully

inadequate. See Motion for Preliminary Injunction at 28-29. Petitioner faces no such harm.

Contrary to petitioner's allegations, the Guantanamo medical staff provide appropriate medical

and mental health services to all detainees through a thorough, coordinated team approach, based

on individualized treatment plans that account for each patients's conditions and circumstances.

See Edmondson Decl. ¶ 4.

Guantanamo provides extensive medical care facilities and resources for detainees. The

detention hospital at Guantanamo provides an 18-bed facility with a hospital medical staff of

seventy, including two medical doctors, a physician's assistant, nurses, corpsman, various

technicians (laboratory, radiology, pharmacy, operating room, respiratory, physical therapy,

information technology and biomedical repair), and administrative staff. Id. ¶ 3.[9] In addition, a

21-member Behavioral Health Service ("BHS") staff supports the hospital. The BHS staff

includes a Board Certified Psychiatrist, a Ph.D. Psychologist, psychiatric nurses and psychiatric

---

[9] Medical treatment is available to detainees daily by means of a request, which the detainees can make at any time through a guard or to medical personnel who make rounds on the cellblocks every other day. In addition to following up on detainee requests, the medical staff will investigate any medical issues observed by guards or other staff. The availability of this medical care has led to thousands of out-patient contacts between detainees and medical staff, followed by in-patient treatment and care as needed. See Edmondson Decl. ¶ 5.

technicians. Id. ¶ 4.  The BHS staff provides long term supportive care and short-term

behavioral modification therapy as well as psychotropic medication therapy for acute

management of self-injurious behaviors and intense mood swings associated with possible

danger toward others. Id.  They also manage major mental disorders and maladaptive behaviors

associated with personality disorders. Id.

  With respect to petitioner in this case, he has generally been in good physical health since

his arrival at Guantanamo in February 2002, but he has exhibited various mental health issues

that the BHS staff have diligently and continually undertaken to address through appropriate care

and treatment.[10]  Id. ¶ 6.  Specifically, petitioner has undergone extensive in-person psychiatric

care, and has been seen regularly by behavioral science professionals. Id. ¶ 7.  Petitioner also

has been proscribed various medications. Id. ¶ 8.  However, petitioner has often been

noncompliant in taking this medication, despite repeated humane encouragement and counseling

from the BHS staff. Id.

  Beyond medication, the BHS therapists have repeatedly reached out to petitioner and

attempted to assist him by providing cognitive behavioral therapy. Id. ¶ 9.  This type of therapy,

however, requires patient cooperation and, unfortunately, petitioner has generally been unwilling

to cooperate, or at times even participate in such care, undermining the effectiveness of such

therapy. Id.

---

  [10] In light of potential privacy implications regarding petitioner's specific mental health
diagnoses and treatment regimens, respondents have filed a redacted version of Dr. Edmonson's
declaration on the public record.  An unredacted version of Dr. Edmondson's declaration has
been provided to the Court and petitioner's counsel.  Respondents' counsel are in the process of
consulting with petitioners' counsel to determine whether the redacted information should
remain under seal.

Petitioner's mental health situation has varied over time and there have been ebbs and flows in his condition. Id. ¶ 10. For example, there have been periods of time when petitioner has not exhibited any symptoms of his various mental health ailments and has appeared to be functioning normally. Id. However, petitioner has unfortunately attempted to commit suicide multiple times between March 2003 and the present, with his last attempt occurring on November 14, 2005, when he attempted to reopen a laceration that had been treated following a previous suicide attempt on October 15, 2005. Id. The medical staff has responded on these occasions by renewing their efforts to treat and assist him, including on an in-patient basis. Id.

For example, petitioner was seen daily by behavioral science professionals, including on an in-patient basis, for an 8-month period during 2003 following an initial suicide attempt by petitioner. Id. ¶ 11. Also, for a 7-month period in 2004, petitioner was housed in the mental health ward of the detention hospital, where he was kept under 24-hour surveillance by both medical staff and security personnel, while he received treatment. Id. He was subsequently seen three times per week by BHS staff for an additional three months, at the end of which time he reported, and BHS staff agreed, that he no longer harbored self-harmful intentions. Id. Since that time petitioner was seen periodically by behavioral health staff, including almost weekly beginning in August of 2005, and regularly since his October 2005 suicide attempt. Id.

The BHS staff and other staff at Guantanamo have been and will continue to take appropriate, humane steps to prevent petitioner from being in a situation where he might cause harm to himself, while attempts to treat his conditions appropriately continue.[11] Id. ¶ 12. For

---

[11] Petitioner also recently, since the first week of November 2005, initiated a hunger strike, which he reports to be in protest that he was not included in a group of detainees that were released from Guantanamo to Bahrain recently. See Edmondson Decl. ¶ 12. Petitioner is being

example, when detainees at Guantanamo are determined to be at risk for suicide or other self-harmful behavior, they are placed on "self-harm precautions." Id. Petitioner has regularly been placed on such precautions. Id. These self-harm precautions include, for example, (a) regularly inquiring with petitioner about his mood and whether he is having suicidal thoughts, (b) keeping petitioner in regular or constant line-of-sight or video surveillance; (c) making appropriate adjustments to his cell environment to account for his propensity to harm himself, and (d) denying him items that he might be able to use to hurt himself or permitting him such items (e.g., a safety razor) only under close supervision (e.g., when shaving or grooming).

\*\*\*

As illustrated above, far from neglecting petitioner's mental health conditions, Guantanamo medical personnel are providing petitioner with appropriate and attentive medical and mental health care. Consequently, petitioner has not carried his burden of establishing an imminent threat of irreparable harm related to Guantanamo's provision of medical care.[12]

---

monitored and treated on this issue also in accordance with the protocols described in the declarations of Major General Jay Hood, Commander of Joint Task Force-Guantanamo, and Dr. Edmondson, previously submitted in other Guantanamo detainee cases. See Exhibits 3-4; see also infra pp. 23-25 (discussing recent orders by Judges of this Court denying injunctive relief related to detainee hunger strikes).

[12] Petitioner's motion also raises allegations concerning past physical abuse and abusive interrogations. Respondents vigorously dispute the accuracy of these allegations. In any event, the allegations are not material to petitioner's requested injunctive relief – which is limited to conditions of confinement – because a series of historical allegations manifestly does not establish an entitlement to forward-looking injunctive relief. See City of Los Angeles v. Lyons, 461 U.S. 95, 105, 110 (1982); O.K. v. Bush, 377 F. Supp. 2d 102, 113-14 (D.D.C. 2005) (Bates, J.). Guantanamo personnel consider allegations of mistreatment to be serious matters. Credible claims have received high level attention and are being investigated so that corrective action can be taken where appropriate. See, e.g., Final Report, Investigation Into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility, available at http://www.defenselink.mil/news/Jul2005/d20050714report.pdf.

III.    **PETITIONER'S CHALLENGE TO HIS CONDITIONS OF CONFINEMENT IS NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THERE IS NO ADEQUATE LEGAL BASIS FOR THE RELIEF REQUESTED.**

In addition to lacking a justifiable factual basis (as demonstrated in the sworn declarations of Dr. Edmondson and Col. Bumgarner), petitioner's motion lacks an adequate legal basis for the requested relief. As a threshold matter, petitioner asserts that he has enforceable rights under the Fifth Amendment to the Constitution that enable him to challenge his conditions of confinement. See Motion for Preliminary Injunction at 19. In support of this proposition, petitioner cites to Judge Green's decision in In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 464 (D.D.C. 2005), which found that "the detainees at Guantanamo Bay have the fundamental right to due process of law under the Fifth Amendment" to challenge the legality of their detention through petitions for writs of habeas corpus. Judge Green's opinion, however, did not address whether alien enemy combatants have a constitutional basis to challenge their conditions of confinement or authorize such claims. Judge Green's analysis of the constitutional issues was limited solely to whether Guantanamo detainees are "entitled to due process under the Fifth Amendment" to challenge "the government's determinations that they are 'enemy combatants.'" See In re Guantanamo, 355 F. Supp.2d at 465. The Court's focus on the legality of the detention – as opposed to the legality of the conditions of confinement – is reflected throughout the opinion. See id. at 464 ("In sum, there can be no question that the Fifth Amendment right asserted by the Guantanamo detainees in this litigation – the right not to be deprived of liberty without due process of law – is one of the most fundamental rights recognized by the U.S. Constitution."); id. at 476 ("[T]he detainee is entitled to fully litigate the factual basis for his detention in these habeas proceedings and to have a fair opportunity to prove

that he is being detained on improper grounds."); id. at 477 (stating that a detainee must be

provided with a "fair opportunity to challenge . . . the legality of his detention as an 'enemy

combatant'"). Put simply, Judge Green only addressed the scope of petitioners' Fifth

Amendment rights to challenge the lawfulness of the procedures used to confirm their enemy

combatant status; she did not make any findings or conclusions with respect to the scope of any

Fifth Amendment right to challenge the conditions of their confinement.[13]

Furthermore, petitioner ignores Judge Leon's decision in Khalid v. Bush, 355 F. Supp. 2d

311 (D.D.C. 2005), which found that aliens held at Guantanamo, that is, outside the sovereign

territory of the United States, are not possessed of any constitutional rights, id. at 320-21, and

concluded that "no viable legal theory exists" by which the Court "could issue a writ of habeas

corpus" in favor of the Guantanamo detainees, id. at 314. Judge Leon also noted that petitioners'

challenges to the conditions of their confinement did not support the issuance of a writ of habeas

corpus because such claims, even if true, would not render the custody itself unlawful. Id. at

324-25. Judge Leon explained that separation of powers principles prevent the judiciary from

---

[13] The distinction between legal challenges to the fact or duration of custody and legal challenges to the conditions of confinement is well-established. See Preiser v. Rodriguez, 411 U.S. 475, 498 (1973). This distinction is based in part on the different legal bases underlying these types of challenges. On the one hand, challenges to the procedures used to determine the lawfulness of custody invoke the procedural due process component of the Fifth Amendment, which requires the government to follow appropriate procedures when its agents or officials decide to deprive a person of liberty. See Daniels v. Williams, 474 U.S. 327, 331 (1986). On the other hand, challenges to conditions of confinement rely on the substantive due process component of the Fifth Amendment, which forbids "certain government actions regardless of the fairness of the procedures used to implement them." See id. Judge Green's opinion addressed only the Guantanamo detainees' procedural due process rights to challenge the procedures used to confirm their status as enemy combatants. See In re Guantanamo, 355 F. Supp.2d at 465-78 (discussing whether CSRTs comport with procedural due process). Judge Green gave no consideration to whether the detainees have any rights under substantive due process to challenge their conditions of confinement.

scrutinizing the conditions of the aliens' detention because such matters are the province of the Executive and Legislative branches. Id. at 328.

Petitioner also overlooks the fact that both Judge Green's decision and Judge Leon's decision are on appeal to the D.C. Circuit and are under consideration on a consolidated basis. Accordingly, the D.C. Circuit will decide whether and to what extent detainees at Guantanamo have any rights under the United States Constitution. As a result, Judge Green's finding that Guantanamo detainees have some due process rights under the Fifth Amendment may be undermined by the decision of the D.C. Circuit, and, in any event, fails, by itself, to establish that petitioner's conditions of confinement claims are likely to succeed.[14]

Even assuming that petitioner is entitled to constitutional protections under the Fifth Amendment or otherwise (which respondents contest), he still fails to demonstrate that his challenge to his conditions of confinement is likely to succeed. As an initial matter, because no court has ever determined that detainees of the military can even bring conditions of confinement claims, especially in a habeas context,[15] no court has definitively determined what legal standard should be applied to evaluate such claims brought by detainees in the custody of the military.

_____

[14] Indeed, in light of the pending D.C. Circuit appeals, Judge Green, acting as coordinating judge, stayed this case and the other coordinated cases, and twice rejected petitioners' requests to assert claims objecting to their confinement conditions. See In re Guantanamo Detainee Cases, Order Granting in Part and Denying in Part Respondents' Motion for Certification of Jan. 31, 2005 Orders and for Stay (Feb. 3, 2005); Order Denying Motion for Reconsideration of Order Granting Stay Pending Appeal (Feb. 7, 2005) (refusing to allow claims regarding conditions of confinement to proceed "in light of the substantial resources that would be expended and the significant burdens that would be incurred should this litigation go forward").

[15] See infra note 21 (arguing that conditions of confinement claims are not cognizable in habeas proceedings).

See O.K. v. Bush, 377 F. Supp. 2d 102, 112 n.10 (D.D.C. 2005) ("No federal court has ever examined the nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of war context."). The Supreme Court has explained that constitutional challenges to conditions of confinement brought by convicted criminals are analyzed under the Eighth Amendment's "deliberate indifference" standard, which requires a prisoner to establish that prison officials "were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety."[16] Farmer v. Brennan, 511 U.S. 825, 834-35, 846 (1994); see also Ingram v. Wright, 430 U.S. 651, 664 (1977) (holding that the Eighth Amendment applies only to "those convicted of crimes"). In contrast, the constitutional standard of care owed to "pretrial detainees" in the criminal justice context – defined by the Supreme Court as "those persons who have been charged with a crime but who have not yet been tried on that charge" – is governed by the Due Process Clause of the Fifth Amendment. Bell v. Wolfish, 441 U.S. 520, 523, 536 (1979). "[W]here it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment, for under the Due Process Clause, a detainee must not

---

[16] This standard is applicable both to claims alleging inadequate medical care as well as challenges to general conditions of confinement, such as inadequate food, clothing, and cell temperature. See Wilson v. Seiter, 501 U.S. 294, 303 (1991) ("Whether one characterizes the treatment received by the prisoner as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in Estelle [v. Gamble, 429 U.S. 97 (1976)]"). The two-prong deliberate indifference test requires the moving party to establish first that "the deprivation alleged must be, objectively, sufficiently serious, . . . a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; second, a prison official must have a "sufficiently culpable state of mind" – "one of deliberate indifference to inmate health or safety." Farmer, 511 U.S. at 834 (internal quotations omitted).

be punished prior to an adjudication of guilt in accordance with due process of law."[17] Block v.
Rutherford, 468 U.S. 576, 583 (1984) (internal quotations omitted); see also Brogsdale v. Barry,
926 F.2d 1184, 1188 n.4 (D.C. Cir. 1991).

Regardless of whether either of these two standards directly applies to the Guantanamo
detainees,[18] courts have employed the constitutionally-based "deliberate indifference" standard
as a guide to evaluate claims of deficient medical care and challenges to conditions of
confinement asserted by Guantanamo detainees, despite the fact that it is presently unclear
whether the detainees at Guantanamo even have constitutional rights. See O.K. v. Bush, 344 F.
Supp. 2d 44, 60-63 & n.23 (D.D.C. 2004) (Bates, J.) ("Without concluding that the 'deliberate

---

[17] Although the Supreme Court has never resolved the precise relationship between these
two tests, see City of Canton v. Harris, 489 U.S. 378, 389 n.8 (1989) (reserving "whether
something less than the Eighth Amendment's 'deliberate indifference' test may be applicable in
claims by [pretrial] detainees asserting violations of their due process right to medical care while
in custody"), the Court has explained that "the due process rights of a pretrial detainee are at
least as great as the Eighth Amendment protections available to a convicted prisoner." County
of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998).

[18] Guantanamo detainees, such as petitioner, have not been convicted of any crime, and
thus cannot rely on the Eighth Amendment as a basis for their conditions of confinement claims,
see In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 465-78 (D.D.C. 2005) (dismissing
Eighth Amendment claims), and they also are not "pretrial detainees," as defined by the Supreme
Court, because they have not been charged with a crime, nor are they being detained as part of
the criminal justice system. Cf. Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2640 (2004) (plurality
opinion) (detention of enemy combatants is not punishment or penal in nature); Padilla v. Hanft,
2005 WL 2175946 at *6 (4th Cir. Sept. 9, 2005) (distinguishing criminal detention from military
detention of enemy combatants). Furthermore, the criminal justice interests served by confining
"pretrial detainees" are completely distinct from the military and national security interests
served by detaining individuals, such as petitioner, in conjunction with ongoing hostilities.
Compare Wolfish, 441 U.S. at 536-37 (criminal justice interest served by pretrial detention is to
ensure detainees' presence at trial), with Hamdi, 124 S. Ct. at 2640 (2004) (plurality opinion)
("The capture and detention of lawful combatants and the capture, detention, and trial of
unlawful combatants is to prevent captured individuals from returning to the field of battle and
taking up arms once again.").

indifference' doctrine applies" to challenges regarding inadequate medical care, "the Court will

draw on this well-developed body of law to guide its analysis"); Al Odah v. United States, No.

02-CV-828 (CKK), Memorandum Opinion at 11-12 (dkt. no. 254; Sept. 30, 2005) (attached as

Exhibit 5). Under that standard, only upon a showing that prison conditions or care sink to the

level of "deliberate indifference" to an inmate's health or well-being is a court justified in

intervening in the treatment of inmates in the traditional penal prison setting. See Neitzke v.

Williams, 490 U.S. 319, 321 (1989); Chandler v. District of Columbia Dept. of Corrections, 145

F.3d 1355, 1360 (D.C. Cir. 1998) ("To prevail in a case alleging unconstitutional conditions of

confinement, a prisoner must show that the government official 'knew of and disregarded an

excessive risk to inmate health or safety").[19]

     In light of this demanding standard, courts accord substantial deference to the judgment

of prison administrators and generally refrain from interfering in the day-to-day operations of

correctional facilities, including the provision of medical care. See, e.g., Bell v. Wolfish, 441

U.S. 520, 548, 562 (1979) (explaining that the operation of even domestic "correctional facilities

is peculiarly the province of the Legislative and Executive Branches of our Government, not the

Judicial," and cautioning lower courts to avoid becoming "enmeshed in the minutiae of prison

---

     [19] Separation of powers principles, however, may require satisfaction of an even more
stringent standard here before judicial intervention is warranted, in light of the fact that petitioner
is challenging the practices of a military detention center during a time of war. See, e.g., Hamdi
v. Rumsfeld, 124 S. Ct. 2633, 2647 (2004) (plurality opinion) (stating that "[w]ithout doubt, our
Constitution recognizes that core strategic matters of warmaking belong in the hands of those
who are best positioned and most politically accountable for making them"); Almurbati v. Bush,
366 F. Supp. 2d 72, 81 (D.D.C. 2005) (indicating that "it is a fundamental principle under our
Constitution that deference to the Executive Branch must be afforded in matters concerning the
military and national security matters."); Khalid v. Bush, 355 F. Supp. 2d 311, 328 (D.D.C.
2005) (explaining that management of wartime detainees' confinement conditions is the province
of the Executive and Legislative branches, thus precluding judicial scrutiny of such conditions).

operations."); <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 408 (1989) ("Acknowledging the expertise

of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate

problems of prison management, this Court has afforded considerable deference to the

determinations of prison administrators who, in the interest of security, regulate the relations

between prisoners and the outside world."); <u>Inmates of Occoquan v. Barry</u>, 844 F.2d 828, 841

(D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons" and that

"questions of prison administration are to be left to the discretion of prison administrators);

<u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979) (stating that

federal courts will "disallow any attempt to second-guess the propriety of a particular course of

treatment" chosen by prison doctors).

      Petitioner's numerous requests for relief, however, clearly indicate that petitioner is

asking the Court to micro-manage the manner in which he is detained.  Petitioner seeks the

Court's involvement in, for example, the provision of telephone calls between himself and his

attorneys and family members, the reading materials available to petitioner, the lighting in his

cell, the amount of exercise time he is permitted, and the provision of an independent

psychological exam.  Petitioner's motion thus requests the type of judicial intervention and

oversight of the operations and medical care provided at Guantanamo that is highly discouraged

under the law and particularly unwarranted in this case.

      As demonstrated previously, the facts do not support a finding that the Guantanamo staff

has been deliberately indifferent to the health or well-being of petitioner.  To the contrary, the

record demonstrates that petitioner is not held under strict conditions of solitary confinement.

Petitioner has the ability to interact and communicate with other individuals, including his family

members by mail; he is provided regular opportunities to exercise and maintain personal

hygiene; the lighting in his cell is dimmed during night hours; and he is provided with sufficient

reading materials and intellectual stimulation. See Bumgarner Decl. ¶¶ 4-12.[20]  Additionally, as

explained in Dr. Edmondson's declaration, petitioner receives extensive medical care and

supervision, including psychiatric treatment and counseling. See Edmondson Decl. ¶¶ 3-13.

Accordingly, the requisite showing of deliberate indifference is absent, and petitioner's

objections to his conditions of confinement cannot succeed.  His motion, therefore, should be

denied.

Petitioner's attempt to avoid the demanding "deliberate indifference" standard by

alternatively asserting that courts have inherent authority under the habeas statute, the common

---

[20]  In any event, courts have frequently found no constitutional problems even with various forms of disciplinary segregation and isolation.  See, e.g., Hill v. Pugh, 2003 WL 22100960 at ** 4-** 5 (10th Cir. 2003) (finding that federal prisoner's placement in a maximum security prison where he was isolated in his cell for twenty-three hours a day and suffered from sensory deprivation did not implicate due process rights under the Fifth Amendment or constitute cruel and unusual punishment under the Eighth Amendment where prisoner's minimal physical requirements for food, shelter, clothing, and warmth were satisfied) (consistent with the rules of the Tenth Circuit Court of Appeals, the unpublished opinion in Hill is cited for its persuasive value.  See 10th Cir. R. 36.3 (B)); Novak v. Beto, 453 F.2d 661, 665 (5th Cir. 1971) (concluding that solitary confinement in a lightless cell, with limited bedding and minimal food did not constitute cruel and unusual punishment where the inmate was not deprived of the basic elements of hygiene and noting the "long line of cases . . . holding that solitary confinement *per se* is not 'cruel and unusual.'") (emphasis in original); Campbell v. District of Columbia, 874 F. Supp. 403, 407 (D.D.C. 1994) (holding that prisoner's confinement for ten months in a maximum security cellblock where he was restricted to his cell for twenty-three hours a day did not violate the Fifth or Eighth Amendments); Chavarria v. Stacks, 102 Fed. Appx. 433 437 (5th Cir. 2004) ("Because the policy of 24-hour illumination does not violate the Eighth Amendment, [prisoner's] complaint about the policy is based upon an indisputably meritless legal theory.") (unpublished; cited for persuasive value per 5th Cir. R. 47.5.4).  The Supreme Court's decision in Wilkinson v. Austin, 125 S. Ct. 2384, 2393 (2005), is not to the contrary.  In that case, the Court determined only that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations.

law, and the All Writs Act to take whatever action necessary to protect the lives and health of all

habeas petitioners in order to preserve their ability to appear in court and pursue their habeas

petitions, is misguided and unavailing. See Motion for Preliminary Injunction at 20-21.

Petitioner's theory would involve standardless and unbounded court oversight of detention

conditions all in the name of preserving habeas petitioners' access to the courts, which is not and

cannot be the appropriate legal standard. While respondents contend that conditions of

confinement claims are not even properly cognizable in habeas,[21] that aside, any court oversight

of conditions of confinement must be tethered to an appropriate legal standard, and, as argued

above, the case law, even in the context of domestic incarceration of those possessed of

constitutional rights, requires that prison conditions or care sink to the level of "deliberate

indifference" to an inmate's health or well-being before a court may act to intervene in the

treatment of inmates. See Neitzke v. Williams, 490 U.S. 319, 321 (1989). One other Judge of

this Court recently rejected this alternative theory of amorphous court authority over the

confinement conditions of a habeas petitioner. See Al Odah v. United States, Case No. 02-CV-

---

[21] Contrary to petitioners' assertions, whether conditions of confinement claims are even cognizable in habeas proceedings is subject to dispute. The Supreme Court and the D.C. Circuit have never squarely resolved whether challenges to conditions of confinement may be brought under habeas proceedings. See Bell v. Wolfish, 441 U.S. 520, 526 n.6 (1979) ("Thus, we leave for another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement itself."); Brown v. Plaut, 131 F.3d 163, 168-69 (D.C. Cir. 1997) (acknowledging that habeas corpus might conceivably be used to challenge prison conditions, but indicating that requiring use of habeas corpus in such cases would extend the writ beyond its core). Courts in other jurisdictions that have squarely addressed the issue, however, have affirmatively held that conditions of confinement claims that do not seek accelerated release from custody are not within the scope of the writ of habeas corpus. See, e.g., Cochran v. Buss, 381 F.3d 637, 639 (7th Cir. 2004); Carson v. Johnson, 112 F.3d 818, 820-21 (5th Cir.1997); McIntosh v. United States Parole Commission, 115 F.3d 809, 811-12 (10th Cir. 1997); Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991).

828 (CKK), Memorandum Opinion at 9-11 (dkt. no. 274) (Nov. 8, 2005) (attached as Exhibit 6) (rejecting argument that Court had authority to modify conditions of confinement under the habeas statute, the common law, and the All Writs Act, and finding the petitioner failed to satisfy the deliberate indifference standard). Accordingly, even if habeas courts have the authority to consider challenges to a detainee's confinement conditions, petitioner is not likely to succeed on the merits of his challenge to his conditions of confinement because he cannot demonstrate that the Guantanamo staff has been deliberately indifferent to his health or well-being.

Furthermore, numerous other Judges of this Court have rejected similar challenges by other Guantanamo detainees to their conditions of confinement, suggesting petitioner's claim is also not likely to succeed. In O.K. v. Bush, 344 F. Supp. 2d 44, 60-63 (D.D.C. 2004), Judge Bates rejected a detainee's request for an order requiring an independent medical examination and production of medical records finding that petitioner had not alleged a substantive violation of a legal right and had not offered sufficient competent evidence of medical neglect. Subsequently, in the same case, Judge Bates denied the detainee's request for a preliminary injunction against the alleged torture and other mistreatment of the detainee concluding that the detainee failed to make a sufficient showing of ongoing alleged abuse and noting that the Court was "not equipped or authorized to assume the broader roles of a congressional oversight committee or a superintendent of the operations of a military base." O.K. v. Bush, 377 F. Supp. 2d 102, 114 (D.D.C. 2005).

Several other Judges recently have denied preliminary injunction motions stemming from detainee hunger strikes which challenged various aspects of their confinement conditions. On September 28, 2005, Judge Oberdorfer denied motions for preliminary injunctions that were

filed by petitioners in a number of cases.[22]  See El Banna v. Bush, --- F. Supp. 2d ---, 2005 WL

2375073 (D.D.C. 2005).  In denying the motions, which contained a number of extraordinary

allegations,[23] Judge Oberdorfer concluded that petitioners had not "carried their burden of

proving an imminent threat by respondents to the health and life of the hunger-striking

movants."  Id. at *2.  Two other Judges adopted the reasoning of Judge Oberdorfer in denying

identical motions for preliminary injunctions.  Hamlily v. Bush, Case No. 05-CV-763 (JDB),

Order (Oct. 3, 2005) at 1 (attached as Exhibit 7) (denying an identical "motion for a preliminary

injunction" concerning conditions of confinement and hunger strikes "[f]or the reasons stated by

Judge Oberdorfer in his decision."); Sliti v. Bush, Case No. 05-CV-429 (RJL), Order (Oct. 27,

2005) at 2 (attached as Exhibit 8) (denying nearly identical motions "[f]or the reasons set forth in

Judge Oberdorfer's decision . . . .").

    Additional Judges of this Court have denied other preliminary injunction motions that

sought some of the same forms of relief that petitioner seeks in this case.  On October 5, 2005,

Judge Urbina denied a motion to compel immediate visits to Guantanamo, telephonic access to

detainees, medical updates, and discovery of medical records in five different cases.  See, e.g.,

Al-Oshan v. Bush, Case No. 05-CV-520 (RMU), Memorandum Order (attached as Exhibit 9).

On that same day, Judge Kennedy denied a similar motion for temporary restraining order

---

[22]  El-Banna v. Bush, Case No. 04-1144 (RWR), Deghayes v. Bush, Case No. 04-2215 (RMC), Aziz v. Bush, Case No. 05-492 (JR), Imran v. Bush, Case No. 05-764 (CKK), and Al Habashi v. Bush, Case No. 05-765.  The motions were assigned to Judge Oberdorfer through orders in the relevant cases transferring the motions to Judge Oberdorfer for decision.

[23]  The motions alleged, inter alia, that scorpions were present in detainees' food, that a mini-refrigerator was thrown at a detainee, that guard personnel engaged in various forms of violent mistreatment, and that medical personnel withheld treatment.  See, e.g., El-Banna v. Bush, Case No. 04-1144 (RWR) (dkt. no. 153).

finding court intervention into the Guantanamo staff's response to hunger strikes to be

inappropriate. Anam v. Bush, Case No. 04-CV-1194 (HHK), Memorandum and Order at 3

(attached as Exhibit 10). And on three different occasions, Judge Kollar-Kotelly has denied

motions seeking court intervention into the treatment and confinement conditions of hunger-

striking detainees. Al Odah v. Bush, Case No. 02-CV-828 (CKK), Memorandum Opinion (Sept.

30, 2005) (attached as Exhibit 5) (denying temporary restraining order seeking judicial oversight

of medical treatment of detainees, including periodic reports on medical conditions, access to

detainee medical records, and telephone calls with detainees' family and counsel); Memorandum

Opinion (Nov. 8, 2005) (attached as Exhibit 10) (denying motion for preliminary injunction

requesting same relief as prior temporary restraining order and finding that petitioners' failed to

satisfy deliberate indifference test); Order (Nov. 10, 2005) (attached as Exhibit 11) (denying

request for immediate medical evacuation of hunger-striking detainee, detailing extensive

medical care provided to detainee, and concluding that petitioner's medical treatment at

Guantanamo has not been marked by deliberate indifference). These recent decisions indicate

that petitioner's similar challenge to his conditions of confinement is not likely to succeed; thus,

his motion should be denied.

## IV.    THE RELIEF REQUESTED WOULD IMPOSE UNDUE BURDENS ON THE GOVERNMENT AND INJURE ITS INTERESTS.

Petitioner's lengthy list of requests for relief would impose substantial burdens on the

Guantanamo staff and interfere with the appropriate operation of the detention facilities and the

detention hospital. At the outset, as discussed supra, petitioner's requests are not grounded in a

sufficient showing of irreparable harm or in the proper application of legal authority. Further,

petitioner's requests for relief cannot be viewed in isolation or confined to just the petitioner at

issue in the present motion, because any order granting such forms of relief would likely prompt counsel for many detainees in other cases to demand the same remedies. Accordingly, providing petitioner with telephone access, family DVDs, additional reading materials, independent psychological exams, continuous medical updates and medical records to counsel, and the other relief requested would be a significant burden for both the military authorities and medical staff at Guantanamo.

Counsel's request for bi-weekly telephone calls between petitioner and counsel and petitioner and his family members would particularly impose substantial and unnecessary burdens on Guantanamo operations. With respect to family calls, petitioner's family members do not have security clearances, and such calls, therefore, would have to be monitored, with the burdens attendant thereto and the risk that such steps would not be entirely effective as a security measure. In addition, the logistics of arranging telephone conversations between the detainees and their counsel or family members are complicated and time-consuming. A detainee must be moved from his detention area in order to make a telephone call, and each movement of a detainee requires a number of logistical and security measures, including orders from military supervisors to move the detainee, arrangements for vehicular transport, and arrangements for multiple guards and support personnel for the movement of the detainee. Moreover, a detainee would have to be moved to a location not typically used for holding detainees even temporarily (e.g., an office in an administration building) where a secure classified information international telephone line would be available. The appropriate security procedures required to complete such a movement of a detainee and ensure force protection to Guantanamo personnel far exceed the typical movement of detainees required to accommodate counsel visits. As mentioned, such

burdens would be multiplied many times over in light of the numerous other detainees who would request similar telephone privileges. These incredibly burdensome requirements form an important part of the Protective Order's Revised Procedures for Counsel Access, stating the over-arching premise that "[r]equests for telephonic access to the detainee by counsel or other persons will not normally be approved." Id. Accordingly, petitioner's request for bi-weekly telephone access to counsel and family members is unduly burdensome and should be denied.

Family involvement with detainees, however, may be accommodated at Guantanamo in the form of written communications and direct mail. Despite these avenues of written communication, petitioner's counsel complain that their request to allow petitioner to view a DVD containing personal greetings from his family members was denied. See Motion for Preliminary Injunction at 23. There are sound reasons, however, for distinguishing between written forms of communication and video or other electronic media, including the burdens associated with reviewing, redacting, and showing video and audio submissions to detainees. In contrast to reading and reviewing written correspondence, the burdens associated with review of video messages include understanding and verifying the translation of the audio messages, which may be of varying quality and involve foreign-language speakers of different dialects. Additionally, unlike written communications, military personnel would be required to review the video's images to determine if there are any persons or images that are not permitted to be shared with petitioners. This task can be extremely complicated in cases of group videos consisting of multiple, purported family members who may be unknown to military sources, where codes and signs could be easily masked. Further, in the event objectionable content is found on video messages, images and audio cannot simply be redacted with a black marker.

-27-

Instead, personnel at Guantanamo would have to isolate the offending image or audio message, and redact it using specialized video editing software and computers. For these reasons, enabling even one petitioner to view a DVD from outsiders – let alone setting a precedent for countless other cases – would be an extremely onerous task for the Guantanamo staff. Cf. Abdah v. Bush, Case No. 05-CV-1254 (HHK), Order (June 15, 2005, dkt. no. 157) (denying petitioners' emergency motion for order allowing counsel to show petitioners video messages from their families) (attached hereto as Exhibit 12). As a result, respondents have indicated that any family communications should be through written means.[24]

Petitioner's additional request for access to his medical records relating to any suicide attempts and to his psychiatric condition, see Motion for Preliminary Injunction at 30, is an improper attempt to take discovery that would also be unduly burdensome and, in any event, is unnecessary. A petitioner in a habeas case is not entitled to discovery as a matter of right, but rather must first demonstrate good cause to conduct discovery and obtain court permission. See, e.g., Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999) (explaining that "[a] habeas petitioner does not enjoy the presumptive entitlement to discovery of a traditional civil litigant," and that "discovery is available only in the discretion of the court and for good cause shown.");

_____

[24] While some detainees have been permitted to view DVDs from family members, those DVDs contained only family messages introducing counsel to the detainees, as limited in the Protective Order. See id. at 188 (indicating that with respect to non-legal materials, only "communications introducing counsel to the detainee" are permitted to be brought by counsel into meetings with detainees, and that the Commander, JTF-GTMO, "shall not unreasonably withhold approval for counsel to bring into a meeting with a detainee letters, tapes, or other communications introducing counsel to the detainee, if the government has first reviewed the communication and determined that sharing the communication with the detainee would not threaten the security of the United States"). Clearance of DVDs in such cases takes approximately three weeks in order to account for factors and issues discussed above in the text.

Al Odah v. United States, 329 F. Supp. 2d 106, 107-08 (D.D.C. 2004) (finding that Guantanamo detainee habeas petitioners must first seek leave of court before conducting discovery and denying leave to conduct discovery); cf. Rule 6(a) of the Rules Governing Section 2254 Cases[25] (requiring leave of court for good cause shown before discovery may be conducted). Petitioner has not requested leave of court to take discovery, and the Court should not permit him to evade this requirement simply by filing a motion for preliminary injunction. Discovery should be particularly disfavored in the present case, where petitioner is challenging the military's conduct of a war overseas and such discovery would interfere with military operations. See Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2652 (2004) (plurality opinion) (adjuring lower courts generally to "proceed with the caution that is necessary" and to take only "prudent and incremental" steps when faced with novel issues pertaining to petitions for writs of habeas corpus from detainees involved in the current war on terror).

Furthermore, access to petitioner's medical records is not necessary, and petitioner cannot demonstrate good cause for their production, because as Dr. Edmondson has indicated, the Guantanamo medical staff, including trained psychiatrists and psychologists, carefully monitors the mental and physical health of petitioner and has provided attentive and thorough care to petitioner. See Edmondson Decl. ¶¶ 6-13. Clearly, the only purpose for counsel's request for petitioner's medical records is to set the stage to invite the Court to second-guess the medical treatment provided by the Guantanamo medical staff, which, as explained previously, is improper. Accordingly, there is no need for petitioner's counsel to access petitioner's medical

---

[25] The Rules Governing Section 2254 Cases can apply to other habeas corpus petitions, including habeas petitions, such as the present one, brought under 28 U.S.C. § 2241. See Rule 1(b) of the Rules Governing Section 2254 Cases.

records, and the request should be denied.[26]

Petitioner's requests for English/Arabic textbooks and children's books also should be denied because no legal basis exists for such a request. As discussed previously, petitioner is provided with appropriate reading materials and other opportunities for intellectual engagement. Thus, there is now showing to warrant injunctive relief compelling respondents to provide these materials to petitioner. In any event, materials, such as these, that are intended to teach or improve the English language skills of detainees could result in a security threat to the personnel at Guantanamo and to the United States should they be regularly distributed into the detainee population at Guantanamo, thereby improving detainees' ability to collect and use information against staff or the United States. Although respondents are aware that many of the detainees speak and understand English to varying degrees, nonetheless it is appropriate to limit the detainees' ability to collect information that may be used to harm United States military personnel.

Petitioner's request for a court order requiring the provision of unidentified religious texts and novels should also be denied. Petitioner has access to reading materials. Further, as acknowledged by petitioner, the military already has established an effective system for screening non-legal materials, including books, sent to detainees at Guantanamo. See In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174, 186 (D.D.C. 2004). This system balances making such materials available to detainees while also addressing security concerns that certain

---

[26] In addition, as mentioned, the burden of producing medical records should not be assessed merely within the confines of the petitioner in the present case, because many other detainees are likely to request such records if the Court orders such relief here, thus multiplying the onus on the Guantanamo staff considerably.

books or materials could be used to, among other things, incite detainees, develop codes, or, as

mentioned, develop English language skills that could allow detainees to obtain and exploit

information at Guantanamo. As petitioner concedes, under this system, the military has

approved many types of non-legal reading materials to be delivered to detainees. See Motion for

Preliminary Injunction at 25. Accordingly, in the unique and unprecedented context of this case

– involving the military detention of alien enemy combatants overseas during a time of war in

the interests of national security – the military's judgment regarding the types of prohibited

contraband at Guantanamo is entitled to considerable deference, and the Court should not

intervene in these determinations. See Thornburgh v. Abbott, 490 U.S. 401, 404 (1989)

(upholding Bureau of Prisons regulation that authorized prison warden to reject incoming

publications on the grounds that the publications are "detrimental to the security, good order, or

discipline of the institution"); Robinson v. Palmer, 619 F. Supp. 344, 347-48 (D.D.C. 1985),

aff'd in relevant part, 841 F.2d 1151 (D.C. Cir. 1988) (explaining that the Court should defer to

the reasonable judgment of prison officials as to the details of prison contraband policy because

of the security objectives behind the contraband policy and the dangers posed by the introduction

of contraband).[27]

Petitioner's additional requests for relief are all unnecessary and do not warrant court

intervention. As explained above, petitioner is provided an opportunity to exercise for two hours

per day, making that request for relief moot. See Bumgarner Decl. ¶ 7. Similarly, the lighting in

petitioner's cell is, in fact, dimmed from the hours of 10:00 p.m. to 5:00 a.m., obviating any need

---

[27] In addition, any order requiring the provision of such materials to petitioner would
undoubtedly cause many other detainees to request similar treatment, increasing the military's
burden of reviewing such materials dramatically.

for relief. See Bumgarner Decl. ¶ 5.  Further, petitioner's request for a court-ordered hour of

interaction with his fellow detainees daily is also unwarranted.  As noted in Col. Bumgarner's

declaration, petitioner currently is able to communicate with other detainees from his cell, in

addition to his frequent interactions with medical staff, guards, and interrogators.  Id. ¶¶ 4, 6.

Finally, ordering respondents to permit an "independent" medical professional to travel to

Guantanamo to examine petitioner is unnecessary and would present security concerns.  As Dr.

Edmondson explains, petitioner has and continues to receive thorough and attentive mental care.

See Edmondson Decl. ¶¶ 6-13.  The only purpose of an independent examination would be to

second-guess that care, which is not appropriate.  See supra pp. 19-20.  Further, accommodating

a visit from an independent medical professional would first require that person to obtain a

security clearance and would necessitate the same logistics that are associated with planning

counsel visits, which are complicated and burdensome enough on their own without opening up

a new dimension of visits by other types of professionals.

　　　Finally, counsel's request to visit petitioner at Guantanamo is moot given that counsel

was permitted to meet with petitioner during their recent visit to Guantanamo this past weekend.

Counsel are also free to schedule additional visits to Guantanamo.

## V.　　DENYING PETITIONER'S MOTION WOULD BEST SERVE THE PUBLIC INTEREST.

　　　The public has a strong interest in assuring that the military operations and medical care

provided at Guantanamo are not interrupted, overly burdened, and second-guessed by the

unnecessary demands of petitioner pertaining to the particulars of his confinement conditions.

Petitioner points to the public's interest in ensuring that petitioner's life and health is preserved.

See Motion for Preliminary Injunction at 33.  As demonstrated above, however, the Guantanamo

staff has taken and will continue to take appropriate and careful measures to preserve the life and

health of petitioner, including providing mental health care to him.  Accordingly, to avoid the

unnecessary burdens imposed by petitioner's motion, the public interest would best be served if

the Court denied the motion.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for

preliminary injunction be denied in all respects.

Dated: November 16, 2005                     Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             KENNETH L. WAINSTEIN
                                             United States Attorney

                                             DOUGLAS N. LETTER
                                             Terrorism Litigation Counsel

                                             ___/s/ Edward H. White & Andrew I. Warden___
                                             JOSEPH H. HUNT (D.C. Bar No. 431134)
                                             VINCENT M. GARVEY (D.C. Bar No. 127191)
                                             TERRY M. HENRY
                                             JAMES J. SCHWARTZ
                                             PREEYA M. NORONHA
                                             ROBERT J. KATERBERG
                                             ANDREW I. WARDEN (IN Bar No. 23840-49)
                                             NICHOLAS J. PATTERSON
                                             EDWARD H. WHITE (D.C. Bar No. 468531)
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W.
                                             Washington, DC  20530
                                             Tel:  (202) 514-4107
                                             Fax:  (202) 616-8470

                                             Attorneys for Respondents

-33-

# EXHIBIT M



AMERICAN FORCES INFORMATION SERVICE

# NEWS ARTICLES

**Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures**

By Kathleen T. Rhem
American Forces Press Service

WASHINGTON, May 19, 2006 – A bogus suicide attempt yesterday lured guards into a 10-man detainee bay where an attack awaited them, the admiral in charge of the U.S. detention facility at Guantanamo Bay, Cuba, told reporters today. Two other detainees had attempted suicide earlier in the day.



*One barrack room in Camp 4, the medium-security facility within Camp Delta at Naval Station Guantanamo Bay, Cuba. In Camp 4, highly compliant detainees live in a communal setting and have extensive access to recreation. Photo by Sgt. Sara Wood, USA* (Click photo for screen-resolution image);high-resolution image available.

The large skirmish in Camp 4, the only medium-security facility at Guantanamo Bay, began around 6:30 p.m. when guards were searching all cells in response to earlier incidents in other camps.

Compliant detainees in Camp 4 live in communal bays and have more privileges and more recreation time than those in other camps at Guantanamo. They are "assigned to the camp when they have demonstrated continued compliance with camp rules," Navy Rear Adm. Harry B. Harris Jr., commander of Joint Task Force Guantanamo, said via telephone from Guantanamo Bay.

However, he added, officials "consider this to be the most dangerous camp, because detainees have the opportunity to plan and act out in groups."

A quick-reaction force of 10 guards responded when a detainee was seen hanging sheets from the ceiling and making as if to hang himself. Harris explained that guards are taught to respond to save the detainee's life but also to consider the possibility that such a gesture is intended to lure guards into a cell.

"Because of the dangerous nature of the men in our custody, we train for the possibility that a suicide attempt may be used by the detainees to create an opportunity to conduct an assault, take a hostage, or kill the guards," he said. "In fact, that was exactly what was going on last night."

When guards entered the bay to prevent the detainee from hanging himself, the 10 detainees in that bay attacked them. Harris said the detainees had "slickened the floor in their block with feces, urine and soapy water in an attempt to trip the guards." They then attacked the guards with broken light fixtures, fan blades and "bits of metal."

Harris and Army Col. Mike Bumgarner, commander of the Joint Detention Group, explained that the guards used a "continuum of force" to quell the disturbance. Continuum of force is a law-enforcement term used to explain that guards or officers start with the lowest level of force and escalate until they

Case 1:05-cv-01124-UNA   Document 43-6   Filed 07/21/2006   Page 40 of 65

reach the appropriate level of force for the situation at hand.

In this case, guards started with verbal commands to cease the actions, then quickly moved to using pepper spray. Within a matter of minutes they progressed to physical force and finally to using nonlethal weapons, which allowed the guards to end the skirmish within five minutes of the guards entering the bay.

Officials did not call for the use of nonlethal crowd-control measures until two guards were on the ground after detainees jumped on them from the beds and leaders determined their lives could be at risk, Bumgarner said.

Guards fired five .12-guage shotgun rounds with rubber pellets and one "sponge-type grenade" from an M-203 grenade launcher.

The detainees who started the disturbance were then moved to a maximum-security facility after being examined by medical personnel, Harris said.

While authorities worked to end the fighting in the first bay, detainees in two other bays began acting out by damaging their accommodations, destroying fans, light fixtures and security cameras. Guards used pepper spray in these bays as well. Guards also had to enter one bay to evacuate a detainee who complained of severe chest pains.

Bumgarner said officials have estimated the property damage at $110,000, most of that cost from the security cameras in the bays.

Officials later determined the initial act was not a legitimate suicide attempt but a ruse to get guards into the bay. In all, six detainees were treated for minor injuries, and no servicemembers were injured beyond scrapes and bruises, Bumgarner said.

Guards first responded to a medical emergency in Camp 1, a maximum-security facility within Camp Delta, early yesterday when a detainee was discovered unconscious after missing morning prayer, Harris said.

Later, around noon, a second detainee complained of dizziness and nausea after taking five pills.

"Not knowing if this was another suicide attempt, we locked down the camps and began a total search of each cell, realizing that this process would take several hours," Harris said.

In the end, officials determined that this second detainee had not attempted suicide but was having a reaction to medication prescribed to him for latent tuberculosis. That individual is fine now, Harris said.

Shortly thereafter, guards found a stash of drugs hidden in a detainee's toilet. Minutes after this, guards found another detainee frothing at the mouth when they arrived to search his cell. Harris said this was another suicide attempt.

Both individuals are being treated at the Guantanamo naval hospital, where they are in stable condition but were still unconscious this afternoon, Harris said. Officials determined the men had ingested "large quantities of the benzodiazepine family of drugs." This type of drug is commonly used

to treat anxiety or insomnia.

Harris said neither of the men was prescribed the medication they took. Officials theorize that several detainees surreptitiously hoarded their prescribed medication for an unknown period of time to pass to these "two jihadists who ... either they wanted to be the suicides or they were told to be the suicides."

Medical personnel at Guantanamo Bay dispense about 1,000 pills a day to 200 to 300 detainees, Harris said. "That's a very difficult thing to track," he said. "The guard force and the medical staff do their best to ensure that the detainees are not squirreling away meds, but when you're dispensing that quantity of meds to that quantity of detainees, some get by us."

Two other detainees also complained of nausea and dizziness, and one of them stated that he had tried to kill himself but didn't have enough drugs. Medical officials believe these two are "attention-seeking sympathizers," but were not seriously trying to kill themselves.

Since detainees were first brought to Guantanamo Bay in January 2002, no detainee has died at the facility. Including yesterday's attempts, there have been 41 suicide attempts from a total of 25 detainees, Harris said. About 750 detainees have been through the base, and about 460 currently are held there.

In his comments to the press today, Harris said the guards performed "magnificently yesterday, showing remarkable restraint in the face of considerable danger."

"They were, in fact, heroic," he added. "The young men and women here are doing a magnificent job, and I'm proud of each of them."

He also praised the medical staff involved and credited them with saving the lives of the two detainees who attempted suicide.

Harris said officials believe the detainees were seeking attention by causing the disturbance in Camp 4. "This is a way to bring attention to their position and the fact that they are continuing to wage war against America and our allies, and they are doing what they can to further their ideals."

Defense officials have continually stressed that detainees are not held at Guantanamo Bay to punish or attempt to reform them, but to keep them off the battlefield in the war on terrorism.

"This illustrates to me the true nature of the men we have detained here," Harris said today. "They are dangerous men and committed jihadists who will do whatever it takes to kill an American here, even killing themselves to get to that point."

**Biography:**
Rear Adm. Harry B. Harris Jr., USN

**Related Sites:**
Joint Task Force Guantanamo
Web Special Report: Guantanamo Bay

*A basketball court stands in the center of Camp 4, the medium-security camp within Camp Delta at Naval Station Guantanamo Bay, Cuba. This camp also has a volleyball court and large*

Case 1:05-cv-01124-UNA    Document 43-6    Filed 07/21/2006    Page 42 of 65



*recreation areas for the detainees. Photo by Sgt. Sara Wood, USA*
Download screen-resolution
Download high-resolution



*Detainees walk around an exercise yard in Camp 4, the medium-security facility within Camp Delta at Naval Station Guantanamo Bay, Cuba. In Camp 4, highly compliant detainees live in a communal setting and have extensive access to recreation. Photo by Sgt. Sara Wood, USA*
Download screen-resolution

News Archive

http://www.defenselink.mil/news/May2006/20060519_5177.html

# EXHIBIT N



# Media Advisory

## Joint Task Force Guantanamo
Guantanamo Bay, Cuba
APO, AE 09360



Contact: CDR Robert Durand                                    19 May 2006
Phone: 011-5399-9928
Email: Robert.T.Durand@jtfgtmo.southcom.mil

### Statement on Suicide Attempts at Guantanamo

Transcript of statement by Rear Admiral Harry B. Harris, Jr., Commander, Joint Task
Force Guantanamo at media availability held at 3 pm, 19 May 2006.

Good afternoon. I'm glad to have this opportunity to talk with all of you to tell you what
happened yesterday.

Yesterday morning (May 18, 2006) we responded to a medical emergency in Camp 1. A
detainee was discovered unconscious after missing Morning Prayer.

Medical response teams arrived on scene and he was taken to the Detention Hospital
where it was determined that he had poisoned himself. He has since been transferred to
the Naval Hospital here, in the Acute Care Unit. He is stable but remains unconscious.
Initial tests indicate he ingested a large quantity of the Benzodiazepine family of drugs.
Typical examples include Xanax® and Klonopin®.

Later that morning, around noon, a second detainee in Camp 5 complained of dizziness
and nausea after taking 5 pills. Not knowing if this was another suicide attempt, we
locked down the Camps and began a total search of each cell, realizing this would take
several hours to complete. As it turns out, this detainee simply had a bad reaction to
drugs correctly prescribed to him for latent tuberculosis. This was not a suicide attempt.
He is fine.

Then, early that afternoon, immediately after prayer call, during the cell searches we'd
ordered earlier we found a cache of drugs hidden in the toilet of a detainee. Minutes
later, another detainee was discovered frothing at the mouth when the guard force arrived
to search his cell. This was the second suicide attempt. This detainee is also stable and
unconscious in the Naval Hospital.

Two other detainees complained of nausea and dizziness. One of them told us he tried to
kill himself but did not have enough drugs. However, our medical and psychiatric staffs
now believe both of these to be attention-seeking sympathizers who were not trying to
actually commit suicide.

Now we move to Camp 4 and the disturbance of last night.

Camp 4 is a medium-security facility where detainees live in a communal-living arrangement. Detainees in Camp 4 have the most privileges and are assigned to the camp when they have demonstrated continuous compliance with camp rules. However, we consider it to be the most dangerous camp because detainees have the opportunity to plan and act in groups.

At about 6:30, while continuing the searches we ordered earlier in the day, a detainee in Camp 4 was observed preparing to hang himself. Our quick-reaction force was immediately sent to the compound.

Our policy is to intervene to save the life of a detainee. Because of the dangerous nature of the men in our custody, we train for the possibility that a suicide attempt may be used by the detainees to create an opportunity to assault, take hostage or kill the guards. That was exactly the case here.

When the guard force entered the compound to intervene to save the detainee's life, the detainees assaulted them. The detainees had slickened the floor of the block with feces, urine, and soapy water in an attempt to trip the guards. Detainees then assaulted the guards with broken light fixtures, fan blades and bits of metal. I have some of the actual improvised weapons here that, unfortunately, most of you can't see. (Photos provided)

Minimum force was used to quell the disturbance, using a continuum beginning with verbal commands to OC pepper spray to physical force and finally, non-lethal crowd control measures. (Clarification: The altercation itself lasted about 4-5 minutes.) Over the next hour, the area was secured and the detainees were examined for injuries. Six detainees were treated for minor injuries. No service member was injured.

Let me summarize, before I turn it over to you for questions.
- We have determined that this incident (clarification: Camp 4) was not a suicide attempt but rather a ruse to get the guards to enter the compound in order to be attacked. So, at the end of the day, we have 2 confirmed suicide attempts (clarification: in Camp 1) ...again, both are alive and stable in the Naval Hospital here.
- I believe the guard force performed magnificently yesterday, showing remarkable restraint in the face of considerable danger. They were, in fact, heroic. The young men and women here are doing a magnificent job and I am proud of each of them.
- Equally tremendous work was done by the Medical Group. They saved the lives of the two would-be suicides.
- Finally, this illustrates to me the true nature of the men we have detained here. They are dangerous men and committed jihadists willing to die and order others to commit suicide.

Thank you and I'll now take your questions.

### ###

# EXHIBIT O

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

In re: GRAND JURY SUBPOENAS 04-124-03 AND
04-124-05

Nos. 05-2274/2275

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-73533---Paul D. Borman, District Judge.

Argued: April 18, 2006

Decided and Filed: July 13, 2006

Before: BOGGS, Chief Judge; SUTTON, Circuit Judge; and SCHWARZER, District Judge.[*]

---

### COUNSEL

---

**ARGUED:** David M. Zinn, WILLIAMS & CONNOLLY, Washington, D.C., Kevin D. Finger, GREENBERG & TRAURIG, Chicago, Illinois, for Appellants. Stephen L. Hiyama, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** David M. Zinn, Craig D. Singer, WILLIAMS & CONNOLLY, Washington, D.C., Kevin D. Finger, GREENBERG & TRAURIG, Chicago, Illinois, Deborah L. Fish, ALLARD & FISH, Detroit, Michigan, for Appellants. Stephen L. Hiyama, Ross MacKenzie, ASSISTANT UNITED STATES ATTORNEYS, Detroit, Michigan, for Appellee.

---

### OPINION

---

BOGGS, Chief Judge. These two cases, filed under seal, present a legal question regarding the conduct of reviews of documents for privilege.[1] Specifically, we must determine who has the right to conduct a review for privilege of documents subject to a grand jury subpoena directed to a third party who possesses the documents but has not yet produced them to the government: the targets of the investigation whose rights of privilege are potentially implicated, or the federal government, operating a "taint team" behind a "Chinese wall" or protective screen.

---

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

[1] As the two cases present essentially identical issues of law and fact, we will address them together.

These cases arise from events leading up to the 2003 bankruptcy filing of Venture Holdings LLC ("Venture"), a company once controlled by appellant Larry Winget. After Venture's new (post-filing) management conducted an internal investigation, the company filed suit against Winget for allegedly fraudulent conveyances of goods and services from Venture to other entities that Winget owned or controlled. Shortly thereafter, a federal grand jury issued two subpoenas *duces tecum*, filed under seal, to Venture. Winget filed a motion to intervene, and seven companies affiliated with Winget (the "Affiliated Companies") later joined this motion. The documents in question have not been examined by any of the parties, and they remain in locations under Venture's control. Winget and the Affiliated Companies demanded the right to conduct their own privilege review of the documents responsive to the subpoenas, as both the government and Venture are actually or possibly litigation opponents of Winget's or the Affiliated Companies'. The government opposed this motion, and asserted that any privilege review be conducted by its own "taint team." The district court granted Winget's and the Affiliated Companies' motions to intervene, but agreed with the government with respect to the "taint team" review procedure. The district court issued an alternative holding that Winget had also failed to meet the threshold requirement of showing any rights of privilege in the requested documents. For the reasons stated below, we reverse and remand.

<h1 style="text-align:center">I</h1>

The circumstances leading to the instant controversy are sufficiently convoluted to require some summary description despite the fact that the documents in the suit remain under seal. Larry Winget was once the sole owner of Venture, a global automotive supplier, and had served as its Chairman and Chief Executive Officer. Winget also owned or controlled numerous other companies, including the Affiliated Companies. The headquarters of Venture and of each of the Affiliated Companies were located in the same office in Fraser, Michigan.

In 1999, Venture purchased a German company called Peguform. In October 2002, a German court declared Peguform insolvent under Germany's bankruptcy regime. This threatened Venture's solvency and caused a group of bank creditors to assert more control over the company. Consequently, Joseph Day was installed as a director in January 2003. Venture then filed for bankruptcy on March 28, 2003 under Chapter 11 in the Eastern District of Michigan. At the same time, Day replaced Winget as Venture's Chief Executive Officer. Six months later, on September 22, 2003, Winget and Venture entered into a Contribution Agreement ("Contribution Agreement"), whereby several entities owned by Winget and certain of his affiliates would transfer their assets and ownership to a new company that would be formed in connection with Venture's reorganization.

Also in September 2003, Venture's new management hired an accounting firm to conduct a forensic audit of related-party transactions between Venture and some of the many companies associated with Winget. In March 2004, Venture's auditors concluded that Venture had in the past paid millions of dollars to some Winget-owned or -controlled companies for products and services whose fair market value was allegedly substantially less than the price paid, which would have contradicted certain statements in Venture's SEC filings during the relevant years. The auditors' conclusions remain untested, and we will not venture to assess their accuracy.

On April 5, 2004, as part of the bankruptcy proceedings, Venture and its official committee of unsecured creditors filed a still-pending civil suit against Winget, some of his family members, and numerous associated entities, asserting claims of unjust enrichment, breaches of fiduciary duties, and fraudulent transfers arising from Venture's payment of funds to Winget's affiliated companies. *Venture v. Winget*, Adversary Proc. 04-4374, *In re Venture Holdings Company LLC*, No. 03-48939 (Bankr. E.D. Mich.). On May 13, 2004, Venture and Winget signed a Separation Agreement ("Separation Agreement"), whereby Winget agreed to terminate his employment by Venture and resign as officer and director. In exchange, he was to receive $50,000 every month while Venture remained under Chapter 11 protection, and he was further entitled to "continue the exclusive,

uninterrupted use of the office which he currently occupies" at James J. Pompo Drive. This agreement forms part of the substantive basis for Winget's claims to privilege in the instant case, but we are in no position now to assess its substance or legal effect because the instant controversy involves a matter that is logically antecedent to the substance of any privilege disputes.

On January 21, 2005, the bankruptcy court rejected Venture's proposed reorganization plan, and, therefore, the Contribution Agreement as well. On April 8, 2005, with an April 29 amendment, New Venture Holdings LLC ("New Venture") was formed by Venture's pre-petition lenders, who agreed to buy the assets and assume the liabilities of (old) Venture and nine other companies owned or controlled by Winget that had filed for Chapter 11 in May 2004. The bankruptcy court subsequently approved this transaction. On May 2, 2005, (old) Venture and the nine affiliated companies formally transferred their assets and liabilities to New Venture. In October 2005, New Venture changed its name to Cadence Innovation LLC.

Meanwhile, the federal government began investigating the matter. In the fall of 2004, a number of grand jury subpoenas *duces tecum* were issued. Relevantly to the case at hand, New Venture received two such subpoenas, and the company soon agreed to cooperate with the federal investigation, waiving its corporate attorney-client and work-product privileges in October 2004. As the subpoenas in question were filed under seal, and as their precise substance is not particularly relevant to the instant controversy, we will respect grand jury secrecy and exercise our discretion by not discussing their contents. Instead, we simply note that the subpoenas were directed to New Venture, and they demanded production of some documents that, all sides concede, may be protected by either Winget's or the Affiliated Companies' attorney-client or work-product privileges.

On March 1, 2005, Winget filed a motion in the Eastern District of Michigan to intervene and to modify the subpoenas in order to preserve privilege. In this motion, he claimed that some of the records that New Venture had been called upon to produce were protected by Winget's *personal* attorney-client or work-product privileges even though the documents remained in offices under Venture's control. Winget therefore asked the court to approve a procedure, described in greater detail below, whereby his attorneys would conduct a privilege review of the responsive documents. On April 29, 2005, the Affiliated Companies filed a motion to join Winget's intervention, arguing that the subpoenas called for documents that could be protected by their corporate attorney-client and work-product privileges.

The government opposed Winget's motion, claiming that he was

> requesting this Court to allow him to insert himself into the middle of a grand jury investigation so that he can be the first to screen documents produced . . . in response to the two subpoenas. . . . [S]uch a procedure would subvert the orderly functioning of the grand jury process and would be, to the best of the government's knowledge, *unprecedented.*

(emphasis in original). Instead, the government proposed that a "taint team" composed of government attorneys who are not involved in the grand jury investigation be established to segregate privileged documents from the residue of non-privileged material. As we discuss more extensively below, the proposed taint team would return to Venture any documents that it determined to be privileged, sending copies to Winget where appropriate, and would submit the materials it determined to be potentially protected by privilege to Winget and the district court for final adjudication. However, the taint team would send documents it deemed not to be protected by appellants' privilege directly to the grand jury, and so they would not provide appellants with any opportunity to review or challenge the team's privilege determinations with respect to those documents.

The district court conducted a closed hearing on August 3, 2003. At this hearing, the court sternly questioned the parties regarding the legal merit of any privilege claims, and criticized Winget and the Affiliated Companies for failing to provide a log that detailed specific documents that they claimed to be privileged. It is not clear how they could have done so, for it is certain that neither Winget, nor the Affiliated Companies, nor even the government, has yet had any access to the subpoenaed documents. On September 7, the district court issued an order denying Winget's requested relief, and approved instead the government's proposed taint team. The court issued an alternative ruling wherein it held that the appellants had failed to meet their burden of proving that one or more of them held a privilege over the documents. Winget and the Affiliated Companies filed a timely notice of appeal.

## II

The appellants essentially moved to "modify" the grand jury subpoenas, Fed. R. Crim. P. 17(c)(2), *see* Fed. R. Civ. P. 45(d)(2), and the resulting discovery order is immediately appealable. *See In re Subpoena Duces Tecum*, 439 F.3d 740, 743 (D.C. Cir. 2006). The district court's denial of this motion is reviewed for abuse of discretion. *See United States v. Hughes*, 895 F.2d 1135, 1145 (6th Cir. 1990). A district court abuses its discretion, *inter alia*, "when it applies the incorrect legal standard [or] misapplies the correct legal standard." *Deja Vu of Cincinnati, LLC v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 782 (6th Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1023 (2006) (quoting *Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997)). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). As the district court rested its opinion on legal grounds alone, we review that decision *de novo*. Moreover, to the extent that the court below reached a substantive judgment regarding the waiver of attorney-client privilege, we also review that decision *de novo*. *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 472 (6th Cir. 2006).

The only question before us is whether the district court erred in preferring the government's proposed taint team to the appellants' own attorneys to make initial privilege determinations with respect to documents in the third-party subpoena recipient's possession. We have not been asked to determine whether any of these documents are actually privileged, and the time is clearly not ripe to adjudicate the merits of any potential privilege claims. Instead, our duty here is to determine the logically antecedent issue as to which party – the government or the appellants – has the right to conduct a privilege screen of documents responsive to a grand jury subpoena issued to a third party. The government in fact concedes that some of the documents responsive to the subpoena may be protected by appellants' privilege, does not challenge the appellants' general rights of privilege, and does not seem to contest that the appellants would have had the right to conduct their own privilege review had the subpoena been directed to them instead of New Venture. Instead, the government complains that allowing the appellants' own attorneys to conduct a privilege review of the subpoenaed documents at New Venture would interfere with a government investigation and undermine grand jury secrecy. This controversy thus calls for us to weigh, to some degree, grand jury investigations and grand jury secrecy against attorney-client and work-product privilege.

## A

In the first step of the appellants' proposed procedure,[2] their own counsel would provide the government and New Venture with a "list of the law firms, attorneys, and agents" who represented them. Then, a paralegal retained by appellants' counsel would review the implicated documents in

---

[2]Winget proposed this procedure in his motion to intervene docketed on March 1, 2005. The Affiliated Companies joined in that motion, and in the requested procedure, in their motion filed on April 28, 2005.

offices controlled by New Venture,[3] and segregate those documents that had been "authored by, received by, copied to, or that mention anyone identified on the list" from the remainder. Third, the appellants' attorneys would review "copies of the segregated documents and prepare a privilege log for any documents that [appellants] claim as privileged." The appellants would thus create a log documenting materials for which they claim the protection of privilege, and this log would presumably include sufficient information about the privilege claims that the government could intelligently evaluate appellants' assertions by reviewing the log. Finally, "the parties would bring any privilege disputes before the Court." This seems to reflect a fairly standard practice by which law firms conduct privilege reviews when responding to government subpoenas or other discovery requests. *See Cheney v. United States Dist. Ct. for D.C.*, 542 U.S. 367, 399 n.5 (2004); *Lexicon, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 665-73 (6th Cir. 2006); *McAlpin v. Lexington 76 Auto Truck Stop, Inc.*, 229 F.3d 491, 499 (6th Cir. 2000). *See also In re Subpoena Duces Tecum*, 439 F.3d at 751 ("[Civil] Rule 45(d)(2) is generally satisfied by the submission of a privilege log detailing each document withheld and the reason."). Alternatively, the appellants request that the district court appoint a Special Master to conduct the privilege review.[4]

While the government obviously has an interest in assisting the grand jury's investigation, the government also has a genuine, if conflicting, interest in preventing investigators from accessing privileged materials. Indeed, the government concedes that the leaking of privileged materials to investigators would raise the spectre of *Kastigar*-like evidentiary hearings, *see Kastigar v. United States*, 406 U.S. 441 (1972), and argues that it would therefore act conservatively, and err on the side of caution, in assessing the existence of privilege and in screening privileged documents from investigators. In the government's proposed procedure, a taint team consisting of at least one Assistant United States Attorney (from the same Eastern District of Michigan office as the prosecutors) and at least one Postal Inspector would review for privilege all documents produced by Venture. Materials that the taint team finds clearly to be privileged would then be returned to New Venture, with copies provided to the appellants. However, materials that the taint teams finds clearly not to be privileged would be provided directly to the investigators and the grand jury, and the appellants would have no opportunity to review those documents. Finally, materials whose status is unclear in the taint team's estimation would be submitted by the taint team to the district court for judicial determination, with copies provided to the appellants.

The district court decided in favor of the government's proposed taint team procedure. The court also reached a substantive finding, concluding that "any rights created between the parties in this [Separation Agreement] between [Winget] and Venture, do not undercut the grand jury's right to secure evidence from Venture." The district court framed the issue before it as one primarily of substance, rather than of procedure:

> The critical issue is whether Intervenor has a valid attorney-client privilege or work product protection with regard to documents located in Venture's buildings sought by the subpoenas at issue, and further, if such protections could apply, whether examination of documents at issue should be done initially by the Court, a master

---

[3] It is not, to be sure, a *per se* waiver of privilege for one entity to leave privileged materials on the premises of another entity. *See Schwimmer v. United States*, 232 F.2d 855 (8th Cir. 1956). Actual determination of the merits of any claim of privilege must await adjudication *after* the parties have agreed to a subset of documents over which they disagree as to privilege.

[4] No party seems to have offered a concrete procedural mechanism by which the suggested Special Master would segregate privilege documents, nor whether the master would be expected to perform the entire task or just portions of it. Although the government opposed the request, it did concede before the trial court that "it would be Uncle Sam one way in on way [*sic*] or the other" who paid for the Special Master.

appointed by the Court . . . , a paralegal in the employ of Intervenor's counsel, or a government privilege/taint team.

Thus, the district court had it exactly backward: the parties do not presently dispute that there *might* be material in New Venture's possession over which the appellants *might* have a right of privilege. The government explicitly concedes that there *may* be documents over which appellants hold privilege in New Venture's offices. Rather, they disagree as to *how* to determine whether any of these documents are in fact protected by appellants' privilege. Therefore, the district court's extensive discussion of the agreements and contracts that may or may not have rendered the documents privileged to the appellants is almost wholly irrelevant to the inquiry properly before us. Until the parties raise concrete substantive disputes over whether particular documents are privileged, which they cannot do until a review of the documents for privilege is undertaken in some fashion, the question of privilege is simply not ripe for adjudication.

In addition to its alternative holding that we now reverse in its entirety, the district court specifically granted the government's motion to conduct the privilege review under the aegis of a taint team, holding that any documents that the taint team finds to be privileged "shall be submitted to the Court for a final determination. At that point, if the Court determines that the documents might be deserving of attorney client and/or work product protection(s), the Court will require Intervenor to prove that they were not expose[d] to third parties."[5] The district court thus held that the public policy underlying grand jury secrecy and the effective investigation of criminal activity outweighed the appellants' privilege claims.

<div align="center">B</div>

This controversy requires us to address two rules of our common law inheritance that were already ancient when the Founders drafted the Constitution. In our inquiry, we must first determine whether the grand jury's investigative authority trumps appellants' claims of privilege. Answering that question in the negative, we must then discern whether the government's claim regarding the importance of grand jury secrecy countervails the possible protections of privilege that appellants may enjoy. We also answer that question in the negative. Finally, we will outline a procedure that, we think, appropriately addresses the situation before us.

Grand juries have lain at the very heart of our criminal justice system since time immemorial,[6] so much so that the founders chose to incorporate the grand jury into our Constitution explicitly. It goes almost without saying that grand juries enjoy a broad delegation of authority to conduct investigations. "As a necessary consequence of its investigatory function, the grand jury

---

[5] The court below thus substantially altered the government's proposal. Whereas the government had proposed a procedure whereby the taint team would first identify and segregate (a) definitely privileged, (b) definitely not privileged, and (c) questionably privileged documents, providing only the questionably privileged documents to the court for adjudication, the district court effectively ordered that all documents deemed by the taint team to be definitely or potentially privileged were to be subject to the court's independent determination. The court would thus require the appellants to prove that documents were actually privileged on a case-by-case basis. As there is no case or controversy regarding the substantive adjudication of privilege disputes, we take no position with respect to that portion of the district court's original order.

[6] This is literally so, for grand juries, albeit in their relatively inchoate nascence, predate the accession of King Richard I in 1189 A.D., which the Statute of Westminster I in 1275 established as the day demarcating "time immemorial" from historical (legal) time. 3 Edw. I. c. 39. *See R v. Oxfordshire County Council ex parte Sunningwell Parish Council*, (2000) 1 A.C. 335, 349 (H.L.) (appeal taken from C.A. (Civ. Div.)). *See generally*, *Lipari v. Kawasaki Kisen Kaisha, Ltd.*, 923 F.2d 862, 1991 WL 3060 at **3 (9th Cir. Jan. 11, 1991); *Grace v. Koch*, No. C-90802, 1996 WL 577843 at *3 n.7 (Ohio Ct. App. Oct. 9, 1996); *Macy v. Ok. City Sch. Dist. No. 39*, 961 P.2d 804, 813-14 (Ok. 1998) (Opala, J., concurring); *Morning Call, Inc. v. Bell Atlantic-Pa., Inc.*, 761 A.2d 139, 143 n.7 (Pa. Super. Ct. 2000); *Mercer v Denne* [1905] 2 Ch. 538, 577.

paints with a broad brush." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991). As then-Judge Kennedy wrote, "[t]he grand jury is, to a degree, an entity independent of the courts, and both the authority and obligation of the courts to control its processes are limited." *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 864 (9th Cir. 1985).

Nevertheless, grand juries are not empowered to override private rights in all cases. Pertinently, we have held that grand juries may not use their investigatory authority "to violate a valid privilege, whether established by the Constitution, statutes, or the common law." *In re Grand Jury Investigation (Detroit Police Dep't Special Cash Fund)*, 922 F.2d 1266, 1269-70 (6th Cir. 1991) (citations and internal quotation marks omitted) (finding that informant privilege did not operate to prohibit witness from testifying to grand jury). Yet, as the assertion of privilege "may jeopardize an effective and comprehensive investigation into alleged violations of law," courts must ensure that the "application of the privilege [does] not exceed that which is necessary to effect the policy considerations underlying the privilege." *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir. 1983). Thus, we have held that the government must make a preliminary showing to justify violating work-product privilege pursuant to a grand jury investigation, *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F.2d 933 (6th Cir. 1980), and that grand juries may not breach a valid psychotherapist-patient privilege. *See In re Zuniga*, 714 F.2d 632, 639-40 (6th Cir. 1983). *See also In re Grand Jury Subpoena (Maltby)*, 800 F.2d 981 (9th Cir. 1986) (remanding because district court failed to rule on claims of attorney-client privilege); *Schwimmer v. United States*, 232 F.2d 855 (8th Cir. 1956) (authorizing Special Master to make privilege determinations in grand jury context so long as attorney had a right of review).

The two privileges that all sides concede to be potentially at stake – attorney-client privilege and the work-product doctrine – are well-established and integral to the proper functioning of our legal system. The privilege protecting confidential communications between an attorney and his client dates back to the Tudor dynasty at least, although the reasoning behind the early modern version of this privilege was different from, and far narrower than, that espoused in modern times. *See Dennis v. Codrington*, (1580) 21 Eng. Rep. 53 (Ch.) (regarding a motion to examine a Mr. Oldsworth, "touching a matter in variance, wherein he hath been of Counsel, it is ordered he shall not be compelled by subpoena or otherwise to be examined upon any matter concerning the same, wherein he the said Mr. Oldsworth was of counsel . . . ."); *Onbie's Case*, (1642) 82 Eng. Rep. 422 (K.B.) ("a lawyer who was of counsel may be examined upon oath as to the matter of agreement, not to the validity of an assurance, or to matter of counsel."). *See generally*, 8 Wigmore on Evidence § 2290 *et seq.* (McNaughton rev. ed. 1961).

The Supreme Court has thus justifiably recognized the attorney-client privilege as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The purpose of attorney-client privilege is to ensure free and open communications between a client and his attorney. *See Fisher v. United States*, 425 U.S. 391, 403 (1976) ("Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged. The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." (citations omitted)); *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.").

On the other hand, work-product privilege applies solely to attorney work product compiled in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 49, 511 (1947). Work-product privilege, while properly construed more narrowly than attorney-client privilege, nevertheless operates for a similar purpose: that is, that people should be free to make requests of their attorneys without fear, and that their attorneys should be free to conduct research and prepare litigation strategies without

fear that these preparations will be subject to review by outside parties. We apply a five-step analysis to determine whether the doctrine applies, *In re Powerhouse Licensing, LLC*, 441 F.3d at 473, though, as noted, that issue is not presently ripe for adjudication.

Neither attorney-client nor work-product privilege is absolute, but the government must show sufficient cause for overcoming the privilege. *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F.2d at 935-36. The fullest extent of the privileges are not necessarily mandated by the United States Constitution. *See United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991) ("The [attorney-client privilege] doctrine protects only those disclosures that are necessary to obtain informed legal advice and that would not be made without the privilege. The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." (citations omitted)). Both privileges may be overridden, for instance, by the so-called crime-fraud exception, encompassing advice given with respect to ongoing or future wrongdoing. However, the Supreme Court has authorized even the mere use of *in camera* inspections by district judges of privileged documents to ascertain the applicability of the crime-fraud exception only when the moving party has made a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989). Thus, even inspections by the district judge, which do not destroy privilege, require a prior showing that is weakly analogous to probable cause. In the instant case, the government has not suggested that the crime-fraud exception, or any other exception to privilege, is applicable, and, in any case, a government taint team's review of documents is far riskier to the non-moving party's privilege than is a judge's *in camera* review.

The government prefers a taint team procedure, whereby its lawyers, behind a protective screen or "Chinese wall," would sift the documents for privilege. The government argues that grand jury secrecy requires this procedure, that the appellants' alternative would present an inexcusable intrusion into the grand jury investigative process, and that appellants' alternative would likely be ineffective because appellants' attorneys would have an incentive to drag their feet. The first two arguments require us to weigh the potential protection of privilege against the potential violation of grand jury secrecy, and we find that the arguments have less merit than the government suggests. The last two arguments are well-taken, however, and so they must be addressed by our remedy.

First, the government overstates the role of grand jury secrecy in the present controversy. It has long been recognized that grand juries require a generous zone of secrecy in order to perform their investigative functions. Although grand jury secrecy did not always go unchallenged, it seems to have been well-established long before our independence from Great Britain. As the foreman of the grand jury convened in 1681 for the treason trial of the Earl of Shaftesbury is reported to have said to the Lord Chief Justice, in response to the justice's granting of a motion requiring grand jury evidence to be heard publicly:

> My Lord Chief Justice, it is the opinion of the jury, that they ought to examine the witnesses in private, and it hath been the constant practice of our ancestors and predecessors to do it; and they insist upon it as their right to examine in private, because they are bound to keep the king's secrets, which they cannot do, if it be done in court. . . . [I]t is contrary to the sense of what the jury apprehend. First, they apprehend that the very words of the oath doth bind them, it says, "That they shall keep the counsel's, and their own secrets:" Now, my lord, there can be no secret in public; the very intimation of that doth imply, that the examination should be secret; besides, my lord, I beg your lordship's pardon if we mistake, we do not understand anything of law.

*Earl of Shaftesbury's Trial*, (1681) 8 How. St. Tr. 759, 771-74.  That ancient rule crossed the Atlantic and has been preserved in some fashion since; the federal courts' modern version is established by Rule 6(e)(2)(B) of the Federal Rules of Criminal Procedure, which states that certain persons, including government attorneys and grand jurors, "must not disclose a matter occurring before a grand jury."  Grand jury secrecy is thus a strong command, and federal courts must recognize that, "for the system to function properly, grand jury proceedings must be conducted essentially in a vacuum, free from outside influence and sufficiently enveloped so that grand jury information is not disclosed to the general public." *In re Grand Jury Investigation (90-3-2)*, 748 F. Supp. 1188, 1194 (E.D. Mich. 1990).  Moreover, in general, "[a]ny holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States v. Dionisio*, 410 U.S. 1, 17 (1973).  Indeed,

> A grand jury has broad investigative powers to determine whether a crime has been committed and who has committed it.  The jurors may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge.  No grand jury witness is entitled to set limits to the investigation that the grand jury may conduct.  And a sufficient basis for an indictment may only emerge at the end of an investigation when all the evidence has been received.

*Id.* at 15-16 (citations and internal quotation marks omitted).

But "[t]his is not to say that a grand jury subpoena is some talisman that dissolves all constitutional protections." *Id.* at 11.  Although the rules of evidence do not fully operate before the grand jury, "[t]he investigatory powers of the grand jury are nevertheless not unlimited." *United States v. R. Enters.*, 498 U.S. at 299.  While it is certain that matters before a grand jury are protected by Criminal Rule 6(e)(2)(B), *see Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211 (1979) (setting forth general standards for revealing matters occurring before a grand jury); *In re Antitrust Grand Jury*, 805 F.2d 155 (6th Cir. 1986); *In re Grand Jury Proceedings Relative to Perl*, 838 F.2d 304, 306 (8th Cir. 1988) (the secrecy rule "is designed to protect from disclosure only the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process"), it is equally certain that not all documents reviewed by a grand jury constitute "matters occurring before a grand jury," within the meaning of Criminal Rule 6.  We have previously held that

> confidential documentary information not otherwise public obtained by the grand jury by coercive means is presumed to be [a] "matter[] occurring before the grand jury" just as much as testimony before the grand jury.  The moving party may seek to rebut that presumption by showing that the information is public or was not obtained through coercive means or that disclosure would be otherwise available by civil discovery and would not reveal the nature, scope, or direction of the grand jury inquiry, but it must bear the burden of making that showing . . . .

*In re Grand Jury Proceedings*, 851 F.2d 860, 866-67 (6th Cir. 1988) (alterations added).  Thus, documents prepared by a company for ordinary business purposes become presumptively "matters occurring before the grand jury" only if they are obtained by the grand jury through coercion. *FDIC v. Ernst & Whitney*, 921 F.2d 83, 86-87 (6th Cir. 1990).  This discovery exception to grand jury secrecy has been interpreted somewhat broadly. *In re Grand Jury Proceedings*, 196 F.R.D. 57, 62-64 (S.D. Ohio 2000); *Phillips v. United States*, 843 F.2d 438 (11th Cir. 1988); *In re Grand Jury Investigation*, 630 F.2d 996, 1000 (3d Cir. 1980) ("Documents such as the business records sought by the Commission here are created for purposes independent of grand jury investigations, and such records have many legitimate uses unrelated to the substance of the grand jury proceedings.");

*United States v. Stanford*, 589 F.2d 285, 291 (7th Cir. 1978) ("Unless [sought] information reveals something about the grand jury proceedings, secrecy is unnecessary").

Here, the government does not contend that the appellants would not have had the opportunity to review for privilege documents responsive to the subpoenas if the grand jury's subpoena had been directed to them instead of New Venture. Nor can the government claim that the appellants would not have had independent access in the ordinary course of business to the documents in question. We therefore believe that the discovery exception to the secrecy requirement would apply. Moreover, the appellants are not necessarily demanding access to the entire set of documents responsive to the subpoena; rather, they seek only to conduct a privilege review of documents that contain the names of particular lawyers, law firms, and other entities. The marginal increase in the risk that the appellants could divine or reverse-engineer the grand jury's investigative purpose by reviewing a set of their own documents that involved some sort of communication between them and their counsel seems to us to be minimal at best.

Yet the taint team procedure would present a great risk to the appellants' continued enjoyment of privilege protections. In the first place, government taint teams seem to be used primarily in limited, exigent circumstances in which government officials have already obtained the physical control of potentially-privileged documents through the exercise of a search warrant. In such cases, the potentially-privileged documents are already in the government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege. *See United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995) (after seizing law firm documents through a search warrant, the government employed a taint team to determine privilege; however, court appointed a special master to review the documents, with costs charged to the government). But the government does not actually possess the potentially-privileged materials here, so the exigency typically underlying the use of taint teams is not present.

Furthermore, taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors. That is to say, the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that taint teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience. In *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991), for instance, the government's taint team missed a document obviously protected by attorney-client privilege, by turning over tapes of attorney-client conversations to members of the investigating team. This *Noriega* incident points to an obvious flaw in the taint team procedure: the government's fox is left in charge of the appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion.

It is reasonable to presume that the government's taint team might have a more restrictive view of privilege than appellants' attorneys. But under the taint team procedure, appellants' attorneys would have an opportunity to assert privilege *only* over those documents which *the taint team has identified* as being clearly or possibly privileged. As such, we do not see any check in the proposed taint team review procedure against the possibility that the government's team might make some false negative conclusions, finding validly privileged documents to be otherwise; that is to say, we can find no check against Type II errors in the government's proposed procedure. On the other hand, under the appellants' proposal, which incidentally seems to follow a fairly conventional privilege review procedure employed by law firms in response to discovery requests, the government would still enjoy the opportunity to challenge any documents that appellants' attorneys misidentify (via the commission of Type I errors) as privileged. We thus find that, under these circumstances, the possible damage to the appellants' interest in protecting privilege exceeds the

possible damage to the government's interest in grand jury secrecy and exigency in this case. Therefore, we reverse the district court, and hold that the use of a government taint team is inappropriate in the present circumstances. Instead, we hold that the appellants themselves must be given an opportunity to conduct their own privilege review; of course, we can presently make no ruling with respect to the merits of any claimed privilege that may arise therefrom.

Finally, the government argues that the appellants' proposal would allow them to delay the proceedings in an unreasonable manner that could threaten the grand jury investigation. This stance has some obvious merit, for the targets of a grand jury investigation would logically have an interest in delaying matters. However, we do not think this is necessarily dispositive, for the appellants have asked only to conduct a privilege review of the subset of documents that contain names of attorneys or law firms that they will place on a list that will then be provided to the government. Therefore, assuming this "first cut" proceeds apace, the government should obtain the bulk of the responsive documents rather quickly.

To ensure that the first cut does, in fact, proceed in a timely fashion, and to address in addition the government's legitimate interest in preventing the appellants from themselves reviewing the entire set of subpoenaed documents, we mandate that the district court employ a Special Master to perform this first segregation of documents. The Special Master should conduct a word search of the documents, searching for those words contained in the list to be provided by the appellants and approved by the district court, and should then separate documents containing any of those words from the rest. As this is done, the master should provide appellants with copies of the documents containing any of the words on appellants' list, returning the originals to New Venture's offices, and provide the responsive documents not containing any of the list's words to the grand jury. As we have been led to believe that this first cut would be merely mechanical in nature, we hope that the Special Master should be able to perform the task rather quickly, thereby ensuring that the grand jury receives the bulk of the responsive documents in short order, and we think that the master's production should be done on a rolling basis if practical. Appellants would then be authorized to conduct a privilege review of the documents given to them by the Special Master. As this review progresses, appellants should provide all documents that their attorneys find not to be privileged, as well as a standard privilege log respecting documents over which they claim privilege protection, on a timely and rolling basis to the grand jury. This log should contain summary information, as well as some intelligible explanation of their privilege claims, for each document.

Finally, while we think it would be appropriate to charge the appellants for the Special Master's services, as they would themselves have been responsible for the costs in the ordinary course, we leave it to the district court's sound discretion to determine and enforce proper procedures for implementing our remedy. Moreover, we note that the district court retains its inherent authority to adjudicate legitimate disputes that may arise over issues such as, *inter alia*, cost, timing, the identity and makeup of the Special Master's team, and the word lists. As there remains a legitimate concern regarding the possibility of unreasonable delays, we remind the appellants that the district court also possesses the authority to issue reasonable deadlines within which particular review tasks must be completed, and to sanction them, or their attorneys, or both, for failure to meet those deadlines.

### III

For the reasons noted above, we **REVERSE** the district court's order, **MANDATE** that the district court institute a procedure whereby a Special Master will conduct the first mechanical review of the implicated documents, and the appellants will then conduct a privilege review of the documents provided to them; and **REMAND** to the district court for further proceedings consistent with our opinion.

# EXHIBIT P

FOCUS - 3 of 3 DOCUMENTS

Copyright 2005 Globe Newspaper Company
The Boston Globe

August 10, 2005, Wednesday  THIRD EDITION

**SECTION:** NATIONAL/FOREIGN; Pg. A1

**LENGTH:** 1210 words

**HEADLINE:** GUANTANAMO DETAINEES FIND FAULT WITH LAWYERS
INMATE FRUSTRATION BREEDS MISTRUST

**BYLINE:** By Charlie Savage Globe Staff

**BODY:**

WASHINGTON - Shackled to the floor in a tiny cell, a Guantanamo Bay detainee did something last week that was unimaginable when the Supreme Court declared a year ago that suspected terrorists at the military base have a right to challenge their imprisonment in federal court.

The detainee fired his lawyer and dropped his case.

"He just said, 'I don't want you to continue as my lawyers. I want you to withdraw my lawsuit,' " said David Remes, one of the Yemeni man's attorneys.

A year after they gained the right to have their day in court, many Guantanamo inmates are finding themselves frustrated by the slow movement of a legal process that, for the most part, they don't understand.

Many are taking it out on the only friends they have: the lawyers who had volunteered to help them.

In interviews, almost a dozen volunteer lawyers described similar recent complaints. Detainees have seen no benefit from having lawyers, because all their lawsuits have been frozen while the government appeals lower-court decisions. As a result, many increasingly accuse the lawyers of being useless.

The promise of legal recourse has become increasingly remote for many prisoners, who are nearing their fourth anniversary in detention without trial. Many do not understand the US legal system enough to grasp why their requests for hearings have been tied up in the courts, and the military has sharply restricted their communications with the attorneys.

Under those pressures, the relationship between many lawyers and their clients has noticeably frayed in recent months, the lawyers say. While reports of detainees firing their lawyers are rare, many other inmates have stopped cooperating. Still others have berated their lawyers or condemned them as untrustworthy.

"We're fighting to prove we are who we say we are and not interrogators in disguise," said lawyer Julia Tarver, who represents Saudi inmates without charging a fee.

Tarver added, "The greater problem is that the detainees are all getting together and saying, 'I've had a lawyer for X months and what have they done for me lately?' That is a sentiment that is spreading around the camp."

Of the roughly 500 prisoners currently at Guantanamo, 190 have signed on with volunteer lawyers and another 54 have told a judge they want to file suit as well.

Each lawsuit is a request for a hearing before a federal judge, during which they would be able to see whatever evidence the military may have to justify holding them as enemy combatants, and offer their rebuttal.

GUANTANAMO DETAINEES FIND FAULT WITH LAWYERSINMATE FRUSTRATION BREEDS MI

It has been more than a year since the Supreme Court ruling, and no such hearing has taken place. There is little prospect that the first non-military hearing will be held for at least another year.

The process has been halted by disputes over issues such as whether detainees could meet with lawyers and whether alternative hearings, set up by the military at which detainees have no lawyers and cannot see all the evidence against them are sufficient to meet the court's mandate.

David Rivkin, a former associate White House counsel in the administration of George H.W. Bush, said that the current administration was right to file appeals seeking to keep the cases out of civilian courtrooms. The military hearings, he said, were "carefully designed" to meet the court's requirements. He added that judges should defer to the commander-in-chief in disputes about how to detain enemies during wartime.

A Justice Department aide dismissed the notion that the government was to blame for troubles between lawyers and detainees: "Ending the detainee-counsel relationship is a matter between the counsel and the represented detainee," the aide said.

But some lawyers say the military is also undermining their ability to maintain cordial relations with clients by harassing them on the base and by imposing sharp restrictions on their communications. Phone calls are not allowed. Officers assigned to chaperone the lawyers take a rigid attitude about scheduled meetings, refusing to allow them to go longer than planned, the lawyers said. Letter delivery, they added, is sometimes delayed for months.

Moreover, lawyers said, interrogators have "manipulated" clients by saying that detainees with lawyers will not be released and that the lawyers cannot be trusted.

Joshua Colangelo-Bryan, who represents six Bahraini detainees, said interrogators had told his clients that he is a liar, and that the military knows everything they say to him.

And in an April court filing, a lawyer, Tom Wilner, told a judge that two Kuwaiti clients told him that interrogators had warned them that he was Jewish.

"How could you trust Jews? Throughout history, Jews have betrayed Muslims. Don't you think that your lawyers, who are Jews, will betray you?" the complaint quoted one interrogator as saying. "Don't ever believe that a Jew will help a Muslim unless he gets more out of it than he gives. . . . What will other Arabs and Muslims think of you Kuwaitis when they know the only help you can get is from Jews?"

A military spokesman, Lieutenant Commander Alvin Plexico, denied the attorneys' accusations, saying that the Defense Department does not permit interrogators or guards to interfere in the relationship between detainees and their lawyers.

"The facts simply do not support their concerns," Plexico said. "We are not trying to undermine the relationships between detainees and counsel. To the contrary, the Defense Department has made extraordinary efforts to accommodate the detainees' access to counsel."

The dean of the Yale Law School, Harold Koh, who represented Haitian refugees detained at Guantanamo a decade ago, said he was not surprised to learn that relations between the detainees and their lawyers were fraying. Koh cited the cultural divide that prevents them from understanding how slowly courts can move under the best of circumstances.

And, Koh added, the Guantanamo dispute was the worst of circumstances. In an analogy also cited by several of the detainees' lawyers, he said the government's resistance to complying with the full spirit of the Supreme Court's 2004 decision is like Southern school districts who resisted desegregating for years after the court's 1954 Brown v. Board of Education decision.

"This is similar to the post-Brown era, when implementation of the court's ruling is left to people who are resistant," Koh said. "It's a familiar problem in the law, particularly with regard to individual rights decisions. . . . At the end of the day, we have to have trial judges willing to say that 'the court's ruling is a ruling and you have to follow it.' "

Rivkin rejected the comparison to Southern resistance to desegregation, saying the administration is following the law. He called complaints by the detainees lawyers "self-righteous" and "naive," and said it is appropriate for the government to be aggressive in fighting Guantanamo litigation.

GUANTANAMO DETAINEES FIND FAULT WITH LAWYERSINMATE FRUSTRATION BREEDS MI

"Within the rules, you do things that fit your interests and you don't make things easier for the other guy," Rivkin said.

**LOAD-DATE:** August 10, 2005

# EXHIBIT Q

# LegalTimes.com

Select 'Print' in your browser menu to print this document.

**©2006 Legal Times Online**
Page printed from: http://www.legaltimes.com

Back to Article

---

## Pentagon Suspects Lawyer Involvement in Deaths

Emma Schwartz

07-17-2006

Pentagon officials and attorneys for the 450 foreign detainees held at Guantánamo Bay have always been at odds with each other, but since three prisoners committed suicide last month, the chasm between the two has only grown wider.

Earlier this month investigators probing the suicides disclosed they had seized 1,100 pounds of attorney-client-privilege material — all of the legal documents in the possession of detainees being held as enemy combatants. The move was part of an investigation into whether outsiders, possibly lawyers, were involved in a larger suicide plot.

Government investigators say notes found during their search indicated that detainees "had developed practices for misusing the existence of a privileged attorney-client communication system," which raised questions of "whether a coordinated plan existed for suicides involving the encouragement, assistance or direction of other detainees or individuals," according to a July 7 filing in the U.S. District Court for the District of Columbia. Now the government wants to create a special "filter team" of Pentagon officials and translators to scour thousands of privileged records for any sign of foul play.

Although the Justice Department's brief doesn't say lawyers were knowingly involved in passing information between detainees, public statements by government officials have pointed the finger at the prisoners' counsel. "We find it curious that habeas attorneys may have been involved in the deaths," says Jeffrey Gordon, a Defense Department spokesman.

The seizure of such a broad swath of attorney-client material and the implication that outside lawyers may have played a role in the suicides have evoked a backlash within the legal community and put defense attorneys and government officials on a collision course over the next steps in the contested detention of the Guantánamo prisoners. Defense attorneys fear the seizure will create an irreparable chill in attorney-client relations, which have been strained from the start. The **American Bar Association** excoriated the seizure in a July 11 letter to Senate Judiciary Committee Chairman Arlen Specter (R-Pa.) and called for a further probe. The letter was the latest in a series of complaints by defense attorneys over how the military has blocked their access to their clients.

"The military is at war with the lawyers because, at the end of the day, the military does not accept that the lawyers have a legitimate role to play," says David Remes, a **Covington & Burling** partner who represents 17 Yemeni prisoners. "They think our mission is directly at odds with their mission. Our access to our clients makes it impossible for the military to control the narrative."

Attorney-client privilege has long been a contested topic between defense attorneys and prosecutors, particularly in white-collar criminal cases. But the division over the material seized at Guantánamo Bay goes to the heart of a deeper issue — namely, how both sides view the suicides. To the military, they were an act of "asymmetrical warfare," as base administrator Rear Adm. Harry Harris put it, intended to hurt the credibility of the United States. For the detainees' attorneys, more than a dozen of whom were interviewed for this article, the deaths were acts of desperation, and the government's reaction has been just the most recent incident in a long-standing battle between lawyers and military officials over the very legitimacy of the lawyers' task of defending their clients.

### STRAINED RELATIONS

It took nearly three years after the first prisoners were sent to the Cuba naval base for the detainees to win the

right to challenge their captivity in the U.S. court system with the 2004 Supreme Court decision in *Rasul v. Bush*.

That effort has not been smooth. The lawyers' first challenge was negotiating a system to meet with their clients while still protecting the classified nature of much of their work. Government officials initially asked to monitor all conversations and communications between lawyers and prisoners — a position Judge Coileen Kollar-Kotelly of the U.S. District Court for the District of Columbia struck down in a 2004 opinion. Instead the two sides entered into a painstakingly negotiated protective order that created an elaborate system of requirements for visits, information sharing, and communication.

Although roughly 115 detainees have met with counsel, according to a figure cited in a February filing by the government, a number of attorneys offer examples of the difficulties they have had in meeting with their clients once on base. Some attorneys say guards have often told them their clients do not want to see them, but when they send a formal letter to their clients, the clients eventually agree to a meeting and say they were never told that they were going to meet their lawyers.

Lawyers say they also have been hampered by the way the privilege team — a separate government group tasked with examining all communications with clients for classified material — reviews their notes. In a February court filing with Kollar-Kotelly, attorneys for 12 detainees say the team has "undermined counsel's effectiveness." (The judge has yet to rule.) According to the detainees' filing, the privilege team has often wholly refused to release documents that attorneys believe should be public.

For instance, the team would not declassify a letter from a client of former Covington & Burling attorney Mark Falkoff because it asked the lawyer to "tell the world" about the torture the client had claimed to have suffered and because the letter included poems with lines like "My Dear Love" and "Dearest, Forgive Me." The team also

| RELATED STORIES |
| --- |
| • **Senate to Hold Hearings on *Hamdan* Ruling** *(July 10, 2006)* |
| • **Enemies in Court** *(July 10, 2006)* |
| • **Supreme Court Invalidates Gitmo Tribunals** *(June 29, 2006)* |
| • **High Court Skeptical of Detainee Law** *(March 28, 2006)* |
| • **Legal Elite Fight Bush on Detainees** *(March 27, 2006)* |
| • **Enemy Combatant Case at High Court** *(September 26, 2005)* |
| • **Hamdan v. Rumsfeld** *(U.S. Court of Appeals for the D.C. Circuit opinion)* |
| • **High Court Says No to Accused Terrorist** *(March 9, 2005)* |
| • **Military Commissions and the War on Terror** *(Package of stories)* |

refused to review medical records of weight loss that hospital officials had given to a prisoner represented by Kristine Huskey of **Shearman & Sterling**. After she resubmitted the materials for review, they were marked "unclassified."

More troublesome, attorneys say, are examples of intimidation. Attorneys claim their clients have been interrogated about lawyers' visits and told that their lawyers are Jewish or gay — characterizations intended to make prisoners suspicious of their counsel.

Clive Stafford-Smith, who represents numerous Guantánamo detainees and is the legal director for **Reprieve**, a British charity, says he believes he is a particular target. During an August 2005 visit, he says, a commander took him into a prison cell and accused him of violating the protective order. Stafford-Smith says the commander accused him of fomenting a hunger strike that dozens of detainees were participating in at the time. The commander told him that his client, Shaker Aamer, a detainee leading the strike, had told staff that Stafford-Smith had planned the strike with him, he says. "I was quite taken aback by this, and said that this was obviously nonsense," Stafford-Smith wrote to Guantánamo officials that day.

Joshua Colangelo-Bryan of **Dorsey & Whitney** says he came under similar suspicion when he discovered his client, Jumah Dossari, attempting to kill himself during a visit in October. He says a military lawyer told him that "people at Guantánamo had questioned whether I had given him the implement that he used to cut his arm open."

**THE INVESTIGATION**

Protests from the detainees continued. On May 18 two other detainees attempted to overdose on hoarded medication, which was the same day a band of prisoners attacked cell guards with makeshift weapons fashioned from fans and other material. Then, on June 9, three detainees — two Saudis and one Yemeni — were found dead in their cells.

The **Naval Criminal Investigative Service** was immediately called in. According to the July 7 government filing, handwritten notes were found on the detainees that appeared to be suicide notes, one of which was hidden in the

mesh wall of one of the deceased detainees' cells. That letter, the government claims, had been written on the back of a privileged attorney-client document and "appeared to be written by someone other than the detainee who died in the cell." Notes apparently written by two of the detainees who committed suicide were found in another detainee's cell. This finding prompted investigators to seize the privileged documents from prisoners.

The government claims in its brief that the material already reviewed is "in no way actual attorney-client communications, much less privileged communications." But it contends that the review has "the strong public policy interests in potentially saving lives and in maintaining security and order" at the base.

While detainees' lawyers say they do not object to a thorough probe of the three deaths, they are concerned about the authority the government had for expanding the search to nearly all detainees on the base, especially those in cellblocks far from the three who died. Moreover, only two of the detainees who killed themselves had counsel, and neither had ever met with his lawyer.

Attorneys uniformly say the seized evidence does not show that lawyers gave detainees anything barred by the court. The government brief cites material of "interest" that includes two attorney-client-privileged letters that were examined, one of which contained a "secret" stamp that had been crossed out and marked "unclassified" and another that was marked "for official use only." Attorneys are not inherently barred from sharing information in either of those categories with their clients.

These concerns over the government's evidence, attorneys say, make the government's proposal to create "filter teams" questionable. "Filter teams" are not unusual in the search of law offices during criminal investigations. Most recently, for instance, the Justice Department assigned one to comb through evidence seized from the office of Rep. William Jefferson (D-La.).

But such teams have come under scrutiny over their lack of impartiality in criminal cases targeting lawyers. At least three courts that have allowed similar filter teams have "opined, in retrospect, that the use of other methods of review would have been better," according to a 2002 opinion in the Lynne Stewart case.

Stewart, a radical criminal defense attorney, was convicted of conspiring to defraud the United States in connection with her representation of Sheikh Abdel Rahman, who is serving a life sentence for the 1995 bombing of the World Trade Center. In that case the judge assigned a special master, now the standard practice. The same method was used during the probe of Michael Abbell, a former Justice Department official targeted for his representation of Cali cocaine cartel members in the 1990s.

For now, the detainees' counsel are preparing to file a reply opposing the government's plan for reviewing the seized attorney-client documents. They hope to stop the review, but even if they are successful, some lawyers say it will be hard to rebuild their relationship with clients. "It is a potentially devastating blow to the very delicate situation that lawyers face down there, which is the challenge of gaining the trust and confidence of clients," says attorney Neal Sonnett, who has observed the military tribunals.

*Emma Schwartz can be contacted by **eschwartz@alm.com**.*