IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALI SHAH MOUSOVI, *et al.*, | |
| *Petitioners/Plaintiffs*, | |
| v. | Case No. 1:05-CV-1124 (RMC) |
| GEORGE W. BUSH, *et al.*, | ORAL ARGUMENT REQUESTED |
| *Respondents/Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF PETITIONER HAJI ROHULLAH WAKIL TO ALTER OR AMEND JUDGMENT TO REINSTATE AND STAY HIS PETITION UNTIL THE SUPREME COURT'S DECISIONS IN *BOUMEDIENE v. BUSH* AND *AL ODAH v. UNITED STATES*** 

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, petitioner Haji Rohullah Wakil respectfully moves for an Order: (1) vacating this Court's May 13, 2008, Memorandum Opinion & Order dismissing his *habeas corpus* claims on grounds of mootness; (2) reinstating his *habeas corpus* petition; and (3) staying his petition until the United States Supreme Court issues its decisions in *Boumediene v. Bush*, No. 06-1195, and *Al Odah v. United States*, No. 06-1196.

Haji Rohullah Wakil is being held in the Afghan National Defense Facility, which was financed by the United States and is staffed around the clock with United States military personnel, and at which the United States plays a significant role in decisions about the continued confinement or release of prisoners. He remains incarcerated on the basis of the very accusations and "evidence" that were raised against him at Guantánamo. United States authorities exercise continuing influence over his status.

Submitted with this motion is evidence that an order from this Court declaring Haji Rohullah Wakil's imprisonment at Guantánamo to have been unwarranted, and requiring Respondents to seek his release from the Afghan National Defense Facility, would have a direct and immediate real-world consequence – his release to freedom. The showing is more than sufficient to warrant discovery regarding mootness. Therefore, his *habeas* petition should be reinstated and stayed until the Supreme Court issues its decisions with respect to other jurisdictional issues affecting this case in *Boumediene* and *Al Odah*. Depending on the outcome of those cases, evidence relating to the mootness of this petition should be the subject of full discovery before the Court resolves the issue.

## I. FACTUAL BACKGROUND:
## HAJI ROHULLAH WAKIL AND ANDF AT PUL-E-CHARKHI PRISON

### A. Haji Rohullah Wakil

Petitioner Haji Rohullah Wakil (Rohullah) is an Afghan citizen who has been detained since August 2002, first at the U.S. Air Base in Bagram, Afghanistan, then at the United States Naval Base at Guantánamo Bay, Cuba. Recently, the United States transferred him to the Afghan National Defense Facility (ANDF), attached to Pul-e-Charkhi Prison in Afghanistan.

Prior to his arrest, Rohullah was a tribal leader in Konar Province. In 1990, his cousin, who was then governor of Konar, was assassinated by an organization under the leadership of Osama bin Laden that was a predecessor to al Qaida; Rohullah has opposed bin Laden and al Qaida since that time. *See* Transcript of Combatant Status Review Tribunal of Haji Rohullah Wakil, Ex. A at 6-7. As a leader of "Unity of Afghanistan" (UoA) and other organizations, Rohullah contributed to the reconstruction of Afghanistan, after the Soviet invasion and years of civil war, though the provision of

water and the building of clinics, mosques, and schools, including opening the Afghan University as a coeducational institution. *See id.* at 3-4.

Rohullah opposed the Taliban as brutal and corrupt. *See* Transcript of the 2005 Administrative Review Board of Haji Rohullah Wakil, Ex. B at 7. In 1998, the Taliban fired a rocket at Rohullah's house. Ex. A at 7. He lived in Pakistan during the Taliban's rule. Ex. B at 9. He participated in conferences in Cyprus in opposition to the Taliban and in support of a peaceful, good government in Afghanistan. Ex. B at 10, 13. UoA condemned the September 11th attacks and called for the arrest and trial of bin Laden. Ex. A at 6-7.

During the 2001 American invasion, Rohullah assisted British and American forces in planning and managing battles against the Taliban in Jalalabad and Tora Bora. *See* Ex. A at 4–5. He was a member of the Grand Assembly, or Loya Jirga, where he spoke against al Qaida and the Taliban, and against narcotics trade and trafficking. Ex. B at 14. He nominated Hamid Karzai for president. *Id.* He was a member of the Eastern Assembly and the Northern Alliance. *Id.* at 10, 13. When President Karzai established a new government, Rohullah returned to Afghanistan and represented his province in a pro-government, regional parliamentary proceeding. *Id.* at 14. He worked with British representatives in eradicating the poppy crop in 2002. Ex. A at 5-6. He was arrested in August 2002 by U.S. forces after meeting with several American representatives and inviting them to dinner at his home. *Id.* at 5, 10.

Rohullah has never fought, fired or carried a weapon, or acted as a combatant in any sense. Ex. A at 8, 9-10. He is a political and tribal leader who opposes al Qaida and the Taliban, supports the American coalition and the current government of Afghanistan,

3

and nominated and supports President Karzai. If released, he will serve as a representative of his people in the Karzai government he helped build. Ex. B at 16. Rohullah has been imprisoned for nearly six years.

**B.    ANDF at Pul-e-Charkhi Prison**

Pul-e-Charkhi is a large prison east of Kabul that was completed during the communist rule of Afghanistan between 1979 and 1988. When the Taliban came to power, they continued to hold prisoners there, and it remains in use today.

In 2007, Respondents and the Afghan government completed remodeling of a wing of the prison as ANDF, a new high-security facility. *See* C. Rondeaux, J. White, and J. Tate, "Afghan Detainees Sent Home to Face Closed-Door Trials," *Washington Post* (April 13, 2008), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/04/12/ AR2008041202308_pf.html, Ex. C; Declaration of Col. Anthony Zabek, Ex. D ¶ 2; Press Briefing by Dana Perino (June 22, 2007), *available at* http://www.whitehouse.gov/news/ releases/2007/06/20070622-4.html, Ex. E at 10; United States authorities trained the Afghan military personnel who operate ANDF, and even today, United States advisors are present at ANDF at all times. Ex. D ¶ 3; T. Golden, "Foiling U.S. Plan, Prison Expands in Afghanistan," *New York Times* (January 7, 2008), *available at* http://www.nytimes.com/2008/01/07/world/asia/ 07bagram.html?emc=eta1_&pagewanted=print, Ex. F.

The United States created ANDF as a place to which it could transfer Afghan prisoners from Guantánamo and the United States detention facility at Bagram Air Base (Bagram). *See* Ex. E at 9-10 ("The President gave a firm decision two years ago in which he said, I want [the Guantánamo detention facility] closed . . . that the United States

4

should not be the world's jailers. . . . As you can imagine, many of the detainees we have in Guantánamo Bay are from Afghanistan, and we'd like for them to be able to go back to be held securely [in Afghanistan]."); Ex. D ¶ 4. Its actions came in the wake of growing international diplomatic pressure, as well as domestic legal and political pressure, to reduce the number of prisoners at Guantánamo.

The United States conditions the transfers of Guantánamo prisoners to Afghanistan on that country's willingness to cooperate in ensuring that the prisoners "will not pose a continued threat to the United States and its allies." Ex. D ¶ 4; Ex. E at 8 ("[W]e are figuring out a way to repatriate these individuals, so they can go back to their countries in a way that we can make sure that they're going to be held, and not a threat to anybody else").[1] Respondents' intention, then, is that ANDF serve as a facility for continuing to hold certain former Guantánamo prisoners indefinitely.

As described in the attached affidavit of Jonathan Horowitz, an American human rights investigator who holds a master's degree in international human rights law, United States influence over former Guantanamo detainees' fate continues while they remain in custody at ANDF. United States authorities largely control what the Afghan authorities know about a prisoner and what evidence they can present against him, helped design the

---

[1] *See also*, Prepared Remarks of Att'y Gen. Alberto R. Gonzales at the United States Coast Guard Academy (Sept. 6, 2007), *available at* http://www.usdoj.gov/archive/ag/speeches/2007/ag_speech_070906.html, Ex. G at 4 ("[W]e have released alien enemy combatants to their home countries where those nations have agreed that they will prevent such individuals from returning to combat"). Respondents reportedly obtain assurances before they transfer a Guantánamo prisoner back to his home country that the receiving government will continue to hold the prisoner if the United States wishes. *See* "Gates: U.S. 'Stuck in Guantamamo'", CNN.com (May 20, 2008), *available at* http://www.cnn.com/2008/US/05/20/gates.Guantánamo/index.html?eref=rss_topstories ("Gates said . . . there are about 70 detainees ready for release whose home governments either will not accept them or may free them after they return"), Ex. H at 1.

ANDF review process that is afforded to some prisoners, and strongly influence who has such a review and what its result is.

First, the accusations and the evidence against former Guantanamo prisoners at Pul-e-Charkhi come from United States authorities. United States authorities forward files about prisoners to the Afghan government around the time the subject prisoners are transferred to ANDF. Declaration of Jonathan Horowitz, Ex. I ¶ 30. Mr. Horowitz examined some of these files, and found that they contained reports of interrogations at Guantánamo of unnamed prisoners and, in some cases, a generic photo of a weapon like the one the prisoner is accused of having carried. *Id.* ¶¶ 33, 44. Also included were reports of the prisoner's own statements, some details of the accusations, and identifying information, including a photo of the prisoner. *Id.* ¶ 32. There were also markers in the files for physical evidence, polygraph results, and exhibits, although "many ... categories are marked 'None'. . . ." *Id.* ¶¶ 32, 43.

These transferred United States accusations and "evidence" become the primary basis for the Pul-e-Charkhi reviews, described below, that some prisoners receive. *Id.* ¶¶ 9, 36-39. Sometimes United States authorities also recommend which offenses under Afghan law should be alleged against a prisoner in a Pul-e-Charkhi review. *Id.* ¶¶ 40-41.

Transferred United States "evidence" becomes the primary basis of such proceedings: an Afghan prosecutor reportedly said that the independent investigation – if any – conducted by his office prior to a prisoner's review is based only on the transferred United States accusations; no independently discovered defense or evidence is sought or considered. *Id.* ¶¶ 36-39. Frequently, however, the evidence forwarded by the United States and subsequently utilized by the prosecutor and the judges is incomplete, with

6

exculpatory material removed, or the United States provides inaccurate translations. *Id.* ¶¶ 48-49, 45. In particular, exculpatory evidence necessarily known to Respondents because it was submitted directly to them in connection with annual reviews at Guantanamo or in court proceedings to which they are parties, is not included in the transferred prisoner files. *Id.* ¶ 41.

The review process itself, for the prisoners who receive it, is highly reminiscent of the Combatant Status Review Tribunals (CSRTs) held at Guantánamo. Although the three judges are Afghan, the accusations originally raised at Guantánamo are presented; great reliance is placed on anonymous, hearsay "evidence" contained in the files transferred from United States authorities; the defendant cannot present evidence; and the proceedings take place with little notice to the defendant and are very brief. *Id.* ¶¶ 9, 24. The United States was deeply involved in designing these procedures. *Id.* ¶¶ 15-26.

In addition to providing the accusations and most if not all of the "evidence," United States authorities exert influence over the outcome of individual CSRT-style reviews through the deference they command. Prosecutors and, more importantly, judges participating in the reviews at Pul-e-Charkhi accept as true accusations made by United States authorities, whether substantiated or not, and often consider the fact of prior confinement at Guantanamo to be, in itself, evidence of guilt and dangerousness. One judge reportedly stated,

> The evidence [about the prisoners under review] is based on information we get from Coalition Forces. And we are sure that people who were arrested are arrested for something they did wrong, and the U.S. is not lying.

*Id.* ¶ 43. In one case, Afghan National Security Directorate investigators found no evidence against a prisoner, but the reviewing judges at Pul-e-Charkei convicted and

7

sentenced him anyway because of his United States file. *Id.* ¶ 46. For a such prisoner, his offense is that he had been detained at Guantánamo. *Id.* ¶ 47. Following the reviews, some prisoners are released, while others have received sentences of up to twenty years. *Id.* ¶¶ 9, 25.

Moreover, United States authorities have been observed participating in ways large and small in the review proceedings as well as the overall operation of the facility. On one occasion, a United States official negotiated a compromise between the prosecutor and defense counsel on the scheduling of a CSRT-style review. *Id.* ¶ 52. Access to ANDF for certain visitors is sometimes controlled by the United States. *Id.* An Afghan official reportedly described "U.S. pressure" at "higher levels of the National Security Council and NDS [National Directorate of Security]." *Id.*

Certain prisoners have been reviewed by the recently appointed Block D Presidential Review Committee rather than by a CSRT-style panel. *Id.* ¶ 27. The Committee has recommended that some prisoners be granted amnesty, and, on information and belief, most – but not all – of these prisoners have been released. It appears, however, that a substantial percentage of files are being withheld from the Committee's review. *Id.* What role the United States plays in deciding which files the Committee may review, or which recommended prisoners are actually released, are matters that also merit discovery.

ANDF is, then, a new Guantánamo, erected on Afghan soil but with a ubiquitous United States presence and subject to active, ongoing United States influence. The United States paid for ANDF, participated in establishing the procedures that govern its legal assessments of returning prisoners, and remains on site at all times. ANDF's

8

inmates are held on the basis of accusations originating with Respondents and "evidence" supplied by Respondents, the accuracy of which is often relied upon without question because the United States continues to stand behind it. On information and belief, the United States also exerts direct influence over decisions about the sentencing or release of some individual prisoners.

C.   **Rohullah's Transfer to ANDF**

On May 1, 2008, Respondents notified this Court that they had transferred Rohullah to the control of the Government of Afghanistan. What they failed to mention was that they had transferred him to ANDF, where he remains. On information and belief, he has not had a CSRT-style review, and the Block D Presidential Review Committee has not reviewed his file. He faces potentially indefinite detention. Respondents' Notice of Transfer did not seek to lift the stay of this case, nor did Respondents file a motion to dismiss Rohullah's petition.

## II. ARGUMENT: DISCOVERY ON MOOTNESS IS REQUIRED BEFORE THE COURT RULES ON THE ISSUE

A.   **Procedural Standards Governing Motions Under Federal Rule of Civil Procedure 59(e)**

Under Rule 59(e) of the Federal Rules of Civil Procedure, a motion to alter or amend a judgment must satisfy four threshold requirements, all of which are met here. First, the motion must be filed, as this is, no later than ten days after entry of the judgment at issue. Second, the motion must involve "reconsideration of matters properly encompassed in a decision on the merits." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989) (internal citation omitted). This motion addresses a core issue going to the merits of the case: whether the action is moot. Third, the motion must be based on new

9

facts or theories. *West v. Spellings*, 539 F. Supp. 2d 55, 58 (D.D.C. 2008) (Collyer, J.) (internal citation omitted) ("A Rule 59(e) motion is not simply an opportunity to reargue facts and theories upon which a court has already ruled."). This motion is based on new information about which the Court had not been informed, and had no reason to know, when it issued its *sua sponte* dismissal. Finally, the motion must be based on matters that could not have been presented earlier, *id.* (*citing Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993)), or reflect a "need to correct a clear error or prevent manifest injustice." *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). Here, because this case has long been stayed pending the final decisions in *Boumediene* and *Al Odah*, counsel has had no opportunity to present this new information, and amendment of the judgment is necessary to prevent injustice.

Where these requirements are satisfied, a district court has "considerable discretion" in deciding a Rule 59(e) motion. *Brown v. Wachovia Bank*, 244 F.R.D. 16, 19 (D.D.C. 2007) (Collyer, J.). Given that there are serious open factual questions about mootness and that Rohullah's freedom and right to *habeas* relief are at stake, the Court should exercise its discretion to amend the judgment and reinstate his petition pending the upcoming Supreme Court decisions.

**B.   This Petition Is Not Moot Because Rohullah May Remain In the Constructive Custody of the United States**

   ***1.   Respondents Cannot Moot this Case by Transferring Rohullah to a Surrogate***

Respondents have transferred immediate physical custody and control of Rohullah to the Afghan Ministry of Defense, but Respondents may retain constructive

10

custody over him. If so, his *habeas* petition is not moot. Rohullah's petition should not be dismissed until there has been full discovery on this issue.

The Supreme Court has long recognized that a prisoner can be "in custody" for the purposes of *habeas* jurisdiction even if the custody is constructive rather than direct. In *United States v. Jung Ah Lung*, the Supreme Court held that a prisoner was in custody "under or by color of the authority of the United States," 22 U.S.C. § 2241(c), where the master of a steamship detained the Chinese prisoner on board "by direction of the customs authorities of the port, under the provisions of the Chinese Restriction Act." 124 U.S. 621, 626 (1888). In *Braden v. 30th Judicial Circuit Court of Kentucky*, the Court found constructive custody where "the State holding the prisoner in immediate confinement act[ed] as agent for the demanding state" and was "indifferent to the resolution of prisoner's attack" on the detaining authority. 410 U.S. 484, 498–99 (1973). Here, there are serious questions about the extent of Respondents' involvement and constructive control over the indefinite detention of Rohullah at ANDF.

The Supreme Court has also held that "Federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in Federal courts of the protection of their rights in those tribunals." *Alabama Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906); *see also United States v. United Mine Workers*, 330 U.S. 258, 293 (1947); *United States v. Belbacha*, 520, F.3d 452, 455-56 D.C.Cir. 2008). Federal courts have interpreted this to mean that United States officials may not avoid judicial review of their conduct by cooperating with foreign governments to deprive individuals of their rights. *See, e.g., United States v. Yousef*, 327 F.3d 56, 145–46 (2d Cir. 2003), *cert. denied*, 540 U.S. 933 (2003); *United States v. Maturo*, 982 F.2d 57,

11

60-61 (2d Cir. 1992), *cert. denied sub nom. Pontillo v. United States*, 508 U.S. 980 (1993); *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984), *cert. denied sub nom. Carter v. United States*, 469 U.S. 1217 (1985); *see also Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 68 (D.D.C. 2004); *and Johnson v. Eisentrager*, 339 U.S. 763, 795 (1950) (Black, J., dissenting) ("The Court is fashioning wholly indefensible doctrine if it permits the executive branch, in deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive's illegal incarcerations.").

Here, if the Supreme Court decides in *Boumediene* and *Al Odah* that Guantánamo detainees have the right to *habeas corpus*, the transfer of Rohullah to ANDF for further indefinite detention would constitute an impermissible attempt to deprive Rohullah of that right and to defeat this Court's jurisdiction over a pending *habeas* petition. The Court should therefore reinstate and stay Rohullah's petition until the Supreme Court issues its decisions in *Boumediene* and *Al Odah*.

### 2. *In Other Pul-e-Charkhi and Related Cases, Other Judges Of This Court Have Denied Dismissal or Ordered Discovery*

At least two other judges of this Court have denied motions to dismiss *habeas* petitions brought on behalf of prisoners held at Pul-e-Charkhi Prison. In the case of a *habeas* petitioner transferred to the ANDF wing of the prison from Bagram, a case nearly on all fours with the instant one, Judge Kessler of this Court denied the government's motion to dismiss and stayed the petition pending the Supreme Court's decisions in *Boumediene* and *al Odah*. *See* Order, *Ruzatullah v. Gates*, No. 06-1707 (D.D.C. September 13, 2007), Ex. J; and Petitioner Ruzatullah's Opposition to Respondents' Supplemental Motion to Dismiss at 2-7 ("Facts"), *Ruzatullah v. Gates*, No. 06-1707

12

(D.D.C. August 1, 2007), Ex. K. *See also, Maqaleh v. Gates*, 2007 WL 2059128 (D.D.C. July 18, 2007) (Bates, J.) (motion to dismiss as moot the *habeas* petition of a prisoner held at Bagram denied without prejudice pending the Supreme Court's decisions in *Boumediene* and *Al Odah*).

In the case of an American being held at Pul-e-Charkhi (but not in the ANDF wing) following a proceeding in an Afghan court, Judge Sullivan of this Court denied a motion to dismiss the petition and instead ordered the government to respond to the petitioner's factual allegations that the United States had, among other things, ordered the petitioner's arrest and "either directly or indirectly" ordered Afghan judges not to release him. *Idema v. Rice*, 478 F. Supp.2d 47, 52-53 (D.D.C. 2007). Judge Sullivan dismissed as moot the petitions of other petitioners who were no longer incarcerated. *Id.* at 51-52.

Further, in a case involving an American citizen held in Saudi Arabia, Judge Bates of this Court held that the *habeas* petitioner was entitled to discovery on jurisdictional facts where he alleged that the United States was "responsible for significant restraints on the petitioner's liberty" even though it was working "through the intermediary of a foreign ally." *Abu Ali*, 350 F. Supp. 2d at 48, 49. The petitioner had been arrested and imprisoned by the Saudi police while studying in Saudi Arabia. *Id.* at 38. He alleged that he was detained at the behest of the United States, that his Saudi captors were disinterested intermediaries who had been enlisted by the United States, that the United States favored this form of detention in order to elude judicial scrutiny, and, that if the United States requested his release, the Saudis would release him. *Id.* The Court added, "the presence of a formal relationship between the countries that governs the detention . . . may bear on the jurisdictional question." *Id.* at 68 n.42. The Court did

13

not consider the list of relevant factors comprehensive, *id.*, and suggested that constructive custody was possible even if not all factors were present. *Id.* at 68. The Court held that the allegations, if true, would be sufficient to support *habeas* jurisdiction under the doctrine of constructive custody. *Id.* at 50, 69. It accordingly denied the motion to dismiss and ordered discovery on evidence going to the validity of the custodial assertions. *Id.* at 69.

### 3. *The Evidence of Constructive Custody Requires Further Discovery*

The affidavits and exhibits submitted with this motion constitute evidence that Rohullah, who was arrested by United States forces, is being held "by direction" of Respondents, *see Jung Ah Lung*, 124 U.S. at 626, and that the Afghan authorities are acting "as agent[s] for" Respondents. *See Braden*, 410 U.S. at 498. Rohullah was initially arrested by the United States and imprisoned at Guantánamo for years. The United States then transferred him, subject to agreements with the Islamic Republic of Afghanistan that are not publicly available, to a place where United States officials provide constant guidance and appear to exert considerable control. He is being held in a place that shields his detention from public scrutiny and, if Respondents were to prevail here, removes his detention from all judicial scrutiny in the United States as well. There are "significant restraints on the petitioner['s] liberty." *See Abu Ali*, 350 F. Supp. 2d at 48- 49, 68. Moreover, were Respondents directed to request Rohullah's release because the evidence used to detain him at Guantánamo had been found to be unreliable and factually and legally deficient, Rohullah would very likely be released from ANDF. Accordingly, there is evidence that Respondents hold Rohullah in constructive custody,

14

Case 1:05-cv-01124-UNA   Document 82-2   Filed 05/30/2008   Page 15 of 17

Cleared by the CSO for Public Filing

...

and he is entitled to full discovery on this issue before the Court decides the mootness of his petition.

### C. The Case Is Not Moot Because Petitioner Rohullah May Continue to Suffer Collateral Consequences from His Detention by Respondents

#### 1. *This Case is Not Moot as Long as Rohullah Suffers the Collateral Consequences of His Challenged Detention*

*Habeas* jurisdiction may also survive transfer or even release in cases, like this one, where the petitioner is subject to continuing collateral consequences because of the challenged detention. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (no mootness where the petitioner is suffering, or threatened with, an 'actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision,'" *quoting Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)); *Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968). Collateral consequences can include continued incarceration that, although different from the challenged imprisonment, results from and is attributable to it. *Fiswick v. United States*, 329 U.S. 211, 221-223 (1946) (an increase in a subsequent sentence as a result of a recidivist law applicable because of the challenged prior conviction is a collateral consequence that prevents a *habeas* petition from being moot).

In *Carafas*, the Supreme Court considered the *habeas* petition of a man who, since originally filing his petition, had completed his sentence and been released from custody. *Id.* at 236. The respondent argued that the release rendered the case moot. *Id.* at 237. The Court held that, despite the release, the case was not moot because the petitioner continued to suffer "collateral consequences" from his conviction: "he cannot engage in certain businesses, he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he

15

cannot serve as a juror." *Id.* In *Spencer*, where the Court found mootness, it was not because the petitioner was no longer in custody, but because the consequences he feared were speculative, unlikely ever to occur. *Spencer*, 523 U.S. at 14-16. Here, the collateral consequence of Rohullah's detention at Guantánamo – his indefinite detention at ANDF – is real, substantial, and ongoing.

### 2. *The Evidence of Collateral Consequences Requires Further Discovery*

The continued detention of Rohullah at ANDF is a direct consequence of his detention by Respondents at Guantánamo and Respondents' determination that he is and remains an enemy combatant. The collateral consequences of Rohullah's Guantánamo imprisonment are more grave and direct than those in *Carafas*: Rohullah continues to suffer the loss of his freedom as a direct result of Respondents' challenged actions at Guantánamo.[2] The Court should not consider mootness until Rohullah has had an opportunity for full discovery on the issue of collateral consequences.

### D. The Court Retains the Power to Order Effective Relief If Rohullah Is in Constructive U.S. Custody or Is Suffering Collateral Consequences

This Court can fashion remedies that would end Respondents' continuing constructive custody of Rohullah and the collateral consequences flowing from their detention of him at Guantánamo: the Court could order Respondents to reverse their designation of Rohullah as an "enemy combatant" and to make a formal request that the Afghan authorities release him. *Cf. Carafas*, 391 U.S. at 239 ("[T]he [*habeas*] statute

---

[2] In these respects Rohullah differs from the Uighur petitioners in *Qassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006) (per curiam). In *Qassim*, the D.C. Circuit held that the Uighurs' petition for *habeas* relief was moot because they had been released to Albania. *Id.* at 1078. The court made clear, however, that the distinction between release and transfer of custody guided its decision. *Id.* Further, unlike Rohullah, the Uighurs' "enemy combatant" label was lifted prior to their release. *Quassim v. Bush*, 382 F. Supp. 2d 126, 127 (D.D.C. 2005), *appeal dismissed as moot*, 466 F.3d 1073.

16

does not limit the relief that may be granted to discharge of the applicant from [respondents'] physical custody. Its mandate is broad with respect to the relief that may be granted."). As long as the petitioner asserts a wrong that is "likely to be redressed by a favorable judicial decision," his claim is not moot. *Spencer*, 523 U.S. at 7, *quoting Lewis*, 494 U.S. at 477.

## CONCLUSION

For the reasons set forth above, petitioner Haji Rohullah Wakil respectfully requests that this Court: (1) vacate its May 13, 2008 Order as it relates to him; (2) reinstate his *habeas corpus* petition; and (3) direct that his petition be stayed until the Supreme Court issues its decisions in *Boumediene v. Bush*, No. 06-1195, and *Al Odah v. United States*, No. 06-1196.

Respectfully submitted,

DECHERT LLP
*Counsel for Petitioners*

Dated: May 28, 2008

/s/ George G. Gordon

George G. Gordon
Peter M. Ryan
Brian Decker
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-4000 (Tel.)

Rebecca P. Dick
D.C. Bar No. 463197
1775 I Street, N.W.
Washington, D.C.  20006
(202) 261-3300 (Tel.)
(202) 261-3333 (Fax)

Daniel C. Malone
30 Rockefeller Plaza
New York, NY  10112
(212) 698-3500 (Tel.)

17