Cleared by the CSO for Public Filing

# Exhibit E

Cleared by the CSO for Public Filing



**THE WHITE HOUSE**
PRESIDENT GEORGE W. BUSH

Home > News & Policies > Press Secretary Briefings

For Immediate Release
Office of the Press Secretary
June 22, 2007

## Press Briefing by Dana Perino
White House Conference Center Briefing Room

1:26 P.M. EDT

MS. PERINO: Happy Friday. One quick announcement. Today the governor of Wyoming appointed John Barrasso to fill the vacancy caused by the unfortunate death of U.S. Senator Craig Thomas. The President looks forward to working with Mr. Barrasso as he begins his work on behalf of our nation and the people of Wyoming. I should say Senator Barrasso. If there is more to update on that later, we'll get it to you.

Q Does the President think that the Information Security Oversight Office should be abolished?

MS. PERINO: No, and I don't think that anyone has suggested that. I went back and I looked at this EO -- I don't know if anyone else had a chance to actually read it. I think one thing is clear: first of all, it's the President of the United States who is the author of the EO, and is the sole enforcer of the EO, the executive order on classified materials. And it's clear from the reading of it, the Vice President is not treated separately from the President in the EO. Agencies are treated separately, for just the small section on this ISOO provision. Everything else does apply, except for that one section, for the Vice President.

Q Including the reporting provision?

MS. PERINO: Correct.

Q So that -- he is exempt from reporting? You support --

MS. PERINO: If you look at the EO, the President, in the performance of executive duties, and the Vice President are treated separately from agencies. The President did not intend -- I went back and looked into this -- the President did not intend for the Vice President to be treated separately from how he would treat himself. Agencies are to report to ISOO, and they do. I don't think there's any suggestion that no one else is complying. The Vice President was not intended to be separate from the President in this regard.

Q But part of the rationale the Vice President's office gave is that as President of the Senate, he's part of the legislative branch, almost distancing himself from the executive branch.

MS. PERINO: I saw those reports yesterday, as well, and I think that while that's an interesting constitutional discussion about the separation of powers and different branches, between executive

Created by the CIA for Public Filing

branch and legislative branch, and different functions, under the role -- as his unique role as the Vice President of the United States. The point of Chairman Waxman's letter yesterday regarded this small portion of an executive order of which the President is the sole enforcer, and of which he did not intend for the President [sic] to be treated separately from himself.

Q I'm a little confused here. Is the President's office and the Vice President's office, are they handling this the same way? In other words, Waxman was asserting that the Vice President's office was saying, we don't want to be inspected to make sure that we are following the procedures laid out in this EO. Is the President -- does he feel the same way?

MS. PERINO: The President and the Vice President are complying with all the rules and regulations regarding the handling of classified material and making sure that it is safeguarded and protected.

What is different is, regarding that small section of this ISOO office, that they are not subject to those -- they are subordinate to the sole enforcer of the EO, which is the President of the United States, and they are not subject to such investigation -- as I understand it, as I read the EO and as I had preliminary discussions in between the gaggle and today.

Q Well, then why did the Vice President not have any issue with this in 2001, 2002?

MS. PERINO: That I don't know. All I know is what I have here, which is the executive order that was released in 2002, I think, did not intend to treat the Vice President any differently than he would treat the President.

Q So what are you saying? That he --

Q Yes, Dana, what are you saying? So the President supports the Vice President saying that he doesn't want these inspections?

MS. PERINO: I don't think that he -- it's not a matter of wanting, it's a matter of who's subject to them. And I think that it's important to remember, the Vice President, his office yesterday said that they are in full compliance with all laws regarding classified materials, as is this President, and the President expects that of everyone here at the White House and of all the agencies across the executive branch that handle classified information.

Q Then why isn't it public?

Q So is he supporting -- so he's supporting what the Vice President is doing, by saying he's not part of the executive branch --

MS. PERINO: If you go back and you read the EO, it's -- the President's intention was never to separate the Vice President out from himself. The President, as the sole enforcer of the EO, is instructing agencies on how to handle classified material on a range of issues. The issue that we're talking about yesterday -- that Chairman Waxman was talking about in his letter yesterday is a very narrow one.

Q But the people at the National Archives say that they are meeting with resistance from the Vice President's office, and only the Vice President's office, not from the White House, not from the Office of the President.

MS. PERINO: That's what I just said, I don't think that there's any -- I don't think there's been any complaint about compliance, except for, in this regards, to the Vice President's office. And as I just said, the President's intention was not to have him separate. If you read that, that's clear in the EO. In the EO, as well, the ISOO does have the capability to go to the Department of Justice and ask for an opinion, of which they have done.

Q They did that in January and still haven't heard anything.

MS. PERINO: You'll have to put that question to the Department of Justice.

Q So that they have to apply to the President for any documents that the Vice President has charge of.

MS. PERINO: All of the -- all of the President -- all of the President's documents and all the Vice President's documents are safeguarded, they are held, they are held in the Archives as part of the Presidential Records Act. And all of those rules and regulations are followed.

This small section regarding just the reporting requirements to the group that -- the ISOO that's out of the National Archives is different.

Q Why? He's a public servant, paid by us. He's accountable.

MS. PERINO: And all the laws and regulations regarding classified materials are being complied with. And that's what you, as a taxpayer, should expect.

Q How do we know that?

MS. PERINO: Because I think that if there weren't, there are other ways for people to challenge and find out.

Q Dana, what do you make of what Congressman Waxman referred to as "absurd," which was the Vice President's contention that his office is not part of the executive branch?

MS. PERINO: As I said, I think that that is an interesting constitutional question that people can debate. What I think is absurd is --

Q But do you agree with his contention?

MS. PERINO: -- it's -- I think what was heard is Chairman Waxman --

Q Hang on a second, do you agree with the --

MS. PERINO: -- asserting -- I think what's absurd is Chairman Waxman asserting --

Q Hang on a second. Do you think with --

MS. PERINO: I think what is absurd is Chairman Waxman asserting some sort of authority over the President regarding an executive order, of which he is the sole enforcer.

Q Do you agree with the contention that the Office of the Vice President is not part of the

Cleared by the CSO for Public Filing

executive branch?

MS. PERINO: What I know -- and I am not a lawyer; and this is an interesting constitutional question that legal scholars can debate and I'm sure you'll find plenty of them inside the beltway -- is that the Vice President has a unique role in our United States government. He is not only the Vice President of the United States, but in that role he is also the President of the Senate. I will let him go ahead and —

Q So there's a fourth branch of government.

MS. PERINO: -- I will let that debate be held. But what I'm answering questions on in regard to this morning was Chairman Waxman's accusations about this small provision, going back and reading the EO and realizing that the President did not intend to have the Vice President treated any differently than himself; and remembering that the executive order is enforced solely by the President of the United States. I think this is a little bit of a non-issue.

Q But, Dana, the director of the Information Security Oversight Office, in his letter to the Attorney General, says that the Vice President's office did initially comply in 2001 and 2002, and then stopped complying. They view that the Vice President's office should be participating and is not, and further suggest that the response from Counsel to the Vice President was to eliminate the role of this office in handling and supervising how these classified documents are dealt with.

MS. PERINO: I am not disputing that there is a dispute in regards to how this executive order should be -- who should comply with the executive order in regards to ISOO's questions about the Vice President's office. They have the right to seek a clarification from the Department of Justice, of which they've asked for. That has nothing to do with the President or our office, in terms of the timing of when that's released. I'll ask you to take that to the Department of Justice; I haven't talked to them about that today.

Q Does the President think the Vice President is too secretive?

MS. PERINO: I think the President thinks that the Vice President is a great representor of the United States and that he complies with all the laws regarding secret documents, classified documents, and that he's someone who truly believes in the institution of the presidency and in keeping that intact.

Q Does the President think that the Vice President -- does he agree with the Vice President's handling of this matter?

MS. PERINO: I don't see any reason not to agree with it, especially --

Q So that's a yes?

MS. PERINO: -- when you read the plain face of the EO.

Q So he's not going to tell him --

Q And he's not concerned at all that there's too much secrecy; that he complied with it before; or why he wouldn't want to do the same thing he was doing before?

Created by the GPO for Public Filing

MS. PERINO: I think that what the President wants to make sure of is that all of the rules and regulations regarding classified materials are being followed, and he is assured that that is the case.

Q Even though it's still being looked at, and even though they're looking at this as an executive branch?

MS. PERINO: I don't think there's a question of the handling of the documents. I think there's a question of the reporting. In the handling of the documents, we are confident that we are in full compliance.

Q And does he have concerns about the reporting?

MS. PERINO: I didn't talk to him about that. I don't believe so. Especially since, as I just said in the EO, he's the sole enforcer of the EO, and he never intended for the Vice President to be treated separately from himself.

Alexis.

Q Dana, can I just clarify -- since he's the sole enforcer of this executive order, was the White House's Counsels Office knowledgeable about the letter trail, the dispute trail, when you consulted them today to ask about --

MS. PERINO: Well, as you know, I think that this letter trail goes back many years, and we have a new Counsel and many new people in the Counsel's Office. So I'm not exactly clear on that.

Q But you have members of the Counsel's Office who preceded Mr. Fielding, so I'm curious, when you consulted, can we write or say that the White House Counsel's Office, on behalf of the President, was fully knowledgeable of the dispute before --

MS. PERINO: I can't tell you that right now, because I don't know, but I can check. There are a lot of new people, and I can't tell you that the people that I talked to were here before.

Q But, I mean, there could have been a paper trail --

MS. PERINO: I'll go back and check. The people I talked to weren't necessarily here before.

Q Can we just go back to this phrase that the President never intended for the Vice President to be treated any differently than -- I'll confess, I'm missing the whole thing here. The Vice President is not getting treated any differently, he's acting differently, according to the National Archive.

MS. PERINO: No, but in the EO, who is directed and how they respond -- if you look on page 18 of the EO, when you have a chance, there's a distinction regarding the Vice President versus what is an agency. And the President also, as the author of an EO, and the person responsible for interpreting the EO, did not intend for the Vice President to be treated as an agency, and that's clear.

Q But the Archive doesn't have an issue with, say, the way the President is handling this; the inspectors, the procedures, the protocols are all being followed. It's the Vice President who is acting differently.

Cleared by the ISOO for Public Filing

MS. PERINO: Right, but that's because the President never -- the President treats him differently in this EO, separate from an agency. And again, I'm not disputing that there's a dispute that the ISOO has with the Vice President's office, and they have a right under this EO to take that to the Justice Department. But the Vice President was not to be treated -- to be interpreted to be treated separately from the President in this executive order.

Q Can we expect to hear from the Vice President as to why his office did comply for two years, and then made a decision to stop complying?

Q Bring David in here.

Q Why is it separate?

MS. PERINO: If I could -- I'll ask the Vice President if he'll come to the press briefing room and answer your questions.

Q Wow.

Q I mean, it is a little curious that all of this -- this breaks, and all we get is like a line response from the Office of the Vice President, we're confident that everything is kosher. I mean, I --

MS. PERINO: I'm here today to try to flesh it out a little bit more for you, and I'm doing the best I can with all that I've got.

Q But why does the Vice President not want to be seen to be in compliance?

MS. PERINO: There's no question that he is in compliance, in terms of the meat of the issue, which is classified -- the handling of classified documents. It's just simply a matter of a small portion of an executive order regarding reporting requirements, of which he is not subject to, and -- the interpretation of the EO.

Q But if he's not monitored, we don't know that --

Q Why isn't he subject to this?

MS. PERINO: Because the President gets to decide whether or not he should be treated separately, and he's decided that he should.

Q Why did the President decide that he shouldn't be subjected to this?

MS. PERINO: And if you look at the EO, throughout the Vice President's office is called out on many other issues, and making sure that they are complying, just as with any other agency. But in this regard, it's different.

Q But if he's not monitored, how do we know that, that he's in compliance?

MS. PERINO: I think there are many other ways -- I'm not a lawyer, but --

Q How? Because it's not as though --

Case 1:05-cv-01124-UNA     Document 82-8     Filed 05/30/2008     Page 8 of 14
Created by the GSB for Public Filing

MS. PERINO: Well, Victoria, maybe we can let you in there and you can have an interview and check out his classified materials.

Q The office is not giving away information.

MS. PERINO: Right, they're not giving away classified information, either.

Q Who is making sure they're in compliance?

MS. PERINO: That's a good question. I'm not positive.

Q But you can stand up there and say they're in compliance, but you don't know why or how or who is checking on it.

MS. PERINO: What I said is that the Vice President's office says that they are in compliance, and I can tell you on behalf of the President that we are in compliance with all matters regarding classified materials.

Q And it's just them saying we're in compliance?

MS. PERINO: I'll see if there's any other ways. The ISOO is not the only -- I would believe that ISOO is not the only agency that can check that.

Q Dana, when you make requests to the OVP about this, could you please specify that the big, large, takeaway question is, why no problem in 2001, 2002, and it starts in 2003? Does it have to do with the war, does it have to do with Scooter Libby, does this have to do with what? Why then?

MS. PERINO: I will check into it. I don't know when -- I don't know why the change, and I'll see if there was any different interpretation --

Q Why is an exemption at all? Why is he exempt?

MS. PERINO: He's not exempt from following the laws of the United States. He's exempt just from this reporting requirement in this particular executive order.

Q And why was an announcement not made back then when they stopped reporting, that in fact this was the case, that he was to be treated the same as the President?

MS. PERINO: Why wasn't there a press release announcing it?

Q Yes.

MS. PERINO: We issued the EO. You could have -- it says it right here. It was released publicly.

Q There was no announcement like this. In other words, nobody knew.

MS. PERINO: I think that's kind of a backwards way to treat us. We could go back through and we could find any possible EO that the President has issued in the past seven years, and try to figure out, maybe the press might be interested in this five years from now. I think that's a little bit of a stretch to require us -- I think that we put out information, and you're welcome to read it.

Q What was the date of the EO?

MS. PERINO: Go ahead, Elaine.

Q I was going to ask, these questions, obviously, were kind of percolating yesterday, as well, when we were all asking the Vice President's office about this. Why didn't they cite page 18 of this executive order?

MS. PERINO: Well, I was on the road, and I was with the President in Alabama, and I got back today and was able to get you what I can, right now. I worked hard to do it.

Q Can we go on to Guantanamo? Was there a meeting scheduled for today to discuss Guantanamo?

MS. PERINO: There's meetings scheduled regularly to talk about Guantanamo, they happen frequently, they happen often, because people are charged with the responsibilities that the President has given them to try to close down that facility. Yes, there was going to be a meeting today, but there was a determination that it wasn't needed.

Q Was it because of the AP story?

MS. PERINO: I think that the decision to make -- to not have the meeting happened late in the day after that story came out.

Q So it was because of that?

MS. PERINO: What I can tell you is that meeting was not a decisional meeting, there was nothing imminent coming out of that meeting, and that there are people who are charged with -- tasked with working on this issue every day, not only here at the White House, but at the Defense Department, State Department and other agencies, to make sure that we are figuring out a way to repatriate these individuals, so they can go back to their countries in a way that we can make sure that they're going to be held, and not a threat to anybody else, as well as be treated humanely.

Q Are you nearing a decision? Was there anything different about this meeting? Are the meetings and the attendees -- and the Secretary of State? Was there something different? Was this going to be a focus?

MS. PERINO: Well, the meeting was going to be focusing on doing what the President has asked them to do for the past few years, which is work to get the facility closed. I think that -- I think that report was overblown. There was not an imminent decision made. There's no deadline. There was just a regular meeting.

Q It didn't really say it was imminent. I mean --

MS. PERINO: It did say it was imminent.

Q Why would you -- they said they were nearing a decision. Why would you cancel a meeting after a press report about that?

MS. PERINO: Look, there was a decision that a meeting wasn't necessary. But that should not lead

you to think that there aren't people who are either talking about it today or working towards it. In fact, I think today --

Q I'm sorry, but why wasn't the meeting necessary? I mean, the timing was a little strange, and then the White House was able to say, there's no meeting scheduled for tomorrow, when you start getting press reports. Was the meeting canceled because of the press report?

MS. PERINO: I wasn't there to decide why the meeting was canceled. All I know is that the meeting was canceled, it wasn't -- I was told that it wasn't necessary to have it. For example, today, we released -- we got six people back -- out of Guantanamo today, two to Tunisia and four to Yemen. This process is ongoing. There's 375 there now; there used to be over 600. We're working on getting people back. I think we've got 80 out of 375 that are about to leave.

And so this is an issue that we're working on. We're trying to ratchet it down, but we have folks like Khalid Sheikh Mohammed who was the mastermind of the 9/11 attacks who are down there, and we want to see them tried through the Military Commissions Act.

Q How close are you to a firm decision about the closing of Guantanamo?

MS. PERINO: There has been a firm decision. The President gave a firm decision two years ago in which he said, I want this place closed --

Q But can you give us --

MS. PERINO: -- that the United States should not be the world's jailers. Those are his words.

Q But the question after yesterday that everyone's wondering is, we're trying to get a sense of what is imminent. So it is -- is there going to be an announcement -- I know you're not going to give me a calendar date, but next week are we going to hear that the announcement -- is he going to step out and tell us that Guantanamo is going to be closed?

MS. PERINO: Not that I'm aware of. What I can tell is that these matters are very complex on how you get individuals who are picked up on the battlefield to be taken back by their home countries. A lot of people have complained about Guantanamo Bay around the world, but many of these countries don't want to take them back, don't want to take their individuals back, or we can't get the assurances that they're going to be treated humanely.

And so while the President has said we want to make sure that we close this facility as quickly as possible, he's not put a deadline on it because they're complex issues; we have to make sure that we handle it appropriately.

Q And does it take weeks to work those complex issues out, months?

MS. PERINO: Well, look, since 2002, over 400 detainees have been sent back -- or put back -- sent back to their countries, and they're either serving their time there or they have served their time.

Q What are they charged with? What are they -- what did they do?

MS. PERINO: These are unlawful enemy combatants that intended to harm the United States or other Western civilization --

Q That we have designated — were they defending their own country?

MS. PERINO: No, I don't think they were. They were intending to hurt innocent people.

Q This isn't a matter of thinking. Do you know?

MS. PERINO: Mark, you're on this topic?

Q Yes, can you describe the purpose of the Afghan facility that the United States is now involved with?

MS. PERINO: Well, we've been working closely to renovate a prison. Let me give you the name of it — Pole Charki. This was to renovate a part of that prison and to train up enough of the guards in order to take care of those — that section of the prison. And so we're working just to renovate that. That's the purpose of it.

As you can imagine, many of the detainees that we have in Guantanamo Bay are from Afghanistan, and we'd like for them to be able to go back to be held securely and to make sure that they are being treated humanely.

Q So how should we look on this particular facility, as a partial replacement for Guantanamo, as an alternative, as a place —

MS. PERINO: No. No, I think that, just as with any other country that we have asked to take back their prisoners and to hold them accountable, I would look at it that way. Afghanistan is a sovereign government, and we've asked other governments to take their folks back. As I said, we sent two back to — let's see, it was four to Yemen and two to Tunisia; I think of it in the same way. But Afghanistan has a slightly different problem, because, one, their facilities were so run down and their infrastructure, plus there were so many of them from Afghanistan. They have to send them — be sent back.

Q You've spoken of repatriation. But you're not going to repatriate everybody who's at Guantanamo. Ultimately, you're going to be left with some who you are going to put elsewhere. Are you still looking at places to bring them to in America?

MS. PERINO: Not that I'm aware of.

Q Not at all?

MS. PERINO: Not that I'm aware of.

Q Or, in other words —

MS. PERINO: There's the Military Commissions Act that's working through — there's a different process where you have to be — you go through a naming process where you are deemed an unlawful enemy combatant, and then you go forward to trial, and those things are underway. It takes a long time, though.

Q Just to be clear, if I'm understanding you right, none of the people who are at Guantanamo now, there is no consideration being given to bringing any of those people to U.S. soil?

Case 1:05-cv-01124-UNA    Document 82-8    Filed 05/30/2008    Page 12 of 14

Created by the CSO for Public Filing

MS. PERINO: I think the way that I should answer that is to say, that's a very complex legal question. The Attorney General has been asked this question before; I would refer you to his public comments. And I'm not going to comment here about what is under consideration or not. It's one of the reasons that meeting — meeting that was going to be today and other meetings that we have on this are private.

Q Dana, one of the lawyers representing a couple of the detainees at Guantanamo Bay said that it's a bunch of doublespeak from this White House saying that you want to close Guantanamo Bay when indeed you're not giving due process to many of the detainees that are there.

MS. PERINO: Well, I just told you that since 2002, we have had over 400 detainees go back to their home countries. And we also have a Military Commissions Act process underway to deal with those who have not gone back to their countries and those that we want to try, like Khalid Sheikh Mohammed.

Q I hear what you're saying, but people who are working with the detainees are saying you are not allowing them to go to tribunal, you're not allowing them to have due process, as you were saying, you're not speeding up the process to get rid of these remaining 375 detainees.

MS. PERINO: I strongly disagree, and I'd refer you to Department of Defense, who has dedicated a serious amount of personnel and assets in order to be able to move these trials along.

Q And I want to ask something else. Tony Snow, within the last couple of weeks, he was asked a question, realistically, do you think that this President could close Guantanamo Bay before his term is up? He said no. What will change — what conditions could change that, from what he said a month ago?

MS. PERINO: Well, I think I'm going to go back to what I said to Mark, which is a lot of very smart people are working on that issue, trying to figure out a way that we could close Guantanamo in a way that makes sure that those who are there are held securely and that they are treated humanely.

Q Held securely where, though? I mean, in U.S. custody where?

MS. PERINO: I never said that they were going to be held in the U.S. I'm not commenting —

Q U.S. custody where?

MS. PERINO: Well, right now they're in Guantanamo, and then we'll just have to see from where we go. One of the reasons that these meetings, these interagency meetings are held is to discuss these very complex issues. And it's not something I'm able or prepared to give to you today.

Q If, in fact, there is no decision imminent on Guantanamo, has the administration begun to accelerate or intensify its discussions about the future of that facility in light of the continuing international criticism and legal setbacks?

MS. PERINO: What I know — you look at what the President has said and what he has directed to his Cabinet, which is, close this facility as soon as possible, people take that very seriously. There are people who have — their full-time job is to work on how do you move these individuals out of the Guantanamo Bay facility into places where they can be held securely and treated humanely.

Created by the CSO for Public Filing

And so there's not a deadline on it. We're doing it in a way that is responsible.

Q The President expressed his concerns to the Vietnamese President about the human rights record in Vietnam. Did the Vietnamese President turn the tables on the President, as President Putin did recently, and mention that there's some questions that have been raised internationally about the U.S.'s record on Guantanamo?

MS. PERINO: No. And I can tell you that we are confident that people are treated humanely at Guantanamo Bay.

Q I'm sorry -- the holding of prisoners indefinitely without charge is considered worldwide to be a violation of human rights, so --

MS. PERINO: What the President has said is that if there are -- one, we'll do the military commissions, which are underway; two, this was a matter where we had never dealt with this before. We have an enemy who does not conform to any of the traditional rules of law. But we also knew that we couldn't leave them out there on the battlefield. Their intent was to kill innocent people.

And so the President has done the responsible thing. And I would submit to you that countries who have complained most vehemently about the human rights record, alleged abuses of human rights at Guantanamo Bay are the very ones who refuse to take any prisoners themselves.

Q Staying on Guantanamo?

MS. PERINO: Yes.

Q Currently at Guantanamo Bay, there are no prisoners designated as unlawful enemy combatants. The military commission process is at a dead stop. There is nothing on the books to continue, because the question -- both cases that have been brought before the commissions have been thrown out because the judges have said they do not have jurisdiction over enemy combatants, which everybody at Guantanamo Bay is listed as enemy combatant. Before the process can be undertaken to move Guantanamo to Fort Leavenworth, or wherever it's going to go, does everybody first have to be redesignated?

MS. PERINO: I don't know. That's great questions for Department of Defense legal counsel. Don't know.

Q Because that could be a question of years.

MS. PERINO: Les.

Q Thank you, Dana. Two questions. In his statement, "all human life is sacred," the President deplored what he termed, "the deliberate destruction of human embryos." And my question: If a pregnant woman is medically diagnosed as facing death, unless she has a therapeutic abortion, does the President believe it is wrong to destroy the fetus to save the life of the mother?

MS. PERINO: I think that we've made public comments on this before regarding the health of the mother. And you're raising complex ethical questions, which I'd refer you to the NIH to ask.

Q Well, all right. Is the President opposed to the destruction of any embryo resulting from gang rape or incest?

MS. PERINO: I think we've made comments on that, too, Les. We'll get you those from before.

Q He's made them before?

MS. PERINO: Yes, I'll get those for you. Go ahead.

Q Is the President happy with the discussion of human rights with the Vietnamese President? And if the situation is not changed, what else can he do?

MS. PERINO: Well, the President had a good meeting with President Triet, and it was one of the first issues that he brought up, was human rights and religious freedom. And so the President hopes that the Vietnamese President will take those word to heart and that we'll see some behavior changes in Vietnam.

Q In New York, the Vietnamese President mentioned four people who were arrested in Vietnam were criminals, not dissidents. Did President Bush persuade him to change that view, in that one-hour meeting?

MS. PERINO: I don't know the specifics, because I didn't sit in on that meeting, but I'll consult and see if we can get back to you. Just give me your card after this.

Q Thank you.

END 1:55 P.M. EDT