# Exhibit G

Prepared Remarks of Attorney General Alberto R. Gonzales at the United States Coast G... Page 1 of 7
Case 1:05-cv-01124-UNA   Document 82-10   Filed 05/30/2008   Page 2 of 8
Cleared by the CSO for Public Filing



## Prepared Remarks of Attorney General Alberto R. Gonzales at the United States Coast Guard Academy

### NEW LONDON, CONNECTICUT
### September 6, 2007

Good evening.

I am honored to be here at the Coast Guard Academy.

I have great memories of my own time as a cadet at the Air Force Academy. I remember arriving on campus in Colorado Springs with excitement and apprehension after serving for two years as an enlisted man. I realized then what great opportunities for service the military presented.

In fact, my decision to join the military out of high school remains one of the most important, and best, decisions I've ever made. The sense of pride, of achievement and accomplishment, that you will feel as officers in the Coast Guard will make your toughest days worthwhile.

Every citizen in this country owes every person in uniform a debt. After all, not only did you choose to come here for four rigorous and structured years, you've made a commitment to serve another five beyond that. And, after that, many of you will continue in public service. I know many Academy graduates have gone on to serve in law enforcement, including at the Department of Justice. I am grateful for their and your commitment to public service.

As officers in the Coast Guard you will be protecting our country at a profound moment in our history. Recognizing that, as someone who has had the honor and privilege of serving since 9/11 in both the White House and Department of Justice, I want to share with you a close-up perspective on some of the decisions that were made to help protect our country.

### THE CONTEXT OF SEPTEMBER 11

I want to begin by reading to you the transcript of a phone call between Tom McGinnis, a trader on the 92nd floor of the North Tower of the World Trade Center, and his wife, who he called at 10:18 on the morning of September 11, 2001.

"This looks really, really bad," Tom McGinnis said.

"I know," said Mrs. McGinnis, who had been hoping that his meeting had broken up before the airplane hit.

"This is bad for the country; it looks like World War Three."

Something in his tone alarmed Mrs. McGinnis.

"Are you ok, yes or no?" she demanded.

"We're on the 92nd floor in a room we can't get out of," McGinnis said.

"Who's with you?" she asked.

McGinnis mentioned three old friends—Joey Holland, Brendan Dolan, and Elkin Yuen.

"I love you," he said, "take care of Caitlin."

Mrs. McGinnis was not ready to hear a farewell. "Don't lose your cool," she urged. "You guys are so tough, you're resourceful. You guys are going to get out of there."

"You don't understand," McGinnis said, "there are people jumping from the floors above us!"

McGinnis again told his wife he loved her and their daughter, Caitlin.

"Don't hang up," she pleaded.

"I got to get down on the floor," he said.

And then, the line went dead.

That evening, just before 7:00 pm, I was waiting for the return of Marine One to the South Lawn of the White House. I stood outside the Oval Office, ready to meet the President and begin the work of defending America.

The President was purposeful when he arrived. His face was serious. As he entered the White House he didn't say a word – he just nodded his head slightly. I and others followed him into the Oval Office – which was being set up for his 8:30 address to the nation – and then into his private dining room. There, we sat down, rolled up our sleeves and got to work.

Our discussions that evening included our legal options, a discussion that continues to this day. Lawyers from DOJ, the Pentagon, the CIA, and State Department were brought to the White House to determine the applicable laws and develop the legal strategy that would govern our response. We were confronting a new type of enemy in a new type of warfare. The legal issues were novel, some had not been addressed by our courts in decades, others had never been considered at all. We made one fundamental decision early on: to treat the attacks on our country not simply as criminal acts—though they certainly were that—but as acts of war. We are most definitely a nation at war – and have been since the morning of September 11th, 2001.

I can attest to the fact that reaching a law-of-war-framework was thoroughly-debated and fully-discussed.

Those discussions, and the work that went on around them, were arduous, incredibly important and unprecedented. We knew that our decisions would be judged by the world, and that they would make history.

We were guided, every day, by our Constitution and the goal that we would continue to serve as an example of human liberty and human dignity to the world—while protecting our country.

Unfortunately, this point is often lost in public debate as some over-simplify the complex legal work of the three branches of government, characterizing it as courts slapping the wrist of the President and the Executive branch for allegedly over-reaching in its powers.

From my perspective, the nation's system of checks and balances has worked as it should, and the advice given to and the decisions made by the President on unprecedented and difficult legal questions have, more often than not, been found sound and constitutional by both the courts and the Congress.

WHY A "WAR" ON TERROR?

In some ways, the decisions we made are best explained by answering the question we asked ourselves at the time: Why treat this as a war? To be sure, a massive crime had been committed, but to define those acts merely as a crime would be to ignore a larger issue.

After all, al Qaeda is much more than a criminal organization. It is an enemy. Its purpose is to destroy our freedoms, our democracy, our very way of life. And on September 11, it succeeded in the deadliest foreign attack on American soil in history, killing roughly 850 more people than were killed at Pearl Harbor, with most of those killed being civilians.

A mere law-enforcement response would have focused solely on gathering evidence against those involved, arresting them, interviewing witnesses, convening grand juries, and preparing cases for civilian prosecution.

The President believed strongly that we needed to do something more—that we needed to fight back, to track down the enemy, take apart their physical and financial infrastructure, and take the battle to them. Since September 11, that is exactly what we have been doing, here at home, in Afghanistan, and in Iraq.

That decision has met with criticism. Some say that because al Qaeda isn't a government and does not wear uniforms we simply cannot apply the laws of war and must treat this as a criminal matter.

In the United States, however, we have a long-standing tradition of applying the laws of war to those who would wage war upon us. For example, when the Barbary pirates were raiding U.S. vessels, Thomas Jefferson didn't seek to file criminal charges; he used the United States armed forces to fight back. When Pancho Villa's followers raided New Mexico, Woodrow Wilson did not convene a grand jury; he launched a counterassault.

We often are compared to other countries, some of whom provide terrorists the same rights as every other criminal. While such comparisons are understandable, it also bears noting that in instances, our allies have adopted counterterrorism tools that we have not adopted in the United States because doing so would abridge the civil liberties our Constitution protects.

For example, speaking out in support of past terrorist acts is punishable in several European countries, including Italy, Spain, and France. And after the July 2005 terrorist attacks in London, the United Kingdom passed a law making it a crime to encourage terrorism, or to disseminate terrorist publications, or to post "terrorist publications" on the Internet. Laws like these could violate the First Amendment if adopted in the United States.

In France, police can hold suspects in custody for up to 96 hours if there are plausible reasons to suspect that the person has been involved in a terrorism offense, or up to six days if there is a serious danger that acts of terrorism are believed to be imminent. In our country, there must be a probable cause hearing within 48 hours of a suspect's arrest.

Finally, in the United Kingdom, the arrest or search of a suspected terrorist is allowed if law enforcement "reasonably suspects" the person to be a terrorist or to possess "anything which may constitute evidence that he is a terrorist." This reasonable suspicion standard is a lesser standard than the "probable cause" standard required under our own Constitution. The terrorism suspect can be detained in the United Kingdom for up to 28 days, and the reviewing official still does not need to find probable cause—only that there are reasonable grounds to believe that detention is necessary to obtain relevant evidence.

In short, there are a variety of approaches to combating terrorism, and each country, including ours, makes choices based on their values and unique legal system.

In those early meetings following 9/11, we decided that the fact that al Qaeda flouts the traditional rules of war should not immunize them from a military response.

In order to defend the security of our citizens, we decided that we must have the ability to detain and remove the enemy from the battlefields of armed conflict, just as we have in other wars. We must be able to collect from them the vital intelligence that enables us to capture their associates and to break up future terrorist plots. And we must create effective and fair procedures that will allow us to punish terrorists for their war crimes.

Because we have defined al Qaeda as the enemy, and this conflict as a war, we applied a different legal framework than the one used during peacetime criminal investigations and prosecutions.

The Supreme Court has subsequently recognized that our Constitution and laws have for centuries incorporated the laws of war and accounted for the realities of armed conflict. Congress likewise endorsed this view in the immediate aftermath of September 11 in its Joint Resolution Authorizing the Use of Military Force against the al Qaeda terrorist network and its supporters, and in later adopting two pieces of legislation: the Detainee Treatment Act of 2005, and most recently, the Military Commissions Act of 2006.

Because the public debate often seems to overlook this important set of rules governing our wartime conduct, I would like to talk tonight about the legal framework for two of the core military functions regarding captured terrorists:

Detention and Prosecution.

These two concepts are hardly novel. They are as old as the Republic. General George Washington used military commissions during the Revolutionary War. During the Civil War, Abraham Lincoln ordered many combatants detained without habeas corpus until the war ended, and military commissions were used to prosecute enemy combatants. And the Supreme Court specifically upheld the use of military commissions with only limited judicial review.

1. Detention

First, I'll speak about detention. Unfortunately some forget that the purpose of military detention is not to punish for a crime, but to prevent enemy combatants from returning to the battlefield. Because combatants are not being held for criminal actions, they do not need to be charged with a crime. The Supreme Court in Hamdi recognized that the United States may detain an enemy combatant, even one that is an American citizen, for the duration of hostilities without charges.

This is a potent but limited power. It extends only to those who associate with the enemy and seek to engage in hostile or warlike acts against the United States and its supporters. And it only applies for the duration of hostilities.

Detention is vital in securing our Nation and its citizens—it keeps combatants off the battlefield and helps us disrupt the plans of other combatants who are still on that battlefield.

With respect to our international obligations, keep in mind that the United States provides individuals detained as enemy combatants at Guantanamo with greater legal rights than those owed to lawful prisoners of war under the Geneva Conventions. As President Bush has stated, the United States has no interest in serving as the world's jailer, and we have no interest in detaining individuals who do not threaten our citizens. Accordingly, we have released alien enemy combatants to their home countries where those nations have agreed that they will prevent such individuals from returning to combat, and where we have been assured that those nations will treat such individuals humanely.

We have asked our European allies to join us in these efforts by agreeing to take back their citizens detained at Guantanamo or by helping persuade other countries to provide better security and human rights assurances to allow us to increase the number of transfers.

We have also put in place procedures to ensure that the individuals we detain are, in fact, enemy combatants. The United States has set up tribunals to review every detainee held at Guantanamo to determine whether they should be detained as an enemy combatant at all. Based on the decisions of these tribunals and based on our parallel efforts to repatriate detainees where appropriate, we have transferred approximately 340 individuals from Guantanamo.

The legal rights afforded to detainees do not stop there. Our law provides that each and every detainee has the opportunity to appeal the tribunal's determination to the federal court of appeals in Washington, D.C. In other words, the United States provides every detainee at Guantanamo Bay the opportunity to challenge his detention not only before a military tribunal, but also before a civilian court. This was not done in World War II. Indeed, it would have been considered odd -- at best -- if Nazi soldiers had been able to challenge their detention.

The legal protections afforded to Guantanamo detainees are unprecedented. Here, during the middle of the conflict with al Qaeda, the Department of Defense enlisted hundreds of people to review the status of detainees and afford them hearings to challenge their detentions. Never before in our Nation's history have we given such robust protection to combatants picked up on the field of battle—combatants believed at that time to be bent on the destruction of our home.

These points, it seems to me, are lost in the recent debate over the restrictions on habeas corpus, which allows an individual in custody to seek his release from detention before a civilian judge. Indeed, the entire debate is premised on several misconceptions. Alien enemy combatants captured outside the United States have never before had the right to seek relief from federal judges under the United States Constitution. Detention under these circumstances does not violate any constitutional or legal right that they have ever had. Nevertheless, we have now given detainees the unprecedented right to judicial review of their detention.

2. Prosecution of War Crimes

Prepared Remarks of Attorney General Alberto R. Gonzales at the United States Coast G... Page 5 of 7
Case 1:05-cv-01124-UNA    Document 82-10    Filed 05/30/2008    Page 6 of 8
Cleared by the CSO for Public Filing

That's detention. I'd now like to say a few words about the prosecution of enemy detainees.

The Military Commissions Act, passed by Congress, guides how our prosecutions are working today. The law permits the prosecution of suspected war criminals before military commissions, which have been used during times of war by the United States and other countries. By law, these commissions can be used to try only "alien unlawful enemy combatants." This definition expressly excludes lawful enemy combatants, and it is carefully defined to include only those unlawful combatants who have taken active and purposeful steps to further hostilities against the United States and its allies.

Some have questioned why terrorists should be tried as war criminals in the first place. Although the law of war permits us to detain dangerous enemy combatants for the duration of hostilities to keep them from attacking us, we also believe that we must have the capability to bring them to justice for their crimes. Some ask, why not then try these terrorists in civilian courts just like any other individual who commits a crime?

But for hundreds of years, the United States and other nations have used military commissions—not civilian courts—to try enemy combatants. It is entirely fitting that we continue to do so, consistent with our obligations under both international and domestic law. And as I've already explained, our procedures far exceed our legal obligations.

Equally important, military commissions are necessary because in many cases, the use of civilian courts would simply be unavailable or impractical. To be sure, our recent prosecution of Jose Padilla for aiding terrorists was a success. Even in that case, however, the government was inhibited in terms of the warlike conduct that it could charge in the prosecution; and this model, difficult when applied to a U.S. citizen, is simply unworkable when applied to hundreds of foreign terrorists.

Why? Because the collection of evidence and the prosecution of terrorists pose a host of difficulties not associated with the civilian justice system. For one thing, the bulk of the evidence and witnesses will often be overseas. For another, our civilian courts in the United States strictly limit the introduction of hearsay statements—that is, the admission into evidence of the assertions of individuals not present in court. Yet many whose statements we will need for military commissions are likely to be foreign nationals who are not subject to the jurisdiction of United States courts, or who may be unavailable because they are serving on the battlefield—or have died on it.

Therefore, if we are to put terrorists on trial, military commissions must be permitted to hear a broad range of evidence, including hearsay evidence where it is reliable. International war crimes tribunals, such as the International Criminal Tribunal for the former Yugoslavia, have similarly adopted broad rules of admissibility.

Yet another concern is that our civilian justice system provides for strict rules governing the collection and authentication of evidence. But battlefields and foreign terrorist safe-houses are not like typical crime scenes, and the United States military cannot be expected to stop fighting the enemy to gather evidence like police officers in a local murder case. Again, like international war crimes tribunals, military commissions will consider a broad range of evidence that the military judge deems to be reliable and probative of the guilt or innocence of the accused.

Military commissions ensure a safe and historically recognized means of dispensing justice to enemy detainees.

SUCCESSES

In terms of successes, first, as I've described, was our decision to treat those attacks as acts of war, enabling us to remove enemy combatants from the field of battle and collect intelligence. This has made a critical difference.

For example, our intelligence-gathering efforts were instrumental in capturing dozens of Osama bin Laden's closest associates, including the mastermind of the September 11 attacks, Khalid Sheikh Mohammed, as well as Abu Zubaydah, who we believe had run a terrorist camp in Afghanistan where some of the September 11 hijackers had trained. Based on the information he provided, we were able to capture other terrorist leaders, such as Ramzi bin al Shibh, a coordinator of the 9/11 attacks. And the capture of those terrorists has led to actionable intelligence that has disrupted many other terrorist plots and has saved lives.

We have broken up a cell of 17 Southeast Asian terrorist operatives being groomed for attacks inside the United States; uncovered key operatives in al Qaeda's biological weapons program—including a cell developing anthrax to be used in terrorist attacks. We have stopped planned strikes on U.S. Marines in Africa and on the U.S. consulate in Karachi, and we have foiled a plot to hijack passenger planes and fly them into Heathrow Airport and Canary Wharf in

London.

The second prong of our overall approach has been traditional law enforcement, and I don't want to leave without mentioning that. Planning a terrorist attack is a criminal offense, and the Department of Justice, along with our state and local law enforcement partners have also pursued would-be terrorists as criminals, frequently disrupting their plots before they are viable. We have enjoyed great success utilizing the prosecutorial tools available within our criminal courts to disrupt and prevent further terrorist attacks on American soil in the past six years.

In fact, since the September 11 attacks, hundreds of defendants have been convicted of or have pleaded guilty to terrorism-related offenses. This includes people like Jose Padilla, who I mentioned earlier. It also includes people like Richard Reid, the so-called "shoebomber," who had hoped to down an airliner bound for the United States.

Another recent example of law enforcement success was the charging of several individuals with conspiring to attack JFK airport by planting explosives to blow up the airport's major jet-fuel supply tanks and pipeline. They are in custody now, awaiting trial.

The USA PATRIOT Act helped us enormously by updating anti-terrorism and criminal laws to reflect evolving technologies. It increased penalties for those who commit terrorist crimes, and it gave terrorism investigators the same tools used by those who pursue non-national security cases such as drug dealers and the Mafia. Most important, the act helped break down the wall preventing regular exchange of information between the law enforcement and intelligence communities.

Today, our international terrorism and terrorism-related cases draw on a full range of criminal charges available in the federal criminal code, according to the facts and circumstances of each case. We've used the terrorism and weapons of mass destructions statutes, and have drawn upon other more general statutes such as immigration fraud and false statement offenses where they apply in terrorism investigations. While some have criticized these prosecutions, the fact of the matter is that these tools are designed to intervene at the early stages of terrorist planning before a terrorist act can be carried out.

Many of these successful prosecutions have produced cooperating defendants who have, in turn, provided intelligence information to investigators, prosecutors and national security officials, leading to further investigation, disruption and prosecution.

CONCLUSION

These successes, and the vigorous prosecution of the war on terror, have undoubtedly made us safer, but we are not yet safe. We therefore continue to work with our allies to identify new ways to contain and combat the ever-changing threat of global terrorism.

There can be no doubt that the war on terror is the defining conflict of our time. I believe it is critically important that we continue to treat this conflict as the war that it is. I assure you that our enemies will.

Our enemies in the war on terror are determined. Next week will mark the passing of six years since 9/11. But the threat of terrorism remains real today. Look no further than the events of this week in Germany, where three suspects were arrested for plotting to blow up U.S. outposts in Europe, as well as the Frankfurt airport. If you take nothing else away from what I say tonight, go and read for yourselves the news accounts about those arrested in Germany this week. They had acquired bomb making materials including hydrogen peroxide, which they were in the middle of processing to explosive form at the time of their arrest. These materials, if assembled, would have produced about 1200 pounds of explosives, comparable in effect to dynamite. Those arrested were organized and determined. The threat that they, and thousands of others out there like them, present is relevant to you: because our enemies are bent on destroying our homeland in any way they can. The Coast Guard has a 217-year tradition of answering the Nation's call. Its core values of honor, respect, and devotion to duty represent the essence of what it means to serve. Soon it will be your turn to protect our country from the enemy. I want to thank you for your courage, your conviction, and your service to this great country.

Before I leave, there's one more thing I'd like to do. I know the life of a cadet can be rigorous. Therefore, it gives me great pleasure to grant the fourth class "carry on" for the weekend to expire at twenty-two hundred hours (22h00) Sunday evening. In return, or as they say in legal circles - the quid pro quo - is that you have to beat Kings Point on Saturday. With that in mind, Semper Paratus.

Thank you, God bless you, and God bless America.

###