Cleared by the CSO for Public Filing

# Exhibit I

Cleared by the CSO for Public Filing



# ■ One World Research

### Public Interest Research and Investigations

### Declaration of Jonathan Horowitz

I, Jonathan Horowitz, of New York, hereby state under penalty of perjury:

## A. PURPOSE

1. My name is Jonathan Horowitz. I am the Research Director of One World Research, an investigation firm that conducts research and investigation services worldwide. This declaration provides information about research I conducted into the detention and prosecution of former Guantanamo detainees at the Pul-e Charki prison, Block D, in Kabul, Afghanistan.

## B. CREDENTIALS

2. *Curriculum Vitae*. Attached to this declaration is a true and correct copy of my curriculum vitae.

3. *Education*. I hold a LL.M in International Human Rights Law, with distinction, from the University of Essex, U.K., and a B.A. *cum laude* from Bates College, in Lewiston, Maine.

4. *Experience*. I currently work as the Research Director at One World Research, a public interest investigation firm. As part of my work at One World Research, I carry out research and investigation services in numerous countries worldwide—including Afghanistan (in early 2008, I carried out an extensive research and training project with the Afghan Independent Human Rights Commission, focusing on abuses by Afghan insurgent forces).

www.oneworldresearch.com          25 Washington Street, Suite 408, Bklyn, NY 11201

Cleared by the CSO for Public Filing

5.  Additional work experience, in reverse chronological order, is as follows: From August to September 2007, I was a consultant at Human Rights Watch, where I assisted with the shaping of their Darfur advocacy strategy and authored a 75-page report on current human rights and security conditions in Darfur. From June 2005 to July 2007, I worked for the United Nations Mission in Sudan, documenting human rights and laws of war violations in Sudan, and drafting public reports and briefing papers for the UN High Commissioner for Human Rights.

6.  Prior to working with the United Nations in Sudan, I worked at the NYU Center for Human Rights and Global Justice as a researcher. Prior to NYU, I worked at Human Rights Watch, from 2000 to 2003, as a program associate and coordinator, where I conducted research on post-September 11, 2001 hate crimes and assisted in the logistical and strategic coordination of Human Rights Watch researchers in Iraq in 2003. In 1998 and 1999, I was involved in academic research on truth commissions in South Africa and Chile.

## C. INTRODUCTION AND SUMMARY

7.  In January 2008, One World Research was retained by Dechert LLP to conduct research into the detention and prosecution of Afghan detainees returned to Afghanistan from the detention facility at Guantanamo Bay, several of whom were clients represented by Dechert attorneys. In particular, Dechert asked One World Research to conduct research into the detention and prosecution processes underway at the Pul-e Charki prison "Block D," where many such detainees are held. John Sifton, the executive director of One World Research, tasked me to conduct this research. Mr. Sifton, who has previous experience working in Afghanistan, provided research oversight and additional contacts and information to assist in the research.

8.  From January through March 2008, I conducted extensive research into these issues, in Kabul, interviewing detainees' families, local Afghan government officials, Afghan defense attorneys, and U.N. officials.

Cleared by the CSO for Public Filing

9. Based on these three months of investigation, I made numerous observations and arrived at various conclusions about the Block D detention and prosecution system, including the following:

*The detention and legal system at Block D is deeply flawed as a legal process.*

- Detainees at Block D are detained in violation of domestic Afghan laws and the Afghan constitution, and in violation of numerous international legal standards relating to due process and fair trials.
- Specifically, upon their arrival at Block D, detainees are held without adequate access to attorneys or opportunity to challenge their detention; Afghan authorities later try and convict the detainees in hasty and unfair legal proceedings, which they term "trials." These often last less than an hour and violate evidentiary and procedural rules. At the conclusion of some of these hearings, some defendants have been convicted and sentenced for up to 20 years.
- Afghan defense attorneys have few opportunities to collect or to offer exculpatory evidence at the Block D trials; judges frequently dismiss claims or even evidence of innocence on the grounds that the information and allegations the U.S. authorities provide are irrefutable.

*U.S. authorities are heavily involved in the detention and legal process at Block D.*

- Despite statements by U.S. officials that the U.S. is in no substantive way involved in Block D, U.S. officials are in fact involved to varying degrees in four main aspects of Block D operations: investigations, indictments, trials, and detention.
- U.S. authorities provide a significant portion of the information, allegations, and "evidence" that Afghan authorities present against detainees at Block D legal proceedings. Typically these are contained in a file that is delivered to Afghan authorities when the U.S. military transfers the detainees to Afghanistan. Although Afghan authorities do collect additional information which is presented at court, the

Cleared by the CSO for Public Filing

information that Afghan authorities collect is most often a "re-collection" of the U.S. information.

- U.S. officials also advise Afghan authorities on which charges under Afghan law to make against detainees, and appear to meet with Afghan officials to advise them in relation to the legal processes at Block D.
- Various allegations that U.S. authorities have earlier made against detainees when they were at Guantanamo are typically the basis for later prosecutions at Block D, and prosecutions during Block D "trials" often consist of Afghan prosecutors reading the earlier allegations, that are contained in the various documents that U.S. authorities provide to prosecutors.
- In many cases, it appears that the basis for detainees being held and prosecuted at Block D is the fact that they were detained at Guantanamo Bay—their crime, essentially, is that they "were detained at Guantanamo."
- Generally, U.S. authorities appear to exercise extensive influence over the Block D detention and legal processes. It is difficult to determine exactly the extent of the influence and the mechanisms whereby it is effected, but it is certain that extensive influence exists.

**Research Methodology**

10. I conducted numerous interviews in January through March 2008, in Kabul, Afghanistan, with a variety of relevant sources with knowledge about the detention system and legal processes at Block D. Persons interviewed included:

- Relatives of seven detainees in Block D (six of whom were clients of Dechert LLP);
- One detainee who was released from Block D (also a Dechert client);
- Several officials in the U.N. Assistance Mission for Afghanistan (UNAMA) who were familiar with Block D;
- Several Afghan defense lawyers representing Block D detainees;

Cleared by the CSO for Public Filing

- Several U.S.-based lawyers who visited clients at Block D;
- Two Block D trial judges;
- The Deputy Prosecutor of the Afghanistan National Security Office;
- A high-level member of the Afghanistan National Independent Commission for Peace and Reconciliation, which often deals with cases of detainees returned from U.S. custody;
- The Afghan National Army officer in charge of the Block D facility;
- Members of the Afghan Presidential Review Committee responsible for reviewing cases of detainees at Block D.

While in Kabul, in January 2008, I also observed two Block D trials.

11. In addition to the information collected from interviews, I was also given access to various documents, including relevant notes taken by other attorneys and researchers during meetings with a Supreme Court official and U.S. Government officials.

12. While in Kabul in March 2008, I was also provided access to the investigation dossiers of six Block D detainee dossiers. I examined these documents closely and made an extensive record of their contents.

13. Four of these files were of individuals transferred from Guantanamo Bay, Cuba to the Block D detention facility in Afghanistan. Two files were of individuals transferred from Bagram airbase, north of Kabul (also known as the Bagram Theatre Internment Facility or "BTIF," or simply "Bagram") to Block D.

14. The files I examined contained, among other content, U.S. military documents containing allegations by U.S. authorities against the detainees and U.S. military records of interviews with the detainees. (Although this information has now been provided to Afghan officials and Afghan defense lawyers, U.S. authorities earlier did not disclose the content of these files to attorneys in the United States representing these detainees in habeas proceedings in U.S. federal courts.)

Cleared by the CSO for Public Filing

## D. DETENTION AND LEGAL PROCESSES AT BLOCK D

15. The Block D facility was initially devised and established in 2005-2006, when the U.S. government began seeking to depopulate the detention facilities at Guantánamo Bay and Bagram.

16. Based on interviews with U.N. officials, attorneys, and journalists familiar with the situation, I have collected the following information about events leading to the creation of Block D:

17. In August 2005, the United States and Afghanistan conducted an exchange of diplomatic notes on Afghan detainee issues, apparently aiming to design a plan for sending Afghan detainees at Guantánamo Bay back to Afghanistan, to be detained there without trial as enemy combatants. The exchange of diplomatic notes is apparently classified. However, One World Research did obtain another U.S. government document in late 2007 that refers to the exchange of notes, as the "2005 Exchange of Diplomatic Notes with respect to the transfer of Afghan nationals detained by the US as enemy combatants to the exclusive custody and control of the Government of Afghanistan for detention, investigation and/or for prosecution." A draft of the exchange of notes was also obtained by Tim Golden of the New York Times, who referenced them in a January 2008 New York Times article (Tim Golden, "Foiling U.S. Plan, Prison Expands in Afghanistan," N.Y. Times, Jan. 7, 2008).

18. In the wake of this 2005 agreement, the U.S. government attempted to negotiate a set of procedures with the Afghan government over 2005 and through the summer of 2007, for the transfer of detainees at Guantánamo to Afghanistan. The negotiations were handled on the U.S. side by State Department and military attorneys, including first by Pierre Prosper, in 2005 the Ambassador for War Crimes issues; and Matthew Waxman, now a State Department official and in 2005 the Deputy Assistant Secretary of Defense for Detainee Affairs; and later by other State and military officials, including Manuel Superville, until 2007 the legal advisor to the U.S. military commander in Afghanistan.

19. Based on investigations by One World Research, we concluded that, as part of these negotiations, the U.S. government initially wished to establish a legal regime on Afghan soil, under the jurisdiction of the Afghan government, comparable to the detention facilities at Guantánamo Bay and Bagram. (This conclusion is also suggested by the January 2008 New York Times article by Mr. Golden.)

20. The U.S. government document obtained by One World Research, referred to in paragraphs above, appeared to be a proposal on this topic: the document argued that Afghan President Hamid Karzai could utilize his executive authority to indefinitely detain Afghan citizens on Afghan soil for purposes of national security. Afghan officials, however, apparently resisted this idea, pointing out that the Afghan constitution and international human rights standards would not allow the government to detain its own citizens on Afghan soil without utilizing established criminal law procedures of arraignment, prosecution, and trial. Various U.N. and human rights advocates in Kabul told One World Research that Attorney-General Abdul Sabbit said that the idea was "illegal." Attorney General Sabbit and others appear to have convinced President Karzai and other officials that any arrangement with Block D would have to exist within a criminal law paradigm with due process guarantees. Thus, an "Afghan Guantánamo" did not materialize, but instead plans morphed into the current arrangement, utilizing the Block D facility to detain and then "try" returned detainees for violations of Afghan criminal law.

21. As explained in more detail below, the official arrangement for Block D ultimately was that returned detainees would be investigated, charged with violations of Afghan law, and then prosecuted. Detainees were to be prosecuted primarily under the Internal and External Security Law of 1987, a poorly drafted law promulgated under the Soviet-installed Najib government, the "Democratic Republic of Afghanistan."

22. This arrangement is, in fact, the current process for U.S. detainees returned from Guantanamo to Afghanistan and transferred to Block D. Afghan

Cleared by the CSO for Public Filing

authorities now conduct "trials" at Block D under this Soviet era law, presided over by civilian judges and prosecuted by prosecutors assigned to Block D cases who operate under the Attorney General (often inaccurately referred to as "NDS prosecutors"). Officially, questions of criminal procedure are governed by the 2004 Interim Criminal Procedure Code for Courts.

23. Despite the Afghan government's rejection of U.S. proposals for an "Afghan Guantánamo," the current detention of former U.S. prisoners at Block D is nonetheless seriously flawed. In several respects, the arrangement at Block D is not far from the system of closed and indefinite detention-without-trial that was originally desired by the U.S. government.

24. There are numerous inadequacies with the procedures and overall framework of the detention and justice system at Block D:

- The detention facility and courts at Block D are not generally open to the public.
- Many returned detainees have been held for long periods without being charged or notified why they are being detained.
- Many have been denied their rights to counsel. Attorneys are not permitted to be present with their client while their client is being interrogated; and some attorneys have been blocked altogether from representing Block D detainees.
- Detainees are given no warning as to their trial date, and defense attorneys are hampered in their efforts to prepare for trial. Defense are lawyers are typically notified of the trial date on the day of, or day before, the trial.
- When detainees are tried, judges often allow prosecutors to introduce evidence in violation of evidentiary rules, and defendants are denied their rights to challenge witnesses.
- Evidence against defendants often consists solely of unsupported allegations without witnesses or physical evidence; defendants thus often have no person or piece of evidence to challenge and rebut.

Cleared by the CSO for Public Filing

- Judges prevent defendants from mounting a proper defense, for instance, by rejecting demands for production of witnesses and physical evidence.
- The proceedings are conducted extremely hastily: In several cases, trials lasted on average between 45 to 60 minutes and have resulted in ten to twenty year prison sentences.

25. In some respects, the United States appears to have achieved what it initially wanted: a system in which many detainees are held for prolonged periods of time, perhaps indefinitely, without a fair trial. Although some detainees have been acquitted and released, or released on condition, many other former U.S. detainees have been tried and convicted in the Block D trials, some without attorneys, and are now serving lengthy sentences.

26. Several international officials in Kabul told One World Research that they regard the Block D facility as a means for the United States to legitimize the unlawful detention regime it created at Guantanamo. In other words, when the Afghan legal system finds the detainees guilty, the United States can argue that it was justified in detaining them in the first place.

27. In late February or early March 2008, President Karzai established a Block D Presidential Review Committee. The committee has a mandate to make extrajudicial recommendations to President Karzai as to whether Block D detainees should stand trial, serve a prison sentence that was handed down, be released without trial, or be released even though they were tried and sentenced. President Karzai then has the authority to approve the recommendations. Despite the fact that Block D housed over 200 detainees at the time of my investigation, authorities at the facility have only handed over approximately 120 of their files to the Block D Review Committee for review.

## U.S. Influence on Block D Detentions, Investigations, and Prosecution

28. U.S. authorities appear to exercise extensive influence over the Block D detention and legal processes. The following sections explain this influence in more detail:

Cleared by the CSO for Public Filing

*Transfer of Individuals to Block D*

29. During my time conducting research in Kabul in January through March 2008, several Afghan government officials told me of a private non-public "agreement between the U.S. and Afghans" about detainee transfers. In March 2008, an NDS official informed me that an Afghan-U.S. task force exists for Bagram detainees; the task force decides, or "filters," which detainees are transferred to Afghan custody. According to the NDS official, and an Afghan Supreme Court official, U.S. officials make the final decision on which detainees are handed over from Bagram and Guantánamo to Afghan custody (as opposed to being released to freedom).

*U.S.-Supplied Information*

30. When U.S. authorities transfer individuals from Guantanamo Bay or Bagram to the Block D facility, they provide Afghan officials with a file on the detainee, containing information about the transferred detainee and allegations earlier made against him by U.S. authorities.

31. In March 2008, Afghan government contacts in Kabul permitted me to view and photograph six of these files—four on detainees from Guantanamo and two from Bagram.

32. The four Guantanamo Bay detainee files that I reviewed were clearly U.S. documents, on U.S. Department of Defense letterhead. They included an "Investigative Summary" labeled, "For Official Use Only – Law Enforcement Sensitive." The heading of the document also states it is from the "Department of Defense, Criminal Investigation Task Force – Afghanistan US, Operation Enduring Freedom." The summary contains a photo of the detainee, and the following categories of information: Name and ISN number, Ethnicity, Tribe, Language, Co-subjects, Victims, Offences, Date of Offences, Jurisdiction, Synopsis, Confessions/Admissions/Incrimination Statements, Witnesses, Potential Witnesses, Physical Evidence, Photographs,

10

Polygraph, and Exhibits. (Many of these categories are marked "None," suggesting the U.S. has no relevant information.)

33. In addition to this information, the four files contain records of interrogations of the detainees at Bagram airbase and in Guantanamo Bay, Cuba. Names of the interrogators and language assistants are redacted, but the substance of the interrogation notes is recorded.

34. None of the interrogation reports that I saw mentioned whether or not the person being questioned was subject to physical or mental mistreatment, or had been threatened with such treatment, during the interrogation process.

35. As for the files from Bagram, the information in the two files I reviewed contained a "U.S. Detainee Assessment Branch Report of Investigation" (marked "Unclassified"), which included information similar to the "Investigative Summary." One of the two Bagram files also included an executive summary, information about evidence, sections about whether the detainee admitted or denied the allegations, his behavior at Bagram, and a current assessment of the detainee's threat level and prosecution value, which was labeled as "Low Threat to US/CF, Low Prosecution Value."

*Influence on investigations and prosecutions*

36. To gain a broader understanding of these U.S.-provided files, I discussed the content and impact of the U.S.-provided files with an Afghan National Security Prosecution Office official, two Afghan judges at Block D, two Afghan defense lawyers, and the Block D Presidential Review Committee.

37. Based on these interviews and review of the files, it is evident that the information that the U.S. government supplies to Afghan authorities has a significant influence over the fate of detainees once they pass into Afghan custody. As explained in more detail in the following paragraphs, I came to the conclusions that no criminal cases could be brought against most of the Block D detainees without the information and materials provided by the United States. Based on my interviews and review of the files, I have

concluded that the information that the U.S. government supplies to Afghan authorities in these files has a significant influence over the fate of detainees once they enter Block D. Furthermore, based on my research, it appears that U.S. officials are aware of this influence and likely intend to exercise it.

38. Materials and evidence later assembled by Afghan investigatory bodies—such as transcripts of interviews with our clients by Afghan investigators—are often based primarily or even entirely on information and allegations made in these original materials and files provided by the United States. In March 2008, an Afghan official in the prosecutor's office informed me that: "The evidence for NDS prosecutions comes primarily from the U.S. and is mostly from human intelligence—which is sometimes based on bad information because of enmities. . . ." The official said that any subsequent Afghan investigations are based entirely on the allegations first provided by U.S. authorities. Afghan defense lawyers at Block D affirmed this. Detainee interrogation transcripts in the detainees' files also confirm this: Often, Afghan authorities' line of questioning closely follows the U.S.-based allegations in documents provided by the United States.

39. Based on my interviews and review of files, it appears that in many cases Afghan authorities conduct superficial independent investigations about a detainee; in later Block D legal proceedings, Afghan prosecutors rely exclusively on materials provided by U.S. authorities.

40. Furthermore, in two files I reviewed U.S. authorities explicitly recommended the provisions of Afghan domestic law under which they believe detainees should be prosecuted. In the file of ABDUL RAZAQ USTAZ (ISN#00942), a U.S. document lists his "offence(s)" as "Crimes Against Internal and External Security, Article #9 – Anti-Government Activity; Criminal Code, Article #119 – Illegal Possession of a Weapon." And in the file of SAID AMIR JAN (ISN#000945) a U.S. document lists his "offence(s)" as "Crimes Against Internal and External Security, Article #9 – Anti-Government Activity; Criminal Code, Article #119 Illegal Possession of a Weapon." In other words, U.S. officials suggested allegations and conclusions about the detainees'

Cleared by the CSO for Public Filing

criminal liability under Afghan law, even though they are not trained in Afghan law or authorized to practice in Afghan courts.

41. These recommendations for prosecution under specific provisions of Afghan domestic law suggest that U.S. authorities in Kabul are aware that the detainees they are transferring to Afghan custody will be tried in the Afghan system and that the information provided by the United States against the detainee will be used in that system to support the recommended charges. In addition, as explained in more detail below, U.S. State Department and Department of Defense officials act as mentors and liaisons with the justice system at Block D; this strongly suggests that U.S. authorities in Kabul are well aware of the flawed system at Block D, in which U.S.-provided information and allegations play such an essential role.

42. The influence created by the U.S.-supplied information is magnified by the fact that many judges and prosecutors at Block D regard information provided by the United States as irrefutable, even when it lacks supporting evidence or is weakened by exculpatory evidence.

43. During interviews with judges who work in the Block D courts, one judge informed me: "The evidence is based on information we get from Coalition Forces. And we are sure that people who were arrested are arrested for something they did wrong, and the U.S. is not lying." Defense lawyers informed me that this flawed reasoning is regularly employed by prosecutors, usually at times when they cannot produce further evidence to defend their allegations. A second judge demonstrated unquestioning confidence in U.S.-provided photographic "evidence"—photographs of weapons in detainees' files, used to justify weapon possession charges. The photographs are simply of weapons and do not show the defendant in possession of the weapon, nor do they provide proof of ownership or possession. (The U.S. government does not provide the physical weapon to the court, nor does it produce a witness to testify to the authenticity of the photograph.) Yet the judge viewed the photographs themselves as essential proof for the purposes of a charge of weapons possession. When I asked the judge how he could consider such photographs as proof, he stated that the

photographs suffice because: "We just know that they [defendants] had the weapons in their possession." The two Block D judges I interviewed in January 2008 were also of the view that witness testimony, such as that from U.S. service personnel who captured or interrogated defendants, was generally unnecessary; they had little comprehension of the idea that a defendant should have the right to confront his accusers.

44. Based on my interviews with Afghan officials, and the fact that U.S. authorities work closely with Block D officials, defense lawyers, and the Supreme Court, it appears that U.S. authorities in Kabul are aware of these judicial errors and the misuse or misapplication of evidence that they provide. U.S. officials appear to take advantage of the flawed system and the lower evidentiary bars in the Block D courts, providing flawed evidence with apparent knowledge that it will be misused in court. U.S. authorities may have even reused flawed evidence in multiple cases: A National Security Prosecution Office official told me, "Americans take a picture of one weapon and put the same picture in different files."

45. In addition to the National Security Prosecution Office official who informed me about the improper use of photographs, when the U.S. provided a Dari translation of NASIR ULLAH's (ISN#00951) information to the Afghan authorities (the U.S. also provided the original English version), the last clause of an important sentence was substantively mistranslated. U.S. authorities conceded in his file that there was no evidence of an alleged conversation between the detainee and others about insurgent activities: "Further investigation has developed no further information to verify the alleged conversation between NASIR, ZADAH, and KHAM, or they [sic] any of them committed a crime." (Presumably the word "they" should be "that.") The Dari translation of this, re-translated into English, reads, "Further investigation has developed no further information to verify the alleged conversation between NASIR, ZADAH, and KHAM, or *which one of them* committed a crime" (emphasis added), prejudicially suggesting, without any grounds, that at least one of the persons named committed criminal activity.

46. In contrast to the high-levels of significance that the judges give to U.S.-supplied information, Afghan judges appear to give low-levels of significance to information provided by Afghan investigating authorities or evidence gathered by defense lawyers. For example, an official from the National Security Prosecution Office showed me the file of a detainee named "Fazal Ahmed." The file contained allegations from U.S. authorities of criminal activity by Ahmed, but according to the prosecution official the Afghan intelligence service—the NDS—cleared Ahmed of any wrongdoing. According to his file, Ahmed received a twenty-year sentence for the charges against him. The prosecution official told me: "NDS Department 17 found no evidence against Fazal Ahmed, but he was sentenced anyway according to the evidence provided by the US."

47. Generally, based on my research, I concluded that the basis for detainees being held and prosecuted at Block D was often the fact that they were detained at Guantanamo Bay—their crime, essentially, is that they "were detained at Guantanamo."

*Exculpatory materials not provided by the U.S.*

48. U.S. authorities appear to be transferring detainees to Block D, and expecting prosecutions, even though U.S. authorities themselves appear to doubt in some cases that the detainees are involved in any criminal activity or illegal armed conflict. Specifically, at least three of the files for detainees I reviewed at Block D contained sections in which U.S. authorities voiced serious doubts about the truth of allegations made against detainees. Many of the files also contain notations suggesting that detainees had not committed criminal activity. These reservations about detainees' culpability, however, are not communicated clearly to Afghan authorities—a problematic practice because, as discussed in sections above, many Afghan prosecutors and judges appear to believe detainees are guilty of criminal activity simply because they were in U.S. custody.

49. Generally, U.S. authorities do not transfer any exculpatory information in their possession to Afghan authorities. Based on my review of Block D files

15

Cleared by the CSO for Public Filing

and conversations with defense lawyers working at Block D, it appears that when the U.S. government transfers files with detainees, the files consist almost entirely of accusations contained in U.S. military detainee and interrogation notes. The transferred files do not include information or evidence from the detainees' pending litigation in U.S. courts, such as detainees' filings or submissions to federal courts or military tribunals or letters and other documents sent to U.S. authorities on their behalf. Nor do the files include any court opinions or orders, nor any other potentially exculpatory documents that the United States may have in its possession.

50. All of these facts, taken together, establish that a detainee's detention, trial, and sentencing at Block D are driven in large measure, and sometimes exclusively, by his prior detention at Guantanamo or Bagram.

*Other points of U.S. influence*

51. Based on my interviews with relevant officials at Block D, I learned that U.S. officials play a "mentoring" and "capacity building" role at Block D. Based on my observations and interviews with relevant officials at Block D, I have concluded that these roles also serve as opportunities for the United States to exercise substantive influence over the legal processes at Block D.

52. In January and March 2008, U.N. and E.U. officials in Kabul informed me of the U.S. role in financially and logistically supporting the Block D facility and the legal process there, as well as the NDS and the Afghan government generally. The officials suggested that although the process at Block D was an "Afghan process," it was likely that at least some Afghan officials feel obligated to make decisions that conform to the wishes of the U.S. government. These officials and I also observed dynamics between U.S. and Afghan officials that reinforced this conclusion. For instance, on one occasion I witnessed a U.S. official attempting to arrange a compromise between judges and defense lawyers about the postponement of a trial at Block D; on another occasion I heard a senior Afghan official at Block D suggest that my access to the Block D facility would have to be arranged via the U.S.

government. Afghan officials also suggested to other U.S. lawyers who visited Block D that U.S. officials would need to approve their access. Afghan officials, attorneys, and family members of detainees told me of other examples of influence exercised by U.S. officials over Block D matters. An Afghan government official told me he suspects there is "U.S. pressure placed at higher-levels of the National Security Council and NDS." A relative of a Block D detainee told me that Afghan officials had formally authorized his uncle's release but he remained in Block D "because of U.S. influence."

53. It is not strange or unusual that U.S. influence over Block D would exist. Block D is formally under the control of the Afghanistan National Security Council—a political entity controlled officially by President Karzai but over which the U.S. has varying degrees of influence, because of close contacts with members of the council. U.S. authorities in Kabul have additional influence on the Block D process through President Karzai and the authority he has to approve or reject the extrajudicial recommendations of the Block D Review Committee.

54. As a result of the above factors, I have concluded that U.S. authorities exercise extensive influence over Block D detention and legal processes. The exact nature and extent of the influence and the mechanisms whereby it is effected are not entirely known, but I am certain that extensive influence exists.

I declare under penalty of perjury that the above is true and correct.

Jonathan Horowitz

Date: May 27, 2008

17