Exhibit K

Cleared by the CSO for Public Filing

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUZATULLAH, et al. ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 06-CV-01707 (GK) |
| ) | |
| ROBERT GATES, ) | |
| Secretary, ) | |
| United States Department ) | |
| of Defense, et al. ) | |
| ) | |
| Respondents. ) | |

## PETITIONER RUZATULLAH'S OPPOSITION TO
## RESPONDENTS' SUPPLEMENTAL MOTION TO DISMISS

Petitioner Ruzatullah, through his next friend, submits this opposition to the respondents' assertion of mootness in their Supplemental Motion to Dismiss ("Supp. Mot."). Respondents' supplemental motion is based on the purported transfer of Ruzatullah to the custody and control of the Government of Afghanistan. Consequently, respondents assert that his habeas petition is now moot, and the Court lacks jurisdiction to hear his claims. Supp. Mot. ¶ 5. Neither conclusion is correct.

Respondents' supplemental motion does not affect the procedural posture of this case, nor does it deprive this Court of jurisdiction over Ruzatullah's petition for habeas corpus relief. Respondents' filing seeks only to introduce a new factual basis in support of their assertion that this Court lacks jurisdiction over the petition. It remains the case, however, that where

Case 1:05-cv-01124-UNA    Document 82-14    Filed 05/30/2008    Page 3 of 15
Cleared by the CSO for Public Filing
Case 1:06-cv-01707-GK    Document 25    Filed 08/01/2007    Page 2 of 14

respondents seek a jurisdictional dismissal based on affidavits asserting extrinsic facts, this Court cannot dismiss the case without permitting discovery on those facts. *E.g., Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001).

Contrary to respondents' argument, the fact that Ruzatullah has been transferred to the nominal custody of the Afghan Government does not necessarily deprive this Court of jurisdiction over his petition. *See Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 68 (D.D.C. 2004). Indeed, as set forth below, the purported transfer of Ruzatullah raises more legal and factual questions than it answers. Ruzatullah is currently incarcerated in a notorious Afghan prison that the U.S. military operates and supervises. The terms of his transfer, the authority of the United States to determine the conditions of his confinement, the United States' involvement in his continued incarceration and the ongoing impact of his designation as an "enemy combatant" by the United States are all essential facts that must be resolved before the Court can properly determine whether Ruzatullah's petition is moot.

## FACTS

### Petitioner's Purported Transfer and Continued Incarceration

As set forth in the Second Amended Petition, Ruzatullah has been incarcerated by the United States, without cause, without charge, and without meaningful process, for two and one-half years. According to respondents, the United States recently "relinquish[ed] all legal and physical custody" of petitioner to the Afghan government. Supp. Mot. ¶ 3. Respondents' submission is noticeably silent as to what happened to Ruzatullah upon his purported transfer. As respondents well know, but chose not to confirm to the Court, Ruzatullah was not released from custody. Rather, he was transported directly from the prison at Bagram Airfield to a new

Case 1:05-cv-01124-UNA   Document 82-14   Filed 05/30/2008   Page 4 of 15
Cleared by the CSO for Public Filing
Case 1:06-cv-01707-GK   Document 25   Filed 08/01/2007   Page 3 of 14

"national defense" detention wing of the notorious Policharky prison in Kabul, Afghanistan, where he remains incarcerated. Declaration of Attorney Tina M. Foster (July 31, 2007) ("Foster Decl."), at ¶ 4 (attached as Ex. 1).[1]

Ruzatullah has had no process before an Afghan court or other Afghan authority concerning his continued incarceration. Foster Decl. at ¶ 7. He continues to be held without charges – other than having been labeled an "enemy combatant" by the United States – and without access to counsel. *Id.* To undersigned counsel's knowledge, there is no process available to Ruzatullah in Afghanistan through which he would be able to challenge his designation as an "enemy combatant" or his continued incarceration. Azimi Decl. at ¶¶ 17-22. In short, following his "transfer," the only thing that has changed for petitioner is the address of his prison. His incarceration continues to result directly from his designation as an "enemy combatant" by the United States, and there continues to be no viable means for him to contest that designation.

Although respondents' submission and affidavit are silent on this point, in similar cases, detainee "transfers" have been subject to restrictive terms and conditions imposed by the United States. As Matthew C. Waxman, then Deputy Assistant Secretary of Defense for Detainee Affairs, averred in *Abdah v. Bush*, Civ. Action No. 04-1254 (HHK) (D.D.C.), "the United States also transfers GTMO detainees, under appropriate conditions, to the control of other governments *for continued detention, investigation, and/or prosecution.*" Declaration of Matthew C. Waxman (June 2, 2005) ("Waxman Decl.") at ¶ 3 (emphasis added) (attached as Ex. 3). Dozens of detainees have been transferred to foreign countries for "further detention, investigation and prosecution." Declaration of Pierre-Richard Prosper (March 8, 2005)

---

[1] This facility is known (in English) as the Afghan National Defense Facility (ADNF/Pol-i Charkhi). Declaration of Ahsadullah Azimi (July 31, 2007) ("Azimi Decl."), at ¶ 10 (attached as Ex. 2).

3

("Prosper Decl.") at ¶ 2 (submitted in *Abdah v. Bush*, CA No. 04-1254 (HHK) (D.D.C.) (attached as Ex. 4); Waxman Decl. at ¶ 4.[2] Although the United States has not disclosed the conditions for transfer of specific detainees, *see* Prosper Decl. at ¶ 9, the existence of certain types of conditions have been brought to the attention of petitioner's counsel. The United States acknowledges that continued detention may be a condition of transfer for some detainees. Waxman Decl. at ¶ 3; Prosper Decl. at ¶ 4. Others may experience less onerous, but still restrictive, conditions. For example, a detainee transferred to England was subject to conditions requiring him to register with the police, check in monthly with local police or military, and notify the English government of any plans to travel. Declaration of George Brent Mickum, IV (July 30, 2007), ("Mickum Decl."), at ¶ 10 (attached as Ex. 5).

Although he has purportedly been transferred from U.S. custody, Ruzatullah continues to be incarcerated. He has not been informed of any basis for his incarceration other than his designation as an "enemy combatant" by the United States. As noted above, the United States has acknowledged that a commitment that the detainee will continue to be incarcerated is among the conditions that may be imposed or agreed as part of a detainee transfer. This raises the probability that Ruzatullah's transfer was conditioned on his continued detention by the Afghan government. It is an essential question that respondents have chosen not to address.

---

[2] Former Deputy Assistant Secretary Waxman asserted in his declaration that the continued detention of detainees after transfer is entirely at the discretion of the foreign government and not within the control of the United States. Waxman Decl. at ¶ 5. That statement is, however, in tension with other statements in the Waxman and Prosper declarations. Specifically, both declarants state that the transfer of the detainees is subject to the receiving country's assurance that it will take action that will ensure that a transferred detainee "will not pose a continuing threat to the United States and its allies." Waxman Decl. at ¶ 5; Prosper Decl. at ¶ 3. This strongly suggests that the conditions of transfer are related exclusively to the United States' concerns, and not the law enforcement concerns of the foreign countries. Under these circumstances, it belies reality to suggest that continued detention of a detainee is solely at the receiving country's discretion and based solely on its laws.

4

Case 1:05-cv-01124-UNA   Document 82-14   Filed 05/30/2008   Page 6 of 15
Case 1:06-cv-01707-GK   Document 25   Filed 08/01/2007   Page 5 of 14

Cleared by the CSO for Public Filing

**Policharky Prison**

Policharky prison was initially constructed in the 1970s. Bilal Sarwary, *Kabul's Prison of Death*, BBC News Kabul, Feb. 27, 2006 (attached as Ex. 6). During the Soviet occupation of Afghanistan, Policharky prison (variously spelled Pul-e-Charkhi, Pul-e-Charky, Pul-i-charki, Policharky) became notorious for torture and ill-treatment. In the early 1980s, close to 17,000 prisoners from Policharky were murdered in night executions that were common during in that period. M. Hassan Kakar, *Afghanistan: The Soviet Invasion and the Afghan Response, 1979-1982* (1995), at ch. 9. (attached as Ex. 7).[3] According to the United Nations, Policharky prison "was without doubt a kind of Buchenwald." Leo Dobbs, *A Pilot for Prison Reform*, UNAMA Afghan Update (Summer 2006), at 3 (attached as Ex. 8). For many Afghans the name "Policharky" remains synonymous with horror. Sarwary, *supra*.

Although the principal wings of the Policharky Prison are under Afghan control and are used for ordinary prison functions, the United States has been directly involved in the construction, maintenance and supervision of areas of the prison that houses Afghan detainees "transferred" from Guantanamo and Bagram. Azimi Decl. at ¶ 7. Although these areas are purportedly under the control of the Afghan Ministry of Defense, U.S. military officers continue to control access and security there. These areas operate under different procedures from the rest of Policharky. Azimi Decl. at ¶ 11.[4]

The American military has direct involvement in the physical security of Policharky and the detention of prisoners there. A U.S. Army spokesman has acknowledged that the American military "oversee[s] operations at the prison." Kevin Dougherty, *Afghan Who Killed Two American Soldiers Was "Mentally Ill,"* Stars and Stripes, May 8, 2007 (attached as Ex. 9).

---

[3] Available at http://ark.cdlib.org/ark:/13030/ft7b69p12h/ (last viewed July 31, 2007).
[4] The "national security" wing of Policharky was commissioned and funded by the United States. Foster Decl. at ¶ 8.

5

Case 1:05-cv-01124-UNA   Document 82-14   Filed 05/30/2008   Page 7 of 15
Cleared by the CSO for Public Filing
Case 1:06-cv-01707-GK   Document 25   Filed 08/01/2007   Page 6 of 14

"American trainers" have been stationed at Policharky since the opening of a national security wing in April 2007. Associated Press, *Afghan Gunman Kills 2 U.S. Soldiers*, May 7, 2007 (attached as Ex. 10).

The United States' authority at the prison appears to extend to control of access to the areas of the prison where "enemy combatants" are held. Ahabullah Azimi, an attorney from the International Legal Foundation, sought access to the prisoners in Policharky pursuant to a letter of permission from the Ministry of Defense. In spite of this permission from the Afghan government, he was turned away by a U.S. military officer. Azimi Decl. at ¶ 15. Specifically, the officer informed Mr. Azimi that no prisoner was permitted to see an attorney until his file had been lodged with Afghanistan's "National Security Court." *Id.* at ¶¶ 14-15.

Following his denial of access, Mr. Azimi sought clarification of this statement from Lieutenant Colonel Nader Khan, an Afghan officer who served as the chief legal advisor for Policharky's national security wing. Mr. Azimi informed Lt. Col. Khan that the National Security Court had been dissolved and again sought access to the Policharky prisoners pursuant to the written permission granted by the Afghan Ministry of Defense. Lt. Col. Khan deferred consideration of Mr. Azimi's renewed request for access on the ground that he needed to "speak with his American advisors." *Id.* at ¶ 19. General Khan later informed Mr. Azimi, presumably at the instruction of the American advisors, that he could not see the national security prisoners without a letter of permission from the Minister of Defense personally. *Id.* at ¶ 20. Not surprisingly, no such letter has been forthcoming.

Accordingly, there is strong evidence of the United States' continued involvement in and direction of the incarceration of nominally "transferred" detainees, such as Ruzatullah. The United States admits that it transfers detainees subject to conditions, which can include continued

6

Case 1:05-cv-01124-UNA   Document 82-14   Filed 05/30/2008   Page 8 of 15
Case 1:06-cv-01707-GK   Document 25   Filed 08/01/2007   Page 7 of 14

Cleared by the CSO for Public Filing

incarceration. In addition, it controls operations of and access to prisoners at Policharky. Moreover, as a practical matter, it appears that the United States is taking steps to assure that former detainees are held incommunicado.

## ARGUMENT

Respondents argue that because Ruzatullah is allegedly no longer within the physical or legal custody of the United States, his petition is moot and should be dismissed. Respondents' submission does not, however, warrant dismissal on this record.

First, Ruzatullah's transfer to Policharky does not deprive this Court of jurisdiction. The fact that the petitioner is in the purported custody of a foreign sovereign does not deprive the Court of jurisdiction over a habeas petition if the United States retains constructive custody. *Abu Ali v. Ashcroft*, 350 F. Supp. 2d at 68. There is ample evidence of the United States' continued participation in and supervision of petitioner's incarceration. At the very least, petitioner must be allowed discovery on this issue.

Second, Ruzatullah continues to suffer collateral consequences from his designation as an "enemy combatant" by the United States. Those consequences include his continued incarceration, which is directly caused by his initial designation as an "enemy combatant," as well as other conditions that are likely to result from that designation. Because of these collateral consequences, Ruzatullah continues to have a substantial stake in his status as an "enemy combatant" even if he is no longer in U.S. custody. Consequently, his petition is not moot. *Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968).

7

Case 1:05-cv-01124-UNA     Document 82-14     Filed 05/30/2008     Page 9 of 15
Cleared by the CSO for Public Filing
Case 1:06-cv-01707-GK     Document 25     Filed 08/01/2007     Page 8 of 14

### I. THE UNITED STATES' PARTICIPATION IN THE PETITIONER'S CONTINUED INCARCERATION PRECLUDES A DETERMINATION OF MOOTNESS AT THIS JUNCTURE.

Respondents' submission includes an affidavit asserting that Ruzatullah has been transferred to the custody of the Afghan government and that the United States has "relinquish[ed] all legal and physical custody of Ruzatullah." Supp. Mot. at ¶ 3; Second Declaration of Colonel James W. Gray (July 3, 2007), at ¶ 2. However, the Gray Declaration notably fails to address the current conditions of Ruzatullah's confinement. There are substantial facts suggesting that the United States continues to supervise and control his detention at Policharky. If, as appears to be the case, petitioner has been consigned to another sovereign, but the United States continues to be substantially involved in his incarceration, this petition is not moot.

As Judge Bates has recently observed, although "[t]he turnkey of the habeas statute is the requirement of custody," federal courts must "very liberally construe[] the 'in custody' requirement for the purposes of federal habeas." *Abu Ali*, 350 F. Supp. 2d at 45-46 (quoting *Maleng v. Cook*, 490 U.S. 488, 492 (1989)). There is no requirement that a prisoner be in the United States' physical custody to invoke the protections of the Great Writ. *Stokes v. United States Parole Comm'n*, 374 F.3d 1235, 1237 (D.C. Cir. 2004) (Ohio federal court has jurisdiction to hear habeas petition by prisoner in private prison in Ohio); *United States v. Jung Ah Lung*, 124 U.S. 621 (1888) (Chinese citizen detained by master of steamship was in custody of U.S. for purposes of habeas jurisdiction). Although some involvement of U.S. officials is required to satisfy the "in custody" requirement, *Abu Ali*, 350 F. Supp. 2d at 47, in appropriate circumstances, a prisoner may be "in custody" and therefore protected by the federal habeas statute, even if he is "in the actual, physical custody of some person or entity who cannot be

8

deemed the United States," including a foreign sovereign. *Mohammed v. Harvey*, 456 F. Supp. 2d 115, 122 (D.D.C. 2006), *aff'd*, No. 06-5126, 2006 U.S. App. LEXIS 26336, (D.C. Cir. Oct. 23, 2006).

As described above, in the instant case, there is substantial evidence of the United States' participation in, and control of, petitioner's ongoing detention in Policharky:

(i) The United States has represented repeatedly to this Court that its transfer of detainees to the purported custody of foreign governments is generally subject to conditions, which may include continued detention;[5]

(ii) The U.S. military oversees operations at Policharky;

(iii) U.S. military personnel control access to the prisoners at Policharky's national security wing, including prisoners transferred from Bagram;

(iv) There has been no independent proceeding by the Afghan courts or government considering any evidence against Ruzatullah or confirming any basis for his continued incarceration; and

(v) As far as counsel is aware, there is no court in Afghanistan with jurisdiction and authority to consider any petition for release by Ruzatullah.

These facts evidence continued U.S. involvement in Ruzatullah's incarceration such that he may be deemed to be in "constructive custody" of the United States. His petition for habeas relief is, accordingly, not moot. *Abu Ali*, 350 F. Supp. 2d at 68.

In *Abu Ali*, the petitioner (through his next friend) sought habeas relief from his detention in a Saudi prison. He alleged that his incarceration and interrogation was at the behest and under the supervision of the United States.[6] Respondents argued in *Abu Ali* that this Court lacked jurisdiction because the petitioner was in the physical custody of a foreign sovereign. The Court

---

[5] *E.g., Abdah v. Bush*, No. 04-1254, 2006 U.S. Dist. LEXIS 4942 at *11-*12 (D.D.C. Mar. 29, 2005); *Al-Joudi v. Bush*, No. 05-301, 2005 U.S. Dist. LEXIS 6265 at *6-*7 (D.D.C. Apr. 4, 2005); *Al-Marri v. Bush*, No. 04-2035, 2005 U.S. Dist. LEXIS 6259 at *6-*7 (D.D.C. Apr. 4, 2005).

[6] Abu Ali is a U.S. citizen, a fact that the Court relied on in its consideration of the applicability of the habeas statute and the Constitution to Ali's incarceration abroad. His citizenship status was not, however, germane to the Court's analysis of the "constructive custody" issue. That analysis was premised on evidence of the conduct and agreements of the United States and the foreign government, not the citizenship of the petitioner.

9

denied the motion to dismiss and permitted jurisdictional discovery to go forward. As the Court noted,

> Given the accepted breadth of the habeas statute, the imperative to construe the "in custody" requirement expansively in favor of the petitioner and without regard for formalisms, the absence of any language in the text that carves out an exception where the physical custodian is a foreign body, the many circumstances in which habeas jurisdiction has been found where the individual was not in the immediate possession of the respondent, and the decisions in which habeas jurisdiction was found when the executive or some other government official was working through the intermediary of a State (*Braden*), a private individual (*Jung Ah Lung*) or a private corporation (*Stokes*), the Court cannot find any basis in the habeas statute for denying jurisdiction merely because the executive is allegedly working through the intermediary of a foreign ally.

*Id.* at 49-50.

In *Abu Ali*, this Court identified a number of factors relevant to the question of whether a petitioner is in the constructive custody of the United States, even though he is in the physical custody of another country. These include whether:

(i)   The petitioner was detained at the behest of United States officials;

(ii)  The United States enlisted the foreign state as an agent or intermediary who was generally indifferent to the detention of the prisoner;

(iii) The petitioner was transferred to the foreign state to deny him an opportunity to assert his rights in a United States tribunal; and

(iv)  A request by the United States would secure the petitioners' release.

*Id.* at 68.

These factors are not exhaustive, and all factors need not necessarily be present to find that a petitioner was in constructive U.S. custody. *Id.* at 68 & n.42. ("Where all of these factors are present, however, it blinks reality to conclude that the detainee is anything other than in the custody of the United States for purposes of habeas jurisdiction"). In the instant case, it is undisputed that petitioner was originally detained by the United States military in Afghanistan,

10

Case 1:05-cv-01124-UNA   Document 82-14   Filed 05/30/2008   Page 12 of 15
Case 1:06-cv-01707-GK   Document 25   Filed 08/01/2007   Page 11 of 14

Cleared by the CSO for Public Filing

denominated an "enemy combatant" (though not through procedures authorized by Congress or compliant with the most rudimentary notions of due process), and was held until approximately June 19 in Bagram AFB. If, as has been the case with detainees in Guantanamo Bay, petitioner was released into Afghan custody pursuant to specific terms and conditions that required Afghanistan to continue to detain him (or to take other actions with respect to his imprisonment or restricting his liberty), at least three of the four *Abu Ali* factors would be met.

At the very least, based on the facts set forth, the Court should permit discovery into the United States' continued involvement in Mr. Ruzatullah's confinement. The notable lack of detail in respondents' affidavit, coupled with the information submitted herein, demonstrate a need for further inquiry into the *Abu Ali* factors. As petitioners noted in their initial opposition to respondents' motion to dismiss, where, as here, respondents rely on extrinsic facts to support their argument that the Court lacks jurisdiction, at the very least, the Court should permit petitioners to take discovery in respect of those facts. *E.g.*, *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001).

## II. PETITIONER'S HABEAS PETITION IS NOT MOOT, BECAUSE POTENTIAL ADVERSE CONSEQUENCES COLLATERAL TO HIS DETENTION CONTINUE TO EXIST.

Even if Ruzatullah were not in constructive U.S. custody, he still has a continuing interest in establishing his innocence. A habeas corpus petition is not moot even after a petitioner's release if collateral consequences of the individual's conviction exist. *Carafas v. LaValle*, 391 U.S. at 237-38. In such situations, the petitioner must have a "substantial stake in the judgment

11

of conviction which survives the satisfaction of the sentence imposed on him." *Fiswick v. United States*, 329 U.S. 211, 222 (1946).[7]

Ruzatullah has much at stake here. First, his continued incarceration in Afghanistan appears to be based entirely on his "enemy combatant" designation. As detailed in petitioners' previous submissions, this designation was made without any indicia of due process. Second, his designation as an "enemy combatant" exposes him to additional conditions which are largely unknown to petitioner at this point but which are likely to affect him in the future.

### A. Petitioner's Continued Incarceration In Afghanistan Is A Collateral Consequence Of The U.S. Designation Of Petitioner As An "Enemy Combatant."

There has been no independent consideration of Ruzatullah's status by any forum or authority in Afghanistan, and none is pending. No charges have been filed against him in Afghanistan. Thus, it is apparent that Ruzatullah's incarceration continues to stem entirely from his designation as an "enemy combatant" by the United States. This Court has jurisdiction to review the legality of that designation and to determine that it was improperly and unconstitutionally applied to Ruzatullah. His continued incarceration renders the current petition a live dispute. It is not moot.

In addition, as described above, there is substantial reason to believe that petitioner's continued confinement may be a condition of the United States' transfer of custody to the Afghan government. If the United States could obtain Ruzatullah's release simply by lifting a condition it imposed on his transfer then this petition is not moot. *Abu Ali*, 350 F. Supp. 2d at 68 (Court retains jurisdiction where petitioner could be released upon U.S. request). At the very least, petitioner should be entitled to take discovery concerning any conditions on his transfer to

---

[7] Although Ruzatullah has not been charged with, much less convicted of any crime, his designation as an "enemy combatant" has been used like a criminal conviction as the basis for his incarceration. He clearly has a continuing interest in having this improper designation expunged.

12

determine whether they constitute collateral consequences of his designation as an "enemy combatant."

### B. Petitioner's "Enemy Combatant" Designation Has Additional Consequences Beyond His Incarceration.

It is likely that petitioner's designation as an "enemy combatant" will have further adverse consequences even after his release from prison. As discussed above, the United States has admitted that its transfer and/or release of detainees can be conditioned upon the imposition of particular terms. Waxman Decl. at ¶ 3. Among the terms that the United States has imposed, or has sought to impose, are: i) continued detention; ii) criminal prosecution; iii) release subject to twenty-four hour surveillance; iv) residence registration; v) regular check-ins with police (similar to parole or probation check-ins); and vi) restrictions on travel. *Id.*; Mickum Decl. at ¶ 10. Imposition of *any* of these conditions would constitute a collateral consequence sufficient to prevent this Court from dismissing the existing petition as moot. *See, e.g., Jones v. Cunningham*, 371 U.S. 236, 241-43 (1963) (restrictions on liberty imposed by parole, including registration of address, periodic reporting to parole officer, and restrictions on travel constitute custody for purpose of habeas relief); *Carafas*, 391 U.S. at 237 (restrictions from serving as a labor union official, voting, and jury service are collateral consequences to petitioner's conviction); *Justin v. Jacobs*, 449 F.2d 1017, 1019 (D.C. Cir. 1971) (petitioner's commitment under the Sexual Psychopath Act had sufficient collateral consequences of voting restrictions, jury service disqualification, special driver's license examinations, and limited access to a gun license).

Respondents have failed to disclose to the Court or the petitioner the terms of Ruzatullah's "transfer." Only the respondents have access to this information. It is, accordingly, impossible to particularize all of the specific collateral consequences at issue. To the extent this

Case 1:05-cv-01124-UNA   Document 82-14   Filed 05/30/2008   Page 15 of 15
Case 1:06-cv-01707-GK   Document 25   Filed 08/01/2007   Page 14 of 14

Cleared by the CSO for Public Filing

Court determines that petitioner has failed to particularize the collateral consequences in this case, petitioner must be afforded discovery on these issues.

## CONCLUSION

Ruzatullah has now been in custody for more than two and one-half years. No independent authority has ever considered whether there is any basis for his incarceration. Having challenged his incarceration in a U.S. court, Ruzatullah finds himself shunted unexpectedly from a U.S. military base to a U.S. supervised prison. Respondents now claim that he is beyond the power of this Court, without disclosing that his incarceration remains at the behest, and under the supervision, of the United States government. This Court has the right, and the obligation, to permit inquiry into the respondents' convenient and conclusory representations.

WHEREFORE, for the reasons stated above, Petitioner Ruzatullah respectfully requests that respondents' motion to dismiss be denied and that the Court issue the writ of habeas corpus.

Respectfully submitted,

/s/ A. Katherine Toomey
Eric L. Lewis (#394643)
Dwight P. Bostwick (#427758)
A. Katherine Toomey (# 426658)
Baach, Robinson & Lewis PLLC
1201 F Street, NW, Suite 500
Washington, DC 20004
Tel: (202) 833-8900
Fax: (202) 466-5738

/s/ Tina Foster
Tina Foster
International Justice Network
P.O. Box 610119
Bayside, NY 11361-0119
Tel. +1 917 442 9580
Fax. +1 917 591 3353

Dated: August 1, 2007