~~SECRET~~

Filed with Classified
Information Security Officer
CISO _AM Ruurero Kendall_
Date _06/08/2016_

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALI SHAH MOUSOVI, *et al.*, | ) ) ) |
| Petitioners, | ) ) |
| v. | ) Civil Action No. 05-1124 (RMC) |
| BARACK H. OBAMA, *et al.*, | ) ) |
| Respondents. | ) ) |
| IN RE PETITION of HAJI WALI MOHAMMED MORAFA (ISN 560) | ) ) ) |

### OPINION

In his petition for habeas corpus, Petitioner Haji Wali Mohammed Morafa asks: "Is he the person the Government says he is?" This question has consumed years of discovery, argument, two evidentiary hearings, and stacks of briefs and exhibits. Petitioner, an Afghan citizen, is a detainee at Guantanamo Bay Naval Station in Cuba. The Government contends that Petitioner used the cover of an otherwise legitimate money-changing business to provide financial services to al-Qaida, the Taliban, and Hizb-I-Islami Gulbuddin. Petitioner claims that he was a minor money dealer in Pakistan in the late 1990s and owed so much money to so many people by the end of 1998 that he was disgraced and could not thereafter have given substantial support to any cause.

~~SECRET~~

1

~~SECRET~~

████████████████████████████████████████████████ the Court finds by

a preponderance of the evidence that Petitioner was part of, and substantially supported, the

Taliban and Hizb-I-Islami Gulbuddin at the time he was arrested in January 2002, but there is

insufficient evidence that his activities in support of al-Qaida continued to that time. Because he

is lawfully detained, his petition for habeas corpus will be denied.

## I. FACTS

### A. Brief History of al-Qaida, the Taliban, and HIG

The Soviet Union invaded Afghanistan in 1979 and installed a puppet government

in Kabul. In response, Afghan mujahideen[2] fighters began a guerrilla war against the Soviets,

with help from the United States and other countries. Soviet troops withdrew in 1989 but the

mujahideen continued to fight among themselves for control. In this time period, Mullah

Muhammed Omar, an Islamic cleric, a teacher in a religious school, and a leader of mujahideen

fighters, organized the Taliban[3] as a warrior force of strict Islamists.

In the fall of 1996, a Taliban force led by Mullah Mohammad Rabbani Akhud,

(Mullah Rabbani) seized control of Kabul and overthrew the prior government. Thereafter, the

Taliban established the Islamic Emirate of Afghanistan and governed by a strict interpretation of

Islamic Sharia law. Mullah Omar was the Taliban Supreme Commander and spiritual leader.

---

[1] *See* Tr. (5/19/2010) at 117-18 (Col. Lang). "Haji" is not a birth name but, rather, a sign of
respect for a Muslim who has completed the Haj to Mecca. *See also*
http://www.oxforddictionaries.com/definition/english/haji (last visited on May 25, 2016).

[2] Mujahideen is the plural form of mujahadid, which means those who "fight a jihad." *See*
http://www.oxforddictionaries.com/definition/english/mujadideen (last visited on May 25, 2016).
A "jihad" is a struggle or a fight against the enemies of Islam. *See*
http://www.oxforddictionaries.com/definition/english/jihad (last visited on May 25, 2016).

[3] "Taliban" means "students" in Pashto. *See* http://www.britannica.com/topic/Taliban (last
visited on May 25, 2016).

~~SECRET~~

SECRET

He headed the Taliban Supreme Council in Kandahar. Mullah Rabbani was second in command as the Taliban Prime Minister in Kabul. Mullah Rabbani died in April 2001. He was succeeded as Prime Minister by Maulavi Mohammed Abdul Kabir. Mullah Omar continued to lead the Taliban, either from Afghanistan or Pakistan, until his death in 2013.[4]

Mullah Omar and the Taliban protected al-Qaida and its leader Usama bin Ladin (UBL) in Afghanistan for years before the attacks on September 11, 2001. Based on the Taliban's support for al-Qaida and Usama bin Ladin at the time they were planning the September 11 attacks, the United States considers the Taliban to be a force associated with al-Qaida. The Taliban government was overthrown by the United States' attack in Afghanistan after September 11, 2001, but it continues to exist and to pose a threat to the current government.

Gulbuddin Hekmatyar is an Afghan who is the founder and leader of Hizb-i-Islami Gulbuddin (HIG). HIG was a mujahideen fighting force against the Soviets and against other mujahideen in the post-Soviet civil war, including the Taliban. Gulbuddin Hekmatyar became Prime Minister of Afghanistan in 1993-94 and 1996; he fled to Iran in 1996 when the Taliban seized Kabul but he continued to direct the remaining HIG forces from Iran. Gulbuddin Hekmatyar has called for jihad against the United States, and HIG has battled against U.S. Coalition forces. Since the spring of 2002, HIG has been a force associated with al-Qaida. *See Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011).

---

[4] Mullah Omar's death was not reported until 2015.

SECRET

SECRET

## B. Petitioner's Background

Petitioner was born in 1966 in Baghlan Province, Afghanistan. PTX2.154 at WM299.[5] He moved to Pakistan with his family around 1978, and he speaks Pashto, Persian and Urdu. *Id.*

As of early 2002, Petitioner was 36 years old and had two wives and 10 children. PTX2.154 at WM299. He has four brothers—Haji Sher Muhammed, Jan Muhammed, Haji Wakeel, and Gul Jan—who all live in Peshawar, Pakistan. *Id.*

Petitioner is a Tablighi, *i.e.*, a follower of Tablighi Jamaat, a global Sunni Islamic proselytizing and revivalist movement. Petitioner has been a Tablighi since 1994-95 and has attended multi-day Tablighi conferences three or four times. Tr. at 104;[6]

Petitioner was in the cloth business from 1979 to 1984 or 1986 and the currency business thereafter until his arrest in 2002. PTX2.154 at WM299; Tr. at 34. By 1995, Petitioner had made "a very good fortune" and "a big name" for himself. Tr. at 41, 43-44;

Petitioner profited from the constantly changing values of currency from Afghanistan, Pakistan, and the United Arab Emirates. By late 1998, Petitioner's financial position had changed. He was in substantial debt and unable to pay his creditors. Tr. at 87-93.

---

[5] "PTX2.(number)" refers to Petitioner's Exhibits presented at the Second Merits Hearing; thus, PTX2.154 is Petitioner's Exhibit 154 from that hearing. Specific pages within an exhibit are indicated whenever possible by Bates numbers that appear on bottom right hand side of the page, such as WM299. For ease of reference, Petitioner numbered his exhibits in chronological order.

[6] All cites to the Transcript are to the May 18, 2010 testimony of Petitioner, unless otherwise noted.

SECRET

4

SECRET

Petitioner was sought by the United States because he was suspected of being the money handler for the Taliban, HIG, and al-Qaida. He was arrested at his home in Peshawar, Pakistan, on January 25, 2002, by Pakistani law enforcement and transferred to U.S. custody soon thereafter.

### C. Procedural History

With a group of other detainees, Petitioner filed his petition for a writ of habeas corpus on June 7, 2005. *See* Pet. [Dkt. 1]; *see also* Am. Pet. 10/26/05 [Dkt. 22]. On January 27, 2006, the Court stayed the case pending a ruling on whether the Court had jurisdiction to entertain the habeas petition. *See* Order 1/27/06 [Dkt. 33]. Thereafter, the case was effectively stayed for a lengthy period pending various rulings from the D.C. Circuit and the Supreme Court addressing what vehicle, if any, Guantanamo detainees could use to challenge their detention. After the Supreme Court ruled in *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), that district courts have habeas jurisdiction over Guantanamo detainees, this case became active again. Procedural and logistical matters in this case were consolidated with other Guantanamo cases for coordination and management before Judge Thomas Hogan in Miscellaneous Case No. 08-mc-442. *See* Order 7/2/08 [Dkt. 85].[7]

The Government filed a Factual Return regarding Petitioner in 2008. *See* Factual Return 11/25/08 [Dkt. 143]; Unclassified Factual Return 1/9/09 [Dkt. 170]. In January 2009, after President Barack Obama took office, the Government notified the Court that it had identified additional relevant documents that were undergoing clearance review. *See* Notice 1/30/09 [Dkt. 183]. On December 1, 2009, Respondents filed an Amended Factual Return, Dkt.

---

[7] Judge Hogan issued case management orders that govern this case and others. *See* Order 11/6/08 [Dkt. 136]; Modified Order 12/16/08 [Dkt. 154].

SECRET

SECRET

257, and Petitioner responded with a Traverse on January 15, 2010, Dkt. 264. After numerous filings including cross motions for judgment on the record,[8] the Court held the first merits hearing on May 18, 19, and June 10, 2010.

Although the case's dénouement seemed nigh, matters were not so simple. Following a November 5, 2010, telephone conference, the Court granted the parties' request to reopen the record and approved additional briefing to accommodate ongoing document review that was necessary for the Government to ensure full compliance with its disclosure obligations. *See* Minute Orders dated 11/5/10 & 11/23/10. *See generally* Am. Case Mgmt. Order 12/16/08 [Dkt. 154] §§ 1.D, 1.E. The Government filed a Supplemental Factual Return on March 25, 2011, Dkt. 331.

The discovery fights then renewed. Throughout 2011 and 2012, the parties litigated issues concerning access to certain evidence. In brief, the Government sought to provide adequate substitutes for certain information classified at the "Top Secret" level, the highest of the three levels of national security classification—*i.e.*, Top Secret, Secret, and Confidential.[9] Counsel for Petitioner only hold clearance at the Secret level, making them ineligible to access Top Secret information. *See* Am. Case Mgmt. Order [Dkt. 154] § 1.F ("If any information to be disclosed under Sections I.D or I.E of this Order is classified, the government shall, unless granted an exception by the Merits Judge, provide the petitioner's

---

[8] *See* Gov't Mot. for J. on the Record [Dkt. 271]; Pet. Cross Mot. [Dkt. 278].

[9] *See* "Classified National Security Information," Exec. Order 13526, 75 Fed. Reg. 707, 707–08 (Dec. 29, 2009) ("'Top Secret' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security . . . . 'Secret' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security . . . .").

SECRET

6

SECRET

counsel with the classified information, provided the petitioner's counsel is cleared to access such information. If the government objects to providing the petitioner's counsel with the classified information, the government shall move for an exception to disclosure."). Petitioner moved to either (1) compel the Government to provide the Top Secret information or (2) to preclude the Government from relying on Top Secret information.

Before a court can compel the disclosure of classified information, it must find that the information is relevant and material, "in the sense that it is at least helpful to the petitioner's habeas case." *Al-Odah v. United States*, 559 F.3d 539, 544 (D.C. Cir. 2009). The court also must also find that access by petitioner's counsel to the information is *necessary* to facilitate habeas review. *Id.* at 545 (emphasis added). In lieu of turning over highly classified material, courts permit the Government to provide to a detainee's counsel substitutes such as summaries or redacted documents, so long as the substitutes afford the detainee a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law. *Id.* at 247. In searching for reasonable alternatives to the release of highly classified material, a district court should examine both the highly classified material and the proposed substitutes *ex parte* and *in camera*. *Khan v. Obama*, 655 F.3d 20, 31 (D.C. Cir. 2011). A court should grant the Government's motion to provide a substitute instead of turning over classified material if the substitute provides substantially the same information as the classified material. *Al-Odah*, 559 F.3d at 547.

This Court reviewed the Top Secret material and the Government's proposed Secret substitutes *ex parte* and *in camera* and found that the substitutes were adequate to permit meaningful habeas review because all relevant and material information was provided by the substitutes. *See* Op. 1/9/13 [Dkt. 386]. Accordingly, the Court allowed the Government to

SECRET

7

SECRET

produce the adequate substitutes to Petitioner's counsel and expert instead of producing Top

Secret information. *See id.*; *see also* Order 9/28/11 [Dkt. 343]; Order Denying Reconsideration

7/23/12 [Dkt. 372]; Order 11/27/12 [Dkt. 382]; Minute Order 12/17/2012.

This Court also determined that the Government could rely on Top Secret source-

identifying information for which there was no adequate substitute provided to Petitioner's

counsel. Op. 1/9/13 [Dkt. 386] at 9-13. The Court explained that the failure to provide the Top

Secret source-identifying information to Petitioner was not prejudicial to the Court's ability to

review the evidence or to Petitioner's ability to challenge his detention:

> In this context, the ultimate question is whether access by [Petitioner's] counsel to Top Secret information is necessary to facilitate the Court's own meaningful review of the evidence. *Al-Odah*, 559 F.3d at 545. Under these circumstances, the Court concludes that it is not.
>
> The Court recognizes that its ruling necessarily impacts counsel's ability to access evidence that is relevant and material (but not necessary to facilitate review) and does not dismiss lightly the arguments counsel to Petitioner have made or the frustration they experience in trying to expand the universe of "reasonably available evidence," *Boumediene*, 553 U.S. at 790, from which to argue for their client. Top Secret source information is *not* reasonably available to those with Secret clearances. However, the value of this specific evidence is, at best, marginal: The underlying information provided by any source has been revealed to [Petitioner's] counsel, by way of a properly redacted document or a proper adequate substitute. Thus, [Petitioner's] counsel already can argue its accuracy and present his side. *See Khan*, 655 F.3d at 29 n.7 ("The relevant question is not the number of independent sources but rather the reliability of their evidence . . . ."). Disclosure of source-identifying information might allow [Petitioner]'s counsel to sharpen any attack on a source's credibility but, to be frank, the nature of the classified information already revealed immediately lends itself to such an attack.

SECRET

SECRET

*Id.* at 12.[10]

On January 22, 2013, the Government filed an Amended Supplemental Factual Return together with Exhibits 1 through 133, Dkt. 388, basically starting anew again. *See also* Reply [Dkt. 401]. On September 20, 2013, Petitioner filed a corrected Supplemental Traverse, Dkt. 411.[11] The Court held a second merits hearing on September 24 and 25, 2013.[12]

The Government repeatedly adjusted the evidence on which it relies to justify Petitioner's detention. As a result, the Court requested supplemental briefing at a status conference on May 15, 2015. In response, the Government filed the following: Response to the Court Questions and Ex Parte Response, Dkt. 427 (7/15/15); Ex Parte Response, Dkt. 429 (8/3/15); and Ex Parte Response, Dkt. 431 (8/19/15). In its July 15, 2015 filing, the Government specified precisely those Exhibits upon which it relies to prove that Petitioner is a part of, or acted in substantial support of, al-Qaida, the Taliban, and HIG. On October 26, 2015, Petitioner filed his own Response to the Court Questions, Dkt. 434, and on November 13, 2015, the Government filed a Reply in Response to Court Questions, Dkt. 438.

---

[10] Petitioner continued to object to all *ex parte* submissions by the Government. *See* Objection 9/23/13 [Dkt. 415]; Notice 10/26/15 [Dkt. 435]. The Court has ruled and declines Petitioner's repeated requests for reconsideration.

[11] The Supplemental Traverse, Dkt. 411, is a corrected version of the Supplemental Traverse Petitioner filed on April 18, 2013, Dkt. 397.

[12] Before the second merits hearing, Petitioner filed a Motion to Compel, Dkt. 405, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Opp'n (9/16/13) [Dkt. 408]. The motion to compel is denied as moot.

SECRET

9

SECRET

## II. JURISDICTION AND LEGAL STANDARDS

### A. Jurisdiction

The U.S. District Court for the District of Columbia has jurisdiction over petitions

for writ of habeas corpus brought by detainees held at Guantanamo Bay, Cuba. *See Boumediene*

*v. Bush*, 553 U.S. 723 (2008). The Authorization for Use of Military Force (AUMF), Pub. L.

No. 107-40, § 2(a), 115 Stat. 224, was enacted in response to the terrorist attacks of September

11, 2001. The AUMF authorizes the President to detain individuals who "planned, authorized,

committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such

organizations or persons . . . ." The AUMF "justifies holding a detainee at Guantanamo if the

[G]overnment shows that the detainee was part of al Qaeda, the Taliban, or associated forces at

the time of his capture." *Hussain v. Obama*, 718 F.3d 964, 967 (D.C. Cir. 2013).

### B. Habeas Review and Burden of Proof

The President's authority can be challenged in a habeas proceeding. The

"privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that

he is being held pursuant to 'the erroneous application or interpretation' of relevant law."

*Boumediene*, 553 U.S. at 779 (quoting *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S.

289, 302 (2001)). "The writ of habeas corpus remains the sole means by which Guantanamo

detainees may challenge the legality of their detention." *Ahjam v. Obama*, 37 F. Supp. 3d 273,

278 (D.D.C. 2014), *appeal dismissed*, No. 14-5116 (D.C. Cir. Jan. 16, 2015).

The D.C. Circuit requires that district courts use a flexible standard in determining

whether a detainee is lawfully held under the AUMF. A lawfully detained person is, at a

minimum, one who (1) is part of al-Qaida, the Taliban, or associated enemy forces; or (2) has

substantially supported al-Qaida, the Taliban, or associated enemy forces. *See Al-Bihani v.*

SECRET

10

SECRET

*Obama*, 590 F.3d 866, 872-74 (D.C. Cir. 2010). Either prong stands as an independent basis for lawful detention. *See id.* at 874. The determination of whether an individual is part of, or substantially supported, al-Qaida, the Taliban, or other associated enemy forces "must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization." *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011) (quoting *Salahi v. Obama*, 625 F.3d 745, 751–52 (D.C. Cir. 2010)). The Government does not have to prove that the individual actively engaged in combat against the United States and its allies, *see Khairkhwa v. Obama*, 703 F.3d 547, 550 (D.C. Cir. 2012), or that the individual was part of command structure of the enemy force, *see Hussain*, 718 F.3d at 967. Evidence can include the facts and circumstances of the detainee's movements and activities. *See e.g.*, *Al-Odah v. Obama*, 648 F. Supp. 2d 1, 15 (D.D.C. 2009) (noting that the detainee's movements were consistent with those of a person taking orders from the Taliban), *aff'd*, 611 F.3d 8 (D.C. Cir. 2010).

The government bears the burden of proving detention is lawful and justified based on a preponderance of the evidence. *Al-Bihani*, 590 F.3d at 878; *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010) ("A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF.") The preponderance standard requires the court, as fact finder, "to believe that the existence of a fact is more probable than its nonexistence" before the court may find in favor of the party who has the burden, *i.e.*, in this case the Government. *Barhoumi v. Obama*, 609 F.3d 416, 424 (D.C. Cir. 2010) (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993) (internal quotation marks omitted)).

SECRET

11

SECRET

The critical issue is whether a detainee was "more likely than not" part of, or acted in substantial support of, al-Qaida, the Taliban, or associated enemy forces. *Al-Adahi v. Obama*, 613 F.3d 1102, 1106 (D.C. Cir. 2010). In reviewing the record, a court must consider the evidence in its entirety and should not weigh each piece of evidence in isolation. *See Barhoumi*, 609 F.3d at 424; *Esmail v. Obama*, 639 F.3d 1075 (D.C. Cir. 2011) (emphasizing the importance of considering each fact in light of all of the evidence). Even if no individual piece of evidence alone would justify detention, the evidence may, when considered as a whole and in context, nonetheless demand the conclusion that the petitioner was more likely than not part of al-Qaida, the Taliban, or associated forces or that he purposefully and materially supported such forces. *Al-Adahi*, 613 F.3d at 1105–06.

Further, a court may admit and consider hearsay evidence that is material and relevant to the justification for petitioner's detention, so long as the party introducing the evidence can establish that the hearsay evidence is reliable. *See Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008). "[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al-Bihani*, 590 F.3d at 879–80; *Barhoumi*, 609 F.3d at 422 (hearsay evidence "must be accorded weight only in proportion to its reliability"). The task of resolving "discrepancies among the various accounts" offered into evidence is for the fact-finder. *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 561 (D.C. Cir. 1993).

### C. Conduct Before September 11, 2001

As noted above, the AUMF authorizes holding a detainee at Guantanamo if he was part of (or substantially supported) al Qaeda, the Taliban, or associated forces *at the time of his capture*. *See Al-Bihani*, 590 F.3d at 872-74; *Hussain*, 718 F.3d at 967. In fact, courts

SECRET

12

SECRET

regularly rely on pre-September 11, 2001 evidence to find that a petitioner's detention is lawful.

For example, in *Al-Bihani*, the petitioner was a member of an al-Qaida aligned brigade which

fought against the Northern Alliance prior to the September 11, 2001 attacks. 590 F.3d at 872.

The brigade disbanded immediately when the United States and its allies bombed Afghanistan in

October 2001. The D.C. Circuit affirmed the district court's finding that the petitioner was

lawfully detained, even though all of his fighting occurred prior to September 11 and the brigade

disbanded shortly thereafter.[13]

It is important to understand that the AUMF justifies detention of an individual

who was a part of, or purposefully and materially supported, al-Qaida, the Taliban, or associated

enemy forces at the time of his capture even if he had nothing to do with the September 11, 2001

attacks. *See Al-Adahi v. Obama*, 692 F. Supp. 2d 85, 93 (D.D.C. 2010) (Government need not

show that petitioner had knowledge that the United States would join the battle in Afghanistan or

that petitioner intended to fight the United States, but instead must justify detention by showing

that petitioner had knowledge or intent to join or support al-Qaida, the Taliban, or associated

forces).

Further, the AUMF also covers members who joined al-Qaida or an associated

terrorist organization after the September 11, 2001 attacks. Such members are covered by the

AUMF because they are part of the organization that is covered by it. *See* AUMF, Pub. L. 107-

40, § 2(a), 115 Stat. at 224 (Government may "use all necessary and appropriate force against . . .

---

[13] The Government need not produce evidence of some affirmative action in support of a terrorist organization that took place *after* September 11, 2001 because this "would lead to the illogical and dangerous result that a proven 'sleeper agent' who was actually sleeping on and after 9/11 could not be detained." *Salahi v. Obama*, 710 F. Supp. 2d 1, 5 (D.D.C. 2010), *vacated and remanded on other grounds*, 625 F.3d 745, 750 (D.C. Cir. 2010).

SECRET

SECRET

organizations [that] planned, authorized, committed, or aided the terrorist attacks that occurred

on September 11, 2001 . . . ."); *see also* Curtis A. Bradley & Jack L. Goldsmith, Congressional

Authorization and the War on Terrorism, 118 Harv. L. Rev. 2047, 2109 (May 2005).

   In contrast, the Government lacks authority to detain someone whose ties with

terrorism were "sufficiently vitiated by the passage of time, intervening events, or both, such that

the detainee could no longer be considered to be 'part of' [al-Qaida, the Taliban, or associated

forces] at the time he was taken into custody." *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 128

(D.D.C. 2009). In *Al Ginco*, the petitioner had stayed at an al-Qaida guesthouse in 2000 and had

attended a training camp, but later al-Qaida accused him of being a spy, tortured him for three

months, and handed him over to the Taliban. The Taliban then imprisoned the petitioner for

eighteen months until he was liberated by the Northern Alliance. The Government took the

position that despite two years of horrific treatment by al-Qaida and the Taliban, the petitioner

was still part of al-Qaida and the Taliban. To determine whether a pre-existing relationship was

so sufficiently eroded over a sustained period of time that the relationship was vitiated, courts

must look to the following factors: (1) the nature of the relationship in the first instance; (2) the

nature of the intervening events or conduct; and (3) the amount of time that has passed between

the time of the pre-existing relationship and the point in time at which the detainee is taken into

custody. *Id.* at 129. Under this test, the *Al Ginco* court determined that while a brief relationship

had existed in 2000, petitioner's two-year torture and subsequent custody demonstrated that he

was no longer a trusted member of al-Qaida or the Taliban by 2002 when he was captured.

Because no relationship existed at the time of capture, the detention was not justified.

SECRET

14

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court reviewed and considered all evidence offered by both sides and assessed the evidence item-by-item for consistency, the conditions in which statements were made and documents found, the personal knowledge of the declarant, and the levels of hearsay. The Court has given the evidence the weight it deserves.

1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Petitioner's own admissions together with credible evidence from reliable sources provide a basis to conclude by a preponderance of the evidence that Petitioner himself was part of, and purposefully and materially supported, the Taliban and HIG. The evidence is insufficient to show that Petitioner was part of or supported al-Qaida at the time he was arrested in 2002.

2. **Petitioner was part of, and provided purposeful and material support to, the Taliban.**

3. Petitioner was a good friend of Mullah Rabbani, former Prime Minister of Afghanistan under the Taliban government. PTX2.154 at WM299. Petitioner also was close with Mullah Abdul Salam Qawi, who was a close friend of Mullah Rabbani. *Id.*

4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.  Given Petitioner's statements of allegiance to the Tablighi, his close association with Mullah Rabbani, his fame, and his wealth at the time, these reports ring true.

---

[14] Exhibits filed with the Amended Supplemental Factual Return, Dkt. 388, on January 22, 2013 are cited here as "Ex. #" followed by the document number assigned by the Government. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

6. ███████████████████████████████████████████

7. Mullah Abdul Rahman Zahid became the President of the Afghan Central Bank around the time that the Taliban came to power. Tr. at 54-56.

8. Petitioner and Mullah Zahid were from the same town in Afghanistan, and Mullah Zahid was a Talib (student) in the same mosque as Petitioner's brother. Tr. 41, 54-55.

9. In 1992 or 1993, Mullah Zahid visited the money exchange shop that Petitioner ran with his brothers. Tr. at 55.

10. At some time before 1996, Mullah Zahid had a partnership with Petitioner's brothers. Tr. 54.

11. Sometime between 1996 and 1998, Taliban Supreme Commander Mullah Omar authorized the Afghan Central Bank, through Bank President Mullah Zahid, to provide Petitioner with over $1 million USD to invest in currency exchanges and to make money for the Taliban.[16] Petitioner used the $1 million USD to enter into currency exchange transactions and gold, leading to a loss of $500,000 USD. Tr. at 57-59, 88-89, 95-97; Tr. (5/19/2010) at 14-17 (Petitioner); ███████ Ex. 85 (Decl. of Petitioner 9/16/2009);

12. Petitioner's large loss of funds caused the Taliban to order him and Mullah Zahid to come to Kandahar to answer questions. Mullah Omar assigned two investigators who immediately fired Mullah Zahid from his position at the Afghan Central Bank and jailed Petitioner's cousin to pressure Petitioner to repay the lost monies. Tr. at 92-93.

13. After days of negotiations, the investigators agreed that Petitioner could repay the debt through installments and that his cousin would be released from jail, but Mullah Zahid's job at the Bank was not restored. Tr. at 92-93; ███████ The Taliban did not charge or jail Petitioner. Tr. at 88. The Taliban's leniency in responding to the loss of an enormous amount of money says loudly that Petitioner was a respected part of the Taliban.

14. Petitioner argues that his support of the Taliban before 1999 cannot be a basis for detention because at that time the Taliban was merely a religious and political group involved only in internal Afghan affairs. Petitioner's early support of the Taliban at a time most necessary to that organization's success in seizing control of Afghanistan is critically telling. As the Taliban became stronger in Afghanistan, it protected al-Qaida, Usama bin Ladin, and the plan to attack the United States.

---

[16] The exact nature of the transaction is not clear, as Petitioner stated variously that it was a partnership (Tr. at 57-59, 88, 96), a contract (Tr. at 91) ██████████████████████████ ████████████████████████████

SECRET

SECRET

15. Petitioner testified that he was never close to Mullah Rabbani. Tr. at 101. This testimony is belied by his prior boasting that he was close to both Mullah Rabbani and to Rabbani's close friend, Mullah Abdul Salam Qawi. PTX 2.154.

16. In an attempt to distance himself from the Taliban, Petitioner also testified that his transaction with the Afghan Central Bank was not approved by Mullah Omar. Tr. at 97, 101. Due to the circumstances surrounding the transaction, the Court is not convinced. Petitioner knew Mullah Zahid and was aware that Mullah Zahid was installed as President of the Bank by the Taliban. Also, Petitioner was close to Mullah Rabbani.

17. Petitioner also contends that his connection to the Taliban was severed in 1998, when he lost substantial sums of money and the Taliban ostracized him. There is *no* evidence that Petitioner withdrew his active support of the Taliban, despite the fact that his diminished personal circumstances disallowed the largesse of the early years.

18.

19. Petitioner argues that he could not have performed this feat in April 1999 because he was laboring under his debt to the Afghan Central Bank. However, the record leads the Court to conclude that Mullah Rabbani was a close friend of Petitioner This particular incident of money changing is not tied to any terrorist-related effort by Petitioner but demonstrates Petitioner's continuing close connection to high-level Taliban officials in April 1999.

20.

21.

22.

23. Petitioner was a partner with his brother-in-law, Haji Obaidullah Haji Mushahid (or Mashud) and Sher Khan in the Shaheen Exchange in 1999. Tr. at 105-06. Sher Khan is also known as Sherkhan Faroud, an Afghan from Konduz who operated the Shaheen

SECRET

17

SECRET

Exchange in Dubai. *Id.* Even after the debacle of his large losses relating to the transaction with the Afghan Central Bank in late 1998, Petitioner returned to his currency exchange business. Tr. 106; *see also* Ex. 93 ▮▮▮▮▮▮▮▮▮

24. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25. As reported in April 2001, Petitioner repaid the Taliban the money he owed, and he continued to have a close relationship with the Taliban despite his financial difficulties. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26. He continued to support the Taliban after September 11, 2001. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27. Petitioner has not shown that time or events terminated his association with, or support for, the Taliban. *See Al Ginco*, 626 F. Supp. 2d at 128.

28. **Petitioner was part of, and provided material support to, HIG.**

29. Petitioner does not dispute that Hezb-i-Islami Gulbuddin (HIG) is an anti-Coalition group of mujahideen led by Gulbuddin Hekmatyar.

30. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 90 ▮▮▮▮▮▮▮[8] at 1; Ex. 92 (DHS Terrorist Org. Ref. Guide).

31. HIG has been associated with al-Qaida since the spring of 2002. *See Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011).

32. Petitioner's family is connected to HIG leader Gulbuddin Hekmatyar. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Petitioner described Obaidullah as his "brother in law." Tr. at 105-06. As noted above, Petitioner was partners with Mashud in the Shaheen Exchange. Tr. at 105-06.

---

[18] ▮▮▮▮▮ is a Senior Intelligence Analyst for the Defense Intelligence Agency.

SECRET

18

SECRET

33.

34.

35.

---

[19] Many of the proper nouns used in this Opinion have spelling variations that can be seen in the record. For example, the name Mohammed can be written as Mohammad, Taliban can be Taleban, al-Qaida can be Al-Qaeda or Al-Qa'ida, Usama bin Ladin can be Osama bin Laden, and Muslim can be Moslem.

SECRET

SECRET



36. Petitioner's service to Gulbuddin Hekmatyar in late December 2001 is sufficient to establish that Petitioner was a part of, and purposefully and materially supported, HIG at the time of his arrest on January 25, 2002. *See Al-Adahi*, 613 F.3d at 1109 (receiving and following orders from al-Qaida proves that an individual is part of al-Qaida); *Hussain*, 718 F.3d at 967 (AUMF authorizes the detention of a person who was part of a force associated with al-Qaida at the time of the person's capture).

37. Petitioner's ability, in the months just after September 11, 2001, ███████████ ██████████ is demonstrated by his long-standing strict Islamist religious beliefs, his fame in Pakistan and Afghanistan as a money-changer, his connections to the Taliban, and the indirect familial relationship between Petitioner and Hekmatyar. These facts lend credence to the evidence.

38. The Court also relies on the Top Secret Ex Parte Response filed on August 3, 2015, Dkt. 429.██████████

39. 



SECRET

20

SECRET

40.

41. The evidence is compelling and inevitably leads to the finding that Petitioner offered advice and service to HIG. Petitioner's testimony to the contrary is not credible. Further, Petitioner has not shown that time or events terminated his membership in, or substantial support for, HIG. *See Al Ginco*, 626 F. Supp. 2d at 128.

42. **Petitioner provided support to al-Qaida in 1998, but there is insufficient evidence that he was still providing support to al-Qaida in January 2002 when Petitioner was arrested.**

43. At the beginning of this case, the Government alleged that Petitioner hobnobbed constantly with U.S. enemies and flew all over Europe at bin Ladin's command. The Government has withdrawn some of the evidence as more documentation has been discovered. Nonetheless, the Government continues to argue that Petitioner was part of, and provided substantial support to, al-Qaida.

44. Petitioner's name—Haji Wali Mohammed—is widely used in Pakistan and Afghanistan.

SECRET

21

SECRET

45. Petitioner's support for al-Qaida in 1998 is proved by the record, although not to the degree alleged by the Government.

46. 

47.

48.

49. At the time of his arrest, Petitioner had in his possession an Afghan passport number TR015413. PTX2.166; PTX2.306; PTX2.345 at WM 805-10; PTX2.350. *See also* Ex.



SECRET

SECRET

106 (Passport Photos). The passport showed frequent travel to the United Arab Emirates and Saudi Arabia from 1998-2001.

50. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As a Tablighi and member of the Taliban, it is not unexpected that Petitioner would assist those with similar views and whom the Taliban protected, such as Usama bin Ladin and al-Qaida.

51. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

52. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Court finds that this allegation is not credible.

53. As explained in further detail below, the Court does not find credible the Government's allegations that Petitioner acted as al-Qaida's money manager in 1999 or later. There is insufficient evidence to show that Petitioner was trusted by al-Qaida to engage in large financial transactions on al-Qaida's behalf when Petitioner had lost $500,000 when working for the Taliban's in 1998.

54. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SECRET

23

SECRET



SECRET

SECRET



55. The Court finds that these allegations regarding Petitioner's alleged activities in 1999 are not credible. The Government fails to reconcile (1) Petitioner's disgrace at the end of 1998 due to losing $500,000 that belonged to the Taliban with (2) the allegation that in 1999 al-Qaida trusted Petitioner ████████████████████████████████ It is not credible that al-Qaida relied upon Petitioner

SECRET

25

~~SECRET~~

████████████████████████ after Petitioner had lost substantial sums when he worked for the Taliban in 1998.

56. Further, it is not credible that Petitioner worked for al-Qaida as a powerful financial operative throughout 1999. ████████████ If Petitioner had worked for al-Qaida throughout 1999, in December of that year he would have had either funds to repay his creditors or al-Qaida's support to obtain debt relief.

57. The Government's allegation that Petitioner supported al-Qaida in 1999 or thereafter has not been proved the preponderance of the evidence.

58. Even though the evidence supports the Government's allegation that Petitioner supported al-Qaida in 1998, the Court finds that there is insufficient evidence that Petitioner still supported al-Qaida at the time of his capture in January 2002. *See Hussain*, 718 F.3d at 967 (AUMF authorizes the detention of a person who was part of a force associated with al-Qaida at the time of the person's capture). Even if the Court credited the evidence from 1999, the Government has not proved by a preponderance of evidence that Petitioner's support for al-Qaida at the time of his arrest in January 2002. The Government has not presented evidence connecting Petitioner with al-Qaida in 2000, 2001, or 2002. *See Al Ginco*, 626 F. Supp. 2d at 128 (the Government lacks authority to detain someone whose ties with terrorism were vitiated by the passage of time, intervening events, or both).

## IV. CONCLUSION

As explained above, the Court finds by a preponderance of the evidence that Petitioner was part of, and purposefully and materially supported, the Taliban and HIG at the time of his arrest in January 2002. Because the Government has proved by a preponderance of the evidence that Petitioner has been lawfully detained, his petition for writ of habeas corpus [Dkt. 1], as amended [Dkt. 22], will be denied. A memorializing Order accompanies this Opinion.

Date: June 8, 2016

_____/s/_____

ROSEMARY M. COLLYER
United States District Judge

~~SECRET~~

26